**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**BANKRUPTCY DIVISION**
**ST. CROIX, VIRGIN ISLANDS**

| | |
|---|---|
| In re: | |
| | Chapter 11 |
| HOVENSA L.L.C., | |
| | Case No. 1:15-bk-10003-MFW |
| Debtor. | |

**CERTIFICATION OF THOMAS E. HILL IN SUPPORT OF**
**CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Thomas E. Hill, being duly sworn, depose and say:

1. I am the proposed Chief Restructuring Officer ("CRO") of HOVENSA L.L.C. ("HOVENSA" or the "Debtor"), a limited liability company organized under the laws of the United States Virgin Islands (the "USVI"). I am a Managing Director at Alvarez & Marsal North America, LLC ("A&M"), a financial advisory firm that provides restructuring advice and other related services.

2. On February 23, 2015, A&M was retained by HOVENSA to provide financial consulting services to assist HOVENSA with various financial management activities and to coordinate HOVENSA's restructuring efforts including the preparation for a potential chapter 11 filing. On September 15, 2015, the Executive Committee of HOVENSA appointed me to serve as CRO, subject to the approval of this Court, and HOVENSA and A&M executed a separate agreement providing for the terms of this engagement. As a result of my previous engagement as a financial consultant to HOVENSA, I am generally familiar with the Debtor's day-to-day operations, financial condition, business affairs, and books and records.

3. On the date hereof (the "Petition Date") and contemporaneously with the filing of this certification (this "Certification"), the Debtor filed a voluntary petition commencing a case

in this Court under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") to preserve and maximize the value of its chapter 11 estate. The Debtor will continue to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4. I submit this Certification in support of the Debtor's chapter 11 petition and the First Day Pleadings (defined below) as described herein.[1] Except as otherwise indicated, all statements in this Certification are based upon: my personal knowledge; information supplied or verified by former employees or current consultants familiar with the business operations of the Debtor; my review of the Debtor's books and records as well as other relevant documents; my discussions with members of the Debtor's Executive Committee and management team; information supplied by the Debtor's consultants and professional advisors; or my opinion based upon experience, expertise, and knowledge of the Debtor's operations, financial condition, and history. In making my statements based on my review of the Debtor's books and records, relevant documents, and other information prepared or collected by the Debtor's former employees or current consultants and its management team, professional advisors and/or members of its Executive Committee. I have relied upon these persons accurately recording, preparing, collecting, or verifying any such documentation and other information.

5. Part I of this Certification provides a basic overview of the chapter 11 case. Part II describes the Debtor's business and organizational structure. Part III describes the Debtor's assets and liabilities. Part IV describes in detail the developments that led to the Debtor's

[1] Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the applicable First Day Pleadings.

chapter 11 filing. Finally, Part V sets forth the relevant facts in support of the First Day Pleadings.

## I. OVERVIEW OF THE CHAPTER 11 CASE

6. The Debtor's objectives in this chapter 11 case are the same as they have been since 2013 when it became evident that a restructuring of HOVENSA's businesses and operations was necessary – namely, to sell HOVENSA's assets in order to maximize recoveries for all of the Debtor's stakeholders and, at the same time, promote the best interests (both economic and environmental) of the U.S. Virgin Islands (the "USVI") and its residents. With those objectives in mind, beginning in November 2013, HOVENSA and its professional advisors engaged in an extensive marketing and sale process to find a purchaser for all of its assets – that is, the business and assets related to both its oil refinery operations and related storage (or "terminal") facilities. In late 2014, HOVENSA found a purchaser and negotiated a sale transaction for the entirety of HOVENSA's business and operations. However, as set forth in detail below, in December 2014, the former Senate of the USVI Legislature (the "USVI Senate") voted to reject a proposed operating agreement that was required to complete the proposed sale transaction, thereby preventing HOVENSA from completing the sale, prompting it to restart its marketing and sale process, and eventually precipitating the Debtor's filing of this chapter 11 case.

7. Immediately following the USVI Senate's actions, HOVENSA and its advisors worked tirelessly to continue to market HOVENSA's assets. This additional, nearly year-long marketing process led to the negotiation and ultimate entry into a definitive stalking horse asset purchase agreement (the "APA") with Limetree Bay Holdings, LLC, an affiliate of ArcLight Capital Partners, LLC ("Limetree Bay" or the "Stalking Horse Bidder"). Under the APA, the Debtor has agreed to sell, subject to higher and better offers and approval of this Court, and upon

the terms and subject to the conditions set forth in the APA, certain assets, including all of its oil storage terminal assets (the "Terminal Assets"), for a purchase price of $184 million. Simultaneously with the commencement of the chapter 11 case, the Debtor has filed a motion seeking approval of bidding procedures pursuant to which a competitive sale process will take place. By this process, the Debtor will solicit bids for the sale of the Debtor's assets, including, but not limited to, the Terminal Assets.

8.      The Debtor believes that the contemplated marketing and sale process for the Debtor's assets is the only and best path forward. If consummated, the sale transaction with the Stalking Horse Bidder (or another third party) (the "Sale Transaction") will generate proceeds sufficient to pay in full in cash the $40 million secured claim asserted by the Government of the Virgin Islands (the "GVI") in connection with certain prepetition litigation regarding alleged environmental liability. In addition, the Sale Transaction will allow the Debtor's oil storage terminal facilities to resume operations, thereby ensuring that the facilities remain a vital part of the St. Croix economy as a business, employer, and taxpayer. Moreover, my understanding is that the Sale Transaction will likely provide HOVNSA with liquidity needed to ensure that it can continue to comply with its environmental obligations.

9.      As it has been represented to me, throughout the two-year sale process HOVENSA's owners, HOVIC and PDV-VI (as such terms are defined below), made numerous efforts and spent millions of dollars to accommodate the requests of the GVI. For example, in November 2013, the owners agreed, at the GVI's request, to undertake an extensive marketing and sale process to locate a buyer to re-start and operate HOVENSA's refinery assets, even though that process would impose substantial incremental costs on the owners, and, as I have been advised, was unlikely to succeed. Nonetheless, it is my understanding that HOVENSA and

its owners fully committed themselves to that process, retained financial and legal advisors to market and sell the refinery assets, and ultimately located a buyer, which, as noted above, was ultimately rejected by the USVI Senate.   Further, while HOVENSA was undertaking that marketing process to accommodate the wishes of the GVI, HOVENSA and its owners continued to pay millions of dollars in taxes to the GVI, even while HOVENSA continued to suffer enormous financial losses.   And now, HOVIC and PDV-VI, as the only parties that would be willing to provide financing to HOVENSA due to its lack of significant business operations to fund this chapter 11 case, have agreed to provide the Debtor with $40 million of additional liquidity through a debtor-in-possession financing facility (the "Proposed DIP Facility") in an effort to further demonstrate their good will.   The Proposed DIP Facility is priced below market and is secured on a junior basis to the GVI's lien – again as part of an effort to work cooperatively and constructively with the GVI.   The Proposed DIP Facility, if approved, will provide the Debtor with incremental liquidity that is required to fund operations during the chapter 11 case, remain in compliance with various environmental and regulatory obligations, and ultimately consummate the Sale Transaction for the benefit of all stakeholders.

10.     To enable the Debtor to achieve its objectives in this chapter 11 case, the Debtor requests certain relief in various motions and applications for orders filed with the Court contemporaneously herewith (collectively, the "First Day Pleadings").   As described herein, the First Day Pleadings seek, among other things, to stabilize and maintain the Debtor's remaining operations, ensure ongoing environmental regulatory compliance, promote a seamless transition into chapter 11, and, most importantly, allow the Debtor's marketing and sale process to move forward so that a final sale transaction can be achieved that will, among other things: (a) maximize the recovery for all stakeholders, including payment in full in cash of the $40 million

secured claim of the GVI; (b) maintain high-quality environmental compliance at the Debtor's facilities; and (c) continue HOVENSA's commitment to the residents of the USVI by providing a responsible and reliable employer and taxpayer.

## II.   THE DEBTOR'S ORGANIZATIONAL STRUCTURE AND BUSINESS

### A.   HOVENSA's Formation

11.    HOVENSA, a limited liability company existing under the laws of the USVI, is the owner of an oil refinery that is currently idle and the owner/operator of an oil storage facility business located on the island of St. Croix, USVI.  HOVENSA was formed in June 1998 and, through a series of agreements dated October 30, 1998, became a joint venture between Hess Oil Virgin Islands Corporation ("HOVIC"), a subsidiary of Hess Corporation (f/k/a Amerada Hess Corporation) ("Hess"),[2] and PDVSA V.I., Inc. ("PDV-VI," and together with HOVIC, the "Members"), a subsidiary of the national oil company of Venezuela, Petróleos de Venezuela, S.A. ("PDVSA"). HOVENSA's refinery and storage facilities span approximately 2,000 acres of land located on the south shore of St. Croix, including approximately 300 acres of undeveloped land to the east of the refinery and storage areas.   HOVENSA currently maintains its headquarters at 1 Estate Hope, Christiansted, St. Croix, USVI 00820, which historically served as the primary office for the HOVENSA officers and management team.

12.    Prior to HOVENSA becoming a joint venture in 1998, HOVIC was the sole owner and operator of the businesses, with facilities that constituted one of the ten largest oil refineries in the world.  Through a concession agreement between HOVIC and the GVI (as

---

[2]    Hess is organized under the laws of the State of Delaware.

amended, the "Concession Agreement"),[3] which was originally ratified on September 1, 1965, the GVI authorized HOVIC to construct, operate, and maintain an oil refinery and related facilities, including the storage facilities, on St. Croix. The Concession Agreement provided HOVIC with incentives to maintain the operations, such as exemptions from certain taxes, duties, and fees. The GVI, in turn, received certain fixed payments, taxes,[4] educational subsidies, and service benefits, such as a discounted local source of fuel oil for the USVI Water and Power Authority ("WAPA"),[5] as well as business and employment opportunities for the USVI.

13. In the late 1990s, HOVIC decided that the business would benefit from a relationship with a strategic partner that could provide the refinery with a ready supply of crude oil. This ultimately led to the formation of HOVENSA as a 50/50 joint venture between HOVIC and PDV-VI. At the height of its operations from 2005 through 2011, HOVENSA employed approximately 2,500 individuals, representing nearly 25% of St. Croix's workforce.

## B. HOVENSA's Business Operations

### (1) *Oil Refinery Operations*

14. Historically, HOVENSA's refinery operations were the key generator of revenue and cash flow for the Debtor's business. As part of these operations, HOVENSA utilized its petroleum refining facility to refine crude oil sourced from Venezuela, West Africa, and other locations into products such as gasoline, diesel, home heating oil, jet fuel, kerosene, and residual

---

[3] As detailed below, the Concession Agreement has been extended four times, most recently in 2013.

[4] These taxes include, among others, real property tax, gross receipts tax, export fees, ship dues, and an oil spill tax.

[5] WAPA supplies power to the USVI. HOVENSA charged WAPA a price for fuel based on the cost of crude oil plus freight, which was far below the market value for distillate fuel oil.

fuel oil for sale to the U.S. Gulf and East Coasts, the Caribbean, and other locations. At the height of operations, HOVENSA's refinery had a processing capacity of approximately 500,000 barrels of crude oil per day.

15. Due to an adverse economic climate, intense competition, and other reasons more fully discussed in Section IV below, HOVENSA's oil refinery operations suffered approximately $1.3 billion in financial losses between 2009 and 2011. As a result, HOVENSA idled some of its refinery operations in 2011 and its remaining refinery operations in February 2012. Subsequent to the idling of the oil refinery operations, HOVENSA continued to operate its facility solely as an oil storage terminal.

16. In order to facilitate the possible sale of the refinery, HOVENSA continues to maintain the refinery facility in an "idled" state, incurring significant inspection, maintenance, and oversight expenses in order to comply with various environmental, operational, and safety regulations and related requirements.

**(2) *Storage Terminal Business***

17. As noted, HOVENSA's second line of business – its oil storage and distribution facilities – continued to operate subsequent to the idling of the refinery in February 2012 until February 2015. HOVENSA's oil storage and distribution facilities enabled HOVENSA to transfer crude oil and refined products to and from ocean-going tank ships, tank barges, and a truck loading rack.[6] The storage facility consists of approximately 200 storage tanks located in groups (each called a "tank farm") with a total capacity of approximately 32 million barrels of crude oil and refined products, as well as jetties and docks. HOVENSA also operated a

[6] HOVENSA's truck rack is where refined products can be loaded onto trucks and sold to local customers.

distribution facility comprised of marine loading and unloading facilities for refined oil products (such as motor fuels, fuel oils, diesel, and propane) and crude oil to be shipped by ship or barge to customers within and outside of the USVI.[7] To ensure that its terminal and distribution facilities complied with certain environmental standards, HOVENSA also constructed an on-site laboratory to facilitate testing and related quality control measures.

18. Historically, HOVENSA's tank farms primarily supported the refinery operations and were predominantly used to store crude oil and refined inventory for HOVENSA's own use.[8] By 2010, in light of continued economic challenges due in part to the 2008 economic downturn and diminishing profit margins at the refinery, HOVENSA sought other revenue streams and found a market in providing storage to third parties. HOVENSA then began leasing its storage tanks to third parties to generate additional revenue through storage fees and fees associated with loading and unloading products into and out of vessels and storage tanks. HOVENSA charged terminal customers for leasing space in its storage tanks, typically through either short-term contracts or spot market fees.

19. Effective as of March 20, 2015, HOVENSA ceased to engage in significant business activity relating to its terminal storage facilities. As of the Petition Date, HOVENSA's activities with respect to the terminal storage business relate solely to the maintenance of the facility for operational readiness.

---

7 Additionally, until March 31, 2012, HOVENSA maintained a full-service marine agency to provide professional ship services to vessels visiting HOVENSA's port.

8 One tank farm in particular was restricted to store only Venezuelan crude oil supplied by PDV-VI as provided for in the joint venture agreement.

## III. DEBTOR'S ASSETS AND LIABILITIES

### A. The Debtor's Assets

20. The Debtor's assets are comprised primarily of the Debtor's oil refinery, storage and distribution facilities, related equipment, approximately 2,000 acres of enclosed land, housing facilities, and rights to occupy GVI-owned lands under a lease and other occupancy rights, and certain specialized permits and licenses. In addition, as of the Petition Date, the Debtor has approximately $750,000 in cash on hand.

#### (1) *The Refinery Assets*

21. The refinery facilities consist of a network of real property assets and fixtures, including numerous specialized processing units and structures utilized in the oil refining process. Some of these processing units, in addition to being relatively new, are among the largest in the world. All of these units were solely powered by HOVENSA's own electrical and steam generating assets and other on-site utilities, such as water desalination and distribution facilities.

#### (2) *The Terminal Assets*

22. Additionally, and as noted above, the Debtor owns terminal storage and distribution facilities consisting of eleven docks, approximately 100 miles of connecting pipelines, and approximately 200 tanks that can collectively hold up to approximately 32 million barrels of oil.

#### (3) *Equipment*

23. The Debtor possesses inventories consisting of supplies, tools, and materials in working form, which are currently housed in its warehouses. These inventories also include generators, motors, spare parts, copper, aluminum and steel parts, equipment, and other assets.

The Debtor also owns approximately 200 light and heavy duty motor vehicles (including fire trucks) that remain on the Debtor's premises.

**(4) *Real Property***

24. HOVENSA's real property covers multiple parcels, called "Estates," certain of which are subdivisions dedicated to company and contractor housing.[9] So that employees and their families could live on-site, HOVENSA constructed 128 concrete, weatherproofed, air-conditioned residential housing units. Each unit is linked to the Debtor's electrical grid, potable water, and sewer systems. About 120 modular homes were demolished in 2012 and 2013 after the refinery was idled because they had deteriorated and were no longer needed.

25. HOVENSA owns all but 300 acres of the approximately 2,000 acres on which it operates its business. Of the remaining 300 acres, HOVENSA leases approximately 63 acres from the GVI for $1 per month pursuant to a land lease between HOVIC and the GVI, dated October 16, 1976 and subsequently renewed in 1996 (the "Submerged Lands Lease").[10] The land covered by the Submerged Lands Lease was originally submerged under water and filled, or "reclaimed," by HOVIC. The U.S. Department of the Interior permitted HOVIC (the owner of the refinery at the time) to dredge Limetree Bay and build valuable on-site docking facilities, which generally allow HOVENSA to receive and export raw materials and refined products

---

9 The USVI uses a relatively unusual form of land description, which derives from Danish law, and divides the land into blocks called "Estates." The residential homes are located on the following areas on the Debtor's premises: Estate Cottage (comprised of Estate Caldwell and Castle Coakley); Estate Blessing; Estate Figtree Hill; Estate Hope, and Estate Jerusalem. Modular homes had been located in Estate Hope, but, as noted above, they were demolished after the refinery closure.

10 By a letter agreement dated October 14, 1998, the GVI allowed HOVENSA to assume the Submerged Lands Lease, although the letter agreement provided that HOVIC remained the primary obligor.

using oil tanker vessels or barges,[11] as well as other facilities to support the refinery, such as tanks, pipelines, and utilities. HOVIC also used this "reclaimed" land to build a container-port to ease St. Croix's port congestion and develop the island's port area, as well as other facilities. The current term of the Submerged Lands Lease expires in 2016, but can be renewed for three more 20-year terms pursuant to the terms of the lease.

26. In addition to the lands controlled pursuant to the Submerged Lands Lease, HOVENSA also occupies a small area in the harbor for its loading dock used to export the Debtor's petroleum coke product[12] pursuant to a usage right granted by the GVI in a coastal zone management permit.

**(5) *Permits and Licenses***

27. Additionally, the Debtor holds a significant number of permits and licenses that enable it to operate its business,[13] including a general construction permit, business and terminal licenses, Title V and other air quality-related permits,[14] dredging and land use permits, water appropriation and discharge permits, and waste management permits.

---

11 Some of these docks can accommodate vessels with up to 55 feet of draft. A vessel's "draft" refers to the distance between the vessel's waterline and the lowest point of the vessel, usually the keel. Vessels of this size have the capacity to transport approximately 1.1 million barrels of oil.

12 Petroleum coke is a product of the crude oil refining process. After the refinery initially processes crude oil, it produces a crude oil residue, which is further refined by a process known as coking. This creates petroleum coke, which has a variety of uses including as a cost-effective fuel.

13 These permits and licenses are discussed more fully in the Taxes Motion (as defined herein), filed contemporaneously herewith.

14 A Title V permit is required and overseen by the EPA pursuant to the federal Clean Air Act, but is issued locally by the GVI. Certain businesses, including oil refineries, which have the potential to emit air pollution at or above the Clean Air Act thresholds for such emissions, are required to obtain this permit for their operations.

## B. The Debtor's Liabilities[15]

28. HOVENSA's liabilities fall primarily into the following general categories: (a) obligations, evidenced by promissory notes, in favor of HOVIC, PDV-VI, and PDVSA Petróleo, S.A. ("PPSA"), a subsidiary of PDVSA; (b) a secured claim held by the GVI; (c) the Pension Benefit Guaranty Corporation's (the "PBGC") claim related to the Debtor's pension plan; and (d) other liabilities, including environmental compliance and remediation obligations and pending and potential litigation claims. HOVIC and PPSA are the Debtor's two largest unsecured creditors.

29. As of the Petition Date, HOVENSA has no outstanding secured or unsecured funded debt, other than with respect to the promissory note obligations (identified above and further discussed below), and does not have a credit facility with any lender.[16]

### (1) *The Promissory Notes*

30. HOVENSA issued two separate promissory notes, dated April 1, 2012, to evidence then-outstanding obligations – one to HOVIC and one to PPSA – each in the principal amount of $811 million (together, the "2012 Notes"). The amount owed to PPSA was the amount then outstanding and unpaid for delivered crude oil, and the amount owed to HOVIC was for funds loaned to HOVENSA to repay its outstanding indebtedness and for other purposes. HOVENSA's obligations under the 2012 Notes are unsecured and bear a fixed interest rate of 200 basis points above the base annual rate published by Citibank, N.A. Monthly interest was

---

[15] Nothing herein affects the Debtor's right, and the Debtor expressly reserves such right, to object to, dispute, setoff, and otherwise challenge all claimed liabilities against the estate.

[16] During 2012, HOVENSA successfully tendered a cash offer for its $355.6 million outstanding tax-exempt revenue bonds. HOVENSA also had a 5-year $400 million revolving credit facility until December 30, 2011, when it repaid outstanding borrowings and terminated the revolving credit facility.

accrued but was never paid.[17] The 2012 Notes each matured on April 1, 2013, but both remain unpaid. As of the Petition Date, approximately $1.864 billion (inclusive of interest) is outstanding under the 2012 Notes.

31. HOVENSA issued two separate unsecured promissory notes, dated July 8, 2015, each in the principal amount of $5 million to HOVIC and PDV-VI (together, the "2015 Notes" and, collectively with the 2012 Notes, the "Notes"). The purpose of the 2015 Notes was to provide HOVENSA with the incremental liquidity necessary to be able to negotiate and execute a sale transaction that would result in significant value for all of HOVENSA's stakeholders, the USVI, and the USVI's residents. As of the Petition Date, approximately $10 million is outstanding under the 2015 Notes.

**(2) *The GVI's Secured Claim***

32. HOVENSA is party to a first priority mortgage (the "First Priority Mortgage"), dated May 28, 2014, issued in connection with a settlement agreement related to alleged environmental damages. The First Priority Mortgage secures the GVI's remaining $40 million claim under the DPNR Settlement Agreement (defined below) and grants a first priority lien on: (a) the Debtor's real property as described on Exhibit A to the First Priority Mortgage (the "Premises"); (b) all appliances, fixtures, equipment, and buildings located on the Premises; (c) the Debtor's rights, title, and interest in any agreements, leases, and contracts relating to the Premises; (d) the Debtor's rights, title, and interest in sales contracts, installment sales contracts, and any other agreements relating to the Premises; and (e) all insurance proceeds.

[17] The Notes provide for the payment of interest on overdue principal at the above-referenced interest rate, to the extent that such interest is an allowed claim against the Debtor and is legally permissible.

**(3) *PBGC Claim***

33. Subsequent to the idling of the refinery in 2012, the PBGC determined that there was a shortfall in the funding of the HOVENSA employees' pension plan. In an effort to make its plan current, HOVENSA worked with the PBGC and reached an agreement, as detailed below, whereby HOVENSA agreed to fund its pension plan with scheduled quarterly cash contributions. HOVENSA thereafter timely made such payments through 2014 and believed that it would be able to fully cure its outstanding pension funding obligations through its originally contemplated sale of all its assets at the end of 2014. However, when the USVI Senate rejected the operating agreement and thus the sale transaction, HOVENSA concluded that it lacked sufficient liquidity to continue making periodic pension contributions, and thus the pension plan remained underfunded.

34. As a result of its inability to continue to provide sufficient pension funding, on February 2, 2015, HOVENSA received a notice from the PBGC informing HOVENSA that the HOVENSA pension plan would be terminated, effective as of February 4, 2015. Since that date, the PBGC has been provided with periodic updates on the status of HOVENSA's efforts to complete a sale transaction. The HOVENSA pension plan has not been terminated**.**

**(4) *Other Liabilities***

35. The Debtor faces additional potential liabilities, including those relating to environmental compliance and remediation obligations and pending and potential litigation, both of which are discussed in detail in Section IV.

## IV. EVENTS LEADING TO THE CHAPTER 11 CASE

### A. Challenges Leading to the 2012 Refinery Idling

#### (1) *Industry Competition and Challenges*

36. Over the last decade, in addition to suffering from the impact of fluctuating crude oil prices due to the 2008 economic downturn, HOVENSA faced significant challenges from competition from other fuel suppliers and other challenges within the oil industry. Specifically, the proliferation of alternative, increasingly low-cost fuel sources – most notably, natural gas – has affected HOVENSA's competitiveness. First, depressed natural gas prices and a smaller environmental footprint make natural gas an increasingly attractive fuel option for industrial users, as compared to oil. Second, because of HOVENSA's island location and its current infrastructure's inability to support the use of natural gas to power its own operations, HOVENSA was at a significant operating cost disadvantage as compared to other refineries. Moreover, absent a significant capital investment to reengineer HOVENSA's infrastructure, HOVENSA was also unable to utilize its own refined fuel in an energy-efficient manner, further putting it at a cost disadvantage relative to other comparable refineries.[18] As compared to its mainland U.S. competitors, HOVENSA paid a premium to access and procure crude oil from mainland U.S. sources, narrowing its profit margin on sales. Finally, HOVENSA faced increased competition from other oil storage and terminal facility operations located in the Caribbean.

[18] Other than its purchases of crude oil, HOVENSA's largest expenditure was the cost of fuel for its own use.

**(2) *Environmental Challenges***

37. In addition to industry competition, HOVENSA faced significant environmental obligations inherent in the operation of an older refinery. The oil industry is highly regulated, and HOVENSA's refinery and storage facility business is subject to extensive environmental regulations imposed by both the GVI and U.S. Federal Government. HOVENSA has invested significantly in its environmental compliance efforts and in technology to ensure environmentally responsible operations as regulatory requirements have become more stringent over time. These costs, along with the environmental risks of the refining business generally, have significantly burdened HOVENSA's operations and its liquidity.

**(3) *DPNR Litigation***

38. HOVENSA became subject to a lawsuit initiated by the Virgin Islands Department of Planning and Natural Resources (the "DPNR")[19] on May 5, 2005, which alleged that HOVIC's and HOVENSA's operations at the refinery contaminated and injured the public's natural resources (including potential drinking water sources), the marine environment, plant life, and wildlife (the "DPNR Litigation").[20] The DPNR sought damages, the reimbursement of costs associated with the government's investigation and litigation, and the performance of environmental cleanup and remediation.

39. Following extensive litigation, in which a number of the DPNR's claims were dismissed, HOVENSA decided that despite its view that the remaining claims were without merit, it needed to settle the DPNR Litigation in order to allow it to pursue a marketing and sale

---

19 The DPNR is the USVI's environmental agency, which regulates development and manages coastal resources in the Territory by, among other things, enforcing development permits and related environmental standards in the USVI.

20 The defendants include HOVIC and HOVENSA, among other third-party defendants.

process free from the overhang of litigation.  Accordingly, on May 28, 2014, in anticipation of a sale, HOVIC and HOVENSA entered into a settlement agreement with the DPNR (the "DPNR Settlement Agreement"), pursuant to which HOVENSA agreed to pay the GVI $43.5 million in settlement of the purported $800 million in claims raised by the DPNR complaint.  HOVENSA paid $3.5 million of the settlement amount immediately upon the execution of the DPNR Settlement Agreement.  The remaining $40 million obligation remains outstanding as of the Petition Date.  Pursuant to the DPNR Settlement Agreement, in consideration for HOVENSA's agreement to pay $43.5 million to the GVI and to grant a first priority lien on certain of its assets, the GVI released HOVIC, HOVENSA, and related parties from all claims asserted in the DPNR Litigation and associated litigation costs.

40.     As discussed below, HOVENSA expected that it would be able to pay the remaining $40 million payment in respect of the DPNR Settlement Agreement by December 31, 2014, in connection with the ABR Sale Transaction (as defined below).  However, when the ABR Sale Transaction was rejected by the USVI Senate, HOVENSA was unable to make the additional payment by that date.

41.     On January 26, 2015, the GVI commenced a Superior Court foreclosure action to collect the $40 million payment under the DPNR Settlement Agreement (the "Foreclosure Action"), despite the USVI Senate's decision to reject the ABR Operating Agreement that would have funded the payment.  On March 17, 2015, HOVENSA filed an answer to the GVI's complaint.  As of the Petition Date, the Foreclosure Action remains in its preliminary stages. The Honorable Douglas A. Brady, presiding over the Foreclosure Action, has issued, *sua sponte*, an order requiring HOVENSA and the GVI to meet and confer on a discovery schedule to be put into place by September 30, 2015.

**(4) *Clean Air Act Consent Decree***

42. HOVENSA is also subject to the EPA's petroleum refinery initiative ("PRI"). The PRI targeted nearly all refineries within the territorial jurisdiction of the United States in an effort to further reduce their emissions of certain air pollutants. After six years of negotiations, in January of 2011, the United States (acting through the EPA and the United States Department of Justice) and the GVI (acting through the DPNR) addressed the goals of the PRI with respect to HOVENSA by concurrently filing a civil complaint and a consent decree (the "Consent Decree") in the U.S. District Court of the Virgin Islands, St. Croix Division.

43. The Consent Decree, dated January 26, 2011, resolved the EPA's allegations of past violations of the Clean Air Act's requirements by HOVENSA through a payment of $5.375 million in civil penalties and a deposit of an additional $4.875 million to an escrow account to be used for funding supplemental environmental projects ("SEPs").[21] The Consent Decree also called for HOVENSA to assist WAPA with air emissions monitoring at its generating facilities for up to five years at a cost to HOVENSA not to exceed $500,000 in the aggregate.

44. Significantly, the Consent Decree also specified further Clean Air Act-related compliance requirements that HOVENSA was obligated to meet, including certain capital improvement projects to be made to air pollution controls at the refinery over time.[22] The

[21] The SEP Fund is held in escrow at JPMorgan Chase, and the funds contained therein are inaccessible by HOVENSA, the GVI, and the DPNR, other than for the specific purpose of establishing a charitable venture approved by the EPA. Additional details with respect to the SEP Fund can be found in the Debtor's Cash Management Motion (as defined herein), filed concurrently herewith.

[22] On its PRI website, the EPA estimates the overall capital cost to HOVENSA to comply with all Consent Decree obligations to be in excess of $700 million. While the terms of the Consent Decree were in some ways more favorable than other PRI-driven settlements, these estimated compliance costs were among the highest imposed on a refinery and, in part, reflect HOVENSA's age, location, configuration, and need for control system upgrades.

Consent Decree further specified that the failure to comply with the compliance obligations would subject HOVENSA to specified stipulated civil penalties, which could be significant.

45. Despite HOVENSA idling the refinery subsequent to the entry of the Consent Decree, the EPA has taken the position that HOVENSA is still technically obligated to comply with some of its provisions related to the idled units (which are not producing any relevant emissions while idle) and implement control systems improvements (even though the refinery operations to be further controlled may not be restarted), or to surrender associated permits (which means that they would no longer be transferable). According to a letter sent by the EPA on October 5, 2012, HOVENSA's failure to comply with these provisions has subjected HOVENSA to the Consent Decree's stipulated penalty provisions.

**(5) *RCRA Correction Action Requirements***

46. HOVENSA is also subject to requirements arising from the Resource Conservation Recovery Act ("RCRA").[23] In connection with its RCRA permits, HOVENSA previously agreed to establish two trust accounts to hold funds to provide financial assurance to the EPA related to HOVENSA's performance of certain obligations related to (a) closure of hazardous and solid waste management units at the refinery and (b) the remediation and monitoring of soil and groundwater contamination associated with its historic operations (together, the "Trust Accounts"). The compliance obligations subject to the Trust Accounts

---

[23] *See* 42 U.S.C. § 6901, *et seq.* RCRA imposes requirements for the management of hazardous and solid waste generation, storage, treatment, and disposal; it also sets forth financial assurance requirements imposed upon owners and operators of hazardous and solid waste facilities to address potential closure and post-closure costs. *See generally*, 40 C.F.R. § 264.143 (whereby 40 C.F.R. Part 264 and 280 are part of the regulations implementing RCRA).

include environmental monitoring programs, among others, and are anticipated to last for up to 30 years.

47. As of the Petition Date, the Trust Accounts collectively hold approximately $36.6 million. Depending on the cost estimate for anticipated remaining compliance activities at any point in time, the EPA has discretion (but is not required) to allow HOVENSA to reduce the financial assurance funds held in the Trust Accounts. In 2014, with the consent of the EPA Regional Administrator, HOVENSA was allowed to reduce the amount in the Trust Accounts by approximately $1.8 million after it was determined that, due to the incremental progress HOVENSA had made in addressing its RCRA-related closure and remediation obligations at the refinery, the Trust Accounts had more funds than necessary to assure the funding of the remaining corrective actions.

**(6) *Other Environmental Compliance-Related Liabilities***

48. In addition to the items discussed above, HOVENSA faces other potentially significant liabilities related to environmental compliance matters. These include the EPA's current assertions that (a) a vapor recovery system is required for gasoline and crude oil loading that occurs at the end of the dock related to HOVENSA's historical refinery and terminal storage operations, which could cost as much as $50 million, and (b) over $125 million in additional estimated cleanout and disposal costs are required to process waste materials associated with portions of HOVENSA's terminal operations.[24]

49. In winding down what remains of its business, HOVENSA has taken, and expects to continue to take, significant measures to do so in an environmentally responsible manner.

[24] These costs relate to HOVENSA's terminal operations after idling the refinery in 2012, and may increase if these operations are permanently discontinued instead of being restarted by a potential purchaser.

HOVENSA had previously addressed its responsibilities under RCRA and other laws for remaining hazardous and non-hazardous materials and waste located in the idled refinery, a process that involves cleaning and flushing the facilities, tanks, pipelines, and process units. If terminal operations are not restarted, HOVENSA will incur similar costs for remediation that have not been addressed to date. HOVENSA is also continuing groundwater remediation and monitoring at the refinery, and expects it will have to close its remaining hazardous and solid waste units and wastewater treatment facility unless they are needed by a buyer. To facilitate a sale of its assets, HOVENSA is continuing minimal maintenance activities to maintain operating and regulatory permits necessary for its business, addressing its ongoing environmental compliance responsibilities, and ensuring that safety and security measures are being taken.

**B. Initial Steps Taken to Minimize Losses and Reduce Risks**

50. HOVENSA took several steps to minimize its losses resulting from the changing economic climate, industry competition and challenges, and the increasing cost to comply with environmental regulations. HOVENSA sustained significant operating losses in 2009 and 2010 in the amounts of approximately $422 million and $397 million, respectively. As part of its efforts to minimize losses, in January 2011, the refinery reconfigured its operations by idling a number of older units on the west side of the refinery and reducing crude throughput from 500,000 to 350,000 barrels. These actions were expected to significantly improve the refinery's financial position by reducing overhead and shifting refined oil production to relatively higher-valued gasoline and distillate products. HOVENSA also implemented cost-saving mechanisms, such as renegotiating contracts with certain vendors to procure more favorable terms, reducing the number of employees and contractors and reducing their permitted overtime work to lower operating costs, and selling precious metals in its possession. In addition, HOVENSA implemented monitoring programs and began discussions with the EPA concerning potential

modifications of the Consent Decree in an effort to minimize risks and potential liabilities relating to the risk of non-compliance with certain environmental and operational regulations.

51.     Despite these efforts, HOVENSA's operating losses continued.  HOVENSA's oil refinery operations suffered approximately $1.3 billion in financial losses between 2009 and 2011.  In light of these losses, along with the environmental compliance requirements imposed by the Consent Decree, HOVENSA idled its refinery operations.   On January 18, 2012, HOVENSA announced that the refinery would suspend operations.  Operations were officially suspended on February 16, 2012.

### C.     Idling the Refinery

52.     The idling of the refinery was an extensive – and expensive – process.  In undertaking this process, HOVENSA took measures to maintain the necessary permits and licenses so that the oil refinery operation could be restarted in the future.  To accomplish this task, HOVENSA continued its environmental monitoring and servicing practices in compliance with various regulatory programs.  As part of this effort and to prepare HOVENSA's equipment and operations for sale, HOVENSA's former employees and contractors cleaned and preserved the refinery equipment and tanks and, to address RCRA requirements, undertook the arduous and expensive process of removing and treating residual sludge and oil-bearing secondary materials from the storage tanks, pipelines, process equipment, and waste management units.  At the same time, HOVENSA also brought in a thermal desorption unit to process oil-bearing secondary materials to recover oil to sell to customers while the residual waste was sent off-site for safe disposal.

53.     Further, because HOVENSA was no longer refining crude oil on a large scale, it no longer had access to lower cost fuels produced on-site.  HOVENSA then began to purchase fuels in the open market at prices higher than it had previously incurred in order to run its

remaining operations.  In particular, HOVENSA has to purchase higher cost commercial propane to replace its own refinery-produced gas.

54.      In addition to the operational costs associated with idling the refinery, certain costs related to the termination of HOVENSA's workforce were triggered.  HOVENSA was obligated to make severance payments pursuant to the Virgin Islands Plant Closure Act (the "PCA") and honor HOVENSA's contractual arrangements with its 1,800 employees and contractors.  The idling of the refinery in 2012 was viewed by the PBGC as a triggering event under section 4062(e) of the Employee Retirement Income Security Act of 1974 ("ERISA").[25] Due to the PBGC's view that a triggering event occurred, the PBGC proceeded to audit the company to determine what shortfall, if any, existed in funding the HOVENSA pension plan. The PBGC determined at that time that the shortfall in funding totaled approximately $56 million, and the PBGC and HOVENSA began negotiations on additional contributions to be made by HOVENSA to make the plan current.  Ultimately, HOVENSA and the PBGC entered into a non-binding term sheet, wherein HOVENSA agreed to fund its pension plan with annual cash contributions, comprised of varying amounts over five years,[26] to be paid on a quarterly basis.  Although the parties never executed a final agreement, HOVENSA made all such payments, which totaled approximately $30.5 million, through January 2015.  As previously described, in February 2015, HOVENSA received a notice from the PBGC informing

---

[25]   In general, a section 4062(e) event occurs when an employer ceases an operation at a facility, and, as a result of the cessation, more than 20% of the total number of the employer's employees who are participants under a pension plan maintained by the employer are terminated.

[26]   In 2012, the annual contribution was $7.6 million.  Thereafter, the contribution increased in 2013 to $10 million, then to $12.9 million in each of 2014 and 2015, and to approximately $12.8 million in 2016.

HOVENSA that the pension plan would be terminated. As of the date hereof, the pension plan has not been terminated.

**D. HOVENSA's Marketing and Sale Process**

***(1) Marketing Efforts Under the Fourth Amendment to the Concession Agreement***

55. Immediately after the idling of the refinery in February 2012, HOVENSA, along with HOVIC and PDV-VI approached the GVI and proposed certain amendments to the Concession Agreement intended to facilitate operations as a storage terminal, to allow HOVENSA to continue to operate as a profitable enterprise, and to maintain its status as a center of commerce, valuable employer, and taxpayer in the USVI. Former Governor of the USVI, John de Jongh, Jr., rejected this request and insisted that HOVENSA either restart and operate the refinery or conduct a sale process to sell the business to a purchaser that would engage in refinery operations.

56. After a change in government, on April 3, 2013, HOVENSA ultimately agreed to enter into the Fourth Amendment with the GVI (negotiated with Former Governor de Jongh, Jr., and subsequently ratified by the USVI Senate on November 4, 2013), pursuant to which HOVENSA was permitted to operate its oil storage terminal operations while it undertook a marketing and sale process for the refinery and related business. The GVI agreed to relieve HOVENSA of certain obligations under the Concession Agreement, including a deferral of certain of HOVENSA's payments in lieu of property taxes to the GVI[27] and other obligations contained in the Third Amendment to the Concession Agreement.

[27] As of the Petition Date, HOVENSA has accrued approximately $13.5 million for deferred taxes payable to the GVI.

57.     The terms of the Fourth Amendment to the Concession Agreement required HOVENSA to undertake a process to locate a buyer that would operate the refinery.  HOVENSA dutifully abided by the GVI's directive with the knowledge that such action would impose material ongoing costs on HOVENSA unless it was able to sell the oil refinery business quickly. The Fourth Amendment to the Concession Agreement required HOVENSA to engage an investment banker to manage the marketing and sale process of HOVENSA's assets.  On November 12, 2013, HOVENSA engaged Lazard Fréres SAS and Lazard Frères & Co. LLC (together, "Lazard") to conduct the marketing and sale process.

58.     Lazard marketed HOVENSA's business through Lazard's New York City, Houston, and Paris offices in order to capture a wide group of potential buyers, contacting a total of 142 parties.  Of those potential buyers identified by Lazard, only two submitted preliminary bids in the sale process.  Lazard held discussions with the two bidders in an effort to have them improve their preliminary bids, but one of the bidders failed to submit a final bid.  HOVENSA subsequently engaged in negotiations with the remaining bidder, Atlantic Basin Refining ("ABR"), a newly formed consortium, and was able to negotiate a substantially final form of a purchase and sale agreement with ABR.  The GVI and ABR still needed to complete negotiations on an operating agreement, governing the rights and obligations of the parties with respect to ABR's planned operation of HOVENSA's refinery following its purchase.  To this end, the GVI and ABR separately negotiated and executed an operating agreement, dated October 29, 2014 (the "ABR Operating Agreement"), which remained subject to ratification by the USVI Senate.  The ABR Operating Agreement contemplated, among other things, a substantial series of fixed and variable payments to the GVI and a commitment by ABR as the new operator, to reconfigure, reconstruct, and restart the refinery.

59.     As part of the contemplated sale transaction with ABR (the "ABR Sale
Transaction"), ABR would have been required to pay the USVI $40 million in respect of the
DPNR Settlement Agreement and the PBGC $26 million in respect of pension fund obligations.
In addition to satisfying certain of HOVENSA's third-party claims, the ABR Sale Transaction
would have ensured the continued supply of refined products at competitive prices to the USVI,
as well as significant employment opportunities for the local population.   However, the USVI
Senate rejected the proposed ABR Operating Agreement, which effectively rejected the ABR
Sale Transaction, on December 19, 2014 by a vote of 13-2.

60.     Despite this setback, HOVENSA remained committed to marketing and selling its
assets to realize the highest value for the estate, preserve and create jobs, continue environmental
compliance, support the USVI tax base, and satisfy HOVENSA's obligations to its creditors and
stakeholders.   HOVENSA believed, and continues to believe, that a sale of the Terminal Assets
would be in the best interests of HOVENSA's stakeholders, and, to that end, instructed Lazard to
undertake another full sale and marketing process.   Lazard began to reach out to potential
purchasers who had expressed interest in HOVENSA's Terminal Assets and focused the
marketing process on selling the Terminal Assets, in addition to the refinery assets.   Lazard
contacted 32 potential purchasers, 17 of whom executed a non-disclosure agreement and were
granted access to a virtual data room to conduct due diligence, 11 of which conducted on-site
visits.   As a result of these marketing efforts, HOVENSA received 4 preliminary bids in May
2015.

61.     Since May, HOVENSA and certain of its professional advisors have engaged in
numerous discussions and negotiations with potential purchasers regarding the terms of a
purchase and sale agreement and other ancillary agreements, legal, financial, and other due

diligence matters, and the process for negotiating an operating agreement with the GVI. To facilitate these continued negotiations and the diligence process, the Members each loaned $5.0 million to HOVENSA on an unsecured basis pursuant to the 2015 Notes in order to provide additional liquidity and runway to get to a finalized asset purchase agreement. Ultimately, these efforts resulted in HOVENSA's execution of the APA with Limetree Bay on September 4, 2015, subject to higher and better offers and a Court-approved auction process.

62. In consultation with Lazard and certain of its other advisors, HOVENSA has determined that Limetree Bay's bid maximizes the value of HOVENSA's assets and will yield the greatest recovery for creditors, subject to the receipt of higher and better offers.

**(2) *The Debtor's Proposed Postpetition Sale Process and Debtor-in-Possession Financing***

63. Given its extensive prepetition marketing and sales process, HOVENSA has filed contemporaneously herewith a motion seeking approval of bidding and sale procedures and certain related relief, including approval of bid protections for the Stalking Horse Bidder, described in detail therein, that would continue the sale process for a short postpetition period. The proposed bidding procedures are designed to permit HOVENSA to pursue a sale of its assets, including the Terminal Assets, in a prompt and fair manner that will maximize the value of the Debtor's assets for the benefit of all stakeholders.

64. To foster a competitive bidding environment, HOVENSA is seeking Court approval of a sale process that contemplates the entry of a bidding procedures order shortly after the Petition Date, and a sale hearing within 45 days of the Petition Date, subject to the Court's schedule.

65. Additionally, in order to provide the liquidity necessary for HOVENSA to fund the chapter 11 case and bridge to the consummation of the Sale Transaction, the Members have

agreed to provide the Proposed DIP Facility.  The DIP Facility is a senior secured, superpriority, delayed-draw financing facility, which provides for a total funding commitment of $40 million. Of the $40 million, $10 million will be available to the Debtor upon the entry of the Interim Order.  The remaining $30 million will be available to the Debtor through delayed draws as necessary after the entry of the Final Order, subject to certain terms and conditions in the DIP Agreement.  The liens to be granted by the Proposed DIP Facility are junior to the lien held by the GVI in connection with the DPNR Settlement Agreement, as set forth in the DIP Agreement.

66.     As set forth in the Langbein Declaration in support of the DIP Motion, filed contemporaneously herewith, the Debtor would be unable to obtain post-petition financing, let alone financing on the favorable terms provided in the DIP Facility, from a third party lender given the Debtor's lack of significant business operations, the absence of material unencumbered assets to serve as collateral for a loan, and the contingencies associated with the sale of the Debtor's assets.  As a result, HOVENSA's owners have agreed to provide the DIP Facility, which will be used to provide liquidity for working capital and other general corporate purposes of the Debtor, and will permit the Debtor to engage in a marketing and auction process for the sale of the Debtor's assets.  In addition, in the ordinary course of business, the Debtor incurs significant inspection, maintenance, and oversight expenses and must comply with various environmental, operational, and safety regulations and related requirements.  Compliance with such regulations and requirements is essential to, among other things, facilitate the Sale Transaction.

67.     As a condition of the Proposed DIP Facility, the Debtor must remain in compliance with the Budget. I am familiar with the Budget and I, along with A&M and other of the Debtor's consultants, assisted in its development.  The Budget was developed based upon a

comprehensive review of the Debtor's operations and seeks to take into account the additional costs of the chapter 11 filing. While various assumptions that are beyond the control of management necessarily form the basis for the Budget, I believe that the Debtor is likely to be in compliance with the Budget (within the permitted variances) for the duration of the chapter 11 case.

**E. Continuing Wind Down of Operations**

**(1) *Turnover of Workforce***

68. While marketing its assets, HOVENSA has continued to wind down its business operations in an effort to reduce cash spending and minimize liabilities. As part of the winding down of its operations, and in furtherance of the Debtor's commitment to abide by its contractual and legal duties to its valued employees, HOVENSA provided a 90-day notice to its employees and contractors, consistent with the Worker Adjustment and Retraining Notification (WARN) Act of 1998, the PCA, and HOVENSA's collective bargaining agreement. Effective as of March 1, 2015, 101 employees and the services of 191 independent contractor-employees were terminated.

69. Under the PCA, in addition to 90-days' notice of termination, employees are entitled to receive severance in the amount equal to one week salary for every year of employment or service. As of the Petition Date, all severance obligations required by the PCA have been satisfied. In addition to PCA-mandated severance, eligible members of HOVENSA's workforce were entitled to additional severance consistent with HOVENSA's historical severance policies and practices. This severance included a lump-sum payment to employees equal to one week's pay for every year of service with HOVENSA (subject to a cap), as well as the continuation of services under certain benefit programs provided by HOVENSA. Consistent with past practices, HOVENSA conditioned an individual's entitlement to HOVENSA's

severance packages on the execution of a general release in favor of HOVENSA and the Members,[28] whereby the employee agrees that he or she will refrain from bringing any claims against these parties. As of the Petition Date, all former employees have signed releases.[29] Also, as of the Petition Date, HOVENSA has satisfied substantially all of its employee severance package obligations.

70. In order to maintain operational readiness of its terminal assets after March 1, 2015, and to effectively maintain and market all of its assets through a sale process, HOVENSA hired (or, in certain cases, re-hired) a handful of independent contractors and consultants, as well as one seconded employee each from Hess and PDV-VI, to continue providing necessary services to HOVENSA. This workforce has played, and continues to play, a key role in maintaining the facility in safe condition, operating and maintaining the terminal and distribution facilities, complying with operational and environmental regulations, running the power and utilities, operating the waste water treatment facility and related clean-up efforts, and assisting with the chapter 11 case and sale efforts.

**(2) *Retention of a CRO***

71. In early 2015, HOVENSA sought a financial advisory firm to provide restructuring advice and related services. HOVENSA retained A&M pursuant to an engagement letter, dated February 23, 2015 (the "Initial Engagement Letter"). On September 14, 2015, in

[28] The general release extends to these parties' affiliates, subsidiaries, divisions, predecessors, insurers, successors and assigns, and their current and former employees, attorneys, officers, directors and agents thereof (both individually and in their business capacities), and the administrators and fiduciaries of these parties' employee benefit plans and programs.

[29] As discussed more fully in the Wages Motion (as defined herein), as of the Petition Date, the Debtor has paid in full the PCA Severance and honored its severance obligations, as consistent with past practices and as required by applicable law.

preparation for the filing of this chapter 11 case, the Debtor and A&M entered into a new engagement letter (the "A&M Engagement Letter") for the provision of interim management services.[30] Pursuant to the terms of the A&M Engagement Letter, A&M will make me available to serve as the Debtor's CRO, along with additional personnel (as needed), to assist that HOVENSA in a smooth transition into bankruptcy and to manage the restructuring and bankruptcy process.[31]

## II. FACTS IN SUPPORT OF FIRST DAY PLEADINGS

72. I am familiar with the contents of each of the First Day Pleadings and I believe that the relief sought therein is necessary. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein. In my previous role as the Debtor's financial consultant, I have formed opinions as to: (a) the urgency and necessity for obtaining the relief sought by the Debtor in its First Day Pleadings; (b) the need for the Debtor to continue to effectively maintain its current activities and, as seamlessly as possibly, commence this chapter 11 case; (c) the detrimental effects upon the Debtor and its estate if the Debtor does not obtain the relief requested in the First Day Pleadings; and (d) the immediate and irreparable harm that the Debtor, its estate, and its stakeholders would be exposed to in the event that the Court does not approve such relief. My opinions are based on my review of various materials and

[30] The A&M Engagement Letter shall become effective on the Petition Date and shall cause the Initial Engagement Letter to terminate, except for certain terms that survive, including the Initial Engagement Letter's indemnification and limitation on liability provisions.

[31] A&M specializes in, among other things, financial and operational restructuring advisory services and pre-filing bankruptcy advisory services. Among other areas of expertise, A&M's financial and management experts have substantial experience in advising companies in the oil refinery and terminal industry.

information and discussions with the Debtor's management team and the Debtor's professional advisors, as well as my experience in restructuring similar businesses in the oil industry.

73. The relief sought in the First Day Pleadings will minimize the adverse impact of this chapter 11 case on, and preserve and maximize the value of, the Debtor's estate. The Debtor, in consultation with its professional advisors, carefully designed the relief requested so that the Debtor will not suffer any immediate and irreparable harm as a result of the commencement of this chapter 11 case. Accordingly, for the reasons stated herein and in the First Day Pleadings, I believe that the relief requested in each of the First Day Pleadings is in the best interests of the Debtor, its estate, and its creditors, and, therefore, should be approved. Set forth below are facts in support of the First Day Pleadings, summarized for the convenience of the Court.

**A.** ***Debtor's Motion for Interim and Final Orders (A) Approving Post-Petition Financing; (B) Granting Liens and Providing Superpriority Administrative Expense Claims; (C) Modifying the Automatic Stay; (D) Scheduling an Interim and Final Hearing; and (E) Granting Related Relief* (the "DIP Motion")**

74. The Debtor is in immediate need of postpetition financing for, among other things, working capital and other general purposes of the Debtor, including funds necessary to engage in a marketing and auction process for the sale of the Debtor's assets. As of the Petition Date, the Debtor only has approximately $750,000 of cash on hand. By the DIP Motion, the Debtor seeks authority to (i) obtain $40 million of post-petition financing in the form of the DIP Facility, and (ii) grant liens (subject only to: (x) the GVI Secured Claim, (y) Permitted Encumbrances, and (z) payment of the Carve-Out), and superpriority administrative claims to the Lenders. As set forth in the Langbein Declaration, the costs of the DIP Facility are below market for a loan of this type and size, even if the DIP Facility were to be provided to the Debtor on a senior secured basis instead of on a subordinated basis.

75. I believe that without access to the DIP Facility, the Debtor will not have sufficient cash to, among other things, meet its obligations to its consultants, independent contractors, and vendors, comply with environmental and regulatory obligations, and satisfy other working capital and operational needs during the pendency of this chapter 11 case. Without the funds made available through the DIP Facility, the Debtor will be unable to meet its obligations and risks losing the opportunity to sell its assets and maximize value for all stakeholders. Accordingly, I believe that, in light of the Debtor's need for immediate liquidity, entry into the DIP Facility is in the best interests of the Debtor's estate and stakeholders.

**B. *Debtor's Motion for Interim and Final Orders (I) Authorizing Maintenance of Existing Bank Accounts and Cash Management System; (II) Authorizing Continued Use of Existing Business Forms and Records; and (III) Waiving the Requirements of 11 U.S.C. § 345(b)* (the "Cash Management Motion")**

76. In the ordinary course of its business, the Debtor maintains a cash management system, bank accounts, and business forms to fund its operations and manage its cash flow. Under this system, the Debtor is able to efficiently collect funds generated by its operations and distribute them, as necessary, to pay its obligations. The Debtor's Cash Management System is relatively simple and straightforward. The Debtor maintains ten bank accounts, seven of which are utilized in connection with its cash management functions. The Debtor's other three accounts hold funds in trust to satisfy certain ongoing regulatory obligations.

77. The Debtor seeks authority to continue using the Cash Management System because it is in the best interest of the Debtor's estate, its creditors, and other interested parties. Through the Cash Management System, the Debtor is able to collect and disburse funds, as well as to monitor and control the movement of cash. Requiring the Debtor to establish new accounts at this juncture would create an unnecessary administrative burden, delay the payment of

workforce-related obligations and other expenses, and eliminate cost savings. The cost and delay associated with opening new accounts and establishing modified cash management practices and policies would disrupt the Debtor's transition into bankruptcy and the interim maintenance of its business. Conversely, maintenance of the Cash Management System avoids the inconvenience, cost, confusion, and delay associated with transferring cash management operations to new accounts.

78. The Debtor will continue to maintain strict records of all receipts and disbursements from the Bank Accounts during the chapter 11 case and will ensure that disbursements from the Bank Accounts properly distinguish between prepetition and post-petition transactions.

79. Only if the Bank Accounts are continued in their current form can the Debtor proceed through chapter 11 efficiently and cost-effectively. Also, if the Debtor were required to change their correspondence and business forms, it would be disruptive.

**C. *Debtor's Motion for Interim and Final Orders Authorizing, But Not Directing, the Debtor to Immediately Pay Prepetition Claims of Certain (I) Critical Vendors and (II) Suppliers Entitled to Administrative Priority* (the "Vendor Motion")**

80. The Debtor, in the ordinary course of its activities and as part of the regular maintenance and operation of its facilities, is subject to a number of environmental and other regulatory standards imposed by various government entities. To comply with the Environmental and Regulatory Standards, the Debtor relies on essential goods and services from certain critical vendors that are the sole source or limited source of such goods and services. The Critical Vendors provide invaluable and irreplaceable goods and services to the Debtor, which, in addition to ensuring the Debtor's continued compliance with certain regulations, are necessary to preserve the value of the Debtor's assets.

81.     The Debtor faces many risks if the Critical Vendor Claims are not satisfied.  The Debtor believes that the Critical Vendors may refuse to perform post-petition services if some or all of their prepetition claims are not paid, thereby exposing the Debtor to the risk of not having the power to maintain its operating systems and business facilities.  Further, the Debtor risks non-compliance with one or more of the regulatory standards to which it is subject.  In such circumstances, government entities could attempt to levy fines or penalties against the Debtor or require the complete shut-down of the Debtor's facilities.  Further, a disruption to the goods and services provided by the Critical Vendors could risk the Debtor's ability to maintain its permits and licenses necessary to conduct its business.

82.     I believe that the Debtor's ability to pay Critical Vendors and certain suppliers up to the applicable caps is critical to the preservation of the Debtor's property and assets because the Critical Vendors and certain suppliers may refuse to perform post-petition services or provide goods if some or all of their prepetition claims are not paid.  This would expose the Debtor to the risk of not having the power to maintain its operating systems and business facilities.  In addition, the Debtor has received certain goods with in the 20-day period prior to the Petition Date that may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.  It is essential that the Debtor is able to maintain its business relationships with, and honor outstanding payment obligations to, these key vendors given the role that they play in the Debtor's business.

83.     Accordingly, I believe it is in the estate's best interest for the Court to approve the relief granted in the Vendor Motion, as it will protect the environment and benefit the public's health, as well as preserve the value of the estate for all stakeholders.

**D.** ***Debtor's Motion for Entry of Interim and Final Orders Authorizing Debtor to (I) Pay and Honor Prepetition Wages, Compensation, Reimbursable Business Expenses, and Employee Benefit Obligations; and (II) Maintain and Continue Certain Compensation and Benefit Programs Post-Petition* (the "Wages Motion")**

84. In the months leading up to the Petition Date, to effectively maintain and market its assets through a sale process, the Debtor employed 141 individuals, consisting of 129 Contractors, 10 Consultants, and 2 seconded employees from Hess and a PDVSA entity respectively. The Current Workforce plays a key role in inspecting and monitoring refinery assets, maintaining the terminal and distribution facilities in operational condition, complying with operational and environmental regulations, running the waste water treatment facility and related clean-up efforts, and assisting with the chapter 11 case and related sale efforts in order to maximize the value of the estate. As discussed below, the Current Workforce is being compensated consistent with their respective employment agreements or contracting agency contracts, which is substantially consistent with the Debtor's historical practice in employing such individuals.

85. As of the Petition Date, the Debtor believes that the majority of all prepetition amounts owed on account of the Former Workforce Obligations and Current Workforce Obligations have been satisfied, including severance and other benefit amounts that accrued and became payable upon termination of employment. However, certain amounts may remain outstanding on account of certain Former Workforce Obligations and Current Workforce Obligations due to a number of factors, including (a) discrepancies that exist between amounts paid prepetition and the amounts that should have been paid, (b) the fact that certain accrued obligations may not yet have become due and payable as of the Petition Date, and (c) the possibility that certain prepetition amounts may have accrued but remain outstanding because they are pending approval or they have not yet been submitted.

86. Based on my knowledge and conversations with the Debtor's professional advisors, it is my understanding that the members of the Former Workforce and Current Workforce heavily rely on the continued payment of outstanding wages and benefits. Further, certain members of the Current Workforce have agreed to continue providing service to the Debtor in chapter 11 as a Contractor or Consultant with the expectation that those amounts would be paid. Should these individuals (or Contracting Companies) determine to cease providing services to the Debtor, it would put at risk the success of the proposed sale process, jeopardize the Debtor's continued environmental compliance, and derail the Debtor's efforts to conclude promptly its bankruptcy case. A significant deterioration in their morale at this critical time undoubtedly would have a devastating impact on the Debtor and the value of its assets and business. Thus, the Debtor's payment of these obligations would enable the Debtor to devote its resources to ensuring a successful chapter 11 case and minimize the personal hardship of these individuals following their termination from the Debtor's employ as full-time employees.

**E.** ***Debtor's Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service on Account of Commencement of the Case or Prepetition Invoices; (II) Approving Deposits as Adequate Assurance of Payment; and (III) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment***

87. The Debtor incurs utility expenses for various waste management, environmental, water, telephone, and similar utility products and services. Approximately 11 different Utility Companies provide these services through approximately 15 separate accounts. On average, the Debtor spent an aggregate of approximately $50,000 each month on utility costs.

88. The services provided by the Utility Companies are crucial to the continued operations of the Debtor. If the Utility Companies refuse or discontinue service, even for a brief period, the Debtor's business operations would be severely (and potentially irreparably)

disrupted, and the Debtor could be forced to cease its business and maintenance activities (including critical environmental compliance).

### F. *Debtor's Motion for Entry of an Order Authorizing, But Not Directing, the Debtor to Pay Certain Prepetition Taxes and Fees* (the "Taxes and Fees Motion")[32]

89. The Debtor, in the ordinary course of business, incurs and remits to applicable taxing, licensing, and other regulatory authorities certain real property, gross receipts, excise, and other miscellaneous taxes and business license fees and other similar assessments in connection with obtaining licenses and permits necessary to operate its existing and ongoing business. The Debtor's failure to pay the Taxes and Fees could negatively impact the Debtor's estate because absent payment of Taxes and Fees, the Debtor may incur substantial liabilities to the Authorities. Further, certain Authorities may attempt to suspend the Debtor's operations, file liens, seek to lift the automatic stay, and pursue other remedies that will be administratively burdensome to the estate, including revoking the Debtor's licenses and/or permits and other privileges. Any unexpected or inopportune interruption of the Debtor's activities during the course of this chapter 11 case could greatly diminish estate value and frustrate the Debtor's chapter 11 efforts.

90. Based on my knowledge and conversations with the Debtor's professional advisors, it is my understanding that certain Taxes may be "trust fund" taxes and as such, are not considered property of the estate. Further, based on my knowledge and conversations with the Debtor's professional advisors, it is my understanding that certain of the Taxes and Fees are entitled to priority status under the Bankruptcy Code and, as a result, must be paid in full before any general unsecured obligations may be satisfied. Accordingly, the Debtor's payment of Taxes and Fees is an exercise of sound business judgment.

---

[32] The Debtor is not seeking interim relief with respect to the Taxes and Fees Motion.

**G.** ***Debtor's Motion for Entry of Interim and Final Orders Authorizing, But Not Directing, the Debtor to Continue Prepetition Insurance Coverage and Pay Prepetition Obligations Relating Thereto***

91. The Debtor maintains an insurance program that provides coverage related to, among other things, director and officer liabilities, third-party general liability, third-party property damage, pollution liability, automobile liability, and damage to vessels. The Debtor requests the entry of interim and final orders authorizing, but not directing, the Debtor to continue prepetition insurance coverage and pay prepetition obligations relating to the Insurance Programs.

92. I believe that the Insurance Programs are critical to the preservation of the Debtor's property and assets because, if the Insurance Policies are allowed to lapse, the Debtor could be exposed to substantial liability. Moreover, in many cases, the insurance coverage is required by regulation, law, or contracts that govern the Debtor's day-to-day activities.

**H.** ***Debtor's Motion for an Order Extending the Time for Filing Schedules and Statements*** **(the "Extension Motion")**

93. As a consequence of the complexity of the Debtor's operations, voluminous books and records, and complex accounting systems, the Debtor has not yet finished gathering the statements of financial affairs, schedules of assets and liabilities, schedules of current income and expenditures, statements of executory contracts and unexpired leases, and lists of equity security holders.

94. Given the numerous critical operational matters that the Debtor's workforce must address in the early days of this chapter 11 case, I believe that with an additional 30-day extension, the Debtor will be able to focus the attention of key accounting and legal personnel on vital operational and restructuring issues during the first weeks after the filing of this chapter 11 case. This will help the Debtor make a smooth transition into chapter 11 and, therefore,

ultimately will maximize the value of the Debtor's estate for all stakeholders. Therefore, I believe that the relief requested in the Extension Motion is in the best interest of the Debtor's estate.

**I. *Debtor's Application for an Order Approving Retention and Employment of Prime Clerk as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* (the "Prime Clerk Retention Application")**

95. The Debtor requests entry of an order, pursuant to section 156(c) and title 28 of the United States Code authorizing the retention and appointment of Prime Clerk LLC as claims and noticing agent in this chapter 11 case. I believe that the relief requested in the Prime Clerk Retention Application will ease the administrative burden on the Clerk of the Court in connection with this chapter 11 case.

## CONCLUSION

96. Accordingly, for the reasons stated herein and in each of the First Day Pleadings, the Debtor requests that the relief sought in the orders appended to the First Day Pleadings be approved.

[*Remainder of Page Intentionally Left Blank*]

I swear under penalty of perjury that the foregoing is true and correct.

Dated: September 15, 2015

HOVENSA L.L.C., Debtor and
Debtor-in-Possession

/s/ Thomas E. Hill

Thomas E. Hill
Proposed Chief Restructuring Officer