<u>**EXHIBIT A**</u>

**Asset Purchase Agreement**

**AMENDED AND RESTATED**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**LIMETREE BAY HOLDINGS, LLC,**

**HOVENSA L.L.C.,**

**AND**

**HESS OIL VIRGIN ISLANDS CORP.**

**DATED DECEMBER [__], 2015**

ARTICLE IDEFINITIONS; CONSTRUCTION ......................................................................... 2

    1.1    Defined Terms ..................................................................................................... 2
    1.2    Additional Defined Terms ................................................................................ 18
    1.3    Construction ...................................................................................................... 20
    1.4    Exhibits and the Disclosure Letters ................................................................. 21
    1.5    Knowledge ........................................................................................................ 21

ARTICLE IISALE OF ASSETS ................................................................................................ 21

    2.1    Sale of Purchased Assets and Tug Boats .......................................................... 21
    2.2    Excluded Assets ............................................................................................... 23
    2.3    Assumption of Liabilities ................................................................................. 25
    2.4    Excluded Liabilities ......................................................................................... 27
    2.5    Assumption and Assignment of Contracts........................................................ 29
    2.6    Required Consents ............................................................................................ 30

ARTICLE IIIPURCHASE PRICE ............................................................................................ 31

    3.1    Purchase Price; Delivery of Funds................................................................... 31
    3.2    Good Faith Escrow Deposit. ............................................................................ 31
    3.3    Allocation of the Purchase Price ..................................................................... 32
    3.4    Withholding ...................................................................................................... 33
    3.5    Closing; Closing Deliverables ......................................................................... 34

ARTICLE IVREPRESENTATIONS AND WARRANTIES OF SELLER................................. 36

    4.1    Due Organization, Good Standing and Limited Liability Company Power........ 36
    4.2    Authorization; Noncontravention ..................................................................... 37
    4.3    Governmental Consents and Approvals............................................................ 38
    4.4    Property............................................................................................................. 38
    4.5    Affiliate Transactions....................................................................................... 39
    4.6    Material Contracts............................................................................................ 40
    4.7    Intellectual Property Rights and Claims .......................................................... 41
    4.8    Tax Matters ...................................................................................................... 42
    4.9    Employee Benefits ........................................................................................... 43
    4.10    Compliance with Laws .................................................................................... 43
    4.11    Labor Matters .................................................................................................. 43
    4.12    Environmental Matters..................................................................................... 43
    4.13    Finders; Brokers............................................................................................... 44
    4.14    Permits ............................................................................................................. 44
    4.15    Absence of Changes......................................................................................... 44
    4.16    Litigation ......................................................................................................... 44
    4.17    Title to Purchased Assets ................................................................................. 45
    4.18    Insurance .......................................................................................................... 45
    4.19    Compliance. ...................................................................................................... 45
    4.20    Exclusivity of Representations; Projections, etc................................................ 45

ARTICLE V REPRESENTATIONS AND WARRANTIES OF HOVIC ................................... 46

5.1    Due Organization, Good Standing and Corporate Power .................... 46
5.2    Authorization; Noncontravention. ...................................................... 46
5.3    Governmental Consents and Approvals ............................................... 47
5.4    Litigation ............................................................................................. 48
5.5    Title to Tug Boats ............................................................................... 48
5.6    Exclusivity of Representations; Projections, etc ................................. 48

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PURCHASER ...................... 49

6.1    Due Organization, Good Standing and Limited Liability Company Power of
       Purchaser ............................................................................................. 49
6.2    Authorization; Noncontravention ....................................................... 49
6.3    Governmental Consents and Approvals ............................................... 50
6.4    Financing ............................................................................................. 50
6.5    Litigation ............................................................................................. 51
6.6    Finders; Brokers .................................................................................. 51
6.7    Investigation by Purchaser .................................................................. 51
6.8    Solvency of Purchaser ......................................................................... 52
6.9    Exclusivity of Representations ............................................................ 52

ARTICLE VII COVENANTS .............................................................................................. 53

7.1    Access to Information Concerning Properties and Records ................ 53
7.2    Conduct Pending the Closing Date ..................................................... 54
7.3    Employee Relations and Benefits ....................................................... 56
7.4    Efforts to Close ................................................................................... 56
7.5    Public Announcements ........................................................................ 58
7.6    Notification of Certain Matters ........................................................... 58
7.7    Supplements to Schedules ................................................................... 58
7.8    Post-Closing Access to Records and Personnel; Litigation Support ... 59
7.9    Compliance with WARN, Plant Closing Act and Similar Statutes ...... 60
7.10   Tax Matters ......................................................................................... 61
7.11   USVI Concession Agreement .............................................................. 61
7.12   Access Easement ................................................................................. 62
7.13   Bulk Sales Act. .................................................................................... 63
7.14   Bankruptcy Action .............................................................................. 63
7.15   Sale Order. .......................................................................................... 64
7.16   [Intentionally Omitted] ....................................................................... 65
7.17   Backup Bidder ..................................................................................... 65
7.18   Transfer of Permits; Seller Letters of Credit ...................................... 65
7.19   Expenses. ............................................................................................. 67
7.20   Breakup Fee. ........................................................................................ 67
7.21   Rejected Contracts .............................................................................. 68
7.22   Confidentiality ..................................................................................... 68
7.23   Seller's Marks ...................................................................................... 69

7.24    Shared Services Agreement ................................................................ 69
7.25    Permitting Process ............................................................................ 70
7.26    Registration of Tug Boats .................................................................. 70
7.27    Post-Closing Cooperation for Financial Statements ............................ 70
7.28    Division of Subdivision Parcels; Ground Leases; Cross-Easement Agreements . 71
7.29    Title Policy and Survey...................................................................... 72
7.30    Additional Cross-Easement Agreements. ............................................ 72
7.31    Cooperation ..................................................................................... 73
7.32    Transfer of Government Parcels ......................................................... 73
7.33    Costs and Expenses of Seller ............................................................. 73

ARTICLE VIIICONDITIONS PRECEDENT ........................................................... 73

8.1    Conditions to the Obligations of Each Party........................................ 73
8.2    Conditions to the Obligations of Purchaser. ....................................... 74
8.3    Conditions to the Obligations of Seller and HOVIC ............................ 75
8.4    Frustration of Closing Conditions....................................................... 76

ARTICLE IXTERMINATION................................................................................ 76

9.1    Termination Events............................................................................ 76
9.2    Effect of Termination ........................................................................ 78

ARTICLE XSURVIVAL AND RELEASE ............................................................... 78

10.1    No Survival of Representations and Warranties ................................... 78
10.2    Release ............................................................................................. 79

ARTICLE XIMISCELLANEOUS ........................................................................... 79

11.1    Expenses .......................................................................................... 79
11.2    Extension; Waiver............................................................................. 79
11.3    Notices ............................................................................................. 80
11.4    Entire Agreement .............................................................................. 82
11.5    Binding Effect; Benefit; Assignment.................................................. 82
11.6    Amendment and Modification ............................................................ 82
11.7    Counterparts ..................................................................................... 83
11.8    Applicable Law; Jurisdiction ............................................................. 83
11.9    Severability ...................................................................................... 83
11.10    Specific Enforcement; Limitation on Damages.................................... 84
11.11    Waiver of Jury Trial.......................................................................... 84
11.12    Rules of Construction ....................................................................... 85
11.13    Headings .......................................................................................... 85
11.14    Non- Recourse .................................................................................. 85

## EXHIBITS

| | |
|---|---|
| Exhibit A: | Form of Access Easement |
| Exhibit B: | [Intentionally Omitted] |
| Exhibit C: | Form of Bill of Sale and Assignment and Assumption Agreement |
| Exhibit D: | Form of Protocol of Delivery and Acceptance |
| Exhibit E: | Form of Tug Boat Bill of Sale and Acceptance |
| Exhibit F: | Form of USVI Concession Agreement |
| Exhibit G: | Form of FIRPTA Certificate |
| Exhibit H: | Subdivision Parcels |
| Exhibit I: | Form of Termination and Release for Concession Agreement, the 1976 Contract and the Submerged Land Lease |

## OTHER

Seller Disclosure Letter
HOVIC Disclosure Letter

## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

This AMENDED AND RESTATED ASSET PURCHASE AGREEMENT (this "**Agreement**") is dated December [__], 2015 by and among Limetree Bay Holdings, LLC, a limited liability company organized under the Laws of Delaware ("**Purchaser**"), HOVENSA L.L.C., a limited liability company organized under the Laws of the U.S. Virgin Islands ("**Seller**") and Hess Oil Virgin Islands Corp., a corporation organized under the Laws of the U.S. Virgin Islands ("**HOVIC**" and together with Purchaser and Seller, the "**Parties**" and each a "**Party**"). Capitalized terms used herein have the meanings ascribed thereto in Section 1.1, unless otherwise provided.

W I T N E S S E T H:

WHEREAS, Seller has previously been engaged, in part, in the business of owning and operating a crude oil and product storage and terminalling business (the "**Business**");

WHEREAS, on September 15, 2015, Seller commenced a voluntary case (the "**Bankruptcy Case**") under chapter 11 of the Bankruptcy Code in the United States District Court of the U.S. Virgin Islands, Bankruptcy Court Division – St. Croix, Virgin Islands (the "**Bankruptcy Court**");

WHEREAS, Seller retains possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its business as a debtor-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, HOVIC owns the Tug Boats;

WHEREAS, in connection with the Bankruptcy Case and subject to the respective terms and conditions contained herein and in the Sale Order, Seller desires to sell and assign the Purchased Assets and the Assumed Liabilities to Purchaser, and Purchaser desires to purchase and assume the Purchased Assets and the Assumed Liabilities, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, free and clear of all Liens, Claims, and Liabilities other than Permitted Liens and Assumed Liabilities, upon the terms and conditions set forth in this Agreement (the "**Purchase**") and HOVIC desires to sell to Purchaser, and Purchaser desires to purchase, on the terms and subject to the conditions of this Agreement, the Tug Boats (the "**Tug Boat Sale**");

WHEREAS, Seller has determined, in the exercise of its business judgment, that it is advisable and in the best interest of the estate and the beneficiaries of the estate to consummate the Purchase provided for herein pursuant to the Bid Procedures Order and the Sale Order;

WHEREAS, the Parties entered into an Asset Purchase Agreement, dated September 4, 2015 (the "**Initial Purchase Agreement**");

WHEREAS, as a condition to the willingness of, and as a material inducement to, Seller's and HOVIC's willingness to enter into the Initial Purchase Agreement, Purchaser delivered to Seller the Equity Commitment Letter concurrently with the execution of the Initial Purchase Agreement;

WHEREAS, the Parties desire to amend and restate the Initial Purchase Agreement in its entirety;

WHEREAS, this Agreement amends and restates the Initial Purchase Agreement in its entirety; and

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, representations, warranties and agreements herein contained, the Parties, intending to be legally bound, agree as follows:

## ARTICLE I

## DEFINITIONS; CONSTRUCTION

1.1    Defined Terms.  When used in this Agreement, the following terms shall have the respective meanings specified therefor below:

"**1976 Contract**" shall mean that certain Contract, dated September 22, 1976, by and among the USVI Government, Seller (as assignee of HOVIC) and the Virgin Islands Port Authority, approved by the Legislature of the Virgin Islands on September 29, 1976, and including, for the avoidance of doubt, the 1976 Contract Permits.

"**1998 Letter Agreement**" shall mean that certain letter agreement, dated as of October 14, 1998 (as amended, supplemented or modified from time to time pursuant to which the USVI Government consented to (a) the assignment by HOVIC to Seller of the Submerged Land Lease and (b) the assignment and delegation by HOVIC to Hovensa of the rights and obligations of HOVIC under the 1976 Contract.

"**2012 HOVIC Note**" shall mean that certain note issued as of April 1, 2012 by Seller in favor of HOVIC in the aggregate original principal amount of $811,000,000.

"**2012 Notes**" shall mean the 2012 HOVIC Note and the 2012 Petróleo Note.

"**2012 Petróleo Note**" shall mean that certain note issued as of April 1, 2012 by Seller in favor of PDVSA Petróleo, S.A. in the aggregate original principal amount of $811,000,000.

"**2015 HOVIC Note**" shall mean that certain note issued as of July 8, 2015 by Hovensa in favor of HOVIC in the aggregate original principal amount of $5,000,000.

"**2015 Notes**" shall mean the 2015 HOVIC Note and the 2015 PDVSA Note.

2

"**2015 PDVSA Note**" shall mean that certain note issued as of July 8, 2015 by Hovensa in favor of PDVSA VI in the aggregate original principal amount of $5,000,000.

"**Above-Grade Refinery Assets**" shall mean any and all refining process units, buildings, structures, fixtures or other improvements owned by Seller that are present on the Option Refinery Property or the Leased Submerged Lands [or that certain parcel of real property identified in <u>Exhibit H</u> as an "Excluded" parcel  and located within the submerged land border][1] that are exclusively at or above grade, including the power plant located on the Option Refinery Property, and all equipment, personal property and fixtures, including any and all ancillary and non-structural personal property, required to operate such assets (including below-grade pumps, storage tanks, piping, electrical service and distribution system, control systems and any other associated utility infrastructure); provided, that, for the avoidance of doubt, the Above-Grade Refinery Assets shall not include any Retained Refinery Assets or other Excluded Assets.

"**Access Easement**" shall mean an access easement in form and substance reasonably satisfactory to each of Seller and Purchaser on terms substantially similar to the form attached hereto as <u>Exhibit A</u>.

"**Adverse Person**" shall mean (a) a Person who is a "designated national," "specially designated national," "specially designated terrorist," "specially designated global terrorist," "foreign terrorist organization," "specially designated narcotics trafficker" or "blocked person," within the definitions set forth in the OFAC Regulations, or who otherwise appears on the list of Specially Designated Nationals and Blocked Persons included in the OFAC Regulations, (b) a government, including any Governmental Entity, of any country against which the United States maintains Sanctions, (c) a Person acting or purporting to act, directly or indirectly, on behalf of, or any entity owned or controlled by, any of the Persons listed in clauses (a) or (b) above, or (d) a Person on any other export control, terrorism or drug trafficking related list administered by any Governmental Entity as that list may be amended, adjusted or modified from time to time.

"**Affiliate**" of any Person shall mean any other Person directly or indirectly controlling, controlled by, or under common control with, such Person; provided, that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise; provided, further, that none of HOVIC, PDVSA VI or their respective direct or indirect equity holders shall be deemed to "control" Seller.  Notwithstanding the foregoing, for all purposes of this Agreement and the transactions contemplated hereby, (a) HOVIC and its direct and indirect equity holders are Affiliates of Seller but are not Affiliates of PDVSA VI or PDVSA VI's direct and indirect equity holders and (b) PDVSA VI and its direct and indirect equity holders are Affiliates of Seller but are not Affiliates of HOVIC or HOVIC's direct and indirect equity holders.

---

[1] Note to Draft: Subject to confirmation with Purchaser.

3

"**Alternative Transaction**" shall mean (i) a Restructuring Transaction or (ii) one or more sales, assignments, leases, transfers, or other dispositions of all or any material portion of the Purchased Assets to any Person (or group of Persons), whether in one transaction or a series of transactions, whether by merger, asset purchase, equity purchase or other similar transaction, in each case other than to the Purchaser or its Affiliates.

"**Antitrust Laws**" shall mean the Sherman Act, 15 U.S.C. §§ 1-7, as amended, the Clayton Act, 15 U.S.C. §§ 12-27, 29 U.S.C. §§ 52-53, as amended, the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a et seq., as amended, the Federal Trade Commission Act, 15 U.S.C. § 41-58, as amended, and all other Laws and Orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization, restraint of trade, or lessening of competition through merger or acquisition.

"**Avoidance Actions**" shall mean all preference claims, fraudulent transfer claims and avoidance actions or other related causes of action whether arising under the Bankruptcy Code, non-bankruptcy law, or otherwise, and the proceeds thereof, including actions available to Seller under Chapter 5 of the Bankruptcy Code, of whatever kind or nature, and whether asserted or unasserted.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq.

"**Bid Procedures Order**" shall mean the Order (a) Establishing Bidding Procedures Relating to the Sale of the Debtor's Assets, Including Approving Break-Up Fee and Expense Reimbursement, (b) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, (c) Approving Form and Manner of Notice Relating Thereto, and (d) Scheduling a Hearing to Consider the Proposed Sale entered by the Bankruptcy Court on October 9, 2015.

"**Bill of Sale and Assignment and Assumption Agreement**" shall mean that certain bill of sale and assignment and assumption agreement substantially in the form attached hereto as Exhibit C.

"**Breakup Fee**" shall mean an amount of cash equal to $4,700,000.

"**Business Day**" shall mean any day except a Saturday, a Sunday or any other day on which commercial banks are required or authorized to close in New York, New York or the U.S. Virgin Islands.

"**Business Intellectual Property**" shall mean all rights to Intellectual Property that are owned by Seller, other than the Excluded Intellectual Property.

"**Business IT Assets**" shall mean all rights to Information Technology that are owned by Seller, other than the Excluded IT Assets.

"**Business Real Property**" shall mean the Purchased Real Property and the Leased Submerged Lands, in each case together with all easements, appurtenances, rights and

Americas 90681280

leases, and other hereditaments appurtenant to such land and all the estates and rights of Seller in and to such land.

"**Charter Agreements**" shall mean, with respect to each Tug Boat, the applicable Contract of Bareboat Charter Party, dated as of October 30, 1998, by and between Amerada Hess Shipping Corporation and Seller, as modified by the applicable Novation Agreement, dated as of July 20, 2001, by and among Amerada Hess Shipping Corporation, Seller and HOVIC.

"**Claim**" shall have the meaning assigned to such term under section 101(5) of the Bankruptcy Code.

"**Code**" shall mean the United States Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, as mirrored in the U.S. Virgin Islands.

"**Concession Agreement**" shall mean that certain agreement by and between the USVI Government and HOVIC, dated and approved by the Legislature of the Virgin Islands September 1, 1965, and amended, supplemented and clarified at various times by mutual agreement of the parties, as amended and extended by the Extension and Amendment Agreement, dated April 24, 1981 and approved by the Legislature of the Virgin Islands May 7, 1981, as further amended and extended by the Restated Second Extension and Amendment Agreement, dated July 27, 1990 and approved by the Legislature of the Virgin Islands on August 22, 1990, as further amended by the Technical Clarifying Amendment to Restated Second Extension and Amendment Agreement, dated November 17, 1993 and approved by the Governor and the Legislature of the Virgin Islands, as further amended and extended by the Third Extension and Amendment Agreement, to which PDVSA VI is added as a party, dated April 15, 1998 and approved by the Legislature of the Virgin Islands on May 18, 1998, as further amended by the Fourth Amendment Agreement.

"**Confidentiality Agreement**" shall mean that certain Confidentiality Agreement by and between Seller and ArcLight Capital Partners, LLC, dated April 24, 2015.

"**Consent**" shall mean any authorization, approval, consent, ratification, negative clearance, waiver, notice or filing, or a Final Order of the Bankruptcy Court that deems, or renders unnecessary, the same.

"**Consent Decree**" shall mean the Consent Decree entered on June 7, 2011 in the United States District Court of the Virgin Islands in the matter of United States of America, and United States Virgin Islands v. Hovensa L.L.C. (Civ. No.: 1:11-cv-00006).

"**Contract**" shall mean any note, bond, mortgage, indenture, guaranty, license, franchise, permit, agreement, contract, commitment, lease, purchase order, or other instrument or obligation, and any amendments thereto.

"**Cross-Easement Agreement**" shall mean an agreement, in form and substance reasonably acceptable to each of Seller and Purchaser, by which each of Seller and Purchaser grants the other a customary right of access upon, over, in, under, across and through a portion of its property as is reasonably required for the continued use and operation of the Purchased Real Property, the leased real property subject to any Real Property Leases (including, for the

Americas 90681280

avoidance of doubt, the Leased Submerged Lands) or the Excluded Real Property by Purchaser or Seller (as applicable).

"**Cure Amounts**" shall mean, with respect to any Business Contract or Real Property Lease, the amount of cash required to be paid with respect to such Business Contract or Real Property Lease to cure all defaults under such Business Contract or Real Property Lease to the extent required by Section 365 of the Bankruptcy Code and to otherwise satisfy all requirements imposed by Section 365 of the Bankruptcy Code in order to effectuate, pursuant to the Bankruptcy Code, the assumption by Seller and assignment to Purchaser of such Business Contract or Real Property Lease.

"**Disclosure Conditions**" shall mean, in respect of any obligation of a Person to disclose any information or provide access to another Person, that such disclosing Person shall not be required to disclose such information or provide such access to the extent that such Person reasonably believes that doing so would reasonably be expected to (a) violate any applicable Law or Order, including Antitrust Laws, or the terms of any Contract to which such Person is a party, (b) cause the waiver of attorney/client privilege or similar privilege or (c) unreasonably disrupt the operations of such Person; provided that to the extent permitted by Law, the Person that has the disclosure obligation shall notify the other Person of any such inability to provide information or access and shall use its commercially reasonable efforts to make appropriate substitute arrangements (including entering into joint defense agreements, seeking appropriate waivers or consents) under the circumstances in order to allow for such access or disclosure without violating any Law, Order or Contract or waiving attorney/client privilege or similar privilege.

"**Environmental Law**" shall mean any Law, Order or other requirement of Law (including Environmental Permits) that relates to (a) the protection of the environment (including natural resource restoration and natural resource damages) or of human health or safety (to the extent human health or safety relates to exposure to Hazardous Materials), or (b) the presence, Release, threatened Release, generation, recycling, disposal or treatment of Hazardous Materials, or the arrangement for any such activities.

"**Environmental Liabilities**" shall mean all Liabilities (including the costs of any Remedial Action) arising in connection with or in any way relating to the Business (as currently or formerly conducted), the Purchased Assets or any property currently or formerly owned, leased or operated in connection with the Business (as currently or formerly conducted) or the Purchased Assets (including the activities and operations conducted by anyone thereon, offsite disposal therefrom and Hazardous Materials migrating thereto or therefrom), that in each case arise under or relate to any Environmental Law, Environmental Permit or a Hazardous Material, including Liabilities arising from any Third Party claims for personal injury, death, or property damage caused by an actual or alleged release of, or exposure to, a Hazardous Material.

"**EPA**" shall mean the United States Environmental Protection Agency.

"**Equity Commitment Letter**" shall mean that certain equity commitment letter addressed to Purchaser, dated as of the date of the Initial Purchase Agreement, delivered by ArcLight Energy Partners Fund VI, L.P.

6

"**Escrow Account**" shall mean the account created by the Escrow Agent in which the Good Faith Deposit Amount was deposited pursuant to the Initial Purchase Agreement.

"**Escrow Agent**" shall mean Wells Fargo Bank, N.A. or, if Wells Fargo Bank, N.A. is unable or unwilling to act as the Escrow Agent, such other Person as is mutually agreed upon by Purchaser and Seller.

"**Escrow Agreement**" shall mean that certain Escrow Agreement, dated as of October 8, 2015, by and among Purchaser, Seller and the Escrow Agent, as may thereafter be amended from time to time in accordance with the terms thereof.

"**Event**" shall mean any action, omission, state of facts, condition, occurrence, result, circumstance, event, effect, development or change.

"**Excluded Furniture and Equipment**" shall mean the Furniture and Equipment set forth on Section 1.1(a) of the Seller Disclosure Letter.

"**Excluded Intellectual Property**" shall mean the rights to Intellectual Property listed on Section 1.1(b) of the Seller Disclosure Letter.

"**Excluded IT Assets**" shall mean the rights to Information Technology listed on Section 1.1(c) of the Seller Disclosure Letter.

"**Excluded Permits**" shall mean the Permits (and any pending applications) listed on Section 1.1(d) of the Seller Disclosure Letter.

"**Excluded Real Property**" shall mean all real property owned by Seller, other than the Purchased Real Property, and including, for the avoidance of doubt, the Retained Refinery Assets and the Government Parcels.

"**Excluded Refinery Liabilities**" shall mean (except to the extent covered in Section 2.3(n) or (o)) any Liabilities relating to or arising out of the Retained Refinery Assets, in each case relating to any act, omission, circumstance or other Event that occurs prior to or after the Closing, including to the extent exacerbated, triggered, increased, or their timing is accelerated by any act or omission of, or any delay caused by, Purchaser or any of its Affiliates, their respective successors or assigns or their respective Representatives.

"**Files and Records**" shall mean all current and historical information, data, databases, reports, plans, schedules, correspondence, files, documents, books and other records and information, including (a) customer, vendor, supplier, contractor and service provider lists and records, (b) sales, pricing and performance data and records generated from completed or active transactions (including billing, payment and dispute histories, credit information and similar data), (c) business plans, financial statements, corporate, Tax, human resource, legal, regulatory and financial data and records, (d) operating and production records, quality control records, market research reports, technical documentation (drawings, specifications, process instructions, statistics, functional requirements, operating instructions, manual, etc.) and user documentation (installation guides, manuals, training material working paper, etc.), (e) employment and personnel records, (f) all of the plant diagrams and drawings, equipment

7

diagrams and drawings, equipment manuals, "as built" books, operating manuals, maintenance histories and records, civil engineering drawings, PFDs, PI&Ds and other such technical documents relating to the Above-Grade Refinery Assets and (g) regulatory filings, documents or other information relating to any Proceeding, in each case with respect to clauses (a) through (g), of Seller, whether in paper, electronic, digital or other form or medium, and that relate primarily to the Business, the Purchased Assets or Assumed Liabilities; provided, that Files and Records shall not include (i) any files, documents, books or other records to the extent relating to any existing or anticipated Tax litigations or disputes (to the extent that such litigation or disputes are, or are related to any, Excluded Liabilities hereunder), (ii) any information which, if transferred to Purchaser or its Affiliates, would reasonably be expected to violate any applicable Law or Order or the terms of any Contract and (iii) any items described in clauses (a) through (g) that relate primarily to the Retained Refinery Assets or any other Excluded Assets or any Excluded Liabilities.

"**Final Order**" shall mean an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Case (or the docket of such other court), which is and remains in full force and effect, has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, re-argument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, re-argument or rehearing shall then be pending or (ii) if an appeal, writ of certiorari new trial, re-argument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, re-argument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, re-argument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such order, shall not cause an order not to be a Final Order.

"**Fourth Amendment Agreement**" shall mean that certain Fourth Amendment Agreement, by and among the USVI Government, Seller, HOVIC and PDVSA VI, dated April 3, 2013, as ratified by the legislature of the Virgin Islands on November 4, 2013 and approved by the Governor of the Virgin Islands on November 4, 2013, as Act No. 7566 (such ratification including that certain letter, dated October 16, 2013, from George H.T. Dudley to the Governor of the Virgin Islands incorporated as part of Act No. 7566).

"**Furniture and Equipment**" shall mean all furniture, furnishings, equipment, vehicles, machinery, cranes, forklifts, tools, truck racks, fixtures, consumables and other tangible personal property owned by Seller, including artwork, desks, chairs, tables, miscellaneous office furnishings, copiers, scanners, printers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles and supplies.

"**GAAP**" shall mean generally accepted accounting principles of the United States of America consistently applied, as in effect from time to time.

8

"**Good Faith Deposit Amount**" shall mean $19,000,000, which amount was deposited with the Escrow Agent in accordance with the terms of the Initial Purchase Agreement and held and released pursuant to the terms and subject to the conditions set forth in this Agreement and the Escrow Agreement.

"**Governmental Entity**" shall mean any multinational, United States or non-United States, federal, state, territory, provincial or local court (including, for the avoidance of doubt, the Bankruptcy Court), arbitral tribunal, administrative agency, legislature or commission or other governmental, quasi-governmental or regulatory agency or authority (including any bureau, division or department thereof) or any securities exchange.

"**Hazardous Material**" shall mean any waste or other substance that is listed, defined, designated, classified as, or otherwise determined to be, hazardous, extremely hazardous, toxic, radioactive, or a pollutant or a contaminant under or pursuant to any Law, Order or requirement of Law, including any admixture or solution thereof, and specifically including petroleum and all derivatives thereof or synthetic substitutes therefor and asbestos or asbestos-containing materials.

"**Hovensa Operating Agreement**" shall mean that certain Amended and Restated Limited Liability Company Agreement of Seller, dated as of October 30, 1998, and as thereafter amended from time to time, including those certain amendments dated as of February 10, 2000 and December 1, 2006.

"**HOVIC**" shall mean Hess Oil Virgin Islands Corp., a corporation organized under the Laws of the U.S. Virgin Islands.

"**Improvements**" shall mean any and all buildings, structures, fixtures or other improvements owned by or leased to Seller that are attached or affixed to the Business Real Property (including all construction and work-in-progress), including above ground and underground piping and storage tanks, canopies, signage, terminals, fixtures, pumps and appurtenances, control houses, the terminal office building, the administrative office building, the marine compound building, laboratory facilities, warehouses, boiler houses and waste water treatment facilities (and all equipment related thereto), the docks, equipment, personal property of a permanent nature and other similar facilities; provided, however, that the Retained Refinery Assets and Excluded Furniture and Equipment shall not be considered "Improvements".

"**Indebtedness**" of any Person shall mean (a) any obligations or indebtedness (i) for borrowed money or indebtedness issued or incurred in substitution or exchange for indebtedness for borrowed money, (ii) evidenced by any note, bond, debenture, mortgage or other debt instrument or debt security, (iii) for the deferred purchase price of property or service, (iv) for the reimbursement of any obligor on any letter of credit, banker's acceptance, guarantee or similar credit transaction (but only to the extent drawn upon or if there has been a demand made for reimbursement thereunder) and (v) under any commodity, swap, derivative, currency, interest rate, call, hedge or similar agreement, (b) any obligations of any kind referred to in the foregoing clause (a) above guaranteed or secured, directly or indirectly, in any manner by such Person (including by a Lien on the assets or properties of such Person whether or not such obligations are assumed) and (c) any accrued and unpaid principal, interest, premiums, penalties,

9

pre-payment penalties, fees, expenses, "make-whole" or similar payments, indemnities and breakage costs owing by such Person with respect to any indebtedness of a type described in clauses (a) or (b); provided, that Indebtedness of Seller shall not include accounts payable to trade creditors or accrued expenses, in each case, arising in the ordinary course of business of Seller (as currently conducted).

"**Information Technology**" shall mean all computers, computer systems, servers, workstations, databases, and software programs.

"**Intellectual Property**" shall mean (a) patents and patent applications, (b) trademarks, service marks, trade dress, and all registrations and applications for the same, (c) Internet domain names, (d) registered and unregistered copyrights and applications for the same, and (e) trade secrets.

"**IRS**" shall mean the United States Internal Revenue Service.

"**Law**" shall mean any statute, law, ordinance, ruling, policy, rule or regulation of any Governmental Entity and all judicial or administrative interpretations thereof and any common law doctrine.

"**Leased Submerged Lands**" shall mean those portions of real property identified in Exhibit H as "Terminal" or "Refinery" parcels that are leased by Seller subject to the Submerged Land Lease, the 1976 Contract and the 1998 Letter Agreement.

"**Legal Proceeding**" shall mean any judicial, administrative or arbitral actions, suits or legal proceedings (public or private) by or before a Governmental Entity.

"**Liabilities**" shall mean any and all Indebtedness, Taxes, losses, charges, debts, damages, obligations, payments, costs and expenses, bonds, indemnities, liabilities and obligations of any nature, including any unknown, undisclosed, unmatured, unaccrued, unasserted, contingent, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability, regardless of whether such claim, debt, obligation, duty or liability would be required to be disclosed on a balance sheet prepared in accordance with GAAP and regardless of whether such claim, debt, obligation, duty or liability is immediately due and payable.

"**Liens**" shall mean any liens (as defined in Section 101(37) of the Bankruptcy Code), debts (as defined in Section 101(12) of the Bankruptcy Code), security interests, Claims, easements, mortgages, charges, indentures, deeds of trust, rights of way, encroachments, or any other encumbrances and other restrictions or limitations on ownership or use of real or personal property or irregularities in title thereto.

"**Loss**" or "**Losses**" shall mean, without duplication, any and all Liabilities, judgments, awards, losses, costs or damages, including reasonable fees and expenses of attorneys, accountants and other professional advisors.

"**LPG Flare**" shall mean the liquid petroleum gas flaring facility and related interconnection equipment currently used in the operation of the Business.

Americas 90681280

"**Material Adverse Effect**" shall mean any Event that, individually or in the aggregate with any other related Events, (a) has had or would reasonably be expected to have a material adverse effect on the business, condition (financial or otherwise), properties, assets or results of operations of the Business, the Purchased Assets or the Assumed Liabilities, in each case, taken as a whole or (b) prevents or materially delays beyond the End Date, or would reasonably be expected to prevent or materially delay beyond the End Date, the consummation of the transaction contemplated by this Agreement or the Transaction Documents or the performance of any of Seller's material obligations under this Agreement or the Transaction Documents; provided, that no Event (by itself or when aggregated with other Events) to the extent resulting from any of the following, shall be considered in determining whether there has been or would reasonably be expected to be a Material Adverse Effect:

(i)      changes in general economic, business or political conditions;

(ii)     conditions or changes in the securities markets, credit markets, currency markets or other financial markets in the United States or any other country or region in the world, including (x) interest rates in the United States or any other country or region in the world and exchange rates for the currencies of any countries and (y) any suspension of trading in securities (whether equity, debt, derivative or hybrid securities) on any securities exchange or over-the counter market operating in the United States or any other country or region in the world;

(iii)    changes in any applicable Laws or interpretations thereof by any Governmental Entity or GAAP;

(iv)    conditions affecting generally the hydrocarbon, terminal or refining industry (including feedstock pricing, refining, marketing, transportation, terminalling, trading costs and margins, and crude oil refined products and other commodity prices) or any other industries or markets in which the Business, the Purchased Assets and the Assumed Liabilities are owned or operated;

(v)     other than for purposes of any representation or warranty set forth in Section 4.2(b) or Section 4.3, the announcement of this Agreement or the consummation of the transactions contemplated by this Agreement;

(vi)    the commencement or continuation of the Bankruptcy Case;

(vii)   any action required to be taken by the Bankruptcy Court pursuant to the Sale Motion, the Sale Order, or the Bid Procedures Order;

(viii)  general political conditions in the United States, the U.S. Virgin Islands or any other country or region in the world or any natural or man-made disaster or any acts of terrorism, sabotage, military action or war (whether or not declared) or any escalation or worsening thereof, regardless of when occurring or commenced (and excluding, for the avoidance of doubt, the effect of the failure of any Governmental Entity to approve any transactions contemplated by this Agreement or the Transaction Documents);

11

(ix)    any failure by Seller or any of its Affiliates or the Business (or any portion thereof) to meet any estimates or expectations of revenue, earnings or other financial performance or results of operations for any period, or any failure to meet internal or published projections, budgets, plans or forecasts of revenues, earnings, cash flows or other financial performance or results of operations for any period; provided, that the exception in this clause shall not prevent the underlying cause or causes of such failure from being taken into consideration in determining whether there has been or would reasonably be expected to be a Material Adverse Effect; or

(x)    any action taken at the written request of, or with the express prior written consent of, Purchaser;

provided, further, that any Event in clauses (i), (ii), (iii), (iv) and (viii) may be taken into account when determining whether there has been or would reasonably be expected to be a Material Adverse Effect to the extent that such Event has a disproportionate effect on the Business, the Purchased Assets and the Assumed Liabilities taken as a whole, compared to other hydrocarbon terminalling and storage businesses in the United States or Caribbean region. A "Material Adverse Effect" shall not be measured based on any forward-looking statements, projections or forecasts of Seller or any other Person.

"**Notes**" shall mean the 2012 Notes and the 2015 Notes.

"**NRD Settlement Agreement**" shall mean that certain Settlement and Release Agreement entered into on May 29, 2014 by Seller, Alicia V. Barnes in her capacity as Trustee for Natural Resources of the Territory of the United States Virgin Islands, the USVI Government in its *parens patriae* and public trustee capacity, on behalf of the public and its quasi-sovereign interests, and HOVIC.

"**Operational Terminals Business**" shall mean the ownership and operation of a hydrocarbon storage and terminal facility consistent in all material respects with the manner in which the Business was operated by Seller when the Business was fully operational, assuming such ownership and operation are in compliance with all Laws, Permits, Orders and Contracts.

"**Option Agreement**" shall mean an option agreement by and among Purchaser and Seller, pursuant to which Purchaser will have the right to acquire some or all of the Option Refinery Property for a purchase price of $1 per acre, exercisable until the date that is the earlier of (i) ten (10) years from the Closing Date and (ii) three (3) years after the removal of the Above-Grade Refinery Assets from the Option Refinery Property and which is otherwise in form and substance reasonably satisfactory to each of Seller and Purchaser.

"**Option Refinery Property**" shall mean the real property owned by Seller and described in Section 1.1(e) of the Seller Disclosure Letter (and including, for the avoidance of doubt, the Option Refinery Parcels), together with all easements, appurtenances, rights and other hereditaments appurtenant to such real property.

"**Order**" shall mean any judgment, order, injunction, decree, writ, permit or license issued or entered by or with any Governmental Entity or any arbitrator, whether

12

preliminary, interlocutory or final, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Sale Order).

"**OSRO**" shall mean Oil Spill Response Organization.

"**Parts Inventory**" shall mean the inventories of supplies, maintenance and capital spares, joints, valves, parts and tools owned by Seller as of the Closing that are (x) stored in the warehouses located on the Business Real Property or in the Above-Grade Refinery Assets or (y) used primarily in connection with the Business; provided, that the Parts Inventory shall not include any Retained Refinery Assets.

"**PDVSA VI**" shall mean PDVSA V.I., Inc., a corporation organized under the Laws of the U.S. Virgin Islands.

"**Pension Plan**" shall mean that certain HOVENSA L.L.C. Employees' Pension Plan.

"**Permitted Liens**" shall mean (a) statutory Liens or other Liens arising in the ordinary course of business of Seller (including by operation of law) securing payments not yet due, including mechanics', carriers', workmen's, repairmen's, materialmens' and maritime Liens, (b) Liens for Taxes not yet due and payable or for Taxes that may thereafter be paid without penalty or which are being contested in good faith and by appropriate Proceedings and are set forth on Section 1.1(f) of the Seller Disclosure Letter, (c) Liens set forth in Section 1.1(f) of the Seller Disclosure Letter, (d) Liens affecting the Business Real Property with respect to (i) zoning, building code or planning restrictions or regulations, servitudes, permits, licenses, surface leases, ground leases to utilities, municipal agreements, railway siding agreements and other similar rights, easements for streets, alleys, highways, telephone lines, gas pipelines, power lines and railways, and other easements and rights of way of public record on, over, or in respect of any such real property and (ii) encroachments and other matters that would be shown in an accurate survey or physical inspection of such real property that, in each case of (i) and (ii) of this clause (d) above, do not, individually or in the aggregate, materially interfere with the use, operation or occupancy of such real property as an Operational Terminals Business, (e) Liens arising pursuant to any Environmental Permit, (f) any Liens arising under ERISA or the Code with respect to the Pension Plan and (g) any Lien that will be extinguished at or prior to Closing.

"**Permitted Tax Liens**" shall mean those Liens, and only those Liens, described in clause (b) of the definition of Permitted Liens.

"**Person**" shall mean and include an individual, a partnership, a limited partnership, a limited liability partnership, a joint venture, a corporation, a limited liability company, an association, a trust, an unincorporated organization, a group and a Governmental Entity.

"**Petition**" means the voluntary petition under Chapter 11 of the Bankruptcy Code filed by Seller with the Bankruptcy Court.

"**Petition Date**" shall mean September 15, 2015.

13

"**Pinnacle Contract**" shall mean that certain Term Services Agreement, dated as of May 1, 2012, by and between Seller and Pinnacle Services L.L.C., as amended from time to time in accordance with its terms.

"**Pinnacle Cure Amount**" shall mean the Cure Amount with respect to the Pinnacle Contract.

"**Plant Closing Act**" shall mean the Virgin Islands Code Title 24, § 471- 478 (1957).

"**Post-Closing Litigation Liabilities**" shall mean all Liabilities arising from a Proceeding first commenced after the Closing by a Third Party against Purchaser, Seller or any of their respective Affiliates, in respect of the Business, the Purchased Assets or the Assumed Liabilities that is based on any Event first existing, arising or occurring following the Closing; provided, that the Parties agree and acknowledge that Post-Closing Litigation Liabilities shall not include any Environmental Liabilities, which are separately addressed in this Agreement.

"**Post-Closing Period**" shall mean all taxable years or other taxable periods that begin after the Closing Date and, with respect to any taxable year or other taxable period beginning on or before and ending after the Closing Date, the portion of such taxable year or period beginning on the day after the Closing Date.

"**Pre-Closing Litigation Liabilities**" shall mean all Liabilities arising from a Proceeding first commenced prior to or following the Closing by a Third Party against Purchaser, Seller or any of their respective Affiliates in respect of the Business, the Purchased Assets or the Assumed Liabilities that is based on any Event first existing, arising or occurring before the Closing; provided, that the Parties agree and acknowledge that Pre-Closing Litigation Liabilities shall not include any Environmental Liabilities, which are separately addressed in this Agreement.

"**Pre-Closing Period**" shall mean all taxable years or other taxable periods that end on or before the Closing Date and, with respect to any taxable year or other taxable period beginning on or before and ending after the Closing Date, the portion of such taxable year or period ending on the Closing Date.

"**Proceeding**" shall mean any claim, demand, action, arbitration, audit, hearing, investigation, litigation, suit or other proceeding (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Third Party (including any Governmental Entity).

"**Property Taxes**" shall mean all real property Taxes, personal property Taxes and other similar ad valorem Taxes, in each case, that are imposed with respect to the Purchased Assets.

"**Protocol of Delivery and Acceptance**" shall mean, with respect to each Tug Boat, the applicable protocol of delivery and acceptance for such Tug Boat, substantially in the form attached hereto as Exhibit D.

14

"**Purchase Price**" shall mean $190,000,000.

"**Purchased Furniture and Equipment**" shall mean all Furniture and Equipment owned by Seller that is located at the Seller Facilities or the Above-Grade Refinery Assets or that is otherwise primarily used or held for use in the Business (assuming that the Business includes an Operational Terminals Business) or in the ownership or operation of the Above-Grade Refinery Assets; provided, that, for the avoidance of doubt, the Purchased Furniture and Equipment shall not include the Excluded Furniture and Equipment or any other Excluded Assets.

"**Purchaser Expense Reimbursement**" shall mean the sum of the aggregate amount of the Purchaser's reasonable documented out-of-pocket costs and expenses (including expenses of outside counsel, accountants and financial advisors, which shall be based on summary invoices, redacted to preserve privileged or confidential information, and which shall not be required to comply with applicable United States Trustee guidelines) incurred by Purchaser in connection with or related to Purchaser's evaluation, consideration, analysis, negotiation, and documentation of the transactions contemplated by this Agreement, up to a maximum amount of $1,900,000.

"**RCRA Permit**" shall mean the Resource Conservation and Recovery Act Part B Permit No. VID980536080 and any document that replaces such Permit.

"**Real Property**" shall mean the Purchased Real Property and the Excluded Real Property.

"**Release**" shall mean the disposing, discharging, injecting, spilling, leaking, pumping, leaching, dumping, emitting, escaping or emptying into or upon any air, soil, sediment, subsurface strata, surface water or groundwater.

"**Remedial Action**" shall mean any action to investigate, abate, clean up, remove or remediate (or words of similar import), or conduct remedial or corrective actions, including sampling and/or monitoring activities, with respect to Hazardous Materials in the environment.

"**Representatives**" of any Person shall mean such Person's directors, managers, officers, employees, agents, attorneys, consultants, advisors, financing sources or other Persons acting on behalf of such Person.

"**Restructuring Transaction**" shall mean, in each case, which does not include the Purchase and Tug Boat Sale pursuant to this Agreement (i) any recapitalization transaction, plan of reorganization, liquidation, or sale, including any such transaction by way of a credit bid or by any creditor of Seller, involving, whether in whole or in part, Seller or all or any material portion of the Purchased Assets, or (ii) any merger, consolidation, share exchange, business combination or similar transaction involving, whether in whole or in part, Seller or all or any material portion of the Purchased Assets, in each case whether in one transaction or a series of transactions.

"**Retained Refinery Assets**" shall mean the Option Refinery Property, to the extent such Option Refinery Property has not been conveyed pursuant to the Option Agreement (and excluding, for the avoidance of doubt, the Above-Grade Refinery Assets).

"**Returns**" shall mean all returns, statements, forms, reports and other similar documentation relating to Taxes, including any schedules, exhibits and other attachments thereto and any amendments thereof.

"**Sale Hearing**" shall mean the hearing at which the Bankruptcy Court considers approval of the Sale Order pursuant to Sections 105, 363 and 365 of the Bankruptcy Code.

"**Sale Motion**" shall mean Debtor's Motion for Entry of Orders (a)(i) Establishing Bidding Procedures Relating to the Sale of the Debtor's Assets, Including Approving Break-Up Fee and Expense Reimbursement, (ii) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, (iii) Approving Form and Manner of Notice Relating Thereto, and (iv) Scheduling a Hearing to Consider the Proposed Sale; (b)(i) Approving the Sale of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (ii) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (c) Granting Related Relief filed by the Seller in the Bankruptcy Court on September 15, 2015.

"**Sale Order**" shall mean an Order of the Bankruptcy Court approving this Agreement, containing the findings and conclusions set forth in Section 7.15, and authorizing and directing Seller to consummate the transactions contemplated by this Agreement (including, but not limited to, the assumption and assignment of the Business Contracts and Real Property Leases) under sections 105, 363 and 365 of the Bankruptcy Code, in form and substance acceptable to Seller and Purchaser in their respective sole discretion.

"**Sanctions**" shall mean any sanctions or embargos administered or enforced by the U.S. Government, (including, the OFAC Regulations), the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant Governmental Entity that is a sanctions authority.

"**Seller Facilities**" shall mean the storage, terminalling and refining facilities and related equipment owned by Seller located on the Business Real Property and the Option Refinery Property, including all Improvements related thereto; provided, that, for the avoidance of doubt, the Seller Facilities shall not include any Excluded Assets.

"**Seller Letters of Credit**" shall mean (a) that certain Irrevocable Letter of Credit No. 123146-793, issued as of April 5, 2012 by Intesa Sanpaolo S.p.A. on behalf of Hess Corporation for the benefit of the EPA, (b) that certain Irrevocable Letter of Credit No. 123147-793, issued as of April 5, 2012 by Intesa Sanpaolo S.p.A. on behalf of Hess Corporation for the benefit of the EPA, (c) that certain Irrevocable Standby Letter of Credit No. CNYI 5051/12, issued as of April 4, 2012 by Banco Espirito Santo on behalf of Seller for the benefit of the EPA, and (d) that certain Irrevocable Standby Letter of Credit No. CNYI 5050/12, issued as of April 4,

16

2012 by Banco Espirito Santo on behalf of Seller for the benefit of the EPA, and any document that replaces such Letters of Credit.

"**Shared Services Agreement**" shall mean a shared services agreement by and among Purchaser and Seller, in form and substance satisfactory to Seller and Purchaser in their sole discretion.

"**Submerged Land Lease**" shall mean that certain Lease, dated as of October 16, 1976, by and between the USVI Government and Seller (as assignee of HOVIC).

"**Subsidiary**", with respect to any Person, shall mean (a) any corporation more than fifty percent (50%) of the stock of any class or classes of which having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is owned by such Person directly or indirectly through one or more subsidiaries of such Person and (b) any partnership, association, joint venture, limited liability company or other entity in which such Person directly or indirectly through one or more subsidiaries of such Person has more than a fifty percent (50%) equity interest.

"**Taxes**" shall mean all taxes, assessments, charges, duties, fees, levies or other governmental charges imposed by a taxing authority, including all United States federal, state, territory (including the U.S. Virgin Islands), local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, sales, use, value added, occupation, property, excise, severance, windfall profits, stamp, license, payroll, social security, withholding and other taxes, assessments, charges, duties, fees, levies or other governmental charges imposed by a taxing authority of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest, and including Liability for any of the foregoing items pursuant to applicable Law, as a transferee, as a successor, or pursuant to a Contract.

"**Terminal Assets**" shall mean the Purchased Assets, other than the Above-Grade Refinery Assets.

"**Third Party**" shall mean any Person other than the Parties and their respective Affiliates (including, for the avoidance of doubt, any Governmental Entity).

"**Transaction Documents**" shall mean the Access Easement, the Escrow Agreement, the Shared Services Agreement, the Ground Leases, the Cross-Easement Agreements and the Option Agreement.

"**Tug Boat Bill of Sale and Acceptance**" shall mean, with respect to each Tug Boat, the applicable Bill of Sale and Acceptance of sale for such Tug Boat, substantially in the form attached hereto as Exhibit E, pursuant to which HOVIC will transfer to Purchaser at the Closing such Tug Boat.

17

"**Tug Boats**" shall mean the following six (6) tug boats owned by HOVIC: (1) M/V Turquoise Bay, (2) M/V Teague Bay, (3) M/V Canegarden Bay, (4) M/V Manchenil Bay, (5) M/V Limetree Bay and (6) M/V HOVIC 1.

"**USCG**" shall mean the United States Coast Guard.

"**USVI Concession Agreement**" shall mean that certain concession agreement substantially in the form attached hereto as <u>Exhibit F</u>.

"**USVI Government**" shall mean the Government of the United States Virgin Islands, including any United States Virgin Islands Governmental Entity.

"**USVI Government Concession Fee**" shall mean $100,000,000. The USVI Government Concession Fee reflects the amount necessary to satisfy all monetary obligations of Seller to the USVI Government in respect of the Purchased Assets, including the full and final satisfaction and settlement of the secured claim in the amount of approximately $40,000,000, as certified by Seller and the USVI Government at least ten (10) days prior to the Closing.

1.2    <u>Additional Defined Terms</u>. In addition to the terms defined in <u>Section 1.1</u>, additional defined terms used herein shall have the respective meanings assigned thereto in the Sections indicated below.

| Defined Term | Section |
|---|---|
| 1976 Contract Permits | Seller Disclosure Letter |
| Additional Requirements | 7.24 |
| Agreement | Preamble |
| Allocation | 3.3(b) |
| Assumed Liabilities | 2.3 |
| Bankruptcy Case | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Rules | 4.3 |
| Business | Recitals |
| Business Confidential Information | 7.22 |
| Business Contracts | 2.1(a)(i) |
| Business Permits | 2.1(a)(vii) |
| Closing | 3.5(a) |
| Closing Cross-Easement Agreements | 7.28 |
| Closing Date | 3.5(a) |
| Closing Payment | 3.1 |
| Deferred Asset | 2.6(a) |
| Deferred Terminal Parcels | 7.28 |
| Designation Deadline | 2.5(a)(iii) |
| Efforts Condition | 7.4(a) |
| Eliminated Agreement | 2.5(a)(iii) |
| Employee Benefit Plans | 4.9 |
| End Date | 9.1(b)(ii) |

18

Americas 90681280

Environmental Permits ................................................. 4.12(c)
Equity Financing ........................................................ 6.4
Equity Financing Source .............................................. 6.4
ERISA ...................................................................... 4.9
Excess Power ............................................................ 7.24
Excluded Assets ......................................................... 2.2
Excluded Liabilities .................................................... 2.4
FIRPTA .................................................................... 3.4
Government Parcels ..................................................... 7.28
Ground Lease ............................................................ 7.28
Hovensa Consultant ..................................................... 4.11
HOVIC .................................................................... Preamble
HOVIC Disclosure Letter ............................................. Article V
HOVIC Update Schedule ............................................... 7.7(a)
Initial Purchase Agreement ............................................ Recitals
Knowledge of Purchaser ............................................... 1.5
Knowledge of Seller .................................................... 1.5
Limited Consent Decree Modification .............................. 7.4(c)
Material Contracts ...................................................... 4.6(b)
Other Required Approvals ............................................. 8.2(d)
Option Refinery Parcels ............................................... 7.28
Parties .................................................................... Preamble
Permits .................................................................... 4.14
Permitting Process ...................................................... 7.25
Pinnacle Employee ...................................................... 7.9
Purchase .................................................................. Recitals
Purchased Assets ....................................................... 2.1(a)
Purchased Real Property ............................................... 2.1(a)(ii)
Purchaser ................................................................ Preamble
Purchaser Borne Withholding Taxes ................................ 3.4
Purchaser's Required Permits ......................................... 7.18(d)
Real Property Leases ................................................... 2.1(a)(iv)
Related Parties .......................................................... 11.14
Released Claims ......................................................... 10.2
Releasee .................................................................. 10.2
Releasor .................................................................. 10.2
Required Governmental Approvals ................................... 8.1(e)
Seller ..................................................................... Preamble
Seller Access Indemnitees ............................................ 7.1(b)
Seller Disclosure Letter ............................................... Article IV
Seller Update Schedule ................................................ 7.7(a)
Seller's Marks ........................................................... 7.23
Subdivision Parcels .................................................... 7.28
Tax Purchase Price ..................................................... 3.3(a)
Transfer Taxes .......................................................... 7.10(a)
Trust Funds .............................................................. 2.2(q)

19

| | |
|---|---|
| Tug Boat Permits ......................................................... | 7.25 |
| Tug Boat Sale.............................................................. | Recitals |
| Update Schedule ......................................................... | 7.7(a) |
| WARN ........................................................................ | 7.9 |
| Wind-Up Cost Cap....................................................... | 7.33 |
| Wind-Up Costs............................................................. | 7.33 |

1.3    Construction. In this Agreement, unless the context otherwise requires:

(a)    references to "writing" or comparable expressions include a reference to electronic mail, provided that, where applicable, the sender complies with the provisions of Section 11.3;

(b)    the phrases "delivered" or "made available" shall mean that the information referred to has been physically or electronically delivered to the relevant parties (including, in the case of "made available" to Purchaser, material that has been posted and thereby made available to Purchaser through the on-line "virtual data room" established by Seller);

(c)    words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa;

(d)    references to Articles, Sections, Sections of the Seller Disclosure Letter, Sections of the HOVIC Disclosure Letter, Exhibits, the Preamble and Recitals are references to articles, sections, exhibits, the preamble and recitals of this Agreement and the disclosure letters delivered with respect to this Agreement, and the descriptive headings of the several Articles and Sections of this Agreement, the Seller Disclosure Letter and the HOVIC Disclosure Letter (as applicable) are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement;

(e)    references to "day" or "days" are to calendar days;

(f)    the words "hereof", "herein", "hereto" and "hereunder", and words of similar import, shall refer to this Agreement as a whole and not to any provision of this Agreement;

(g)    this "Agreement" or any other Contract or document shall be construed as a reference to this Agreement or, as the case may be, such other Contract or document as the same may have been, or may from time to time be, amended, varied, novated or supplemented and shall include each and every exhibit, attachment, schedule, addendum, appendix, statement of work, change order, and any other similar instrument relating to such Contract or document (as amended);

(h)    "include", "includes", and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of similar import;

Americas 90681280

(i)     references to "Dollars", "dollars" or "$", without more are to the lawful currency of United States of America;

(j)     references to "commercially reasonable efforts" shall not require any Party to repay any Indebtedness, amend any Contract to increase the amount payable thereunder or otherwise to be materially more burdensome to such Party, commence any litigation, settle or compromise any matter, offer or grant any accommodation (financial or otherwise, including with respect to the Notes or any accounts payable) to any Third Party, pay any amount or bear any other incremental economic burden and, without limiting the foregoing, for purposes of Section 7.11(a), references to "commercially reasonable efforts" shall not require any Party to agree or consent to any modifications to the form of USVI Concession Agreement attached as Exhibit F;

(k)     with respect to the Business (including the Purchased Assets and Assumed Liabilities), references to the "ordinary course of business" or its business in the "ordinary course" shall mean (i) with respect to the period from and after February 5, 2015, the ordinary course of business of Seller as currently conducted, (ii) with respect to the period from February 21, 2012 until February 5, 2015, the ordinary course of business of Seller solely as the owner and operator of a hydrocarbon storage terminal (taking into account changes in the business of Seller in preparation for the shutdown of the terminalling and storage business) and (iii) with respect to all periods prior to February 21, 2012, the ordinary course of business of Seller as the owner and operator of a petroleum refining business (taking into account changes in the business of Seller in preparation for the shutdown of its refinery operations); and

(l)     references to any Party shall include such Party's successors and permitted assigns.

1.4     Exhibits and the Disclosure Letters.  The Exhibits, the Seller Disclosure Letter and the HOVIC Disclosure Letter are incorporated into and form an integral part of this Agreement.

1.5     Knowledge.     When any representation, warranty, covenant or agreement contained in this Agreement is expressly qualified by reference to the "**Knowledge of Seller**" or words of similar import with respect to Seller, it shall mean the actual knowledge of the individuals set forth in Section 1.5 of the Seller Disclosure Letter with respect to Seller, without inquiry or investigation.  When any representation, warranty, covenant or agreement contained in this Agreement is expressly qualified by reference to the "**Knowledge of Purchaser**" or words of similar import, it shall mean the actual knowledge of Evan Schwartz, Jake Erhard and Christine Miller, without inquiry or investigation.

ARTICLE II

SALE OF ASSETS

2.1     Sale of Purchased Assets and Tug Boats.

(a)     On the terms and subject to the conditions of this Agreement (including as set forth in Section 2.5(b)) and the Sale Order, Purchaser agrees to purchase from Seller, and

21

Seller agrees to sell, convey, transfer, assign and deliver to Purchaser, at the Closing, all the right, title and interest of Seller in and to the Purchased Assets, free and clear of any Liens, Claims and Liabilities of any kind whatsoever except Permitted Liens. The "**Purchased Assets**" shall mean all right, title and interest of Seller in the following assets (other than any such assets excluded pursuant to Section 2.2)

> (i)    each Contract listed or described in Section 2.1(a)(i) of the Seller Disclosure Letter and the Pinnacle Contract (collectively, the "**Business Contracts**");

> (ii)    the real property described in Section 2.1(a)(ii) of the Seller Disclosure Letter, together with all easements, appurtenances, rights and other hereditaments appurtenant to such real property  (collectively, the "**Purchased Real Property**"); provided, that any Option Refinery Property transferred to Purchaser pursuant to the Option Agreement shall be considered Purchased Real Property (and therefore shall be Business Real Property) for purposes of this Agreement;

> (iii)    all Improvements;

> (iv)    each real property lease and sublease listed or described in Section 2.1(a)(iv) of the Seller Disclosure Letter ("**Real Property Leases**");

> (v)    all Parts Inventory;

> (vi)    the Files and Records, whether in hard copy or electronic format, except that, with respect to Files and Records that Seller or any of its Affiliates is required by Law or Order to retain, the Purchased Assets shall include copies of such Files and Records to the extent permitted by any applicable Law or Order (and, with respect to any personnel records which Seller is required to retain, copies of such personnel records to the extent permitted by any applicable Law or Order); provided, that Seller shall be permitted to retain a copy of any such Files and Records that Seller requires in connection with any of the Excluded Assets;

> (vii)    all Permits   (and any pending applications), other than the Excluded Permits, that are owned, utilized, held or maintained by or licensed to Seller primarily in connection with Seller's ownership or operation of the Business, the other Purchased Assets or the Assumed Liabilities or which are otherwise required for Seller's operation of the Business or the other  Purchased Assets (assuming, in each case, that the Business includes an Operational Terminals Business), including those Permits described in Section 2.1(a)(vii) of the Seller Disclosure Letter (which shall not include the RCRA Permit) (the "**Business Permits**");

> (viii)    the Business Intellectual Property;

> (ix)    the Business IT Assets;

> (x)    all rights, claims, defenses, causes of action (including Avoidance Actions) and rights of offset or counterclaim against a Third Party relating to or arising from the Business, the Purchased Assets or the Assumed Liabilities (including rights

22

under manufacturer and vendor warranties, indemnities and guarantees), except to the extent related to any Excluded Assets or Excluded Liabilities; provided, that Purchaser shall not prosecute, or commence any litigation with respect to, the Avoidance Actions;

(xi)    the Purchased Furniture and Equipment;

(xii)    accounts receivable and pre-paid assets, solely to the extent related to an Assumed Liability;

(xiii)    all tank bottoms, heels and line fill which are located at the Seller Facilities;

(xiv)    the LPG Flare;

(xv)    the Above-Grade Refinery Assets; and

(xvi)    with respect to the Tug Boats, the Tug Boat spare parts owned by Seller and stored (x) in the warehouses and the marine compound located on the Business Real Property or in the Above-Grade Refinery Assets and (y) on the Tug Boats.

(b)    On the terms and subject to the conditions of this Agreement, Purchaser agrees to purchase from HOVIC, and HOVIC agrees to sell, convey, transfer, assign and deliver to Purchaser, at the Closing, all its right, title and interest in and to the Tug Boats, together with, to the extent transferable, the related assets described in Section 2.1(b) of the HOVIC Disclosure Letter.

2.2    Excluded Assets.  Notwithstanding anything herein to the contrary, the Purchased Assets shall not include any assets, rights or privileges of Seller other than the Purchased Assets and specifically shall not include Seller's right, title or interest in any of the following assets, whether owned by, held by or relating to Seller (collectively, the "**Excluded Assets**"):

(a)    all cash, certificates of deposit or other cash equivalents;

(b)    any real property other than (i) Purchased Real Property and (ii) real property subject to the Real Property Leases;

(c)    all personal property, equipment and inventory not included in the Purchased Assets;

(d)    all rights, claims, defenses, causes of action  and rights of offset or counterclaim (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, contingent or non-contingent) of Seller against Third Parties (i) to the extent relating to any of the Excluded Assets or Excluded Liabilities or (ii) not included in the Purchased Assets;

(e)    all Avoidance Actions related solely to any Excluded Assets or Excluded Liabilities;

Americas 90681280

   (f)  all rights under any Contract to which Seller is a party that is not a Business Contract or a Real Property Lease;

   (g)  general books of account and books of original entry that comprise Seller's permanent Tax records, corporate minute books, stock books and related organizational documents and the books and records that Seller is required to retain pursuant to any Law or Order and the books and records solely related to the Excluded Assets or Excluded Liabilities;

   (h)  personnel records that Seller is required by Law or Order to retain (provided that the copies of any such personnel records shall be Purchased Assets to the extent permitted by any applicable Law or Order pursuant to Section 2.1(a)(vi)) and personnel records of employees, former employees or consultants of Seller who do not, as of the Closing, become employees of Purchaser;

   (i)  all insurance recoveries under Seller's or its Affiliates' insurance policies with respect to the Purchased Assets or the Business and any rights to assert claims with respect to any such insurance recoveries;

   (j)  all claims for refund or credit of (i) income Taxes of Seller and its Affiliates for any taxable period and (ii) non-income Taxes of Seller and its Affiliates with respect to a Pre-Closing Period;

   (k)  the Excluded Intellectual Property;

   (l)  the Excluded IT Assets;

   (m)  Seller's or any of its Affiliates' rights under this Agreement or any Transaction Document or relating to the Excluded Assets or the Excluded Liabilities;

   (n)  all deposits (including security deposits, rent, electricity, telephone or otherwise and retainers held by attorneys, accountants, financial advisors and other professional advisors retained by Seller or by any creditors' committee in the Bankruptcy Case) and other prepaid charges of Seller, in each case other than with respect to any Purchased Assets;

   (o)  any assets of Seller in a directors and officers liability insurance policy, executive or incentive compensation, bonus, deferred compensation, pension, retiree medical, stock option or other stock purchase plan or other Employee Benefit Plan;

   (p)  the RCRA Permit and any related financial assurance;

   (q)  any rights or assets related to trusts for groundwater remediation or land farms (the "Trust Funds");

   (r)  all toy trucks and related inventory which are located at the Seller Facilities;

   (s)  all Excluded Furniture and Equipment;

24

(t)    all Retained Refinery Assets;

(u)    all accounts receivable and pre-paid assets of Seller, except to the extent related to a Purchased Asset or an Assumed Liability;

(v)    the Excluded Permits; and

(w)    all attorney client privilege and attorney work product protection of Seller or associated with the Business (as currently or formerly conducted) as a result of legal counsel representing Seller or the Business (as currently or formerly conducted), and all Files and Records related thereto subject to such attorney client privilege or work product protection; provided that any privilege or work product that exclusively relates to the Purchased Assets or the Assumed Liabilities or that is necessary to operate the Business (other than such privileges, protections and related Files and Records related to or in connection with the transactions contemplated by this Agreement or any Transaction Document) shall not be deemed to be an Excluded Asset whether or not in connection with the transactions contemplated by this agreement or any Transaction Document.

2.3    _Assumption of Liabilities_.  On the terms and subject to the conditions of this Agreement, including Section 2.5(b), and except for the Excluded Liabilities, Purchaser agrees, effective as of the Closing (except as otherwise provided), to assume and shall agree to pay, perform and discharge when due, the following Liabilities (collectively, the "**Assumed Liabilities**") of Seller:

(a)    all Liabilities (including for the avoidance of doubt, all Environmental Liabilities), other than Excluded Refinery Liabilities, relating to or arising out of the Purchased Assets or the Business arising out of or relating to any act, omission, circumstance or other Event occurring after the Closing, _provided_, _however_, that, except with respect to Cure Amounts assumed pursuant to Section 2.3(c), Purchaser shall not assume or agree to pay, discharge or perform any Liabilities of Seller under or with respect to any Business Contracts and Real Property Leases, including Liabilities arising out of any breach, misfeasance or under any other theory to the extent relating to Seller's conduct prior to the Closing;

(b)    all Post-Closing Litigation Liabilities;

(c)    all Cure Amounts with respect to the Business Contracts and the Real Property Leases (other than the Pinnacle Cure Amount);

(d)    all valid reclamation claims related to the Business;

(e)    any and all costs and expenses necessary in connection with providing "adequate assurance of future performance" with respect to the Business Contracts and Real Property Leases (as contemplated by section 365 of the Bankruptcy Code) for the period commencing on or after the Closing;

(f)    all Environmental Liabilities, other than Excluded Refinery Liabilities, arising out of or relating to any act, omission or circumstance that occurred prior to the Closing, including for the avoidance of doubt, the presence of Hazardous Materials arising from Seller's

25

former refinery operations and located at the Purchased Assets, solely to the extent such Liabilities are exacerbated, triggered, increased, or have their timing accelerated by any act or omission of, or any delay caused by, Purchaser or any of its Affiliates, their respective successors or assigns or their respective Representatives; provided, that, all Environmental Liabilities arising out of or relating to Events or conditions occurring or existing prior to Closing shall not be Assumed Liabilities solely by virtue of Purchaser discovering, identifying or quantifying such Environmental Liabilities through sampling of environmental media if such sampling is (i) required by Environmental Law or by a Governmental Entity, (ii) required to be conducted in response to a Third Party Claim alleging that Hazardous Materials have migrated offsite from the Business Real Property or (iii) undertaken in connection with ordinary course construction, remodeling, demolition, operation or maintenance, assuming that the Business includes an Operational Terminals Business, or undertaken in connection with the dismantling, demolition or removal of the Above-Grade Refinery Assets;

(g)     all Liabilities related to the Business Contracts and Real Property Leases arising out of or relating to any act, omission, circumstance or other Event occurring on or after the Closing Date (including the ordinary course obligations arising under the Business Contracts and Real Property Leases in accordance with their terms);

(h)     all accounts and notes payable to Seller's third-party trade creditors that relate to the Purchased Assets and are in respect of goods or services that will be provided to the Business following the Closing, including any unresolved vendor rebates or credits associated with such trade creditors that are unpaid, uncollected or unresolved, as the case may be, at the Closing;

(i)     any Transfer Taxes applicable to the transfer of the Purchased Assets for which Purchaser is responsible pursuant to Section 7.10(a);

(j)     any Liability for any Tax or Taxes arising out of or relating to the operation of the Business (as currently or formerly conducted) or the ownership of the Purchased Assets with respect to any Post-Closing Period;

(k)     all Liabilities under the Consent Decree in connection with the Purchased Assets arising out of or relating to any act, omission, circumstance or other Event occurring after the Closing;

(l)     all Environmental Liabilities arising out of or relating to any (i) violation, by the Purchaser or any of its Affiliates (including the Business) or their respective Representatives occurring after the Closing, of any environmental covenant or environmental deed notice recorded with respect the Purchased Assets, (ii) change in use, discontinued use, closure or shutdown of the Purchased Assets after the Closing (other than with respect to the Above-Grade Refinery Assets in connection with the dismantling, demolition or removal thereof) or (iii) the Liabilities with respect to the Above-Grade Refinery Assets assumed by Purchaser pursuant to Section 2.3(o);

(m)     all Liabilities associated with any draw on any Seller Letter of Credit to the extent such Liabilities are exacerbated, triggered, increased or have their timing accelerated

Americas 90681280

by any act or omission of, or any delay caused by, Purchaser or any of its Affiliates, their respective successors or assigns or their respective Representatives;

      (n)     Purchaser's obligations under Section 7.33; and

      (o)     other than for any Excluded Refinery Liabilities, any Environmental Liabilities directly arising from the physical presence of Hazardous Materials (including asbestos and asbestos-containing materials) on, at or within (but not under, adjacent or otherwise proximate to) the Above-Grade Refinery Assets.

    2.4    Excluded Liabilities. Notwithstanding anything contained herein to the contrary, Purchaser shall not assume, or cause to be assumed, or be deemed to have assumed or caused to have assumed or be liable or responsible for any of the following Liabilities of Seller or any of its Affiliates (collectively, the "**Excluded Liabilities**"):

      (a)     all Liabilities not set forth in clauses (a) – (o) of Section 2.3;

      (b)     all Liabilities (other than Environmental Liabilities) relating to or arising out of any breach or violation of any Law (other than any Environmental Law), Business Contract, Real Property Lease or any Business Permit occurring prior to Closing;

      (c)     any Liability arising out of or relating to the Excluded Assets or any other assets of Seller or its Affiliates that are not Purchased Assets (other than any Assumed Liability);

      (d)     any Liability arising out of or relating to this Agreement or any Transaction Document for which Seller has responsibility;

      (e)     any severance obligations that accrue under any severance plan of Seller existing at or prior to the Closing with respect to Seller's employees and resulting from actions taken by Seller prior to the Closing;

      (f)     without limiting Section 2.3(h), any amounts due from Seller or its Affiliates to the USVI Government pursuant to the Concession Agreement;

      (g)     all Environmental Liabilities (that are not Assumed Liabilities) arising out of or relating to any act, omission, circumstance or other Event occurring prior to the Closing, including (i) Seller's obligations under the RCRA Permit to the extent such obligations (A) are not exacerbated, triggered, increased, or have their timing accelerated by any act or omission of, or any delay caused by, Purchaser or any of its Affiliates, their respective successors or assigns or their respective Representatives or (B) do not arise out of or relate to a non-industrial change in use, discontinued use, long-term closure or permanent shutdown of the Purchased Assets after the Closing (other any of Seller's obligations under the RCRA Permit arising out of the dismantling, demolition or removal of the Above-Grade Refinery Assets), (ii) Liabilities arising from the MTBE Litigations (as such term is defined in the Seller Disclosure Letter), (iii) any Liabilities arising from Orders issued to Seller that may result in Environmental Liabilities to the extent such Liabilities (A) are not exacerbated, triggered, increased, or accelerated by any act or omission of, or any delay caused by, Purchaser or any of its Affiliates, their respective successors or assigns or their respective Representatives or (B) do not arise out of or relate to a change in

Americas 90681280

use, discontinued use, closure or shutdown of the Purchased Assets after the Closing (other any of Seller's obligations under such Orders arising out of the dismantling, demolition or removal of the Above-Grade Refinery Assets) or (C) are not Liabilities under the Consent Decree in connection with the Purchased Assets arising out of or relating to any act, omission, circumstance or other Event occurring after the Closing, and (iv) all Excluded Refinery Liabilities and all other Liabilities (other than Liabilities with respect to the Above-Grade Refinery Assets assumed by Purchaser pursuant to Section 2.3(o)) arising out of or relating to any act, omission, circumstance or other Event occurring prior to the Closing with respect to the Above-Grade Refinery Assets;

(h)    any costs, expenses or other Liabilities incurred by Purchaser arising from or relating to any Remedial Action (i) required to be undertaken by Seller to address an Excluded Liability pursuant to applicable Environmental Laws and (ii) not fully performed by Seller to the satisfaction of applicable Governmental Entities;

(i)    any obligations of Seller (including funding obligations) under the Pension Plan;

(j)    any Liabilities arising pursuant to the NRD Settlement Agreement and in connection with actions taken or circumstances that arose prior to the Closing Date to the extent such Liabilities (i) are not exacerbated, triggered, increased, or accelerated by any act or omission of, or any delay caused by, Purchaser or any of its Affiliates, their respective successors or assigns or their respective Representatives, or (ii) do not arise out of or relate to a change in use, discontinued use, closure or shutdown of the Purchased Assets after the Closing;

(k)    any Liabilities that both (i) arise under the Consent Decree and (ii) are in connection with actions taken or circumstances that arose prior to the Closing Date to the extent such Liabilities (A) are not exacerbated, triggered, increased, or accelerated by any act or omission of, or any delay caused by, Purchaser or any of its Affiliates, their respective successors or assigns or their respective Representatives or (B) do not arise out of or relate to a change in use, discontinued use, closure or shutdown of the Purchased Assets after the Closing;

(l)    all Liabilities for fees and expenses (i) relating to the negotiation and preparation of this Agreement and the Transaction Documents and (ii) relating to the transactions contemplated by this Agreement and the Transaction Documents, in each case, to the extent incurred by Seller or its Affiliates;

(m)    any Liability for any Tax or Taxes of Seller or its Affiliates for any taxable period;

(n)    any Liability for any Tax or Taxes arising out of or relating to the operation of the Business (as currently or formerly conducted) or the ownership of the Purchased Assets in any Pre-Closing Period, including any Property Taxes with respect to any Pre-Closing Period;

(o)    any Liability for any withholding taxes imposed as a result of the transactions contemplated by this Agreement;

Americas 90681280

(p)    the Pinnacle Cure Amount;

(q)    any Transfer Taxes applicable to the transfer of the Purchased Assets for which Seller is responsible pursuant to Section 7.10(a); and

(r)    any Liability or obligation arising out of or relating to Indebtedness of Seller or any of its Affiliates, including pursuant to the Notes.

Notwithstanding the foregoing, to the extent any of the Liabilities excluded pursuant to clauses (a) through (r) of this Section 2.4 would cause a Liability otherwise assumed pursuant to Section 2.3(n) or (o) to be an Excluded Liability, Section 2.3(n) or (o), as applicable, shall govern and such Liability shall not be an Excluded Liability.

2.5    Assumption and Assignment of Contracts.

(a)    (i)    Until five (5) Business Days prior to the Closing Date, Seller may provide updates or supplements to Section 2.1(a)(i) or Section 2.1(a)(iv) of the Seller Disclosure Letter to include revised Cure Amounts and revised amounts of any accrued and unpaid expenses and accounts payable with respect to any Business Contracts or Real Property Leases set forth therein, which updates shall amend Section 2.1(a)(i) or Section 2.1(a)(iv) of the Seller Disclosure Letter for all purposes hereof.  Prior to the Sale Hearing, Seller shall commence appropriate proceedings before the Bankruptcy Court and otherwise take all reasonably necessary actions in order to determine Cure Amounts with respect to any Business Contract or Real Property Lease entered into prior to the Petition Date.

(ii)    At the Closing, Seller shall assume and assign to Purchaser the Business Contracts and Real Property Leases, in each case pursuant to Section 365 of the Bankruptcy Code and the Sale Order, subject to provision by Purchaser of adequate assurance as may be required under Section 365 of the Bankruptcy Code and payment of the Cure Amounts in respect of Business Contracts and Real Property Leases as contemplated hereby.

(iii)    Notwithstanding anything in this Agreement to the contrary, Purchaser may, from time to time and in its sole and absolute discretion, amend or revise Section 2.1(a)(i) and Section 2.1(a)(iv) of the Seller Disclosure Letter in order to remove any Contract from Section 2.1(a)(i) or Section 2.1(a)(iv) of the Seller Disclosure Letter, as applicable, up to five (5) Business Days prior to the Closing Date (the "**Designation Deadline**"); provided, that Purchaser shall not remove the Pinnacle Contract and shall, to the extent approved by the Sale Order, assume the Pinnacle Contract pursuant to Sections 2.1 and 2.3.  Automatically upon the removal of any Business Contract or Real Property Lease from Section 2.1(a)(i) or Section 2.1(a)(iv) of the Seller Disclosure Letter, as applicable, by Purchaser in accordance with the first sentence of this Section 2.5(a)(iii) (any such deleted Business Contract or Real Property Lease, an "**Eliminated Agreement**"), it shall be an Excluded Asset for all purposes of this Agreement, and no Liabilities arising thereunder or relating thereto shall be assumed by Purchaser or be the obligation, liability or responsibility of Purchaser.

29

(b)    At any time and from time to time after the Closing, without further consideration, each party hereto shall, at the reasonable request of the other party hereto, execute and deliver such further instruments of conveyance, assignment, assumption and transfer with respect to the Purchased Assets and the Assumed Liabilities and take such further action as may be necessary or appropriate to (i) effectuate the intent of this Agreement, (ii) perfect or record title of Purchaser in the Purchased Assets, (iii) put Purchaser in possession of the Purchased Assets and ensure that Purchaser assumes the Assumed Liabilities and (iv) provide such other party in all material respects with the intended benefits of this Agreement.  If Purchaser receives or becomes aware that it holds any of the Excluded Assets, Purchaser agrees to promptly return or cause the return to Seller of, or allow Seller or its Representatives to remove and recover, such assets at Purchaser's sole cost and expense.  In furtherance of the foregoing, with respect to such Excluded Assets that Seller will remove and recover, Purchaser shall grant to Seller and its Representatives reasonable access to Purchaser's property from and after the Closing to permit Seller and its Representatives to remove and recover such Excluded Assets and make any other appropriate arrangements with respect thereto.  If Seller receives or becomes aware that it holds any of the Purchased Assets, Seller agrees to promptly return or cause the return to Purchaser of, or allow Purchaser or its Representatives to remove and recover, such assets at Seller's sole cost and expense.  In furtherance of the foregoing, with respect to such Purchased Assets that Purchaser will remove and recover, Seller shall grant to Purchaser and its Representatives reasonable access to Seller's property from and after the Closing to permit Purchaser and its Representatives to remove and recover such Purchased Assets and make any other appropriate arrangements with respect thereto.

2.6    <u>Required Consents</u>.

(a)    Notwithstanding anything to the contrary contained herein, to the extent that the sale, conveyance, transfer, assignment or delivery or attempted sale, conveyance, transfer, assignment or delivery to Purchaser of any Purchased Asset or Tug Boat pursuant to sections 363 and 365 of the Bankruptcy Code is prohibited by any applicable Law or Order or would require the Consent of any Third Party or any Governmental Entity and such Consent cannot be effectively overridden or canceled by the Sale Order or other related Order of the Bankruptcy Court or shall otherwise not have been obtained prior to Closing, this Agreement shall not constitute a sale, conveyance, transfer, assignment or delivery, or an attempted sale, conveyance, transfer, assignment or delivery of such Purchased Asset or Tug Boat (a "**Deferred Asset**") and the provisions set forth below in <u>Section 2.6(c)</u> shall govern; <u>provided</u>, <u>however</u>, that with respect to any Deferred Terminal Parcels, the provisions set forth in <u>Section 7.28</u> shall govern.  For the avoidance of doubt, nothing in this <u>Section 2.6</u> shall limit or have an effect on the conditions to Closing set forth in <u>Section 8.1(e)</u> (in respect of the Required Governmental Approvals) or <u>Section 8.2(d)</u> (in respect of the Other Required Approvals).

(b)    Following the Closing, the Parties shall have a continuing obligation to use their respective commercially reasonable efforts to cooperate with each other and to obtain promptly all Consents that cannot be effectively overridden or canceled by the Sale Order or other related Order of the Bankruptcy Court and that are necessary for the transfer of the Deferred Assets and each Party shall provide all of the assistance that is reasonably requested by the other Party in connection with securing such Consents; <u>provided</u>, that the Parties' obligations under this <u>Section 2.6(b)</u> and <u>Section 2.6(c)</u> shall be subject to the Efforts Conditions.

30

(c)      To the extent that Consent is not received and cannot be effectively overridden or canceled by the Sale Order or other related Order of the Bankruptcy Court in respect of any Deferred Asset as of Closing, the Parties shall reasonably cooperate with each other and use their respective commercially reasonable efforts to enter into any lawful and feasible arrangement pursuant to which Purchaser will obtain (for no additional cost or consideration) the same rights and benefits, and assume the same obligations, with respect to such Deferred Asset following the Closing, of Seller or HOVIC, as applicable, immediately prior to the Closing, whereby: (i) Purchaser shall be responsible for performing all obligations in respect of such Deferred Asset required to be performed by Seller or HOVIC, as applicable, after the Closing to the extent set forth in this Agreement; (ii) Seller or HOVIC, as applicable, shall give such commercially reasonable assistance as Purchaser may reasonably require to enable Purchaser to enforce its rights under such Deferred Asset and to ensure that Purchaser has the sole and exclusive right to direct and control the exercise or waiver of any rights under such Deferred Asset; and (iii) Seller and HOVIC, as applicable, shall promptly pay to Purchaser, when received, all monies received by Seller and HOVIC, as applicable, under any such Deferred Asset; provided, that Purchaser shall not be responsible for any Liabilities under any such Deferred Asset to the extent constituting Excluded Liabilities or arising from any negligence or misconduct by Seller, or any failure by Seller or its Affiliates to comply with Law, the terms of such Deferred Asset, this Agreement or any of the Transaction Documents.  Upon obtaining the requisite Consent, Seller or HOVIC, as applicable, shall promptly convey, transfer, assign and deliver, or cause to be conveyed, transferred, assigned and delivered, such Deferred Asset to Purchaser at no additional cost.

## ARTICLE III

## PURCHASE PRICE

3.1      Purchase Price; Delivery of Funds.  At the Closing, Purchaser shall in full consideration for the sale and transfer by Seller of the Purchased Assets and for the sale and transfer by HOVIC of the Tug Boats (a) pay to Seller an amount (such amount, the "**Closing Payment**") equal to (i) the Purchase Price, less (ii) the Good Faith Deposit Amount, less (iii) the Pinnacle Cure Amount, less (iv) the USVI Government Concession Fee, by wire transfer of immediately available funds to an account designated by Seller in writing to Purchaser at least three (3) Business Days prior to the Closing; (b) together with Seller, execute and deliver a joint written instruction to the Escrow Agent instructing it to release from the Escrow Account to Seller by wire transfer of immediately available funds to an account designated by Seller, an amount equal to the Good Faith Deposit Amount, and (c) assume the Assumed Liabilities.

3.2      Good Faith Escrow Deposit.

(a)      Purchaser has paid to the Escrow Agent the Good Faith Deposit Amount, which funds shall be held in the Escrow Account by the Escrow Agent and invested as provided for in the Escrow Agreement and released by the Escrow Agent only in accordance with the terms of this Agreement and the Escrow Agreement.

31

(b)     If the Closing occurs, then the Good Faith Deposit Amount, shall be paid to Seller and the applicable Parties shall submit joint written instructions to the Escrow Agent (in accordance with Section 3.1) to give effect to the same.

(c)     If the Closing does not occur as a result of the termination of this Agreement by Seller pursuant to Section 9.1(c), then within five (5) Business Days of such termination, the Good Faith Deposit Amount shall be disbursed to Seller by the Escrow Agent as liquidated damages and the applicable Parties shall submit joint written instructions to the Escrow Agent to give effect to the same.

(d)     If the Closing does not occur as a result of the termination of this Agreement for any reason other than as set forth in Section 3.2(c), then the Good Faith Deposit Amount shall be returned to Purchaser by the Escrow Agent within five (5) Business Days of such termination, and the applicable Parties shall submit joint written instructions to the Escrow Agent to give effect to the same.

(e)     The parties hereto acknowledge that the agreements contained in this Section 3.2 are an integral part of the transactions contemplated by this Agreement and that without these agreements neither Seller nor Purchaser would enter into this Agreement.

3.3     Allocation of the Purchase Price.

(a)     Seller and Purchaser agree to allocate the Purchase Price, Assumed Liabilities, and any other items constituting or adjusting consideration for applicable income Tax purposes (collectively, the "**Tax Purchase Price**") among the Purchased Assets and the Tug Boats.

(b)     Seller shall provide Purchaser with draft allocations pursuant to Section 3.3(a) that comply with Section 1060 of the Code and the Treasury regulations promulgated thereunder as soon as commercially practicable and shall use reasonable efforts to provide such draft allocations twenty (20) days prior to the Closing Date.  If Seller provides Purchaser with such draft allocations twenty (20) days prior to the Closing Date then Seller and Purchaser shall use commercially reasonable efforts to reach agreement on the allocations prior to the Closing Date.  If Seller does not provide Purchaser with such draft allocations at least twenty (20) days prior to the Closing Date, then Seller shall provide Purchaser with such draft allocation as soon as commercially practicable after the Closing Date (and in any event within sixty (60) days after the Closing Date).  If Purchaser disagrees with the draft allocations provided by Seller, then Purchaser may, within ten (10) days after Seller provided the draft allocations, deliver written notice to Seller setting forth in reasonable detail Purchaser's objection(s) to the draft allocations.  If Purchaser does not duly deliver timely written notice of any objections pursuant to the previous sentence, then Purchaser shall be deemed to have agreed to Seller's draft allocations.  However, if Purchaser does duly deliver timely written notice of objections to the draft allocations, then Seller and Purchaser shall negotiate in good faith to resolve such objections and to reach agreement on the allocations; provided, that if Seller and Purchaser are not able to reach agreement within ten (10) days after Purchaser delivered its written notice of objections to Seller, then Seller and Purchaser shall submit the unresolved issues for prompt resolution to a nationally recognized accounting firm that is mutually agreed upon by Seller and Purchaser.    The

32

determination of such accounting firm shall be binding on Seller and Purchaser, and Seller and Purchaser shall each bear one-half of the costs and expenses of such accounting firm. The final allocations (as agreed upon, as deemed agreed upon or as determined by such accounting firm, as the case may be, and as updated, if applicable, pursuant to the next sentence) shall be referred to as the "**Allocation**." In the event of any subsequent adjustment to the Tax Purchase Price, Seller and Purchaser shall work together in good faith to agree upon an updated Allocation to reflect such adjustment, taking into account applicable Law and the nature of the circumstances giving rise to the relevant adjustment. Seller and Purchaser shall, and shall cause their Affiliates to, report consistently with the Allocation in all Returns, including IRS Form 8594, which Purchaser and Seller shall timely file with the appropriate Taxing authority, and Seller, Purchaser and each of their respective Affiliates shall not file any Return or other document or otherwise take any position that is inconsistent with the Allocation determined pursuant to this Section 3.3(b), except as may be adjusted by subsequent agreement following an audit by the Virgin Islands Bureau of Internal Revenue or the IRS or by an Order.

(c)    The Parties shall promptly inform one another of any challenge by any Governmental Entity to any allocation made pursuant to this Section 3.3 and agree to consult in good faith with and keep one another informed with respect to the state of, and any discussion, proposal or submission with respect to, such challenge; provided, that nothing in this Section 3.3 shall require Seller, Purchaser or their Affiliates to litigate before any court any proposed deficiency or adjustment by any Governmental Entity challenging the Allocation.

3.4    Withholding. Purchaser, and any Person acting on its behalf, shall be entitled to deduct and withhold any amounts in connection with the transactions contemplated by this Agreement that are required to be deducted and withheld under applicable Law; provided, however, Purchaser shall not withhold any amounts under the Foreign Investment in Real Property Tax Act ("**FIRPTA**") rules if it receives the certificates described in Section 3.5(b)(viii) and in Section 3.5(d)(iii). To the extent any such amounts are deducted or withheld, such amounts shall be treated as having been paid to the Person in respect of which the deduction or withholding was made. Seller shall (and shall cause its Affiliates to) cooperate with Purchaser reasonably and in good faith, to enable Purchaser to apply for and obtain a withholding certificate on a timely basis upon which Purchaser can rely from the applicable United States and/or United States Virgin Islands Tax authorities, stating that no withholding is required in connection with the transactions contemplated by this Agreement; provided, that the Parties acknowledge and agree that (a) Purchaser's application for a withholding certificate may not result in its receipt of such certificate and Purchaser may be required to bear withholding Taxes which cannot be deducted or withheld from amounts paid to Seller under this Agreement ("**Purchaser Borne Withholding Taxes**") and (b) Purchaser's receipt of a withholding certificate shall not be a condition to Closing. In furtherance of and without limiting the foregoing, Seller shall promptly provide to Purchaser upon request any relevant addresses, identifying numbers, depreciation schedules, other evidence confirming adjusted basis, a calculation of the maximum tax that may be imposed in connection with the Purchase, a calculation of Seller's unsatisfied withholding liability (or evidence that no such liability exists) and any other information and documentation reasonably requested by Purchaser in connection with applying for and obtaining any such withholding certificate. In addition, Seller shall (and shall cause its Affiliates to) reasonably cooperate with Purchaser in good faith to the extent permitted by Law to apply for and obtain a refund of any Purchaser Borne Withholding Tax that

33

is remitted by Purchaser to a Governmental Entity in connection with the transactions contemplated by this Agreement, and to the extent Seller or its Affiliates receive a refund of any such Purchaser Borne Withholding Tax, Seller shall cause such refund to be paid to Purchaser.

3.5     Closing; Closing Deliverables.

(a)     Subject to the satisfaction or waiver of all of the conditions set forth in Sections 8.1, 8.2 and 8.3, the closing of the Purchase (the "**Closing**") shall take place at the offices of White & Case LLP, 1155 Avenue of the Americas, New York, New York, 10036-2787, as soon as practicable, but in any event within five (5) Business Days, after the last of the conditions set forth in Sections 8.1, 8.2 and 8.3 is satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the fulfillment or waiver of those conditions), or at such other time, date or place as the Parties shall agree in writing.  Such date is herein referred to as the "**Closing Date**".

(b)     At the Closing, Seller shall deliver or cause to be delivered to Purchaser:

(i)     a certificate in a form reasonably satisfactory to Purchaser signed by an authorized officer of Seller, dated as of the Closing Date, confirming the matters set forth in Sections 8.2(a) and (b) with respect to Seller;

(ii)     counterparts to the assignment, transfer and conveyance instruments listed on Section 3.5 of the Seller Disclosure Letter, in each case, duly executed by Seller (as applicable);

(iii)     a counterpart to the Bill of Sale and Assignment and Assumption Agreement, duly executed by Seller;

(iv)     a counterpart to the Access Easement, duly executed by Seller;

(v)     a counterpart to the Shared Services Agreement, duly executed by Seller;

(vi)     counterparts to the Ground Leases, duly executed by Seller;

(vii)     a certificate, duly completed and executed by Seller and dated as of the Closing Date, in the form of Exhibit G;

(viii)     a counterpart to each Closing Cross-Easement Agreement, duly executed by Seller;

(ix)     a properly executed deed in recordable and customary form for conveyances of commercial real property in the United States Virgin Islands conveying the Purchased Real Property, which has the real property legal description approved by the Office of the Public Surveyor of the Government of the Virgin Islands, together with real property tax clearance letters from the Government of the Virgin Islands covering all the tax bills for all of the parcels of real property being conveyed by the deed;

34

(x)     written instructions to the Escrow Agent to release the Good Faith Deposit Amount pursuant to Section 3.1; and

(xi)    a counterpart to the Option Agreement, duly executed by Seller.

(c)     At the Closing, Purchaser shall deliver or cause to be delivered to Seller, and Seller shall have received:

(i)     the Closing Payment by wire transfer of immediately available funds to an account designated by Seller in writing to Purchaser at least three (3) Business Days prior to the Closing;

(ii)    a certificate in a form reasonably satisfactory to Seller signed by an authorized officer of Purchaser, dated as of the Closing Date, confirming the matters set forth in Sections 8.3(a) and (b);

(iii)   counterparts to the assignment, transfer and conveyance instruments listed on Section 3.5 of the Seller Disclosure Letter, in each case, duly executed by Purchaser (as applicable);

(iv)    a counterpart to the Bill of Sale and Assignment and Assumption Agreement, duly executed by Purchaser;

(v)     a counterpart to the Access Easement, duly executed by Purchaser;

(vi)    a counterpart to the Shared Services Agreement, duly executed by Purchaser;

(vii)   counterparts to the Ground Leases, duly executed by Purchaser;

(viii)  a counterpart to each Closing Cross-Easement Agreement, duly executed by Purchaser;

(ix)    written instructions to the Escrow Agent to release the Good Faith Deposit Amount pursuant to Section 3.1; and

(x)     a counterpart to the Option Agreement, duly executed by Purchaser.

(d)     At the Closing, HOVIC shall deliver or cause to be delivered to Purchaser:

(i)     two (2) counterparts to the Tug Boat Bill of Sale and Acceptance with respect to each Tug Boat, in each case duly executed by HOVIC (including any notarization, apostille or other form of authentication as required in the applicable jurisdiction for such Tug Boat);

(ii)    two (2) counterparts to the Protocol of Delivery and Acceptance with respect to each Tug Boat, in each case duly executed by HOVIC; and

35

(iii)    a certificate, duly completed and executed by HOVIC and dated as of the Closing Date, in the form of Exhibit G.

(e)    At the Closing, Purchaser shall deliver or cause to be delivered to HOVIC:

(i)    two (2) counterparts to the Tug Boat Bill of Sale and Acceptance with respect to each Tug Boat, in each case duly executed by Purchaser (including any notarization, apostille or other form of authentication as required in the applicable jurisdiction for such Tug Boat); and

(ii)    two (2) counterparts to the Protocol of Delivery and Acceptance with respect to each Tug Boat, in each case duly executed by Purchaser.

(f)    At the Closing, Purchaser shall deliver or cause to be delivered to the USVI Government, the USVI Government Concession Fee, by wire transfer of immediately available funds to an account designated by the USVI Government in writing to Purchaser.

(g)    At the Closing, Purchaser shall deliver or cause to be delivered to Pinnacle Services L.L.C., the Pinnacle Cure Amount, by wire transfer of immediately available funds to an account designated by Pinnacle Services L.L.C. in writing to Purchaser.

(h)    The Closing shall not be deemed to have occurred unless each of the items set forth in Sections 3.5(b), 3.5(c), 3.5(d), 3.5(e), 3.5(f) and 3.5(g) has been completed or waived in writing by the applicable Party.  If such items have been completed, they and the Closing shall be deemed to have been completed simultaneously.  Notwithstanding anything to the contrary in this Agreement and without limiting the generality of the immediately preceding two sentences, neither Seller nor HOVIC shall acquire any right, title or interest in the funds transferred in respect of the Purchase Price, and Purchaser shall not acquire any right, title or interest in the Purchased Assets or the Tug Boats, except upon actual receipt by Seller of the Closing Payment in the bank account designated by Seller pursuant to Section 3.1.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the disclosure letter delivered by Seller to Purchaser (the "**Seller Disclosure Letter**") concurrently with the execution of this Agreement (it being agreed that any matter disclosed pursuant to any section of the Seller Disclosure Letter shall be deemed disclosed for purposes of any other section of the Seller Disclosure Letter to the extent the applicability of the disclosure to such other section is reasonably apparent on the face of such disclosure), Seller hereby represents and warrants to Purchaser as follows as of the date hereof and as of the Closing Date (or as of such other date as may be specified herein):

4.1    Due Organization, Good Standing and Limited Liability Company Power.  Seller is duly organized, validly existing and in good standing under the Laws of the U.S. Virgin Islands.  Seller has all requisite limited liability company power and authority to own, lease and operate its assets and properties and conduct its business as now being conducted.  Seller is in good standing under the laws of each jurisdiction where the character of its assets or properties

36

or the conduct of its business requires such qualification, except where the failure to be in good standing would not reasonably be expected to materially and adversely affect the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, or prevent or materially delay beyond the End Date Seller's ability to consummate the transactions contemplated by this Agreement or the Transaction Documents.

4.2    Authorization; Noncontravention.

(a)    Subject to obtaining Bankruptcy Court approval pursuant to the Sale Order, Seller has the requisite limited liability company power and authority and has taken all limited liability company action necessary to execute and deliver this Agreement, the Transaction Documents and all other instruments and agreements to be delivered by Seller as contemplated hereby, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. Subject to obtaining Bankruptcy Court approval pursuant to the Sale Order, the execution, delivery and performance by Seller of this Agreement, the Transaction Documents and all other instruments and agreements to be delivered by Seller as contemplated hereby, the consummation by Seller of the transactions contemplated hereby and thereby and the performance of its obligations hereunder and thereunder have been, and in the case of documents required to be delivered at the Closing will be, duly authorized and approved by all necessary limited liability company, member or other action. This Agreement has been, and the Transaction Documents and all other instruments and agreements to be executed and delivered by Seller as contemplated hereby will be, duly executed and delivered by Seller. Subject to obtaining Bankruptcy Court approval pursuant to the Sale Order, assuming that this Agreement, the Transaction Documents and all such other instruments and agreements constitute valid and binding obligations of Purchaser and each other Person (other than Seller or any Affiliate thereof) party hereto and thereto, this Agreement, the Transaction Documents and all such other instruments and agreements constitute valid and binding obligations of Seller, enforceable against Seller in accordance with the terms thereof, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether considered in a proceeding in equity or at law).

(b)    Except as a result of the Bankruptcy Case and, subject to obtaining Bankruptcy Court approval pursuant to the Sale Order, the execution and delivery by Seller of this Agreement, the Transaction Documents and all other instruments and agreements to be delivered by Seller as contemplated hereby do not, and the consummation of the transactions contemplated hereby and thereby will not:

(i)    conflict with any of the provisions of the certificate of formation of Seller or the Hovensa Operating Agreement;

(ii)    except as provided in Section 4.2(b)(ii) of the Seller Disclosure Letter and subject to receipt of the Consents set forth in Section 4.3 of the Seller Disclosure Letter, conflict with or result in a breach of, or constitute a default under or give rise to any right of termination, cancellation, modification or acceleration (including any right of first refusal or similar right) or the loss of a benefit under, or require the Consent of or giving of notice to any Person under any Business Contract, Business

37

Permit or Real Property Lease (in each case, with or without notice or lapse or time or both); except, in the case of this clause (ii) for such conflicts or breaches or Consents or notices that (if not received) would not reasonably be expected to materially and adversely affect the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, or prevent or materially delay beyond the End Date Seller's ability to consummate the transactions contemplated by this Agreement or the Transaction Documents;

(iii)    subject to the receipt of the Consents referred to in <u>Section 4.3</u> of the Seller Disclosure Letter, contravene any Law or any Order applicable to Seller or by which any of its properties or assets are bound except such contraventions that would not reasonably be expected to materially and adversely affect the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, or prevent or materially delay beyond the End Date Seller's ability to consummate the transactions contemplated by this Agreement or the Transaction Documents; or

(iv)    result in the creation or imposition of any Lien (other than a Permitted Lien) on any of the Purchased Assets.

4.3    <u>Governmental Consents and Approvals</u>.  Except as a result of the Bankruptcy Case and, subject to obtaining Bankruptcy Court approval pursuant to the entry of the Sale Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in rules 6004(h) and 3020(e) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), as applicable, except as set forth in <u>Section 4.3</u> of the Seller Disclosure Letter, no Consent of or filing with any Governmental Entity must be obtained or made by Seller in connection with the execution and delivery of this Agreement or any Transaction Document by Seller or the consummation by Seller of the transactions contemplated by this Agreement or any Transaction Document, except for any Consents that, if not obtained or made, would not reasonably be expected to materially adversely affect the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, or prevent or materially delay beyond the End Date Seller's ability to consummate the transactions contemplated by this Agreement or the Transaction Documents.

4.4    <u>Property</u>.  (a) Other than the Real Property, Seller owns no other real property. Seller has good and valid title to the Purchased Real Property (other than any Excluded Asset), subject to Permitted Liens.  There are no outstanding options, rights of first offer or rights of first refusal to purchase any Purchased Real Property or any portion thereof or interest therein.  Seller has not leased or otherwise granted to any Person the right to use or occupy the Purchased Real Property or any material portion thereof, except as set forth in <u>Section 4.4(b)</u> of the Seller Disclosure Letter.  Other than the Deferred Terminal Parcels, each parcel of Purchased Real Property constitutes a legally subdivided lot in compliance with all applicable subdivision Laws, separate from any adjoining land or improvements.

(b)    <u>Section 4.4(b)</u> of the Seller Disclosure Letter contains an accurate and complete list as of the date hereof of all Real Property Leases and all other real property leases and subleases to which Seller is a party, and sets forth the role of Seller.  With respect to each Real Property Lease pursuant to which Seller is a lessee or sublessee, Seller has valid leasehold interests in all leased real property described in such Real Property Lease, free and clear of any

38

and all Liens, except for Permitted Liens. Each Real Property Lease is a valid and binding obligation of Seller and, to the Knowledge of Seller, is enforceable against the other parties thereto in accordance with the terms thereof, in each case, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether considered in a proceeding in equity or at law). Except as set forth in Section 4.4(b), of the Seller Disclosure Letter, there exists no material default or event of default (with or without notice or lapse of time or both) with respect to any Real Property Lease by Seller or, to the Knowledge of Seller, by any other party thereto and Seller has not received or delivered any notice with respect to any alleged material default that has not been rescinded or completely cured. Seller has not subleased or otherwise granted any Person the right to use or occupy any material portion of the real property leased or subleased by Seller pursuant to any Real Property Lease.

(c)    There are no assets or properties of Seller that are used or necessary for the use, maintenance and operation of the Business Real Property as currently used, maintained and operated by Seller that are not included in Purchased Assets or that will not be available to Purchaser by means of the Shared Services Agreement or the Cross-Easement Agreements, except for such assets or properties that (if not so included or accessible) are not material to Seller's current use, maintenance and operation of the Business Real Property. To the Knowledge of Seller, there is no, and Seller has not received written notice of any, existing or threatened change in the zoning classification of any Business Real Property (or any portion thereof) from that in effect on the date of this Agreement, in each instance, which would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. All water, sewer, gas, electric, telephone and drainage facilities and all other utilities and public or quasi-public improvements related thereto required by Law with respect to, or required for the operation of, the Business at the Business Real Property, are installed and available to serve the Business Real Property. There are no pending or, to the Knowledge of Seller, threatened, material interruptions (except in the ordinary course) of any utility services to any material portion of the Business Real Property. The Business Real Property has sufficient access to and from dedicated streets, whether over public or private roads, for the operation of the Business, and the responsibility for maintenance of such dedicated streets has, to the Knowledge of Seller, been accepted by the appropriate Governmental Entity. No condemnation proceeding, lawsuit or administrative action or other matter affecting and adversely impairing the current use or occupancy of the Business Real Property is pending or, to the Knowledge of Seller, threatened in writing with respect to any Business Real Property which has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. To the Knowledge of Seller, there has been no material casualty damage at any of the Business Real Property that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(d)    Except as set forth in Section 4.4(d) of the Seller Disclosure Letter, and excluding Purchased Real Property (which is governed by Section 4.4(a) above), Seller owns and has good and valid title to, or a valid leasehold interest in, all personal property included in the Purchased Assets, free and clear of all Liens, except for Permitted Liens.

4.5    Affiliate Transactions. Except for the Hovensa Operating Agreement and as

disclosed in <u>Section 4.5</u> of the Seller Disclosure Letter and except for employment and consultant relationships and compensation, benefits, travel advances and employee or consultant loans to any officer, director, employee or consultant of Seller, in each case, in the ordinary course of business, there is no Contract or Liability relating primarily to the Business, the Purchased Assets or the Assumed Liabilities between (a) Seller, on the one hand, and (b) any Affiliate, equity holder, option holder, officer, member, partner or director of Seller, on the other hand, that remains in force and provides for obligations of any party from and after the Closing.

4.6    <u>Material Contracts</u>.

(a)    <u>Section 4.6</u> of the Seller Disclosure Letter sets forth (organized to refer to each of the clauses in this <u>Section 4.6</u>) an accurate, correct and complete list of the following Contracts to which Seller is a party and which are currently in effect as of the date hereof:

(i)    each Contract that is not a Business Contract and that is (A) with any current or former customer of, or supplier to, the Business or (B) material to the operation of Business (assuming the Business includes an Operational Terminals Business);

(ii)    each Contract whereby Seller has created a Lien in respect of any of the Purchased Assets;

(iii)    each Business Contract containing any covenant limiting the freedom of Seller or any of its Affiliates (A) to compete with any Person, engage in any line of business or exploit the Purchased Assets, in each case, in any geographic territory, (B) which grants to any Person any exclusivity with respect to any geographic territory, any customer or any product or service or (C) to solicit for employment, hire or employ any Person;

(iv)    each Business Contract that requires capital expenditures or other outstanding payments to be made by Seller, in each case, following the date hereof;

(v)    each Business Contract involving the sharing of profits, losses, costs or liabilities with any other Person relating to the Business, the Purchased Assets or the Assumed Liabilities;

(vi)    each Business Contract that requires (or may require in certain circumstances) in accordance with its terms the provision of credit support, collateral, a guarantee or similar financial assurance in respect of the Business, the Purchased Assets or the Assumed Liabilities;

(vii)    each Business Contract that (A) provides services for a fixed price or maximum fee, or pursuant to any cap or similar provisions; (B) grants "most favored nation" status (or similar status) to a Person (whether in respect of pricing or otherwise) or (C) provides any performance guarantee, material rebates, discounts, incentive or volume credits;

40

(viii)    each Contract that involves the resolution or settlement of any actual or threatened Proceeding relating to the Business, the Purchased Assets or the Assumed Liabilities; and

(ix)    each Contract with any Governmental Entity relating to the Business, the Purchased Assets or the Assumed Liabilities.

(b)    The Contracts required to be listed in Section 4.6(a), together with the Business Contracts and the Real Property Leases are referred to as "**Material Contracts**." True, correct and complete copies of each Material Contract have been made available to Purchaser prior to the date hereof. Each Business Contract is a valid and binding obligation of Seller (except for any breach or default that results from the insolvency of Seller or the commencement of the Bankruptcy Case and any breach or default to be cured through the payment of the Cure Amounts) and to the Knowledge of Seller, enforceable against the other parties thereto in accordance with the terms thereof, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether considered in a proceeding in equity or at law). Except as set forth in Section 4.6 of the Seller Disclosure Letter and any breach or default that results from the insolvency of Seller or the commencement of the Bankruptcy Case and any breach or default to be cured through the payment of the Cure Amounts, there exists no material default or event of default (with or without notice or lapse of time or both) with respect to any Business Contract by Seller or, to the Knowledge of Seller, by any other party thereto and Seller has not received or delivered any notice with respect to any alleged material default that has not been rescinded or completely cured.

4.7    Intellectual Property Rights and Claims.  (a) Except as set forth in Section 4.7(a) of the Seller Disclosure Letter, Seller owns all right, title, and interest to or is licensed to use the Business Intellectual Property, free and clear of any Liens, other than Permitted Liens.

(b)    Seller has not, within the last twelve (12) months made any written claim of an infringement or misappropriation by any Third Party of its rights to any Business Intellectual Property, which claim is still pending. To the Knowledge of Seller, no Third Party is infringing or misappropriating any Business Intellectual Property.

(c)    Except for claims that have since been satisfactorily resolved or for which the statute of limitations has lapsed, Seller has not received any written notice from any Third Party challenging the right of Seller to use any of the Business Intellectual Property that would reasonably be expected to materially and adversely affect the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole (assuming the Business includes an Operational Terminals Business).

(d)    There are no pending actions, suits or arbitrations by, before or against any Person or Governmental Entity for an infringement or misappropriation by Seller of any Intellectual Property owned by any Third Party which would reasonably be expected to materially and adversely affect the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole (assuming the Business includes an Operational Terminals Business).

41

4.8     Tax Matters.  Except as set forth in Section 4.8 of the Seller Disclosure Letter:

(a)     Tax Returns.  Seller has timely filed or caused to be timely filed, taking into account any applicable extensions, with the appropriate taxing authorities all income Tax Returns and all material non-income Tax Returns with respect to the Business or the Purchased Assets.  All such Returns are correct and complete in all material respects.  Seller is not currently the beneficiary of any extension of time within which to file any material tax Return with respect to the Business or the Purchased Assets.  No claim has ever been made by a Governmental Entity in a jurisdiction in which Seller does not file Returns that Seller is or may be subject to taxation by that jurisdiction with respect to Taxes that would be the subject of such Returns.

(b)     Payment of Taxes.  All income Tax Liabilities and all material non-income Tax Liabilities of Seller due and payable with respect to the Business or the Purchased Assets, in each instance for all Pre-Closing Periods, have been timely paid, taking into account any applicable extensions, to the extent the non-payment of such Taxes could reasonably be expected to result in a Lien (other than a Permitted Tax Lien) on the Purchased Assets, adversely affect the Business, or result in Purchaser becoming liable for such Taxes.  There are no pending or threatened audits, investigations, disputes, notices of deficiency, claims or other similar actions relating to Property Taxes or any other Taxes that are imposed on a periodic basis (which are not based on income) of Seller with respect to the Business or the Purchased Assets.  Seller has not waived any statute of limitations in respect of non-income Taxes or agreed to any extension of time with respect to a non-income Tax assessment or deficiency.

(c)     Withholding Taxes.  All material Taxes that Seller is (or was) required by Law to withhold or collect on or prior to the date hereof in connection with amounts paid or owing to any employee, independent contractor, creditor, equity holder or other Third Party have been duly withheld or collected, and have been timely paid over to the proper authorities to the extent due and payable, to the extent the non-payment of such Taxes could reasonably be expected to result in a Lien (other than a Permitted Tax Lien) on the Purchased Assets, adversely affect the Business, or result in Purchaser becoming liable for such Taxes.

(d)     Liens.  There are no Liens for Taxes on any of the Purchased Assets, other than Permitted Liens.

(e)     Depreciation.  No Purchased Asset (i) is property required to be treated as owned by another person pursuant to the provisions of Section 168(f)(8) of the Internal Revenue Code of 1954, as amended and in effect immediately prior to the enactment of the Tax Reform Act of 1986, (ii) constitutes "tax-exempt use property" within the meaning of Section 168(h) of the Code, (iii) is "tax-exempt bond financed property" within the meaning of Section 168(g) of the Code, (iv) secures any debt the interest of which is tax-exempt under Section 103(a) of the Code or (v) is subject to a "section 467 rental agreement" within the meaning of Section 467 of the Code.

(f)     The representations and warranties contained in Section 4.8(a) and Section 4.8(b) shall only apply if and to the extent Purchaser or its Affiliates could be held liable for the Taxes to which such representations and warranties relate or if the Purchased Assets could become subject to a Lien (other than a Permitted Tax Lien) in respect of such Taxes and, for the

42

avoidance of doubt, such representations and warranties shall not be considered inaccurate or breached to the extent the applicable representation or warranty does not apply as a result of this Section 4.8(f).

4.9    Employee Benefits.  Set forth in Section 4.9(a) of the Seller Disclosure Letter is, as of February 15, 2015, a true and complete list of each material employee benefit plan, within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), and each material fringe benefit, deferred compensation, severance, stock option, stock appreciation rights, incentive and bonus plan maintained or contributed to, or required to be contributed to, by Seller or its Affiliates, in each case for the benefit of Seller's employees as of such date, but excepting any such plan sponsored in whole or in part by any government, Governmental Entity or union or employee organization or any other Person (collectively, the "**Employee Benefit Plans**").

4.10    Compliance with Laws.  Except as set forth in Section 4.10 of the Seller Disclosure Letter, (a) Seller is not, and has not been in the past three (3) years, in material violation of any Law or Order applicable to the Business, the Purchased Assets or the Assumed Liabilities, and (b) Seller has not received any written notice alleging or, to the Knowledge of Seller, been subject to any investigation by any Governmental Entity concerning, any such material violation of a Law or Order.

4.11    Labor Matters.  Section 4.11 of the Seller Disclosure Letter sets forth each consultant of Seller as of the date hereof who is a natural person and indicates which of such consultants are former employees of Seller or any of its Affiliates (each such former employee, a "**Hovensa Consultant**").  Since May 1, 2015, Seller has not had any employees.  Since January 1, 2015, no Hovensa Consultant has been improperly excluded from participation in any Employee Benefit Plan, and Seller has no direct or indirect liability, whether absolute or contingent, with respect to any misclassification of any Hovensa Consultant as an independent contractor rather than as an employee, except for such exclusion or misclassification that would not reasonably be expected to result in, individually or in the aggregate, a material Assumed Liability.  Seller is in compliance in all material respects with the terms of the Pinnacle Contract, except for such non-compliance that would not reasonably be expected to result in, individually or in the aggregate, a material Assumed Liability.

4.12    Environmental Matters.  Except as set forth in Section 4.12 of the Seller Disclosure Letter, with respect to the Business:

(a)    Seller is in material compliance with all applicable Environmental Laws, and Orders including the Consent Decree and NRD Settlement Agreement;

(b)    there are no Proceedings pending, or to the Knowledge of Seller threatened in writing, against Seller that alleges any material violation of Environmental Law and Seller has not received from any Person any written notice of material violation or alleged material violation of Environmental Law;

(c)    Seller possesses and is in material compliance with all Permits (including the RCRA Permit) required under Environmental Laws to operate the Business as currently operated and as the Business is expected to be operated following the Closing as contemplated

43