**<u>Exhibit A</u>**

**EXECUTION COPY**

**AMENDED AND RESTATED**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**LIMETREE BAY TERMINALS, LLC,**

**LIMETREE BAY HOLDINGS, LLC,**

**HOVENSA L.L.C.,**

**AND**

**HESS OIL VIRGIN ISLANDS CORP.**

**DATED JANUARY 4, 2016**

ARTICLE I DEFINITIONS; CONSTRUCTION ........................................................................ 2

    1.1    Defined Terms ........................................................................................... 2
    1.2    Additional Defined Terms ....................................................................... 19
    1.3    Construction ............................................................................................. 21
    1.4    Exhibits and the Disclosure Letters ........................................................ 22
    1.5    Knowledge ............................................................................................... 22

ARTICLE II SALE OF ASSETS ........................................................................................... 22

    2.1    Sale of Purchased Assets and Tug Boats ............................................... 22
    2.2    Excluded Assets ...................................................................................... 24
    2.3    Assumption of Liabilities ....................................................................... 26
    2.4    Excluded Liabilities ................................................................................ 28
    2.5    Assumption and Assignment of Contracts .............................................. 30
    2.6    Required Consents .................................................................................. 31

ARTICLE III PURCHASE PRICE ........................................................................................ 32

    3.1    Purchase Price; Delivery of Funds ......................................................... 32
    3.2    Good Faith Escrow Deposit. ................................................................... 33
    3.3    Allocation of the Purchase Price ............................................................ 33
    3.4    Withholding ............................................................................................. 34
    3.5    Closing; Closing Deliverables ................................................................ 35

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER .............................. 38

    4.1    Due Organization, Good Standing and Limited Liability Company Power ......... 39
    4.2    Authorization; Noncontravention ........................................................... 39
    4.3    Governmental Consents and Approvals .................................................. 40
    4.4    Property ................................................................................................... 40
    4.5    Affiliate Transactions ............................................................................. 42
    4.6    Material Contracts .................................................................................. 42
    4.7    Intellectual Property Rights and Claims ................................................. 43
    4.8    Tax Matters ............................................................................................. 44
    4.9    Employee Benefits .................................................................................. 45
    4.10    Compliance with Laws ........................................................................... 45
    4.11    Labor Matters ......................................................................................... 45
    4.12    Environmental Matters ........................................................................... 45
    4.13    Finders; Brokers ..................................................................................... 46
    4.14    Permits .................................................................................................... 46
    4.15    Absence of Changes ............................................................................... 46
    4.16    Litigation ................................................................................................ 47
    4.17    Title to Purchased Assets ........................................................................ 47
    4.18    Insurance ................................................................................................. 47
    4.19    Compliance. ............................................................................................ 47
    4.20    Exclusivity of Representations; Projections, etc .................................... 48

ARTICLE V REPRESENTATIONS AND WARRANTIES OF HOVIC ................................... 48

| 5.1 | Due Organization, Good Standing and Corporate Power ..................................... 49 |
| 5.2 | Authorization; Noncontravention. ......................................................................... 49 |
| 5.3 | Governmental Consents and Approvals .................................................................. 50 |
| 5.4 | Litigation ............................................................................................................... 50 |
| 5.5 | Title to Tug Boats ................................................................................................. 50 |
| 5.6 | Exclusivity of Representations; Projections, etc .................................................... 50 |

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PURCHASER ...................... 51

| 6.1 | Due Organization, Good Standing and Limited Liability Company Power of Purchaser ............................................................................................................... 51 |
| 6.2 | Authorization; Noncontravention ......................................................................... 51 |
| 6.3 | Governmental Consents and Approvals .................................................................. 52 |
| 6.4 | Financing ................................................................................................................ 52 |
| 6.5 | Litigation ............................................................................................................... 53 |
| 6.6 | Finders; Brokers .................................................................................................... 53 |
| 6.7 | Investigation by Purchaser .................................................................................... 53 |
| 6.8 | Solvency of Purchaser ............................................................................................ 54 |
| 6.9 | Exclusivity of Representations .............................................................................. 54 |

ARTICLE VII COVENANTS ............................................................................................... 55

| 7.1 | Access to Information Concerning Properties and Records ................................ 55 |
| 7.2 | Conduct Pending the Closing Date ....................................................................... 56 |
| 7.3 | Employee Relations and Benefits .......................................................................... 58 |
| 7.4 | Efforts to Close ..................................................................................................... 58 |
| 7.5 | Public Announcements .......................................................................................... 60 |
| 7.6 | Notification of Certain Matters ............................................................................. 60 |
| 7.7 | Supplements to Schedules ...................................................................................... 60 |
| 7.8 | Post-Closing Access to Records and Personnel; Litigation Support ................... 61 |
| 7.9 | Compliance with WARN, Plant Closing Act and Similar Statutes ..................... 62 |
| 7.10 | Tax Matters ........................................................................................................... 63 |
| 7.11 | USVI Concession Agreement ................................................................................ 64 |
| 7.12 | Remediation Access Easement ............................................................................. 64 |
| 7.13 | Bulk Sales Act ....................................................................................................... 65 |
| 7.14 | Bankruptcy Action ................................................................................................ 65 |
| 7.15 | Sale Order. ............................................................................................................. 66 |
| 7.16 | [Intentionally Omitted] ......................................................................................... 67 |
| 7.17 | Backup Bidder ....................................................................................................... 67 |
| 7.18 | Transfer of Permits; Seller Letters of Credit ....................................................... 67 |
| 7.19 | Expenses. ............................................................................................................... 69 |
| 7.20 | Breakup Fee. .......................................................................................................... 69 |
| 7.21 | Rejected Contracts ................................................................................................ 70 |
| 7.22 | Confidentiality ...................................................................................................... 70 |
| 7.23 | Seller's Marks ....................................................................................................... 71 |

(ii)

7.24    Shared Services Agreement ............................................................... 71
7.25    Permitting Process ........................................................................... 72
7.26    Registration of Tug Boats ................................................................. 72
7.27    Post-Closing Cooperation for Financial Statements ............................ 72
7.28    Division of Subdivision Parcels; Cross-Easement Agreements ............ 73
7.29    Title Policy and Survey .................................................................... 74
7.30    Additional Cross-Easement Agreements. .......................................... 74
7.31    Cooperation ................................................................................... 74
7.32    Transfer of Government Parcels ....................................................... 74
7.33    Costs and Expenses of Seller ........................................................... 75
7.34    Environmental Response Trust Insurance Policies .............................. 75

ARTICLE VIII CONDITIONS PRECEDENT ................................................... 75

8.1     Conditions to the Obligations of Each Party ...................................... 76
8.2     Conditions to the Obligations of Purchaser. ...................................... 76
8.3     Conditions to the Obligations of Seller and HOVIC ........................... 77
8.4     Frustration of Closing Conditions ..................................................... 78

ARTICLE IX TERMINATION ...................................................................... 78

9.1     Termination Events .......................................................................... 78
9.2     Effect of Termination ...................................................................... 80

ARTICLE X SURVIVAL AND RELEASE ....................................................... 81

10.1    No Survival of Representations and Warranties .................................. 81
10.2    Release .......................................................................................... 81

ARTICLE XI MISCELLANEOUS .................................................................. 81

11.1    Expenses ........................................................................................ 81
11.2    Extension; Waiver. .......................................................................... 82
11.3    Notices .......................................................................................... 82
11.4    Entire Agreement ............................................................................ 84
11.5    Binding Effect; Benefit; Assignment ................................................ 84
11.6    Amendment and Modification .......................................................... 85
11.7    Counterparts ................................................................................... 85
11.8    Applicable Law; Jurisdiction ........................................................... 85
11.9    Severability .................................................................................... 86
11.10   Specific Enforcement; Limitation on Damages .................................. 86
11.11   Waiver of Jury Trial ........................................................................ 87
11.12   Rules of Construction ...................................................................... 87
11.13   Headings ........................................................................................ 87
11.14   Non- Recourse ................................................................................ 87

Americas 90921623

## EXHIBITS

Exhibit A:      Form of Remediation Access Easement
Exhibit B:      [Intentionally Omitted]
Exhibit C:      Form of Bill of Sale and Assignment and Assumption Agreement
Exhibit D:      Form of Protocol of Delivery and Acceptance
Exhibit E:      Form of Tug Boat Bill of Sale and Acceptance
Exhibit F:      Form of USVI Concession Agreement
Exhibit G:      Form of FIRPTA Certificates
Exhibit H:      Subdivision Parcels
Exhibit I:      Form of Termination and Release for Concession Agreement, the 1976 Contract
                and the Submerged Land Lease
Exhibit J:      Form of Limetree Access Easement
Exhibit K:      Form of Closing Cross-Easement Agreement
Exhibit L:      Assignment of Purchased Submerged Lands
Exhibit M:      Miscellaneous Access Easement

## OTHER

Seller Disclosure Letter
HOVIC Disclosure Letter

Americas 90921623

## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

This AMENDED AND RESTATED ASSET PURCHASE AGREEMENT (this "**Agreement**") is dated January 4, 2016 by and among Limetree Bay Terminals, LLC, a limited liability company organized under the Laws of the U.S. Virgin Islands ("**Purchaser**"), Limetree Bay Holdings, LLC, a limited liability company organized under the Laws of Delaware ("**Limetree Delaware**"), HOVENSA L.L.C., a limited liability company organized under the Laws of the U.S. Virgin Islands ("**Seller**") and Hess Oil Virgin Islands Corp., a corporation organized under the Laws of the U.S. Virgin Islands ("**HOVIC**" and together with Purchaser, Limetree Delaware and Seller, the "**Parties**" and each a "**Party**"). Capitalized terms used herein have the meanings ascribed thereto in <u>Section 1.1</u>, unless otherwise provided.

<u>W I T N E S S E T H</u>:

WHEREAS, Seller has previously been engaged, in part, in the business of owning and operating a crude oil and product storage and terminalling business (the "**Business**");

WHEREAS, on September 15, 2015, Seller commenced a voluntary case (the "**Bankruptcy Case**") under chapter 11 of the Bankruptcy Code in the United States District Court of the U.S. Virgin Islands, Bankruptcy Court Division – St. Croix, Virgin Islands (the "**Bankruptcy Court**");

WHEREAS, Seller retains possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its business as a debtor-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, HOVIC owns the Tug Boats;

WHEREAS, in connection with the Bankruptcy Case and subject to the respective terms and conditions contained herein and in the Sale Order, Seller desires to sell and assign the Purchased Assets and the Assumed Liabilities to Purchaser, and Purchaser desires to purchase and assume the Purchased Assets and the Assumed Liabilities, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, free and clear of all Liens, Claims, and Liabilities other than Permitted Liens and Assumed Liabilities, upon the terms and conditions set forth in this Agreement (the "**Purchase**") and HOVIC desires to sell to Purchaser, and Purchaser desires to purchase, on the terms and subject to the conditions of this Agreement, the Tug Boats (the "**Tug Boat Sale**");

WHEREAS, Seller has determined, in the exercise of its business judgment, that it is advisable and in the best interest of the estate and the beneficiaries of the estate to consummate the Purchase provided for herein pursuant to the Bid Procedures Order and the Sale Order;

WHEREAS, Limetree Delaware, Seller and HOVIC entered into an Asset Purchase Agreement, dated September 4, 2015 (the "**Initial Purchase Agreement**");

WHEREAS, as a condition to the willingness of, and as a material inducement to, Seller's and HOVIC's willingness to enter into the Initial Purchase Agreement, Limetree Delaware delivered to Seller the Initial Equity Commitment Letter concurrently with the execution of the Initial Purchase Agreement;

WHEREAS, Purchaser is a Subsidiary of Limetree Delaware;

WHEREAS, the Parties desire to amend and restate the Initial Purchase Agreement in its entirety;

WHEREAS, as a condition to the willingness of, and as a material inducement to, Seller's and HOVIC's willingness to enter into this Agreement, Limetree Delaware has fully and unconditionally assigned to Purchaser its rights and obligations under the Equity Commitment Letter, and ArcLight Energy Partners Fund VI, L.P. has consented to such assignment, in each case concurrently with the execution of this Agreement;

WHEREAS, this Agreement amends and restates the Initial Purchase Agreement in its entirety; and

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, representations, warranties and agreements herein contained, the Parties, intending to be legally bound, agree as follows:

ARTICLE I

DEFINITIONS; CONSTRUCTION

1.1    Defined Terms.  When used in this Agreement, the following terms shall have the respective meanings specified therefor below:

"**1976 Contract**" shall mean that certain Contract, dated September 22, 1976, by and among the USVI Government, Seller (as assignee of HOVIC) and the Virgin Islands Port Authority, approved by the Legislature of the Virgin Islands on September 29, 1976, and including, for the avoidance of doubt, the 1976 Contract Permits.

"**1998 Letter Agreement**" shall mean that certain letter agreement, dated as of October 14, 1998 (as amended, supplemented or modified from time to time pursuant to which the USVI Government consented to (a) the assignment by HOVIC to Seller of the Submerged Land Lease and (b) the assignment and delegation by HOVIC to Hovensa of the rights and obligations of HOVIC under the 1976 Contract.

"**2012 HOVIC Note**" shall mean that certain note issued as of April 1, 2012 by Seller in favor of HOVIC in the aggregate original principal amount of $811,000,000.

"**2012 Notes**" shall mean the 2012 HOVIC Note and the 2012 Petróleo Note.

2

"**2012 Petróleo Note**" shall mean that certain note issued as of April 1, 2012 by Seller in favor of PDVSA Petróleo, S.A. in the aggregate original principal amount of $811,000,000.

"**2015 HOVIC Note**" shall mean that certain note issued as of July 8, 2015 by Hovensa in favor of HOVIC in the aggregate original principal amount of $5,000,000.

"**2015 Notes**" shall mean the 2015 HOVIC Note and the 2015 PDVSA Note.

"**2015 PDVSA Note**" shall mean that certain note issued as of July 8, 2015 by Hovensa in favor of PDVSA VI in the aggregate original principal amount of $5,000,000.

"**Above-Grade Refinery Assets**" shall mean any and all refining process units, buildings, structures, fixtures or other improvements owned by Seller that are present on the Option Refinery Property or the Leased Submerged Lands that are exclusively at or above grade, including the power plant located on the Option Refinery Property, and all equipment, personal property and fixtures, including any and all ancillary and non-structural personal property, required to operate such assets (including below-grade pumps, storage tanks, piping, electrical service and distribution system, control systems and any other associated utility infrastructure); provided, that, for the avoidance of doubt, the Above-Grade Refinery Assets shall not include any Retained Refinery Assets or other Excluded Assets. Notwithstanding the foregoing, the Above-Grade Refinery Assets shall include the above-grade portion of the ground flare present on that certain parcel of real property identified in Exhibit H as an "Excluded" parcel and located within the submerged land border.

"**Adverse Person**" shall mean (a) a Person who is a "designated national," "specially designated national," "specially designated terrorist," "specially designated global terrorist," "foreign terrorist organization," "specially designated narcotics trafficker" or "blocked person," within the definitions set forth in the OFAC Regulations, or who otherwise appears on the list of Specially Designated Nationals and Blocked Persons included in the OFAC Regulations, (b) a government, including any Governmental Entity, of any country against which the United States maintains Sanctions, (c) a Person acting or purporting to act, directly or indirectly, on behalf of, or any entity owned or controlled by, any of the Persons listed in clauses (a) or (b) above, or (d) a Person on any other export control, terrorism or drug trafficking related list administered by any Governmental Entity as that list may be amended, adjusted or modified from time to time.

"**Affiliate**" of any Person shall mean any other Person directly or indirectly controlling, controlled by, or under common control with, such Person; provided, that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise; provided, further, that none of HOVIC, PDVSA VI or their respective direct or indirect equity holders shall be deemed to "control" Seller. Notwithstanding the foregoing, for all purposes of this Agreement and the transactions contemplated hereby, (a) HOVIC and its direct and indirect equity holders are Affiliates of Seller but are not Affiliates of PDVSA VI or

3

PDVSA VI's direct and indirect equity holders and (b) PDVSA VI and its direct and indirect equity holders are Affiliates of Seller but are not Affiliates of HOVIC or HOVIC's direct and indirect equity holders.

"**Alternative Transaction**" shall mean (i) a Restructuring Transaction or (ii) one or more sales, assignments, leases, transfers, or other dispositions of all or any material portion of the Purchased Assets to any Person (or group of Persons), whether in one transaction or a series of transactions, whether by merger, asset purchase, equity purchase or other similar transaction, in each case other than to the Purchaser or its Affiliates.

"**Antitrust Laws**" shall mean the Sherman Act, 15 U.S.C. §§ 1-7, as amended, the Clayton Act, 15 U.S.C. §§ 12-27, 29 U.S.C. §§ 52-53, as amended, the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a et seq., as amended, the Federal Trade Commission Act, 15 U.S.C. § 41-58, as amended, and all other Laws and Orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization, restraint of trade, or lessening of competition through merger or acquisition.

"**Assignment of Leased Submerged Lands**" or "**Assignment of Purchased Submerged Lands**" shall mean an assignment agreement by and among Purchaser and Seller, in the form attached hereto as Exhibit L.

"**Avoidance Actions**" shall mean all preference claims, fraudulent transfer claims and avoidance actions or other related causes of action whether arising under the Bankruptcy Code, non-bankruptcy law, or otherwise, and the proceeds thereof, including actions available to Seller under Chapter 5 of the Bankruptcy Code, of whatever kind or nature, and whether asserted or unasserted.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq.

"**Bid Procedures Order**" shall mean the Order (a) Establishing Bidding Procedures Relating to the Sale of the Debtor's Assets, Including Approving Break-Up Fee and Expense Reimbursement, (b) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, (c) Approving Form and Manner of Notice Relating Thereto, and (d) Scheduling a Hearing to Consider the Proposed Sale entered by the Bankruptcy Court on October 9, 2015.

"**Bill of Sale and Assignment and Assumption Agreement**" shall mean that certain bill of sale and assignment and assumption agreement substantially in the form attached hereto as Exhibit C.

"**Breakup Fee**" shall mean an amount of cash equal to $4,700,000.

"**Business Day**" shall mean any day except a Saturday, a Sunday or any other day on which commercial banks are required or authorized to close in New York, New York or the U.S. Virgin Islands.

4

"**Business Intellectual Property**" shall mean all rights to Intellectual Property that are owned by Seller, other than the Excluded Intellectual Property.

"**Business IT Assets**" shall mean all rights to Information Technology that are owned by Seller, other than the Excluded IT Assets.

"**Business Real Property**" shall mean the Purchased Real Property and the Leased Submerged Lands, in each case together with all easements, appurtenances, rights and leases, and other hereditaments appurtenant to such land and all the estates and rights of Seller in and to such land.

"**Charter Agreements**" shall mean, with respect to each Tug Boat, the applicable Contract of Bareboat Charter Party, dated as of October 30, 1998, by and between Amerada Hess Shipping Corporation and Seller, as modified by the applicable Novation Agreement, dated as of July 20, 2001, by and among Amerada Hess Shipping Corporation, Seller and HOVIC.

"**Claim**" shall have the meaning assigned to such term under section 101(5) of the Bankruptcy Code.

"**Code**" shall mean the United States Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, as mirrored in the U.S. Virgin Islands.

"**Concession Agreement**" shall mean that certain agreement by and between the USVI Government and HOVIC, dated and approved by the Legislature of the Virgin Islands September 1, 1965, and amended, supplemented and clarified at various times by mutual agreement of the parties, as amended and extended by the Extension and Amendment Agreement, dated April 24, 1981 and approved by the Legislature of the Virgin Islands May 7, 1981, as further amended and extended by the Restated Second Extension and Amendment Agreement, dated July 27, 1990 and approved by the Legislature of the Virgin Islands on August 22, 1990, as further amended by the Technical Clarifying Amendment to Restated Second Extension and Amendment Agreement, dated November 17, 1993 and approved by the Governor and the Legislature of the Virgin Islands, as further amended and extended by the Third Extension and Amendment Agreement, to which PDVSA VI is added as a party, dated April 15, 1998 and approved by the Legislature of the Virgin Islands on May 18, 1998, as further amended by the Fourth Amendment Agreement.

"**Confidentiality Agreement**" shall mean that certain Confidentiality Agreement by and between Seller and ArcLight Capital Partners, LLC, dated April 24, 2015.

"**Consent**" shall mean any authorization, approval, consent, ratification, negative clearance, waiver, notice or filing, or a Final Order of the Bankruptcy Court that deems, or renders unnecessary, the same.

"**Consent Decree**" shall mean the Consent Decree entered on June 7, 2011 in the United States District Court of the Virgin Islands in the matter of United States of America, and United States Virgin Islands v. Hovensa L.L.C. (Civ. No.: 1:11-cv-00006).

5

"**Contract**" shall mean any note, bond, mortgage, indenture, guaranty, license, franchise, permit, agreement, contract, commitment, lease, purchase order, or other instrument or obligation, and any amendments thereto.

"**Cross-Easement Agreement**" shall mean an agreement, in form and substance reasonably acceptable to each of Seller and Purchaser, by which each of Seller and Purchaser grants the other a customary right of access upon, over, in, under, across and through a portion of its property as is reasonably required for the continued use and operation of the Purchased Real Property, the leased real property subject to any Real Property Leases (including, for the avoidance of doubt, the Leased Submerged Lands) or the Excluded Real Property by Purchaser or Seller (as applicable).

"**Cure Amounts**" shall mean, with respect to any Business Contract or Real Property Lease, the amount of cash required to be paid with respect to such Business Contract or Real Property Lease to cure all defaults under such Business Contract or Real Property Lease to the extent required by Section 365 of the Bankruptcy Code and to otherwise satisfy all requirements imposed by Section 365 of the Bankruptcy Code in order to effectuate, pursuant to the Bankruptcy Code, the assumption by Seller and assignment to Purchaser of such Business Contract or Real Property Lease.

"**Disclosure Conditions**" shall mean, in respect of any obligation of a Person to disclose any information or provide access to another Person, that such disclosing Person shall not be required to disclose such information or provide such access to the extent that such Person reasonably believes that doing so would reasonably be expected to (a) violate any applicable Law or Order, including Antitrust Laws, or the terms of any Contract to which such Person is a party, (b) cause the waiver of attorney/client privilege or similar privilege or (c) unreasonably disrupt the operations of such Person; <u>provided</u> that to the extent permitted by Law, the Person that has the disclosure obligation shall notify the other Person of any such inability to provide information or access and shall use its commercially reasonable efforts to make appropriate substitute arrangements (including entering into joint defense agreements, seeking appropriate waivers or consents) under the circumstances in order to allow for such access or disclosure without violating any Law, Order or Contract or waiving attorney/client privilege or similar privilege.

"**Environmental Law**" shall mean any Law, Order or other requirement of Law (including Environmental Permits) that relates to (a) the protection of the environment (including natural resource restoration and natural resource damages) or of human health or safety (to the extent human health or safety relates to exposure to Hazardous Materials), or (b) the presence, Release, threatened Release, generation, recycling, disposal or treatment of Hazardous Materials, or the arrangement for any such activities.

"**Environmental Liabilities**" shall mean all Liabilities (including the costs of any Remedial Action) arising in connection with or in any way relating to the Business (as currently or formerly conducted), the Purchased Assets or any property currently or formerly owned, leased or operated in connection with the Business (as currently or formerly conducted) or the Purchased Assets (including the activities and operations conducted by anyone thereon, offsite disposal therefrom and Hazardous Materials migrating thereto or therefrom), that in each case

6

arise under or relate to any Environmental Law, Environmental Permit or a Hazardous Material, including Liabilities arising from any Third Party claims for personal injury, death, or property damage caused by an actual or alleged release of, or exposure to, a Hazardous Material.

"**Environmental Response Trust**" means the trust to be established on the effective date of the Plan in accordance with Article VIII of the Plan.

"**Environmental Response Trust Agreement**" means the agreement governing, among other things, the retention and duties of the Environmental Response Trustee (as defined in the Plan) as described in Article VIII of the Plan.

"**EPA**" shall mean the United States Environmental Protection Agency.

"**Equity Commitment Letter**" shall mean that certain equity commitment letter addressed to Limetree Delaware, dated as of the date of the Initial Purchase Agreement, delivered by ArcLight Energy Partners Fund VI, L.P., and assigned to Purchaser pursuant to that certain assignment agreement, dated as of the date hereof, pursuant to which Limetree Delaware assigned its rights and obligations thereunder to Purchaser and ArcLight Energy Partners Fund VI, L.P. has consented to such assignment.

"**Escrow Account**" shall mean the account created by the Escrow Agent in which the Good Faith Deposit Amount was deposited pursuant to the Initial Purchase Agreement.

"**Escrow Agent**" shall mean Wells Fargo Bank, N.A. or, if Wells Fargo Bank, N.A. is unable or unwilling to act as the Escrow Agent, such other Person as is mutually agreed upon by Purchaser and Seller.

"**Escrow Agreement**" shall mean that certain Escrow Agreement, dated as of October 8, 2015, by and among Limetree Delaware, Seller and the Escrow Agent, as may thereafter be amended from time to time in accordance with the terms thereof.

"**Event**" shall mean any action, omission, state of facts, condition, occurrence, result, circumstance, event, effect, development or change.

"**Excluded Furniture and Equipment**" shall mean the Furniture and Equipment set forth on Section 1.1(a) of the Seller Disclosure Letter.

"**Excluded Intellectual Property**" shall mean the rights to Intellectual Property listed on Section 1.1(b) of the Seller Disclosure Letter.

"**Excluded IT Assets**" shall mean the rights to Information Technology listed on Section 1.1(c) of the Seller Disclosure Letter.

"**Excluded Permits**" shall mean the Permits (and any pending applications) listed on Section 1.1(d) of the Seller Disclosure Letter.

Americas 90921623

"**Excluded Real Property**" shall mean all real property owned by Seller, other than the Purchased Real Property, and including, for the avoidance of doubt, the Retained Refinery Assets and the Government Parcels.

"**Excluded Refinery Liabilities**" shall mean (except to the extent covered in Section 2.3(n) or (o)) any Liabilities relating to or arising out of the Retained Refinery Assets, in each case relating to any act, omission, circumstance or other Event that occurs prior to or after the Closing, including to the extent exacerbated, triggered, increased, or their timing is accelerated by any act or omission of, or any delay caused by, Purchaser or any of its Affiliates, their respective successors or assigns or their respective Representatives.

"**Files and Records**" shall mean all current and historical information, data, databases, reports, plans, schedules, correspondence, files, documents, books and other records and information, including (a) customer, vendor, supplier, contractor or service provider lists and records, (b) sales, pricing and performance data and records generated from completed or active transactions (including billing, payment and dispute histories, credit information and similar data), (c) business plans, financial statements, corporate, Tax, human resource, legal, regulatory and financial data and records, (d) operating and production records, quality control records, market research reports, technical documentation (drawings, specifications, process instructions, statistics, functional requirements, operating instructions, manual, etc.) and user documentation (installation guides, manuals, training material working paper, etc.), (e) employment and personnel records, (f) all of the plant diagrams and drawings, equipment diagrams and drawings, equipment manuals, "as built" books, operating manuals, maintenance histories and records, civil engineering drawings, PFDs, PI&Ds and other such technical documents relating to the Above-Grade Refinery Assets and (g) regulatory filings, documents or other information relating to any Proceeding, in each case with respect to clauses (a) through (g), of Seller, whether in paper, electronic, digital or other form or medium, and that relate primarily to the Business, the Purchased Assets or Assumed Liabilities; provided, that Files and Records shall not include (i) any files, documents, books or other records to the extent relating to any existing or anticipated Tax litigations or disputes (to the extent that such litigation or disputes are, or are related to any, Excluded Liabilities hereunder), (ii) any information which, if transferred to Purchaser or its Affiliates, would reasonably be expected to violate any applicable Law or Order or the terms of any Contract and (iii) any items described in clauses (a) through (g) that relate primarily to the Retained Refinery Assets or any other Excluded Assets or any Excluded Liabilities.

"**Final Order**" shall mean an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Case (or the docket of such other court), which is and remains in full force and effect, has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, re-argument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, re-argument or rehearing shall then be pending or (ii) if an appeal, writ of certiorari new trial, re-argument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, re-argument or rehearing shall have been denied or resulted in no modification of such order, and the time to

8

take any further appeal, petition for certiorari or move for a new trial, re-argument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such order, shall not cause an order not to be a Final Order.

"**Fourth Amendment Agreement**" shall mean that certain Fourth Amendment Agreement, by and among the USVI Government, Seller, HOVIC and PDVSA VI, dated April 3, 2013, as ratified by the legislature of the Virgin Islands on November 4, 2013 and approved by the Governor of the Virgin Islands on November 4, 2013, as Act No. 7566 (such ratification including that certain letter, dated October 16, 2013, from George H.T. Dudley to the Governor of the Virgin Islands incorporated as part of Act No. 7566).

"**Furniture and Equipment**" shall mean all furniture, furnishings, equipment, vehicles, machinery, cranes, forklifts, tools, truck racks, fixtures, consumables and other tangible personal property owned by Seller, including artwork, desks, chairs, tables, miscellaneous office furnishings, copiers, scanners, printers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles and supplies.

"**GAAP**" shall mean generally accepted accounting principles of the United States of America consistently applied, as in effect from time to time.

"**Good Faith Deposit Amount**" shall mean $19,000,000, which amount was deposited with the Escrow Agent in accordance with the terms of the Initial Purchase Agreement and held and released pursuant to the terms and subject to the conditions set forth in this Agreement and the Escrow Agreement.

"**Governmental Entity**" shall mean any multinational, United States or non-United States, federal, state, territory, provincial or local court (including, for the avoidance of doubt, the Bankruptcy Court), arbitral tribunal, administrative agency, legislature or commission or other governmental, quasi-governmental or regulatory agency or authority (including any bureau, division or department thereof) or any securities exchange.

"**Hazardous Material**" shall mean any waste or other substance that is listed, defined, designated, classified as, or otherwise determined to be, hazardous, extremely hazardous, toxic, radioactive, or a pollutant or a contaminant under or pursuant to any Law, Order or requirement of Law, including any admixture or solution thereof, and specifically including petroleum and all derivatives thereof or synthetic substitutes therefor and asbestos or asbestos-containing materials.

"**Hovensa Operating Agreement**" shall mean that certain Amended and Restated Limited Liability Company Agreement of Seller, dated as of October 30, 1998, and as thereafter amended from time to time, including those certain amendments dated as of February 10, 2000 and December 1, 2006.

"**HOVIC**" shall mean Hess Oil Virgin Islands Corp., a corporation organized under the Laws of the U.S. Virgin Islands.

9

"**Improvements**" shall mean any and all buildings, structures, fixtures or other improvements owned by or leased to Seller that are attached or affixed to the Business Real Property (including all construction and work-in-progress), including above ground and underground piping and storage tanks, canopies, signage, terminals, fixtures, pumps and appurtenances, control houses, the terminal office building, the administrative office building, the marine compound building, laboratory facilities, warehouses, boiler houses and waste water treatment facilities (and all equipment related thereto), the docks, equipment, personal property of a permanent nature and other similar facilities; provided, however, that the Retained Refinery Assets and Excluded Furniture and Equipment shall not be considered "Improvements".

"**Indebtedness**" of any Person shall mean (a) any obligations or indebtedness (i) for borrowed money or indebtedness issued or incurred in substitution or exchange for indebtedness for borrowed money, (ii) evidenced by any note, bond, debenture, mortgage or other debt instrument or debt security, (iii) for the deferred purchase price of property or service, (iv) for the reimbursement of any obligor on any letter of credit, banker's acceptance, guarantee or similar credit transaction (but only to the extent drawn upon or if there has been a demand made for reimbursement thereunder) and (v) under any commodity, swap, derivative, currency, interest rate, call, hedge or similar agreement, (b) any obligations of any kind referred to in the foregoing clause (a) above guaranteed or secured, directly or indirectly, in any manner by such Person (including by a Lien on the assets or properties of such Person whether or not such obligations are assumed) and (c) any accrued and unpaid principal, interest, premiums, penalties, pre-payment penalties, fees, expenses, "make-whole" or similar payments, indemnities and breakage costs owing by such Person with respect to any indebtedness of a type described in clauses (a) or (b); provided, that Indebtedness of Seller shall not include accounts payable to trade creditors or accrued expenses, in each case, arising in the ordinary course of business of Seller (as currently conducted).

"**Information Technology**" shall mean all computers, computer systems, servers, workstations, databases, and software programs.

"**Initial Equity Commitment Letter**" shall mean that certain equity commitment letter addressed to Purchaser, dated as of the date of the Initial Purchase Agreement, delivered by ArcLight Energy Partners Fund VI, L.P.

"**Intellectual Property**" shall mean (a) patents and patent applications, (b) trademarks, service marks, trade dress, and all registrations and applications for the same, (c) Internet domain names, (d) registered and unregistered copyrights and applications for the same, and (e) trade secrets.

"**IRS**" shall mean the United States Internal Revenue Service.

"**Law**" shall mean any statute, law, ordinance, ruling, policy, rule or regulation of any Governmental Entity and all judicial or administrative interpretations thereof and any common law doctrine.

10

Americas 90921623

"**Leased Submerged Lands**" shall mean those portions of real property identified in Exhibit H as "Terminal" or "Refinery" parcels that are leased or otherwise occupied by Seller subject to the Submerged Land Lease, the 1976 Contract and the 1998 Letter Agreement.

"**Legal Proceeding**" shall mean any judicial, administrative or arbitral actions, suits or legal proceedings (public or private) by or before a Governmental Entity.

"**Liabilities**" shall mean any and all Indebtedness, Taxes, losses, charges, debts, damages, obligations, payments, costs and expenses, bonds, indemnities, liabilities and obligations of any nature, including any unknown, undisclosed, unmatured, unaccrued, unasserted, contingent, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability, regardless of whether such claim, debt, obligation, duty or liability would be required to be disclosed on a balance sheet prepared in accordance with GAAP and regardless of whether such claim, debt, obligation, duty or liability is immediately due and payable.

"**Liens**" shall mean any liens (as defined in Section 101(37) of the Bankruptcy Code), debts (as defined in Section 101(12) of the Bankruptcy Code), security interests, Claims, easements, mortgages, charges, indentures, deeds of trust, rights of way, encroachments, or any other encumbrances and other restrictions or limitations on ownership or use of real or personal property or irregularities in title thereto.

"**Limetree Access Easement**" shall mean an access easement in the form attached hereto as Exhibit J.

"**Loss**" or "**Losses**" shall mean, without duplication, any and all Liabilities, judgments, awards, losses, costs or damages, including reasonable fees and expenses of attorneys, accountants and other professional advisors.

"**LPG Flare**" shall mean the liquid petroleum gas flaring facility and related interconnection equipment currently used in the operation of the Business.

"**Material Adverse Effect**" shall mean any Event that, individually or in the aggregate with any other related Events, (a) has had or would reasonably be expected to have a material adverse effect on the business, condition (financial or otherwise), properties, assets or results of operations of the Business, the Purchased Assets or the Assumed Liabilities, in each case, taken as a whole or (b) prevents or materially delays beyond the End Date, or would reasonably be expected to prevent or materially delay beyond the End Date, the consummation of the transaction contemplated by this Agreement or the Transaction Documents or the performance of any of Seller's material obligations under this Agreement or the Transaction Documents; provided, that no Event (by itself or when aggregated with other Events) to the extent resulting from any of the following, shall be considered in determining whether there has been or would reasonably be expected to be a Material Adverse Effect:

      (i)      changes in general economic, business or political conditions;

      (ii)      conditions or changes in the securities markets, credit markets, currency markets or other financial markets in the United States or any other country or region in the world, including (x) interest rates in the United States or any other country

11

or region in the world and exchange rates for the currencies of any countries and (y) any suspension of trading in securities (whether equity, debt, derivative or hybrid securities) on any securities exchange or over-the counter market operating in the United States or any other country or region in the world;

(iii)    changes in any applicable Laws or interpretations thereof by any Governmental Entity or GAAP;

(iv)    conditions affecting generally the hydrocarbon, terminal or refining industry (including feedstock pricing, refining, marketing, transportation, terminalling, trading costs and margins, and crude oil refined products and other commodity prices) or any other industries or markets in which the Business, the Purchased Assets and the Assumed Liabilities are owned or operated;

(v)    other than for purposes of any representation or warranty set forth in <u>Section 4.2(b)</u> or <u>Section 4.3</u>, the announcement of this Agreement or the consummation of the transactions contemplated by this Agreement;

(vi)    the commencement or continuation of the Bankruptcy Case;

(vii)    any action required to be taken by the Bankruptcy Court pursuant to the Sale Motion, the Sale Order, or the Bid Procedures Order;

(viii)    general political conditions in the United States, the U.S. Virgin Islands or any other country or region in the world or any natural or man-made disaster or any acts of terrorism, sabotage, military action or war (whether or not declared) or any escalation or worsening thereof, regardless of when occurring or commenced (and excluding, for the avoidance of doubt, the effect of the failure of any Governmental Entity to approve any transactions contemplated by this Agreement or the Transaction Documents);

(ix)    any failure by Seller or any of its Affiliates or the Business (or any portion thereof) to meet any estimates or expectations of revenue, earnings or other financial performance or results of operations for any period, or any failure to meet internal or published projections, budgets, plans or forecasts of revenues, earnings, cash flows or other financial performance or results of operations for any period; <u>provided</u>, that the exception in this clause shall not prevent the underlying cause or causes of such failure from being taken into consideration in determining whether there has been or would reasonably be expected to be a Material Adverse Effect; or

(x)    any action taken at the written request of, or with the express prior written consent of, Purchaser;

<u>provided</u>, <u>further</u>, that any Event in clauses (i), (ii), (iii), (iv) and (viii) may be taken into account when determining whether there has been or would reasonably be expected to be a Material Adverse Effect to the extent that such Event has a disproportionate effect on the Business, the Purchased Assets and the Assumed Liabilities taken as a whole, compared to other hydrocarbon terminalling and storage businesses in the United States or Caribbean region.  A

12

"**Material Adverse Effect**" shall not be measured based on any forward-looking statements, projections or forecasts of Seller or any other Person.

"**Miscellaneous Access Easement**" shall mean an access easement in the form attached hereto as <u>Exhibit M</u>.

"**Notes**" shall mean the 2012 Notes and the 2015 Notes.

"**NRD Settlement Agreement**" shall mean that certain Settlement and Release Agreement entered into on May 29, 2014 by Seller, Alicia V. Barnes in her capacity as Trustee for Natural Resources of the Territory of the United States Virgin Islands, the USVI Government in its *parens patriae* and public trustee capacity, on behalf of the public and its quasi-sovereign interests, and HOVIC.

"**Operational Terminals Business**" shall mean the ownership and operation of a hydrocarbon storage and terminal facility consistent in all material respects with the manner in which the Business was operated by Seller when the Business was fully operational, assuming such ownership and operation are in compliance with all Laws, Permits, Orders and Contracts.

"**Option Agreement**" shall mean an option agreement by and among Purchaser and Seller, pursuant to which Purchaser will have the right to acquire some or all of the Option Refinery Property for a purchase price of $1 per acre, exercisable until the date that is the earlier of (i) ten (10) years from the Closing Date and (ii) three (3) years after the removal of the Above-Grade Refinery Assets from the Option Refinery Property and which is otherwise in form and substance reasonably satisfactory to each of Seller and Purchaser.

"**Option Refinery Property**" shall mean the real property owned by Seller and described in <u>Section 1.1(e)</u> of the Seller Disclosure Letter (and including, for the avoidance of doubt, the Option Refinery Parcels), together with all easements, appurtenances, rights and other hereditaments appurtenant to such real property.

"**Order**" shall mean any judgment, order, injunction, decree, writ, permit or license issued or entered by or with any Governmental Entity or any arbitrator, whether preliminary, interlocutory or final, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Sale Order).

"**OSRO**" shall mean Oil Spill Response Organization.

"**Parts Inventory**" shall mean the inventories of supplies, maintenance and capital spares, joints, valves, parts and tools owned by Seller as of the Closing that are (x) stored in the warehouses located on the Business Real Property or in the Above-Grade Refinery Assets or (y) used primarily in connection with the Business; <u>provided</u>, that the Parts Inventory shall not include any Retained Refinery Assets.

"**PDVSA VI**" shall mean PDVSA V.I., Inc., a corporation organized under the Laws of the U.S. Virgin Islands.

Americas 90921623

"**Pension Plan**" shall mean that certain HOVENSA L.L.C. Employees' Pension Plan.

"**Permitted Liens**" shall mean (a) statutory Liens or other Liens arising in the ordinary course of business of Seller (including by operation of law) securing payments not yet due, including mechanics', carriers', workmen's, repairmen's, materialmens' and maritime Liens, (b) Liens for Taxes not yet due and payable or for Taxes that may thereafter be paid without penalty or which are being contested in good faith and by appropriate Proceedings and are set forth on <u>Section 1.1(f)</u> of the Seller Disclosure Letter, (c) Liens set forth in <u>Section 1.1(f)</u> of the Seller Disclosure Letter, (d) Liens affecting the Business Real Property with respect to (i) zoning, building code or planning restrictions or regulations, servitudes, permits, licenses, surface leases, ground leases to utilities, municipal agreements, railway siding agreements and other similar rights, easements for streets, alleys, highways, telephone lines, gas pipelines, power lines and railways, and other easements and rights of way of public record on, over, or in respect of any such real property and (ii) encroachments and other matters that would be shown in an accurate survey or physical inspection of such real property that, in each case of (i) and (ii) of this clause (d) above, do not, individually or in the aggregate, materially interfere with the use, operation or occupancy of such real property as an Operational Terminals Business, (e) Liens arising pursuant to any Environmental Permit, (f) any Liens arising under ERISA or the Code with respect to the Pension Plan and (g) any Lien that will be extinguished at or prior to Closing.

"**Permitted Tax Liens**" shall mean those Liens, and only those Liens, described in clause (b) of the definition of Permitted Liens.

"**Person**" shall mean and include an individual, a partnership, a limited partnership, a limited liability partnership, a joint venture, a corporation, a limited liability company, an association, a trust, an unincorporated organization, a group and a Governmental Entity.

"**Petition**" means the voluntary petition under Chapter 11 of the Bankruptcy Code filed by Seller with the Bankruptcy Court.

"**Petition Date**" shall mean September 15, 2015.

"**Pinnacle Contract**" shall mean that certain Term Services Agreement, dated as of May 1, 2012, by and between Seller and Pinnacle Services L.L.C., as amended from time to time in accordance with its terms.

"**Pinnacle Cure Amount**" shall mean the Cure Amount with respect to the Pinnacle Contract.

"**Plan**" means the *Debtor's Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* filed on December 10, 2015 in the Bankruptcy Case Docket No. 422, as amended, supplemented, or otherwise modified from time to time, including the Plan Supplement (as defined in the Plan).

"**Plant Closing Act**" shall mean the Virgin Islands Code Title 24, § 471- 478 (1957).

Americas 90921623

"**Post-Closing Litigation Liabilities**" shall mean all Liabilities arising from a Proceeding first commenced after the Closing by a Third Party against Purchaser, Seller or any of their respective Affiliates, in respect of the Business, the Purchased Assets or the Assumed Liabilities that is based on any Event first existing, arising or occurring following the Closing; provided, that the Parties agree and acknowledge that Post-Closing Litigation Liabilities shall not include any Environmental Liabilities, which are separately addressed in this Agreement.

"**Post-Closing Period**" shall mean all taxable years or other taxable periods that begin after the Closing Date and, with respect to any taxable year or other taxable period beginning on or before and ending after the Closing Date, the portion of such taxable year or period beginning on the day after the Closing Date.

"**Pre-Closing Litigation Liabilities**" shall mean all Liabilities arising from a Proceeding first commenced prior to or following the Closing by a Third Party against Purchaser, Seller or any of their respective Affiliates in respect of the Business, the Purchased Assets or the Assumed Liabilities that is based on any Event first existing, arising or occurring before the Closing; provided, that the Parties agree and acknowledge that Pre-Closing Litigation Liabilities shall not include any Environmental Liabilities, which are separately addressed in this Agreement.

"**Pre-Closing Period**" shall mean all taxable years or other taxable periods that end on or before the Closing Date and, with respect to any taxable year or other taxable period beginning on or before and ending after the Closing Date, the portion of such taxable year or period ending on the Closing Date.

"**Proceeding**" shall mean any claim, demand, action, arbitration, audit, hearing, investigation, litigation, suit or other proceeding (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Third Party (including any Governmental Entity).

"**Property Taxes**" shall mean all real property Taxes, personal property Taxes and other similar ad valorem Taxes, in each case, that are imposed with respect to the Purchased Assets.

"**Protocol of Delivery and Acceptance**" shall mean, with respect to each Tug Boat, the applicable protocol of delivery and acceptance for such Tug Boat, substantially in the form attached hereto as Exhibit D.

"**Purchase Price**" shall mean $190,000,000.

"**Purchased Furniture and Equipment**" shall mean all Furniture and Equipment owned by Seller that is located at the Seller Facilities or the Above-Grade Refinery Assets or that is otherwise primarily used or held for use in the Business (assuming that the Business includes an Operational Terminals Business) or in the ownership or operation of the Above-Grade Refinery Assets; provided, that, for the avoidance of doubt, the Purchased Furniture and Equipment shall not include the Excluded Furniture and Equipment or any other Excluded Assets.

15

"**Purchaser Expense Reimbursement**" shall mean the sum of the aggregate amount of the Purchaser's reasonable documented out-of-pocket costs and expenses (including expenses of outside counsel, accountants and financial advisors, which shall be based on summary invoices, redacted to preserve privileged or confidential information, and which shall not be required to comply with applicable United States Trustee guidelines) incurred by Purchaser in connection with or related to Purchaser's evaluation, consideration, analysis, negotiation, and documentation of the transactions contemplated by this Agreement, up to a maximum amount of $1,900,000.

"**RCRA Permit**" shall mean the Resource Conservation and Recovery Act Part B Permit No. VID980536080 and any document that replaces such Permit.

"**Real Property**" shall mean the Purchased Real Property and the Excluded Real Property.

"**Release**" shall mean the disposing, discharging, injecting, spilling, leaking, pumping, leaching, dumping, emitting, escaping or emptying into or upon any air, soil, sediment, subsurface strata, surface water or groundwater.

"**Remedial Action**" shall mean any action to investigate, abate, clean up, remove or remediate (or words of similar import), or conduct remedial or corrective actions, including sampling and/or monitoring activities, with respect to Hazardous Materials in the environment.

"**Remediation Access Easement**" shall mean an access easement in the form attached hereto as Exhibit A.

"**Representatives**" of any Person shall mean such Person's directors, managers, officers, employees, agents, attorneys, consultants, advisors, financing sources or other Persons acting on behalf of such Person.

"**Restructuring Transaction**" shall mean, in each case, which does not include the Purchase and Tug Boat Sale pursuant to this Agreement (i) any recapitalization transaction, plan of reorganization, liquidation, or sale, including any such transaction by way of a credit bid or by any creditor of Seller, involving, whether in whole or in part, Seller or all or any material portion of the Purchased Assets, or (ii) any merger, consolidation, share exchange, business combination or similar transaction involving, whether in whole or in part, Seller or all or any material portion of the Purchased Assets, in each case whether in one transaction or a series of transactions.

"**Retained Refinery Assets**" shall mean the Option Refinery Property, to the extent such Option Refinery Property has not been conveyed pursuant to the Option Agreement (and excluding, for the avoidance of doubt, the Above-Grade Refinery Assets).

"**Returns**" shall mean all returns, statements, forms, reports and other similar documentation relating to Taxes, including any schedules, exhibits and other attachments thereto and any amendments thereof.

16

"**Sale Hearing**" shall mean the hearing at which the Bankruptcy Court considers approval of the Sale Order pursuant to Sections 105, 363 and 365 of the Bankruptcy Code.

"**Sale Motion**" shall mean Debtor's Motion for Entry of Orders (a)(i) Establishing Bidding Procedures Relating to the Sale of the Debtor's Assets, Including Approving Break-Up Fee and Expense Reimbursement, (ii) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, (iii) Approving Form and Manner of Notice Relating Thereto, and (iv) Scheduling a Hearing to Consider the Proposed Sale; (b)(i) Approving the Sale of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (ii) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (c) Granting Related Relief filed by the Seller in the Bankruptcy Court on September 15, 2015.

"**Sale Order**" shall mean an Order of the Bankruptcy Court approving this Agreement, containing the findings and conclusions set forth in Section 7.15, and authorizing and directing Seller to consummate the transactions contemplated by this Agreement (including, but not limited to, the assumption and assignment of the Business Contracts and Real Property Leases) under sections 105, 363 and 365 of the Bankruptcy Code, in form and substance acceptable to Seller and Purchaser in their respective sole discretion.

"**Sanctions**" shall mean any sanctions or embargos administered or enforced by the U.S. Government, (including, the OFAC Regulations), the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant Governmental Entity that is a sanctions authority.

"**Seller Facilities**" shall mean the storage, terminalling and refining facilities and related equipment owned by Seller located on the Business Real Property and the Option Refinery Property, including all Improvements related thereto; provided, that, for the avoidance of doubt, the Seller Facilities shall not include any Excluded Assets.

"**Seller Letters of Credit**" shall mean (a) that certain Irrevocable Letter of Credit No. 123146-793, issued as of April 5, 2012 by Intesa Sanpaolo S.p.A. on behalf of Hess Corporation for the benefit of the EPA, (b) that certain Irrevocable Letter of Credit No. 123147-793, issued as of April 5, 2012 by Intesa Sanpaolo S.p.A. on behalf of Hess Corporation for the benefit of the EPA, (c) that certain Irrevocable Standby Letter of Credit No. CNYI 5051/12, issued as of April 4, 2012 by Banco Espirito Santo on behalf of Seller for the benefit of the EPA, and (d) that certain Irrevocable Standby Letter of Credit No. CNYI 5050/12, issued as of April 4, 2012 by Banco Espirito Santo on behalf of Seller for the benefit of the EPA, and any document that replaces such Letters of Credit.

"**Shared Services Agreement**" shall mean a shared services agreement by and among Purchaser and Seller, in form and substance satisfactory to Seller and Purchaser in their sole discretion.

"**Submerged Land Lease**" shall mean that certain Lease, dated as of October 16, 1976, by and between the USVI Government and Seller (as assignee of HOVIC).

"**Subsidiary**", with respect to any Person, shall mean (a) any corporation more than fifty percent (50%) of the stock of any class or classes of which having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is owned by such Person directly or indirectly through one or more subsidiaries of such Person and (b) any partnership, association, joint venture, limited liability company or other entity in which such Person directly or indirectly through one or more subsidiaries of such Person has more than a fifty percent (50%) equity interest.

"**Taxes**" shall mean all taxes, assessments, charges, duties, fees, levies or other governmental charges imposed by a taxing authority, including all United States federal, state, territory (including the U.S. Virgin Islands), local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, sales, use, value added, occupation, property, excise, severance, windfall profits, stamp, license, payroll, social security, withholding and other taxes, assessments, charges, duties, fees, levies or other governmental charges imposed by a taxing authority of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest, and including Liability for any of the foregoing items pursuant to applicable Law, as a transferee, as a successor, or pursuant to a Contract.

"**Terminal Assets**" shall mean the Purchased Assets, other than the Above-Grade Refinery Assets.

"**Third Party**" shall mean any Person other than the Parties and their respective Affiliates (including, for the avoidance of doubt, any Governmental Entity).

"**Transaction Documents**" shall mean the Remediation Access Easement, the Escrow Agreement, the Shared Services Agreement, the Limetree Access Easement, the Cross-Easement Agreements, the Miscellaneous Access Easement, the Option Agreement, the Transition Services Agreement, the Assignment of Leased Submerged Lands and this Agreement.

"**Transition Services Agreement**" shall mean a transition services agreement by and between Purchaser and Seller, in form and substance satisfactory to Seller and Purchaser in their sole discretion.

"**Tug Boat Bill of Sale and Acceptance**" shall mean, with respect to each Tug Boat, the applicable Bill of Sale and Acceptance of sale for such Tug Boat, substantially in the form attached hereto as Exhibit E, pursuant to which HOVIC will transfer to Purchaser at the Closing such Tug Boat.

"**Tug Boats**" shall mean the following six (6) tug boats owned by HOVIC: (1) M/V Turquoise Bay, (2) M/V Teague Bay, (3) M/V Canegarden Bay, (4) M/V Manchenil Bay, (5) M/V Limetree Bay and (6) M/V HOVIC 1.

"**USCG**" shall mean the United States Coast Guard.

18

"**USVI Concession Agreement**" shall mean that certain concession agreement substantially in the form attached hereto as <u>Exhibit F</u>.

"**USVI Government**" shall mean the Government of the United States Virgin Islands, including any United States Virgin Islands Governmental Entity.

"**USVI Government Concession Fee**" shall mean $100,000,000.   The USVI Government Concession Fee reflects the amount necessary to satisfy all monetary obligations of Seller to the USVI Government in respect of the Purchased Assets, including the full and final satisfaction and settlement of the secured claim in the amount of approximately $40,000,000, as certified by Seller and the USVI Government at least ten (10) days prior to the Closing.

1.2    <u>Additional Defined Terms</u>.   In addition to the terms defined in <u>Section 1.1</u>, additional defined terms used herein shall have the respective meanings assigned thereto in the Sections indicated below.

| Defined Term | Section |
| --- | --- |
| 1976 Contract Permits | Seller Disclosure Letter |
| Additional Requirements | 7.24 |
| Agreement | Preamble |
| Allocation | 3.3(b) |
| Assumed Liabilities | 2.3 |
| Bankruptcy Case | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Rules | 4.3 |
| Business | Recitals |
| Business Confidential Information | 7.22 |
| Business Contracts | 2.1(a)(i) |
| Business Permits | 2.1(a)(vii) |
| Closing | 3.5(a) |
| Closing Cross-Easement Agreements | 7.28 |
| Closing Date | 3.5(a) |
| Closing Payment | 3.1 |
| Deferred Asset | 2.6(a) |
| Deferred Terminal Parcels | 7.28 |
| Designation Deadline | 2.5(a)(iii) |
| Efforts Condition | 7.4(a) |
| Eliminated Agreement | 2.5(a)(iii) |
| Employee Benefit Plans | 4.9 |
| End Date | 9.1(b)(ii) |
| Environmental Permits | 4.12(c) |
| Equity Financing | 6.4 |
| Equity Financing Source | 6.4 |
| ERISA | 4.9 |
| Excess Power | 7.24 |

19

Excluded Assets ......................................................... 2.2
Excluded Liabilities .................................................. 2.4
FIRPTA ................................................................... 3.4
Government Parcels ................................................. 7.28
Hovensa Consultant .................................................. 4.11
HOVIC ..................................................................... Preamble
HOVIC Disclosure Letter ......................................... Article V
HOVIC Update Schedule ........................................... 7.7(a)
Imperfect Deed.......................................................... 7.28
Initial Purchase Agreement ...................................... Recitals
Knowledge of Purchaser ........................................... 1.5
Knowledge of Seller ................................................. 1.5
Limited Consent Decree Modification........................ 7.4(c)
Material Contracts...................................................... 4.6(b)
Other Required Approvals ........................................ 8.2(d)
Option Refinery Parcels ............................................ 7.28
Parties...................................................................... Preamble
Permits .................................................................... 4.14
Permitting Process ................................................... 7.25
Pinnacle Employee ................................................... 7.9
Purchase .................................................................. Recitals
Purchased Assets...................................................... 2.1(a)
Purchased Real Property ........................................... 2.1(a)(ii)
Purchaser.................................................................. Preamble
Purchaser Borne Withholding Taxes .......................... 3.4
Purchaser's Required Permits .................................... 7.18(d)
Real Property Leases................................................. 2.1(a)(iv)
Related Parties ......................................................... 11.14
Released Claims........................................................ 10.2
Releasee ................................................................... 10.2
Releasor.................................................................... 10.2
Required Governmental Approvals ........................... 8.1(e)
Seller ....................................................................... Preamble
Seller Access Indemnitees ........................................ 7.1(b)
Seller Disclosure Letter............................................. Article IV
Seller Update Schedule ............................................. 7.7(a)
Seller's Marks ........................................................... 7.23
Subdivision Parcels ................................................... 7.28
Tax Purchase Price .................................................... 3.3(a)
Transfer Taxes.......................................................... 7.10(a)
Trust Funds .............................................................. 2.2(q)
Tug Boat Permits ...................................................... 7.25
Tug Boat Sale............................................................ Recitals
Update Schedule ....................................................... 7.7(a)
WARN ...................................................................... 7.9
Wind-Up Cost Cap.................................................... 7.33

Wind-Up Costs.............................................................   7.33

1.3     Construction.  In this Agreement, unless the context otherwise requires:

(a)     references to "writing" or comparable expressions include a reference to electronic mail, provided that, where applicable, the sender complies with the provisions of Section 11.3;

(b)     the phrases "delivered" or "made available" shall mean that the information referred to has been physically or electronically delivered to the relevant parties (including, in the case of "made available" to Purchaser, material that has been posted and thereby made available to Purchaser through the on-line "virtual data room" established by Seller);

(c)     words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa;

(d)     references to Articles, Sections, Sections of the Seller Disclosure Letter, Sections of the HOVIC Disclosure Letter, Exhibits, the Preamble and Recitals are references to articles, sections, exhibits, the preamble and recitals of this Agreement and the disclosure letters delivered with respect to this Agreement, and the descriptive headings of the several Articles and Sections of this Agreement, the Seller Disclosure Letter and the HOVIC Disclosure Letter (as applicable) are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement;

(e)     references to "day" or "days" are to calendar days;

(f)     the words "hereof", "herein", "hereto" and "hereunder", and words of similar import, shall refer to this Agreement as a whole and not to any provision of this Agreement;

(g)     this "Agreement" or any other Contract or document shall be construed as a reference to this Agreement or, as the case may be, such other Contract or document as the same may have been, or may from time to time be, amended, varied, novated or supplemented and shall include each and every exhibit, attachment, schedule, addendum, appendix, statement of work, change order, and any other similar instrument relating to such Contract or document (as amended);

(h)     "include", "includes", and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of similar import;

(i)     references to "Dollars", "dollars" or "$", without more are to the lawful currency of United States of America;

(j)     references to "commercially reasonable efforts" shall not require any Party to repay any Indebtedness, amend any Contract to increase the amount payable thereunder or

21

otherwise to be materially more burdensome to such Party, commence any litigation, settle or compromise any matter, offer or grant any accommodation (financial or otherwise, including with respect to the Notes or any accounts payable) to any Third Party, pay any amount or bear any other incremental economic burden and, without limiting the foregoing, for purposes of Section 7.11(a), references to "commercially reasonable efforts" shall not require any Party to agree or consent to any modifications to the form of USVI Concession Agreement attached as Exhibit F;

(k)     with respect to the Business (including the Purchased Assets and Assumed Liabilities), references to the "ordinary course of business" or its business in the "ordinary course" shall mean (i) with respect to the period from and after February 5, 2015, the ordinary course of business of Seller as currently conducted, (ii) with respect to the period from February 21, 2012 until February 5, 2015, the ordinary course of business of Seller solely as the owner and operator of a hydrocarbon storage terminal (taking into account changes in the business of Seller in preparation for the shutdown of the terminalling and storage business) and (iii) with respect to all periods prior to February 21, 2012, the ordinary course of business of Seller as the owner and operator of a petroleum refining business (taking into account changes in the business of Seller in preparation for the shutdown of its refinery operations); and

(l)     references to any Party shall include such Party's successors and permitted assigns.

1.4    Exhibits and the Disclosure Letters.    The Exhibits, the Seller Disclosure Letter and the HOVIC Disclosure Letter are incorporated into and form an integral part of this Agreement.

1.5    Knowledge.    When any representation, warranty, covenant or agreement contained in this Agreement is expressly qualified by reference to the "**Knowledge of Seller**" or words of similar import with respect to Seller, it shall mean the actual knowledge of the individuals set forth in Section 1.5 of the Seller Disclosure Letter with respect to Seller, without inquiry or investigation.  When any representation, warranty, covenant or agreement contained in this Agreement is expressly qualified by reference to the "**Knowledge of Purchaser**" or words of similar import, it shall mean the actual knowledge of Evan Schwartz, Jake Erhard and Christine Miller, without inquiry or investigation.

ARTICLE II

SALE OF ASSETS

2.1    Sale of Purchased Assets and Tug Boats.

(a)     On the terms and subject to the conditions of this Agreement (including as set forth in Section 2.5(b)) and the Sale Order, Purchaser agrees to purchase from Seller, and Seller agrees to sell, convey, transfer, assign and deliver to Purchaser, at the Closing, all the right, title and interest of Seller in and to the Purchased Assets, free and clear of any Liens, Claims and Liabilities of any kind whatsoever except Permitted Liens.  The "**Purchased Assets**"

Americas 90921623

shall mean all right, title and interest of Seller in the following assets (other than any such assets excluded pursuant to Section 2.2)

(i)    each Contract listed or described in Section 2.1(a)(i) of the Seller Disclosure Letter and the Pinnacle Contract (collectively, the "**Business Contracts**");

(ii)    the real property described in Section 2.1(a)(ii) of the Seller Disclosure Letter, together with all easements, appurtenances, rights and other hereditaments appurtenant to such real property  (collectively, the "**Purchased Real Property**"); provided, that any Option Refinery Property transferred to Purchaser pursuant to the Option Agreement shall be considered Purchased Real Property (and therefore shall be Business Real Property) for purposes of this Agreement;

(iii)    all Improvements;

(iv)    (x) each real property lease and sublease listed or described in Section 2.1(a)(iv) of the Seller Disclosure Letter ("**Real Property Leases**") and (y) those portions of the Submerged Land Lease, the 1976 Contract and the 1998 Letter Agreement related to the Leased Submerged Lands in accordance with the Assignment of Leased Submerged Lands;

(v)    all Parts Inventory;

(vi)    the Files and Records, whether in hard copy or electronic format, except that, with respect to Files and Records that Seller or any of its Affiliates is required by Law or Order to retain, the Purchased Assets shall include copies of such Files and Records to the extent permitted by any applicable Law or Order (and, with respect to any personnel records which Seller is required to retain, copies of such personnel records to the extent permitted by any applicable Law or Order); provided, that Seller shall be permitted to retain a copy of any such Files and Records that Seller requires in connection with any of the Excluded Assets;

(vii)    all Permits   (and any pending applications), other than the Excluded Permits, that are owned, utilized, held or maintained by or licensed to Seller primarily in connection with Seller's ownership or operation of the Business, the other Purchased Assets or the Assumed Liabilities or which are otherwise required for Seller's operation of the Business or the other  Purchased Assets (assuming, in each case, that the Business includes an Operational Terminals Business), including those Permits described in Section 2.1(a)(vii) of the Seller Disclosure Letter (which shall not include the RCRA Permit) (the "**Business Permits**");

(viii)    the Business Intellectual Property;

(ix)    the Business IT Assets;

(x)    all rights, claims, defenses, causes of action (including Avoidance Actions) and rights of offset or counterclaim against a Third Party relating to or arising from the Business, the Purchased Assets or the Assumed Liabilities (including rights

23

under manufacturer and vendor warranties, indemnities and guarantees), except to the extent related to any Excluded Assets or Excluded Liabilities; <u>provided</u>, that Purchaser shall not prosecute, or commence any litigation with respect to, the Avoidance Actions;

(xi)    the Purchased Furniture and Equipment;

(xii)    accounts receivable and pre-paid assets, solely to the extent related to an Assumed Liability;

(xiii)    all tank bottoms, heels and line fill which are located at the Seller Facilities;

(xiv)    the LPG Flare;

(xv)    the Above-Grade Refinery Assets;

(xvi)    with respect to the Tug Boats, the Tug Boat spare parts owned by Seller and stored (x) in the warehouses and the marine compound located on the Business Real Property or in the Above-Grade Refinery Assets and (y) on the Tug Boats;

(xvii)    process makeup water wells P-1233A, P-1644, P-1618, P-1643, P-1617, P-1616, P-1641, P-1642, P-1615, P-1613, P-1612, P-1611, P-1610, P-1609, P-1608, P-1290A, P-1290B, P-1274C, P-1274B, P-1274A, P-1233C, and P-1233B;

(xviii)  the sulfur dioxide air monitoring stations; and

(xix)    the meteorological station located on the Government Parcels.

(b)    On the terms and subject to the conditions of this Agreement, Purchaser agrees to purchase from HOVIC, and HOVIC agrees to sell, convey, transfer, assign and deliver to Purchaser, at the Closing, all its right, title and interest in and to

(i)    the Tug Boats, together with, to the extent transferable, the related assets described in <u>Section 2.1(b)</u> of the HOVIC Disclosure Letter; and

(ii)    all rights of HOVIC or Seller set forth in paragraph 3 of the 1976 Contract as well as those rights set forth in the Regulations adopted relating to Title 29 of the Virgin Islands Code, "Sub-Chapter 543-A Sub-section 'A'. St. Croix South Shore Harbors."

2.2    <u>Excluded Assets</u>.  Notwithstanding anything herein to the contrary, the Purchased Assets shall not include any assets, rights or privileges of Seller other than the Purchased Assets and specifically shall not include Seller's right, title or interest in any of the following assets, whether owned by, held by or relating to Seller (collectively, the "**Excluded Assets**"):

(a)    all cash, certificates of deposit or other cash equivalents;

24

(b)      any real property other than (i) Purchased Real Property and (ii) real property subject to the Real Property Leases;

(c)      all personal property, equipment and inventory not included in the Purchased Assets;

(d)      all rights, claims, defenses, causes of action  and rights of offset or counterclaim (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, contingent or non-contingent) of Seller against Third Parties (i) to the extent relating to any of the Excluded Assets or Excluded Liabilities or (ii) not included in the Purchased Assets;

(e)      all Avoidance Actions related solely to any Excluded Assets or Excluded Liabilities;

(f)      all rights under any Contract to which Seller is a party that is not a Business Contract or a Real Property Lease;

(g)      general books of account and books of original entry that comprise Seller's permanent Tax records, corporate minute books, stock books and related organizational documents and the books and records that Seller is required to retain pursuant to any Law or Order and the books and records solely related to the Excluded Assets or Excluded Liabilities;

(h)      personnel records that Seller is required by Law or Order to retain (provided that the copies of any such personnel records shall be Purchased Assets to the extent permitted by any applicable Law or Order pursuant to <u>Section 2.1(a)(vi)</u>) and personnel records of employees, former employees or consultants of Seller who do not, as of the Closing, become employees of Purchaser;

(i)      all insurance recoveries under Seller's or its Affiliates' insurance policies with respect to the Purchased Assets or the Business and any rights to assert claims with respect to any such insurance recoveries;

(j)      all claims for refund or credit of (i) income Taxes of Seller and its Affiliates for any taxable period and (ii) non-income Taxes of Seller and its Affiliates with respect to a Pre-Closing Period;

(k)      the Excluded Intellectual Property;

(l)      the Excluded IT Assets;

(m)      Seller's or any of its Affiliates' rights under this Agreement or any Transaction Document or relating to the Excluded Assets or the Excluded Liabilities;

(n)      all deposits (including security deposits, rent, electricity, telephone or otherwise and retainers held by attorneys, accountants, financial advisors and other professional advisors retained by Seller or by any creditors' committee in the Bankruptcy Case) and other prepaid charges of Seller, in each case other than with respect to any Purchased Assets;

25

(o)    any assets of Seller in a directors and officers liability insurance policy, executive or incentive compensation, bonus, deferred compensation, pension, retiree medical, stock option or other stock purchase plan or other Employee Benefit Plan;

(p)    the RCRA Permit and any related financial assurance;

(q)    any rights or assets related to trusts for groundwater remediation or land farms (the "Trust Funds");

(r)    all toy trucks and related inventory which are located at the Seller Facilities;

(s)    all Excluded Furniture and Equipment;

(t)    all Retained Refinery Assets;

(u)    all accounts receivable and pre-paid assets of Seller, except to the extent related to a Purchased Asset or an Assumed Liability;

(v)    the Excluded Permits; and

(w)    all attorney client privilege and attorney work product protection of Seller or associated with the Business (as currently or formerly conducted) as a result of legal counsel representing Seller or the Business (as currently or formerly conducted), and all Files and Records related thereto subject to such attorney client privilege or work product protection; provided that any privilege or work product that exclusively relates to the Purchased Assets or the Assumed Liabilities or that is necessary to operate the Business (other than such privileges, protections and related Files and Records related to or in connection with the transactions contemplated by this Agreement or any Transaction Document) shall not be deemed to be an Excluded Asset whether or not in connection with the transactions contemplated by this agreement or any Transaction Document.

2.3    Assumption of Liabilities.  On the terms and subject to the conditions of this Agreement, including Section 2.5(b), and except for the Excluded Liabilities, Purchaser agrees, effective as of the Closing (except as otherwise provided), to assume and shall agree to pay, perform and discharge when due, the following Liabilities (collectively, the "**Assumed Liabilities**") of Seller:

(a)    all Liabilities (including for the avoidance of doubt, all Environmental Liabilities), other than Excluded Refinery Liabilities, relating to or arising out of the Purchased Assets or the Business arising out of or relating to any act, omission, circumstance or other Event occurring after the Closing, provided, however, that, except with respect to Cure Amounts assumed pursuant to Section 2.3(c), Purchaser shall not assume or agree to pay, discharge or perform any Liabilities of Seller under or with respect to any Business Contracts and Real Property Leases, including Liabilities arising out of any breach, misfeasance or under any other theory to the extent relating to Seller's conduct prior to the Closing;

(b)    all Post-Closing Litigation Liabilities;

26

(c)     all Cure Amounts with respect to the Business Contracts and the Real Property Leases (other than the Pinnacle Cure Amount);

(d)     all valid reclamation claims related to the Business;

(e)     any and all costs and expenses necessary in connection with providing "adequate assurance of future performance" with respect to the Business Contracts and Real Property Leases (as contemplated by section 365 of the Bankruptcy Code) for the period commencing on or after the Closing;

(f)     all Environmental Liabilities, other than Excluded Refinery Liabilities, arising out of or relating to any act, omission or circumstance that occurred prior to the Closing, including for the avoidance of doubt, the presence of Hazardous Materials arising from Seller's former refinery operations and located at the Purchased Assets, solely to the extent such Liabilities are exacerbated, triggered, increased, or have their timing accelerated by any act or omission of, or any delay caused by, Purchaser or any of its Affiliates, their respective successors or assigns or their respective Representatives; provided, that, all Environmental Liabilities arising out of or relating to Events or conditions occurring or existing prior to Closing shall not be Assumed Liabilities solely by virtue of Purchaser discovering, identifying or quantifying such Environmental Liabilities through sampling of environmental media if such sampling is (i) required by Environmental Law or by a Governmental Entity, (ii) required to be conducted in response to a Third Party Claim alleging that Hazardous Materials have migrated offsite from the Business Real Property or (iii) undertaken in connection with ordinary course construction, remodeling, demolition, operation or maintenance, assuming that the Business includes an Operational Terminals Business, or undertaken in connection with the dismantling, demolition or removal of the Above-Grade Refinery Assets;

(g)     all Liabilities related to the Business Contracts and Real Property Leases arising out of or relating to any act, omission, circumstance or other Event occurring on or after the Closing Date (including the ordinary course obligations arising under the Business Contracts and Real Property Leases in accordance with their terms);

(h)     all accounts and notes payable to Seller's third-party trade creditors that relate to the Purchased Assets and are in respect of goods or services that will be provided to the Business following the Closing, including any unresolved vendor rebates or credits associated with such trade creditors that are unpaid, uncollected or unresolved, as the case may be, at the Closing;

(i)     any Transfer Taxes applicable to the transfer of the Purchased Assets for which Purchaser is responsible pursuant to Section 7.10(a);

(j)     any Liability for any Tax or Taxes arising out of or relating to the operation of the Business (as currently or formerly conducted) or the ownership of the Purchased Assets with respect to any Post-Closing Period;

(k)     all Liabilities under the Consent Decree in connection with the Purchased Assets arising out of or relating to any act, omission, circumstance or other Event occurring after the Closing;

27

(l)    all Environmental Liabilities arising out of or relating to any (i) violation, by the Purchaser or any of its Affiliates (including the Business) or their respective Representatives occurring after the Closing, of any environmental covenant or environmental deed notice recorded with respect the Purchased Assets, (ii) change in use, discontinued use, closure or shutdown of the Purchased Assets after the Closing (other than with respect to the Above-Grade Refinery Assets in connection with the dismantling, demolition or removal thereof) or (iii) the Liabilities with respect to the Above-Grade Refinery Assets assumed by Purchaser pursuant to Section 2.3(o);

(m)    all Liabilities associated with any draw on any Seller Letter of Credit to the extent such Liabilities are exacerbated, triggered, increased or have their timing accelerated by any act or omission of, or any delay caused by, Purchaser or any of its Affiliates, their respective successors or assigns or their respective Representatives;

(n)    Purchaser's obligations under Section 7.33; and

(o)    any Environmental Liabilities to the extent directly arising from the physical presence of Hazardous Materials (including asbestos and asbestos-containing materials) on, at or within (but not under, adjacent or otherwise proximate to) the Above-Grade Refinery Assets, including Environmental Liabilities arising directly from such Hazardous Materials as a result of the dismantling, demolition or removal of the Above-Grade Refinery Assets.

2.4    Excluded Liabilities.  Notwithstanding anything contained herein to the contrary, Purchaser shall not assume, or cause to be assumed, or be deemed to have assumed or caused to have assumed or be liable or responsible for any of the following Liabilities of Seller or any of its Affiliates (collectively, the "**Excluded Liabilities**"):

(a)    all Liabilities not set forth in clauses (a) – (o) of Section 2.3;

(b)    all Liabilities (other than Environmental Liabilities) relating to or arising out of any breach or violation of any Law (other than any Environmental Law), Business Contract, Real Property Lease or any Business Permit occurring prior to Closing;

(c)    any Liability arising out of or relating to the Excluded Assets or any other assets of Seller or its Affiliates that are not Purchased Assets (other than any Assumed Liability);

(d)    any Liability arising out of or relating to this Agreement or any Transaction Document for which Seller has responsibility;

(e)    any severance obligations that accrue under any severance plan of Seller existing at or prior to the Closing with respect to Seller's employees and resulting from actions taken by Seller prior to the Closing;

(f)    without limiting Section 2.3(h), any amounts due from Seller or its Affiliates to the USVI Government pursuant to the Concession Agreement;

(g)    all Environmental Liabilities (that are not Assumed Liabilities) arising out of or relating to any act, omission, circumstance or other Event occurring prior to the Closing,

28

including (i) Seller's obligations under the RCRA Permit (including the operation and maintenance of all hydrocarbon recovery and groundwater monitoring wells and corrective actions required under the RCRA Permit) to the extent such obligations (A) are not exacerbated, triggered, increased, or have their timing accelerated by any act or omission of, or any delay caused by, Purchaser or any of its Affiliates, their respective successors or assigns or their respective Representatives or (B) do not arise out of or relate to a non-industrial change in use, discontinued use, long-term closure or permanent shutdown of the Purchased Assets after the Closing (other any of Seller's obligations under the RCRA Permit arising out of the dismantling, demolition or removal of the Above-Grade Refinery Assets), (ii) Liabilities arising from the MTBE Litigations (as such term is defined in the Seller Disclosure Letter), (iii) any Liabilities arising from Orders issued to Seller that may result in Environmental Liabilities to the extent such Liabilities (A) are not exacerbated, triggered, increased, or accelerated by any act or omission of, or any delay caused by, Purchaser or any of its Affiliates, their respective successors or assigns or their respective Representatives or (B) do not arise out of or relate to a change in use, discontinued use, closure or shutdown of the Purchased Assets after the Closing (other any of Seller's obligations under such Orders arising out of the dismantling, demolition or removal of the Above-Grade Refinery Assets) or (C) are not Liabilities under the Consent Decree in connection with the Purchased Assets arising out of or relating to any act, omission, circumstance or other Event occurring after the Closing, and (iv) all Excluded Refinery Liabilities and all other Liabilities (other than Liabilities with respect to the Above-Grade Refinery Assets assumed by Purchaser pursuant to <u>Section 2.3(o)</u>)) arising out of or relating to any act, omission, circumstance or other Event occurring prior to the Closing with respect to the Above-Grade Refinery Assets;

(h)     any costs, expenses or other Liabilities incurred by Purchaser arising from or relating to any Remedial Action (i) required to be undertaken by Seller to address an Excluded Liability pursuant to applicable Environmental Laws and (ii) not fully performed by Seller to the satisfaction of applicable Governmental Entities;

(i)     any obligations of Seller (including funding obligations) under the Pension Plan;

(j)     any Liabilities arising pursuant to the NRD Settlement Agreement and in connection with actions taken or circumstances that arose prior to the Closing Date to the extent such Liabilities (i) are not exacerbated, triggered, increased, or accelerated by any act or omission of, or any delay caused by, Purchaser or any of its Affiliates, their respective successors or assigns or their respective Representatives, or (ii) do not arise out of or relate to a change in use, discontinued use, closure or shutdown of the Purchased Assets after the Closing;

(k)     any Liabilities that both (i) arise under the Consent Decree and (ii) are in connection with actions taken or circumstances that arose prior to the Closing Date to the extent such Liabilities (A) are not exacerbated, triggered, increased, or accelerated by any act or omission of, or any delay caused by, Purchaser or any of its Affiliates, their respective successors or assigns or their respective Representatives or (B) do not arise out of or relate to a change in use, discontinued use, closure or shutdown of the Purchased Assets after the Closing;

29

(l)      all Liabilities for fees and expenses (i) relating to the negotiation and preparation of this Agreement and the Transaction Documents and (ii) relating to the transactions contemplated by this Agreement and the Transaction Documents, in each case, to the extent incurred by Seller or its Affiliates;

(m)      any Liability for any Tax or Taxes of Seller or its Affiliates for any taxable period;

(n)      any Liability for any Tax or Taxes arising out of or relating to the operation of the Business (as currently or formerly conducted) or the ownership of the Purchased Assets in any Pre-Closing Period, including any Property Taxes with respect to any Pre-Closing Period;

(o)      any Liability for any withholding taxes imposed as a result of the transactions contemplated by this Agreement;

(p)      the Pinnacle Cure Amount;

(q)      any Transfer Taxes applicable to the transfer of the Purchased Assets for which Seller is responsible pursuant to Section 7.10(a); and

(r)      any Liability or obligation arising out of or relating to Indebtedness of Seller or any of its Affiliates, including pursuant to the Notes.

Notwithstanding the foregoing, to the extent any of the Liabilities excluded pursuant to clauses (a) through (r) of this Section 2.4 would cause a Liability otherwise assumed pursuant to Section 2.3(n) or (o) to be an Excluded Liability, Section 2.3(n) or (o), as applicable, shall govern and such Liability shall not be an Excluded Liability.

2.5      Assumption and Assignment of Contracts.

(a)      (i)      Until five (5) Business Days prior to the Closing Date, Seller may provide updates or supplements to Section 2.1(a)(i) or Section 2.1(a)(iv) of the Seller Disclosure Letter to include revised Cure Amounts and revised amounts of any accrued and unpaid expenses and accounts payable with respect to any Business Contracts or Real Property Leases set forth therein, which updates shall amend Section 2.1(a)(i) or Section 2.1(a)(iv) of the Seller Disclosure Letter for all purposes hereof.  Prior to the Sale Hearing, Seller shall commence appropriate proceedings before the Bankruptcy Court and otherwise take all reasonably necessary actions in order to determine Cure Amounts with respect to any Business Contract or Real Property Lease entered into prior to the Petition Date.

(ii)      At the Closing, Seller shall assume and assign to Purchaser the Business Contracts and Real Property Leases, in each case pursuant to Section 365 of the Bankruptcy Code and the Sale Order, subject to provision by Purchaser of adequate assurance as may be required under Section 365 of the Bankruptcy Code and payment of the Cure Amounts in respect of Business Contracts and Real Property Leases as contemplated hereby.

Americas 90921623

(iii)    Notwithstanding anything in this Agreement to the contrary, Purchaser may, from time to time and in its sole and absolute discretion, amend or revise Section 2.1(a)(i) and Section 2.1(a)(iv) of the Seller Disclosure Letter in order to remove any Contract from Section 2.1(a)(i) or Section 2.1(a)(iv) of the Seller Disclosure Letter, as applicable, up to five (5) Business Days prior to the Closing Date (the "**Designation Deadline**"); provided, that Purchaser shall not remove the Pinnacle Contract and shall, to the extent approved by the Sale Order, assume the Pinnacle Contract pursuant to Sections 2.1 and 2.3.  Automatically upon the removal of any Business Contract or Real Property Lease from Section 2.1(a)(i) or Section 2.1(a)(iv) of the Seller Disclosure Letter, as applicable, by Purchaser in accordance with the first sentence of this Section 2.5(a)(iii) (any such deleted Business Contract or Real Property Lease, an "**Eliminated Agreement**"), it shall be an Excluded Asset for all purposes of this Agreement, and no Liabilities arising thereunder or relating thereto shall be assumed by Purchaser or be the obligation, liability or responsibility of Purchaser.

(b)    At any time and from time to time after the Closing, without further consideration, each party hereto shall, at the reasonable request of the other party hereto, execute and deliver such further instruments of conveyance, assignment, assumption and transfer with respect to the Purchased Assets and the Assumed Liabilities and take such further action as may be necessary or appropriate to (i) effectuate the intent of this Agreement, (ii) perfect or record title of Purchaser in the Purchased Assets, (iii) put Purchaser in possession of the Purchased Assets and ensure that Purchaser assumes the Assumed Liabilities and (iv) provide such other party in all material respects with the intended benefits of this Agreement.  If Purchaser receives or becomes aware that it holds any of the Excluded Assets, Purchaser agrees to promptly return or cause the return to Seller of, or allow Seller or its Representatives to remove and recover, such assets at Purchaser's sole cost and expense.  In furtherance of the foregoing, with respect to such Excluded Assets that Seller will remove and recover, Purchaser shall grant to Seller and its Representatives reasonable access to Purchaser's property from and after the Closing to permit Seller and its Representatives to remove and recover such Excluded Assets and make any other appropriate arrangements with respect thereto.  If Seller receives or becomes aware that it holds any of the Purchased Assets, Seller agrees to promptly return or cause the return to Purchaser of, or allow Purchaser or its Representatives to remove and recover, such assets at Seller's sole cost and expense.  In furtherance of the foregoing, with respect to such Purchased Assets that Purchaser will remove and recover, Seller shall grant to Purchaser and its Representatives reasonable access to Seller's property from and after the Closing to permit Purchaser and its Representatives to remove and recover such Purchased Assets and make any other appropriate arrangements with respect thereto.

2.6    Required Consents.

(a)    Notwithstanding anything to the contrary contained herein, to the extent that the sale, conveyance, transfer, assignment or delivery or attempted sale, conveyance, transfer, assignment or delivery to Purchaser of any Purchased Asset or Tug Boat pursuant to sections 363 and 365 of the Bankruptcy Code is prohibited by any applicable Law or Order or would require the Consent of any Third Party or any Governmental Entity and such Consent cannot be effectively overridden or canceled by the Sale Order or other related Order of the Bankruptcy Court or shall otherwise not have been obtained prior to Closing, this Agreement

31

shall not constitute a sale, conveyance, transfer, assignment or delivery, or an attempted sale, conveyance, transfer, assignment or delivery of such Purchased Asset or Tug Boat (a "**Deferred Asset**") and the provisions set forth below in Section 2.6(c) shall govern; provided, however, that with respect to any Deferred Terminal Parcels, the provisions set forth in Section 7.28 shall govern.  For the avoidance of doubt, nothing in this Section 2.6 shall limit or have an effect on the conditions to Closing set forth in Section 8.1(e) (in respect of the Required Governmental Approvals) or Section 8.2(d) (in respect of the Other Required Approvals).

(b)     Following the Closing, the Parties shall have a continuing obligation to use their respective commercially reasonable efforts to cooperate with each other and to obtain promptly all Consents that cannot be effectively overridden or canceled by the Sale Order or other related Order of the Bankruptcy Court and that are necessary for the transfer of the Deferred Assets and each Party shall provide all of the assistance that is reasonably requested by the other Party in connection with securing such Consents; provided, that the Parties' obligations under this Section 2.6(b) and Section 2.6(c) shall be subject to the Efforts Conditions.

(c)     To the extent that Consent is not received and cannot be effectively overridden or canceled by the Sale Order or other related Order of the Bankruptcy Court in respect of any Deferred Asset as of Closing, the Parties shall reasonably cooperate with each other and use their respective commercially reasonable efforts to enter into any lawful and feasible arrangement pursuant to which Purchaser will obtain (for no additional cost or consideration) the same rights and benefits, and assume the same obligations, with respect to such Deferred Asset following the Closing, of Seller or HOVIC, as applicable, immediately prior to the Closing, whereby: (i) Purchaser shall be responsible for performing all obligations in respect of such Deferred Asset required to be performed by Seller or HOVIC, as applicable, after the Closing to the extent set forth in this Agreement; (ii) Seller or HOVIC, as applicable, shall give such commercially reasonable assistance as Purchaser may reasonably require to enable Purchaser to enforce its rights under such Deferred Asset and to ensure that Purchaser has the sole and exclusive right to direct and control the exercise or waiver of any rights under such Deferred Asset; and (iii) Seller and HOVIC, as applicable, shall promptly pay to Purchaser, when received, all monies received by Seller and HOVIC, as applicable, under any such Deferred Asset; provided, that Purchaser shall not be responsible for any Liabilities under any such Deferred Asset to the extent constituting Excluded Liabilities or arising from any negligence or misconduct by Seller, or any failure by Seller or its Affiliates to comply with Law, the terms of such Deferred Asset, this Agreement or any of the Transaction Documents.  Upon obtaining the requisite Consent, Seller or HOVIC, as applicable, shall promptly convey, transfer, assign and deliver, or cause to be conveyed, transferred, assigned and delivered, such Deferred Asset to Purchaser at no additional cost.

ARTICLE III

PURCHASE PRICE

3.1     Purchase Price; Delivery of Funds.  At the Closing, in full consideration for the sale and transfer by Seller of the Purchased Assets and for the sale and transfer by HOVIC of the Tug Boats (a) Purchaser shall pay to Seller an amount (such amount, the "**Closing Payment**") equal to (i) the Purchase Price, less (ii) the Good Faith Deposit Amount, less (iii) the Pinnacle

32

Cure Amount, less (iv) the USVI Government Concession Fee, by wire transfer of immediately available funds to an account designated by Seller in writing to Purchaser at least three (3) Business Days prior to the Closing; (b) Limetree Delaware shall, together with Seller, execute and deliver a joint written instruction to the Escrow Agent instructing it to release from the Escrow Account to Seller by wire transfer of immediately available funds to an account designated by Seller, an amount equal to the Good Faith Deposit Amount, and (c) Purchaser shall assume the Assumed Liabilities.

3.2    Good Faith Escrow Deposit.

(a)    Limetree Delaware has paid to the Escrow Agent the Good Faith Deposit Amount, which funds shall be held in the Escrow Account by the Escrow Agent and invested as provided for in the Escrow Agreement and released by the Escrow Agent only in accordance with the terms of this Agreement and the Escrow Agreement.

(b)    If the Closing occurs, then the Good Faith Deposit Amount, shall be paid to Seller on behalf of Purchaser, and the applicable Parties shall submit joint written instructions to the Escrow Agent (in accordance with Section 3.1) to give effect to the same.

(c)    If the Closing does not occur as a result of the termination of this Agreement by Seller pursuant to Section 9.1(c), then within five (5) Business Days of such termination, the Good Faith Deposit Amount shall be disbursed to Seller by the Escrow Agent as liquidated damages and the applicable Parties shall submit joint written instructions to the Escrow Agent to give effect to the same.

(d)    If the Closing does not occur as a result of the termination of this Agreement for any reason other than as set forth in Section 3.2(c), then the Good Faith Deposit Amount shall be returned to Limetree Delaware by the Escrow Agent within five (5) Business Days of such termination, and the applicable Parties shall submit joint written instructions to the Escrow Agent to give effect to the same.

(e)    The parties hereto acknowledge that the agreements contained in this Section 3.2 are an integral part of the transactions contemplated by this Agreement and that without these agreements neither Seller nor Purchaser would enter into this Agreement.

3.3    Allocation of the Purchase Price.

(a)    Seller and Purchaser agree to allocate the Purchase Price, Assumed Liabilities, and any other items constituting or adjusting consideration for applicable income Tax purposes (collectively, the "**Tax Purchase Price**") among the Purchased Assets and the Tug Boats.

(b)    Seller shall provide Purchaser with draft allocations pursuant to Section 3.3(a) that comply with Section 1060 of the Code and the Treasury regulations promulgated thereunder as soon as commercially practicable and shall use reasonable efforts to provide such draft allocations twenty (20) days prior to the Closing Date.  If Seller provides Purchaser with such draft allocations twenty (20) days prior to the Closing Date then Seller and Purchaser shall use commercially reasonable efforts to reach agreement on the allocations prior to the Closing

33

Date.  If Seller does not provide Purchaser with such draft allocations at least twenty (20) days prior to the Closing Date, then Seller shall provide Purchaser with such draft allocation as soon as commercially practicable after the Closing Date (and in any event within sixty (60) days after the Closing Date).  If Purchaser disagrees with the draft allocations provided by Seller, then Purchaser may, within ten (10) days after Seller provided the draft allocations, deliver written notice to Seller setting forth in reasonable detail Purchaser's objection(s) to the draft allocations. If Purchaser does not duly deliver timely written notice of any objections pursuant to the previous sentence, then Purchaser shall be deemed to have agreed to Seller's draft allocations. However, if Purchaser does duly deliver timely written notice of objections to the draft allocations, then Seller and Purchaser shall negotiate in good faith to resolve such objections and to reach agreement on the allocations; provided, that if Seller and Purchaser are not able to reach agreement within ten (10) days after Purchaser delivered its written notice of objections to Seller, then Seller and Purchaser shall submit the unresolved issues for prompt resolution to a nationally recognized accounting firm that is mutually agreed upon by Seller and Purchaser.  The determination of such accounting firm shall be binding on Seller and Purchaser, and Seller and Purchaser shall each bear one-half of the costs and expenses of such accounting firm.  The final allocations (as agreed upon, as deemed agreed upon or as determined by such accounting firm, as the case may be, and as updated, if applicable, pursuant to the next sentence) shall be referred to as the "**Allocation**."  In the event of any subsequent adjustment to the Tax Purchase Price, Seller and Purchaser shall work together in good faith to agree upon an updated Allocation to reflect such adjustment, taking into account applicable Law and the nature of the circumstances giving rise to the relevant adjustment.  Seller and Purchaser shall, and shall cause their Affiliates to, report consistently with the Allocation in all Returns, including IRS Form 8594, which Purchaser and Seller shall timely file with the appropriate Taxing authority, and Seller, Purchaser and each of their respective Affiliates shall not file any Return or other document or otherwise take any position that is inconsistent with the Allocation determined pursuant to this <u>Section 3.3(b)</u>, except as may be adjusted by subsequent agreement following an audit by the Virgin Islands Bureau of Internal Revenue or the IRS or by an Order.

(c)    The Parties shall promptly inform one another of any challenge by any Governmental Entity to any allocation made pursuant to this <u>Section 3.3</u> and agree to consult in good faith with and keep one another informed with respect to the state of, and any discussion, proposal or submission with respect to, such challenge; provided, that nothing in this <u>Section 3.3</u> shall require Seller, Purchaser or their Affiliates to litigate before any court any proposed deficiency or adjustment by any Governmental Entity challenging the Allocation.

3.4    <u>Withholding</u>.  Purchaser, and any Person acting on its behalf, shall be entitled to deduct and withhold any amounts in connection with the transactions contemplated by this Agreement that are required to be deducted and withheld under applicable Law; <u>provided</u>, <u>however</u>, Purchaser shall not withhold any amounts under the Foreign Investment in Real Property Tax Act ("**FIRPTA**") rules if it receives the certificates described in <u>Section 3.5(b)(vii)</u> and in <u>Section 3.5(d)(iii)</u>.  To the extent any such amounts are deducted or withheld, such amounts shall be treated as having been paid to the Person in respect of which the deduction or withholding was made.  Seller shall (and shall cause its Affiliates to) cooperate with Purchaser reasonably and in good faith, to enable Purchaser to apply for and obtain a withholding certificate on a timely basis upon which Purchaser can rely from the applicable United States and/or United States Virgin Islands Tax authorities, stating that no withholding is required in

34

connection with the transactions contemplated by this Agreement; provided, that the Parties acknowledge and agree that (a) Purchaser's application for a withholding certificate may not result in its receipt of such certificate and Purchaser may be required to bear withholding Taxes which cannot be deducted or withheld from amounts paid to Seller under this Agreement ("**Purchaser Borne Withholding Taxes**") and (b) Purchaser's receipt of a withholding certificate shall not be a condition to Closing.  In furtherance of and without limiting the foregoing, Seller shall promptly provide to Purchaser upon request any relevant addresses, identifying numbers, depreciation schedules, other evidence confirming adjusted basis, a calculation of the maximum tax that may be imposed in connection with the Purchase, a calculation of Seller's unsatisfied withholding liability (or evidence that no such liability exists) and any other information and documentation reasonably requested by Purchaser in connection with applying for and obtaining any such withholding certificate.  In addition, Seller shall (and shall cause its Affiliates to) reasonably cooperate with Purchaser in good faith to the extent permitted by Law to apply for and obtain a refund of any Purchaser Borne Withholding Tax that is remitted by Purchaser to a Governmental Entity in connection with the transactions contemplated by this Agreement, and to the extent Seller or its Affiliates receive a refund of any such Purchaser Borne Withholding Tax, Seller shall cause such refund to be paid to Purchaser.

3.5    Closing; Closing Deliverables.

(a)    Subject to the satisfaction or waiver of all of the conditions set forth in Sections 8.1, 8.2 and 8.3, the closing of the Purchase (the "**Closing**") shall take place at the offices of White & Case LLP, 1155 Avenue of the Americas, New York, New York, 10036-2787, as soon as practicable, but in any event within five (5) Business Days, after the last of the conditions set forth in Sections 8.1, 8.2 and 8.3 is satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the fulfillment or waiver of those conditions), or at such other time, date or place as the Parties shall agree in writing.  Such date is herein referred to as the "**Closing Date**".

(b)    At the Closing, Seller shall deliver or cause to be delivered to Purchaser:

(i)    a certificate in a form reasonably satisfactory to Purchaser signed by an authorized officer of Seller, dated as of the Closing Date, confirming the matters set forth in Sections 8.2(a) and (b) with respect to Seller;

(ii)    counterparts to the assignment, transfer and conveyance instruments listed on Section 3.5 of the Seller Disclosure Letter, in each case, duly executed by Seller (as applicable);

(iii)    a counterpart to the Bill of Sale and Assignment and Assumption Agreement, duly executed by Seller;

(iv)    a counterpart to the Remediation Access Easement, duly executed by Seller;

(v)    a counterpart to the Shared Services Agreement, duly executed by Seller;

35

(vi)    a counterpart to the Transition Services Agreement, duly executed by Seller;

(vii)    (x) a certificate, duly completed and executed by Seller and dated as of the Closing Date, in the form of Exhibit G and (y) a certificate, duly completed and executed by PDVSA VI and dated as of the Closing Date, in the form of Exhibit G;

(viii)    a counterpart to each Closing Cross-Easement Agreement, duly executed by Seller;

(ix)    a properly executed deed in recordable and customary form for conveyances of commercial real property in the United States Virgin Islands conveying the Purchased Real Property (other than the Deferred Terminal Parcels), which has the real property legal description approved by the Office of the Public Surveyor of the Government of the Virgin Islands, together with real property tax clearance letters from the Government of the Virgin Islands covering all the tax bills for all of the parcels of real property being conveyed by the deed;

(x)    written instructions to the Escrow Agent to release the Good Faith Deposit Amount pursuant to Section 3.1;

(xi)    a counterpart to the Option Agreement, duly executed by Seller;

(xii)    a counterpart to the Assignment of Leased Submerged Lands, duly executed by Seller;

(xiii)    a properly executed Imperfect Deed, otherwise in recordable and customary form for conveyances of commercial real property in the United States Virgin Islands conveying the Deferred Terminal Parcels, but which requires the real property legal description approved by the Office of the Public Surveyor of the Government of the Virgin Islands, together with (1) a power of attorney, executed by Seller, granting Purchaser the ability to execute, deliver and file such Imperfect Deed once the legal description approved by the Office of the Public Surveyor of the Government of the Virgin Islands are available, (2) a counterpart (duly executed by Seller) to an escrow agreement with Nichols, Newman, Logan, Grey & Lockwood, PC, pursuant to which such Imperfect Deed will be held in escrow until the legal description approved by the Office of the Public Surveyor of the Government of the Virgin Islands are available so that the Imperfect Deed may be filed, and (3) real property tax clearance letters from USVI Government covering all the tax bills for all of the parcels of real property being conveyed by such deed;

(xiv)    a counterpart to the Miscellaneous Access Easement, duly executed by Seller; and

(xv)    a counterpart to the Limetree Access Easement, duly executed by Seller.

Americas 90921623

      (c)      At the Closing, Purchaser shall deliver or cause to be delivered to Seller, and Seller shall have received:

      (i)      the Closing Payment by wire transfer of immediately available funds to an account designated by Seller in writing to Purchaser at least three (3) Business Days prior to the Closing;

      (ii)      a certificate in a form reasonably satisfactory to Seller signed by an authorized officer of Purchaser, dated as of the Closing Date, confirming the matters set forth in Sections 8.3(a) and (b);

      (iii)      counterparts to the assignment, transfer and conveyance instruments listed on Section 3.5 of the Seller Disclosure Letter, in each case, duly executed by Purchaser (as applicable);

      (iv)      a counterpart to the Bill of Sale and Assignment and Assumption Agreement, duly executed by Purchaser;

      (v)      a counterpart to the Remediation Access Easement, duly executed by Purchaser;

      (vi)      a counterpart to the Shared Services Agreement, duly executed by Purchaser;

      (vii)      a counterpart to the Transition Services Agreement, duly executed by Purchaser;

      (viii)      a counterpart to each Closing Cross-Easement Agreement, duly executed by Purchaser;

      (ix)      written instructions from Limetree Delaware to the Escrow Agent to release the Good Faith Deposit Amount pursuant to Section 3.1;

      (x)      a counterpart to the Option Agreement, duly executed by Purchaser;

      (xi)      a counterpart to the Assignment of Leased Submerged Lands, duly executed by Purchaser;

      (xii)      a counterpart to the escrow agreement described in Section 3.5(b)(xiii)(2), duly executed by Nichols, Newman, Logan, Grey & Lockwood, PC;

      (xiii)      a counterpart to the Miscellaneous Access Easement, duly executed by Purchaser; and

      (xiv)      a counterpart to the Limetree Access Easement, duly executed by Seller.

37

(d)    At the Closing, HOVIC shall deliver or cause to be delivered to Purchaser:

(i)    two (2) counterparts to the Tug Boat Bill of Sale and Acceptance with respect to each Tug Boat, in each case duly executed by HOVIC (including any notarization, apostille or other form of authentication as required in the applicable jurisdiction for such Tug Boat);

(ii)    two (2) counterparts to the Protocol of Delivery and Acceptance with respect to each Tug Boat, in each case duly executed by HOVIC; and

(iii)    a certificate, duly completed and executed by HOVIC and dated as of the Closing Date, in the form of Exhibit G.

(e)    At the Closing, Purchaser shall deliver or cause to be delivered to HOVIC:

(i)    two (2) counterparts to the Tug Boat Bill of Sale and Acceptance with respect to each Tug Boat, in each case duly executed by Purchaser (including any notarization, apostille or other form of authentication as required in the applicable jurisdiction for such Tug Boat); and

(ii)    two (2) counterparts to the Protocol of Delivery and Acceptance with respect to each Tug Boat, in each case duly executed by Purchaser.

(f)    At the Closing, Purchaser shall deliver or cause to be delivered to the USVI Government, the USVI Government Concession Fee, by wire transfer of immediately available funds to an account designated by the USVI Government in writing to Purchaser.

(g)    At the Closing, Purchaser shall deliver or cause to be delivered to Pinnacle Services L.L.C., the Pinnacle Cure Amount, by wire transfer of immediately available funds to an account designated by Pinnacle Services L.L.C. in writing to Purchaser.

(h)    The Closing shall not be deemed to have occurred unless each of the items set forth in Sections 3.5(b), 3.5(c), 3.5(d), 3.5(e), 3.5(f) and 3.5(g) has been completed or waived in writing by the applicable Party.  If such items have been completed, they and the Closing shall be deemed to have been completed simultaneously.  Notwithstanding anything to the contrary in this Agreement and without limiting the generality of the immediately preceding two sentences, neither Seller nor HOVIC shall acquire any right, title or interest in the funds transferred in respect of the Purchase Price, and Purchaser shall not acquire any right, title or interest in the Purchased Assets or the Tug Boats, except upon actual receipt by Seller of the Closing Payment in the bank account designated by Seller pursuant to Section 3.1.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the disclosure letter delivered by Seller to Purchaser (the "**Seller Disclosure Letter**") concurrently with the execution of this Agreement (it being agreed that any matter disclosed pursuant to any section of the Seller Disclosure Letter shall be deemed

38

disclosed for purposes of any other section of the Seller Disclosure Letter to the extent the applicability of the disclosure to such other section is reasonably apparent on the face of such disclosure), Seller hereby represents and warrants to Purchaser as follows as of the date hereof and as of the Closing Date (or as of such other date as may be specified herein):

4.1     Due Organization, Good Standing and Limited Liability Company Power.  Seller is duly organized, validly existing and in good standing under the Laws of the U.S. Virgin Islands.  Seller has all requisite limited liability company power and authority to own, lease and operate its assets and properties and conduct its business as now being conducted.  Seller is in good standing under the laws of each jurisdiction where the character of its assets or properties or the conduct of its business requires such qualification, except where the failure to be in good standing would not reasonably be expected to materially and adversely affect the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, or prevent or materially delay beyond the End Date Seller's ability to consummate the transactions contemplated by this Agreement or the Transaction Documents.

4.2     Authorization; Noncontravention.

(a)     Subject to obtaining Bankruptcy Court approval pursuant to the Sale Order, Seller has the requisite limited liability company power and authority and has taken all limited liability company action necessary to execute and deliver this Agreement, the Transaction Documents and all other instruments and agreements to be delivered by Seller as contemplated hereby, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  Subject to obtaining Bankruptcy Court approval pursuant to the Sale Order, the execution, delivery and performance by Seller of this Agreement, the Transaction Documents and all other instruments and agreements to be delivered by Seller as contemplated hereby, the consummation by Seller of the transactions contemplated hereby and thereby and the performance of its obligations hereunder and thereunder have been, and in the case of documents required to be delivered at the Closing will be, duly authorized and approved by all necessary limited liability company, member or other action.  This Agreement has been, and the Transaction Documents and all other instruments and agreements to be executed and delivered by Seller as contemplated hereby will be, duly executed and delivered by Seller.  Subject to obtaining Bankruptcy Court approval pursuant to the Sale Order, assuming that this Agreement, the Transaction Documents and all such other instruments and agreements constitute valid and binding obligations of Purchaser and each other Person (other than Seller or any Affiliate thereof) party hereto and thereto, this Agreement, the Transaction Documents and all such other instruments and agreements constitute valid and binding obligations of Seller, enforceable against Seller in accordance with the terms thereof, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether considered in a proceeding in equity or at law).

(b)     Except as a result of the Bankruptcy Case and, subject to obtaining Bankruptcy Court approval pursuant to the Sale Order, the execution and delivery by Seller of this Agreement, the Transaction Documents and all other instruments and agreements to be delivered by Seller as contemplated hereby do not, and the consummation of the transactions contemplated hereby and thereby will not:

(i)        conflict with any of the provisions of the certificate of formation of Seller or the Hovensa Operating Agreement;

(ii)        except as provided in <u>Section 4.2(b)(ii)</u> of the Seller Disclosure Letter and subject to receipt of the Consents set forth in <u>Section 4.3</u> of the Seller Disclosure Letter, conflict with or result in a breach of, or constitute a default under or give rise to any right of termination, cancellation, modification or acceleration (including any right of first refusal or similar right) or the loss of a benefit under, or require the Consent of or giving of notice to any Person under any Business Contract, Business Permit or Real Property Lease (in each case, with or without notice or lapse or time or both); except, in the case of this clause (ii) for such conflicts or breaches or Consents or notices that (if not received) would not reasonably be expected to materially and adversely affect the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, or prevent or materially delay beyond the End Date Seller's ability to consummate the transactions contemplated by this Agreement or the Transaction Documents;

(iii)        subject to the receipt of the Consents referred to in <u>Section 4.3</u> of the Seller Disclosure Letter, contravene any Law or any Order applicable to Seller or by which any of its properties or assets are bound except such contraventions that would not reasonably be expected to materially and adversely affect the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, or prevent or materially delay beyond the End Date Seller's ability to consummate the transactions contemplated by this Agreement or the Transaction Documents; or

(iv)        result in the creation or imposition of any Lien (other than a Permitted Lien) on any of the Purchased Assets.

4.3        <u>Governmental Consents and Approvals</u>.  Except as a result of the Bankruptcy Case and, subject to obtaining Bankruptcy Court approval pursuant to the entry of the Sale Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in rules 6004(h) and 3020(e) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), as applicable, except as set forth in <u>Section 4.3</u> of the Seller Disclosure Letter, no Consent of or filing with any Governmental Entity must be obtained or made by Seller in connection with the execution and delivery of this Agreement or any Transaction Document by Seller or the consummation by Seller of the transactions contemplated by this Agreement or any Transaction Document, except for any Consents that, if not obtained or made, would not reasonably be expected to materially adversely affect the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, or prevent or materially delay beyond the End Date Seller's ability to consummate the transactions contemplated by this Agreement or the Transaction Documents.

4.4        <u>Property</u>.  (a) Other than the Real Property, Seller owns no other real property. Seller has good and valid title to the Purchased Real Property (other than any Excluded Asset), subject to Permitted Liens.  There are no outstanding options, rights of first offer or rights of first refusal to purchase any Purchased Real Property or any portion thereof or interest therein.  Seller has not leased or otherwise granted to any Person the right to use or occupy the Purchased Real Property or any material portion thereof, except as set forth in <u>Section 4.4(b)</u> of the Seller

40

Disclosure Letter.  Other than the Deferred Terminal Parcels, each parcel of Purchased Real Property constitutes a legally subdivided lot in compliance with all applicable subdivision Laws, separate from any adjoining land or improvements.

(b)      Section 4.4(b) of the Seller Disclosure Letter contains an accurate and complete list as of the date hereof of all Real Property Leases and all other real property leases and subleases to which Seller is a party, and sets forth the role of Seller.  With respect to each Real Property Lease pursuant to which Seller is a lessee or sublessee, Seller has valid leasehold interests in all leased real property described in such Real Property Lease, free and clear of any and all Liens, except for Permitted Liens.  Each Real Property Lease is a valid and binding obligation of Seller and, to the Knowledge of Seller, is enforceable against the other parties thereto in accordance with the terms thereof, in each case, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether considered in a proceeding in equity or at law).  Except as set forth in Section 4.4(b), of the Seller Disclosure Letter, there exists no material default or event of default (with or without notice or lapse of time or both) with respect to any Real Property Lease by Seller or, to the Knowledge of Seller, by any other party thereto and Seller has not received or delivered any notice with respect to any alleged material default that has not been rescinded or completely cured.  Seller has not subleased or otherwise granted any Person the right to use or occupy any material portion of the real property leased or subleased by Seller pursuant to any Real Property Lease.

(c)      There are no assets or properties of Seller that are used or necessary for the use, maintenance and operation of the Business Real Property as currently used, maintained and operated by Seller that are not included in Purchased Assets or that will not be available to Purchaser by means of the Shared Services Agreement, the Transition Services Agreement, the Cross-Easement Agreements, the Remediation Access Easement, the Miscellaneous Access Easement or the Limetree Access Easement, except for such assets or properties that (if not so included or accessible) are not material to Seller's current use, maintenance and operation of the Business Real Property.  To the Knowledge of Seller, there is no, and Seller has not received written notice of any, existing or threatened change in the zoning classification of any Business Real Property (or any portion thereof) from that in effect on the date of this Agreement, in each instance, which would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  All water, sewer, gas, electric, telephone and drainage facilities and all other utilities and public or quasi-public improvements related thereto required by Law with respect to, or required for the operation of, the Business at the Business Real Property, are installed and available to serve the Business Real Property.  There are no pending or, to the Knowledge of Seller, threatened, material interruptions (except in the ordinary course) of any utility services to any material portion of the Business Real Property.  The Business Real Property has sufficient access to and from dedicated streets, whether over public or private roads, for the operation of the Business, and the responsibility for maintenance of such dedicated streets has, to the Knowledge of Seller, been accepted by the appropriate Governmental Entity.  No condemnation proceeding, lawsuit or administrative action or other matter affecting and adversely impairing the current use or occupancy of the Business Real Property is pending or, to the Knowledge of Seller, threatened in writing with respect to any Business Real Property which has had or would reasonably be expected to have, individually or in the aggregate, a Material

41

Adverse Effect.  To the Knowledge of Seller, there has been no material casualty damage at any of the Business Real Property that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(d)      Except as set forth in Section 4.4(d) of the Seller Disclosure Letter, and excluding Purchased Real Property (which is governed by Section 4.4(a) above), Seller owns and has good and valid title to, or a valid leasehold interest in, all personal property included in the Purchased Assets, free and clear of all Liens, except for Permitted Liens.

4.5      Affiliate Transactions.  Except for the Hovensa Operating Agreement and as disclosed in Section 4.5 of the Seller Disclosure Letter and except for employment and consultant relationships and compensation, benefits, travel advances and employee or consultant loans to any officer, director, employee or consultant of Seller, in each case, in the ordinary course of business, there is no Contract or Liability relating primarily to the Business, the Purchased Assets or the Assumed Liabilities between (a) Seller, on the one hand, and (b) any Affiliate, equity holder, option holder, officer, member, partner or director of Seller, on the other hand, that remains in force and provides for obligations of any party from and after the Closing.

4.6      Material Contracts.

(a)      Section 4.6 of the Seller Disclosure Letter sets forth (organized to refer to each of the clauses in this Section 4.6) an accurate, correct and complete list of the following Contracts to which Seller is a party and which are currently in effect as of the date hereof:

(i)      each Contract that is not a Business Contract and that is (A) with any current or former customer of, or supplier to, the Business or (B) material to the operation of Business (assuming the Business includes an Operational Terminals Business);

(ii)      each Contract whereby Seller has created a Lien in respect of  any of the Purchased Assets;

(iii)      each Business Contract containing any covenant limiting the freedom of Seller or any of its Affiliates (A) to compete with any Person, engage in any line of business or exploit the Purchased Assets, in each case, in any geographic territory, (B) which grants to any Person any exclusivity with respect to any geographic territory, any customer or any product or service or (C) to solicit for employment, hire or employ any Person;

(iv)      each Business Contract that requires capital expenditures or other outstanding payments to be made by Seller, in each case, following the date hereof;

(v)      each Business Contract involving the sharing of profits, losses, costs or liabilities with any other Person relating to the Business, the Purchased Assets or the Assumed Liabilities;

(vi)      each Business Contract that requires (or may require in certain circumstances) in accordance with its terms the provision of credit support, collateral, a

42

guarantee or similar financial assurance in respect of the Business, the Purchased Assets or the Assumed Liabilities;

(vii)     each Business Contract that (A) provides services for a fixed price or maximum fee, or pursuant to any cap or similar provisions; (B) grants "most favored nation" status (or similar status) to a Person (whether in respect of pricing or otherwise) or (C) provides any performance guarantee, material rebates, discounts, incentive or volume credits;

(viii)    each Contract that involves the resolution or settlement of any actual or threatened Proceeding relating to the Business, the Purchased Assets or the Assumed Liabilities; and

(ix)     each Contract with any Governmental Entity relating to the Business, the Purchased Assets or the Assumed Liabilities.

(b)     The Contracts required to be listed in <u>Section 4.6(a)</u>, together with the Business Contracts and the Real Property Leases are referred to as "**Material Contracts**." True, correct and complete copies of each Material Contract have been made available to Purchaser prior to the date hereof. Each Business Contract is a valid and binding obligation of Seller (except for any breach or default that results from the insolvency of Seller or the commencement of the Bankruptcy Case and any breach or default to be cured through the payment of the Cure Amounts) and to the Knowledge of Seller, enforceable against the other parties thereto in accordance with the terms thereof, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether considered in a proceeding in equity or at law). Except as set forth in <u>Section 4.6</u> of the Seller Disclosure Letter and any breach or default that results from the insolvency of Seller or the commencement of the Bankruptcy Case and any breach or default to be cured through the payment of the Cure Amounts, there exists no material default or event of default (with or without notice or lapse of time or both) with respect to any Business Contract by Seller or, to the Knowledge of Seller, by any other party thereto and Seller has not received or delivered any notice with respect to any alleged material default that has not been rescinded or completely cured.

4.7     <u>Intellectual Property Rights and Claims</u>. (a) Except as set forth in <u>Section 4.7(a)</u> of the Seller Disclosure Letter, Seller owns all right, title, and interest to or is licensed to use the Business Intellectual Property, free and clear of any Liens, other than Permitted Liens.

(b)     Seller has not, within the last twelve (12) months made any written claim of an infringement or misappropriation by any Third Party of its rights to any Business Intellectual Property, which claim is still pending. To the Knowledge of Seller, no Third Party is infringing or misappropriating any Business Intellectual Property.

(c)     Except for claims that have since been satisfactorily resolved or for which the statute of limitations has lapsed, Seller has not received any written notice from any Third Party challenging the right of Seller to use any of the Business Intellectual Property that would

43

reasonably be expected to materially and adversely affect the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole (assuming the Business includes an Operational Terminals Business).

(d)    There are no pending actions, suits or arbitrations by, before or against any Person or Governmental Entity for an infringement or misappropriation by Seller of any Intellectual Property owned by any Third Party which would reasonably be expected to materially and adversely affect the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole (assuming the Business includes an Operational Terminals Business).

4.8    Tax Matters.    Except as set forth in Section 4.8 of the Seller Disclosure Letter:

(a)    Tax Returns.    Seller has timely filed or caused to be timely filed, taking into account any applicable extensions, with the appropriate taxing authorities all income Tax Returns and all material non-income Tax Returns with respect to the Business or the Purchased Assets. All such Returns are correct and complete in all material respects. Seller is not currently the beneficiary of any extension of time within which to file any material tax Return with respect to the Business or the Purchased Assets. No claim has ever been made by a Governmental Entity in a jurisdiction in which Seller does not file Returns that Seller is or may be subject to taxation by that jurisdiction with respect to Taxes that would be the subject of such Returns.

(b)    Payment of Taxes.    All income Tax Liabilities and all material non-income Tax Liabilities of Seller due and payable with respect to the Business or the Purchased Assets, in each instance for all Pre-Closing Periods, have been timely paid, taking into account any applicable extensions, to the extent the non-payment of such Taxes could reasonably be expected to result in a Lien (other than a Permitted Tax Lien) on the Purchased Assets, adversely affect the Business, or result in Purchaser becoming liable for such Taxes. There are no pending or threatened audits, investigations, disputes, notices of deficiency, claims or other similar actions relating to Property Taxes or any other Taxes that are imposed on a periodic basis (which are not based on income) of Seller with respect to the Business or the Purchased Assets. Seller has not waived any statute of limitations in respect of non-income Taxes or agreed to any extension of time with respect to a non-income Tax assessment or deficiency.

(c)    Withholding Taxes.    All material Taxes that Seller is (or was) required by Law to withhold or collect on or prior to the date hereof in connection with amounts paid or owing to any employee, independent contractor, creditor, equity holder or other Third Party have been duly withheld or collected, and have been timely paid over to the proper authorities to the extent due and payable, to the extent the non-payment of such Taxes could reasonably be expected to result in a Lien (other than a Permitted Tax Lien) on the Purchased Assets, adversely affect the Business, or result in Purchaser becoming liable for such Taxes.

(d)    Liens.    There are no Liens for Taxes on any of the Purchased Assets, other than Permitted Liens.

(e)    Depreciation.    No Purchased Asset (i) is property required to be treated as owned by another person pursuant to the provisions of Section 168(f)(8) of the Internal Revenue Code of 1954, as amended and in effect immediately prior to the enactment of the Tax Reform

44

Act of 1986, (ii) constitutes "tax-exempt use property" within the meaning of Section 168(h) of the Code, (iii) is "tax-exempt bond financed property" within the meaning of Section 168(g) of the Code, (iv) secures any debt the interest of which is tax-exempt under Section 103(a) of the Code or (v) is subject to a "section 467 rental agreement" within the meaning of Section 467 of the Code.

(f)    The representations and warranties contained in Section 4.8(a) and Section 4.8(b) shall only apply if and to the extent Purchaser or its Affiliates could be held liable for the Taxes to which such representations and warranties relate or if the Purchased Assets could become subject to a Lien (other than a Permitted Tax Lien) in respect of such Taxes and, for the avoidance of doubt, such representations and warranties shall not be considered inaccurate or breached to the extent the applicable representation or warranty does not apply as a result of this Section 4.8(f).

4.9    Employee Benefits.  Set forth in Section 4.9(a) of the Seller Disclosure Letter is, as of February 15, 2015, a true and complete list of each material employee benefit plan, within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), and each material fringe benefit, deferred compensation, severance, stock option, stock appreciation rights, incentive and bonus plan maintained or contributed to, or required to be contributed to, by Seller or its Affiliates, in each case for the benefit of Seller's employees as of such date, but excepting any such plan sponsored in whole or in part by any government, Governmental Entity or union or employee organization or any other Person (collectively, the "**Employee Benefit Plans**").

4.10    Compliance with Laws.    Except as set forth in Section 4.10 of the Seller Disclosure Letter, (a) Seller is not, and has not been in the past three (3) years, in material violation of any Law or Order applicable to the Business, the Purchased Assets or the Assumed Liabilities, and (b) Seller has not received any written notice alleging or, to the Knowledge of Seller, been subject to any investigation by any Governmental Entity concerning, any such material violation of a Law or Order.

4.11    Labor Matters.  Section 4.11 of the Seller Disclosure Letter sets forth each consultant of Seller as of the date hereof who is a natural person and indicates which of such consultants are former employees of Seller or any of its Affiliates (each such former employee, a "**Hovensa Consultant**").  Since May 1, 2015, Seller has not had any employees.  Since January 1, 2015, no Hovensa Consultant has been improperly excluded from participation in any Employee Benefit Plan, and Seller has no direct or indirect liability, whether absolute or contingent, with respect to any misclassification of any Hovensa Consultant as an independent contractor rather than as an employee, except for such exclusion or misclassification that would not reasonably be expected to result in, individually or in the aggregate, a material Assumed Liability.  Seller is in compliance in all material respects with the terms of the Pinnacle Contract, except for such non-compliance that would not reasonably be expected to result in, individually or in the aggregate, a material Assumed Liability.

4.12    Environmental Matters.    Except as set forth in Section 4.12 of the Seller Disclosure Letter, with respect to the Business:

45

(a)      Seller is in material compliance with all applicable Environmental Laws, and Orders including the Consent Decree and NRD Settlement Agreement;

(b)      there are no Proceedings pending, or to the Knowledge of Seller threatened in writing, against Seller that alleges any material violation of Environmental Law and Seller has not received from any Person any written notice of material violation or alleged material violation of Environmental Law;

(c)      Seller possesses and is in material compliance with all Permits (including the RCRA Permit) required under Environmental Laws to operate the Business as currently operated and as the Business is expected to be operated following the Closing as contemplated by the Transaction Documents ("**Environmental Permits**"), and there are no Proceedings pending, or to the Knowledge of Seller threatened in writing, to modify, suspend, revoke or rescind any such Environmental Permits.

(d)      Seller has not have received notice from any Governmental Entity either that Seller's application for the renewal of Clean Air Act Title V Permit No. STX-TV-003-10 is not complete or that Purchaser will not be able to continue operating the Business under such Permit after the Closing.

(e)      Seller has not assumed the material Liability of any other Person under any Environmental Law; and

(f)      there have been no material Releases of any Hazardous Materials (i) at, in, under, on, or from any Seller Facilities or (ii) at, in, under, on, or from any third-party location for which Seller has any material Liability under Environmental Law.

The representations and warranties in this Section 4.12 are the sole and exclusive representations and warranties of Seller concerning any Environmental Law, Hazardous Material, the Consent Decree or other environmental matters.

4.13    Finders; Brokers.   Except for Lazard Freres & Co. LLC (whose fees are payable by Seller), no agent, broker, Person or firm acting on behalf of Seller is, or shall be, entitled to any broker's fees, finder's fees or commissions from Purchaser in connection with this Agreement or any Transaction Document or any of the transactions contemplated hereby or thereby.

4.14    Permits.   Except for matters that are the subject of the representations and warranties in Section 4.12 (Environmental Matters), which matters are covered solely by Section 4.12, Seller possesses all material permits, approvals, licenses, authorizations, certificates, rights, exemptions and Orders from Governmental Entities (collectively, "**Permits**") that are necessary for the lawful operation of the Business as conducted by Seller in the ordinary course (assuming the Business includes an Operational Terminals Business).  All such Permits are valid and have not lapsed, been cancelled, terminated or withdrawn.  To the Knowledge of Seller, Seller is in compliance in all material respects with all such Permits.

4.15    Absence of Changes.   Except as expressly contemplated by this Agreement or as set forth on Section 4.15 of the Seller Disclosure Letter, between January 1, 2015 and the date

hereof: (a) Seller has operated in the ordinary course of business, but has not been operating an Operational Terminals Business, (b) there has not occurred any Event that has had or would reasonably be expected to have a Material Adverse Effect, (c) there has been no damage, destruction, interruption in use or other casualty loss, whether or not covered by insurance, materially and adversely affecting the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, and (d) Seller has not taken any action with respect to the Business, the Purchased Assets or Assumed Liabilities that would be prohibited by Section 7.2(a) if such action were to occur between the date hereof and the Closing Date.

4.16   Litigation.  Except as set forth in Section 4.16 of the Seller Disclosure Letter: (a) there is no Proceeding pending, or to Seller's Knowledge, threatened, against Seller or its Affiliates in respect of the Business, the Purchased Assets or the Assumed Liabilities that would, if determined adversely, materially and adversely affect the Business (assuming the Business includes an Operational Terminals Business), the Purchased Assets and Assumed Liabilities, taken as a whole, or prevent or materially delay beyond the End Date Seller's ability to consummate the transactions contemplated by this  Agreement or any Transaction Document and (b) there are no material Orders outstanding applicable to the Business, the Purchased Assets or the Assumed Liabilities that have not been fully satisfied.

4.17   Title to Purchased Assets.  Seller has and will convey, transfer and assign and deliver to the Purchaser as of the Closing, good and valid title to all the Purchased Assets, in each case, free and clear of any Liens (other than Permitted Liens).

4.18   Insurance.  Except for any directors' and officers' liability insurance policies, as of the date hereof, Seller does not maintain any policies of insurance relating to the Business, the Purchased Assets or the Assumed Liabilities.

4.19   Compliance.

(a)   None of Seller or any director, officer or employee or, to the Knowledge of Seller, any agent, representative or other Person acting on behalf of Seller (in respect of the Business) has, directly or indirectly, (i) used any of Seller's corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic governmental official from corporate funds; (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, or any Law of similar purpose and scope instituted by any Governmental Entity; or (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

(b)   None of Seller or any director, officer or employee or, to the Knowledge of Seller, any agent, representative or other Person acting on behalf of Seller  (in respect of the Business) (i) is in violation of any anti-money laundering Law or is under investigation by any Governmental Entity for money laundering or any other similar or related activity, (ii) is an Adverse Person or otherwise the subject of any Sanctions administered or enforced by any Governmental Entity or (iii) has, in the past five (5) years, engaged in or are now engaged in any dealings or transactions in violation of or subject to penalty or action under any Sanctions.

(c)    Seller has instituted and maintains policies and procedures designed to ensure continued compliance with the Laws referenced in this <u>Section 4.19</u> and, to the knowledge of Seller, none of Seller or any director, officer or employee of Seller or any agent, representative or other Person acting on behalf of Seller (in respect of the Business) is the subject of any ongoing Proceeding that if resolved against such Person could result in any statement in this <u>Section 4.19</u> being untrue.

4.20    <u>Exclusivity of Representations; Projections, etc</u>. The representations and warranties expressly made by Seller in this <u>Article IV</u> or in any Transaction Document are the exclusive representations and warranties made by Seller with respect to the Business, the Purchased Assets, the Assumed Liabilities and Tug Boats.  Except for any representations and warranties expressly set forth in this Article IV, or in any Transaction Document or in the Seller Disclosure Letter, (i) the Purchased Assets, the Assumed Liabilities and Tug Boats are sold "AS IS, WHERE IS," and Seller expressly disclaims (on its own behalf and on behalf of its Affiliates) any other representations or warranties of any kind or nature, express or implied, as to Liabilities, operations of its business (as currently or formerly conducted) or the Tug Boats, the title, condition, value or quality of assets of Seller or of the Tug Boats or the prospects (financial and otherwise), risks and other incidents of Seller and its business (as currently or formerly conducted), the Purchased Assets, the Assumed Liabilities and the Tug Boats, (ii) SELLER SPECIFICALLY DISCLAIMS (ON ITS OWN BEHALF AND ON BEHALF OF ITS AFFILIATES), AND PURCHASER HEREBY WAIVES, ANY REPRESENTATION OR WARRANTY OF QUALITY, VALUE, DESIGN, OPERATION, MERCHANTABILITY, NON-INFRINGEMENT, FITNESS FOR A PARTICULAR PURPOSE, ELIGIBILITY FOR A PARTICULAR TRADE, CONFORMITY TO SAMPLES, OR CONDITION OF THE ASSETS OF SELLER (INCLUDING THE PURCHASED ASSETS) OR OF THE TUG BOATS OR ANY PART THEREOF, WHETHER LATENT OR PATENT, (iii)  no material or information provided by or communications made by Seller or any of its Affiliates, or by any advisor thereof, whether by use of a "data room," or in any information memorandum, or otherwise, or by any broker or investment banker, will cause or create any warranty, express or implied, as to or in respect of Seller, any Affiliate of Seller or HOVIC or the title, condition, value or quality of its business (as currently or formerly conducted), the Purchased Assets, the Assumed Liabilities or of the Tug Boats, and no other Person shall be deemed to have made, or shall be deemed to make, any other express or implied representation or warranty, either written or oral, on behalf of Seller or any of its Affiliates with respect to the subject matter contained herein and (iv) Seller does not make any representation or warranty whatsoever with respect to any estimates, projections and other forecasts and plans (including the reasonableness of the assumptions underlying such estimates, projections and forecasts).

ARTICLE V

<u>REPRESENTATIONS AND WARRANTIES OF HOVIC</u>

Except as set forth in the disclosure letter delivered by HOVIC to Purchaser (the "**HOVIC Disclosure Letter**") concurrently with the execution of this Agreement (it being agreed that any matter disclosed pursuant to any section of the HOVIC Disclosure Letter shall be deemed disclosed for purposes of any other section of the HOVIC Disclosure Letter to the extent the applicability of the disclosure to such other section is reasonably apparent on the face of such

48

disclosure), HOVIC hereby represents and warrants to Purchaser (with respect to the Tug Boat Sale only and not, for the avoidance of doubt, with respect to the sale of the purchased Assets or any other transactions contemplated hereby) as follows as of the date hereof and as of the Closing Date (or as of such other date as may be specified herein):

5.1    <u>Due Organization, Good Standing and Corporate Power</u>.    HOVIC is duly organized, validly existing and in good standing under the Laws of the U.S. Virgin Islands. HOVIC has all requisite corporate power and authority to own and operate the Tug Boats.

5.2    <u>Authorization; Noncontravention</u>.

(a)    HOVIC has the requisite corporate power and authority and has taken all corporate action necessary to execute and deliver this Agreement and all other instruments and agreements to be delivered by HOVIC as contemplated hereby, to perform its obligations hereunder and thereunder with respect to the Tug Boat Sale and to consummate the Tug Boat Sale.  The execution, delivery and performance by HOVIC of this Agreement and all other instruments and agreements to be delivered by HOVIC as contemplated hereby, the consummation by HOVIC of the Tug Boat Sale and the performance of its obligations hereunder and thereunder with respect to the Tug Boat Sale have been, and in the case of documents required to be delivered at the Closing will be, duly authorized and approved by all necessary corporate, stockholder or other action.  This Agreement has been, and all other instruments and agreements to be executed and delivered by HOVIC as contemplated hereby will be, duly executed and delivered by HOVIC.    Assuming that this Agreement and all such other instruments and agreements constitute valid and binding obligations of Purchaser and each other Person (other than HOVIC) party hereto and thereto, this Agreement and all such other instruments and agreements constitute valid and binding obligations of HOVIC, enforceable against HOVIC in accordance with the terms thereof, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether considered in a proceeding in equity or at law).

(b)    The execution and delivery by HOVIC of this Agreement and all other instruments and agreements to be delivered by HOVIC as contemplated hereby do not, and the consummation of the Tug Boat Sale will not:

(i)    conflict with any of the provisions of the certificate of incorporation or by-laws of HOVIC;

(ii)    except as provided in <u>Section 5.2</u> of the HOVIC Disclosure Letter and subject to receipt of the Consents set forth in <u>Section 5.2</u> of the HOVIC Disclosure Letter, conflict with or result in a breach of, or constitute a default under, any instrument by which HOVIC or any of its properties or assets (other than Seller or any of its properties or assets) are bound, except for such conflicts, breaches or defaults which would not reasonably be expected to prevent, materially delay or impair HOVIC's ability to consummate the Tug Boat Sale; or

(iii)     subject to the receipt of the Consents referred to in <u>Section 5.3</u> of the HOVIC Disclosure Letter, contravene any Law or any Order applicable to HOVIC or by which any of its properties or assets (other than Seller or any of its properties or assets) are bound in any manner that would reasonably be expected to prevent, materially delay or impair HOVIC's ability to consummate the Tug Boat Sale.

5.3     <u>Governmental Consents and Approvals</u>.    No Consent of or filing with any Governmental Entity must be obtained or made by HOVIC in connection with the execution and delivery of this Agreement by HOVIC or the consummation by HOVIC of the transactions contemplated by this Agreement, except for any Consents that, if not obtained or made, would not reasonably be expected to, individually or in the aggregate, prevent, materially delay or impair HOVIC's ability to consummate the Tug Boat Sale.

5.4     <u>Litigation</u>.    Except as set forth in <u>Section 5.4</u> of the HOVIC Disclosure Letter, (a) there is no Proceeding pending or, to HOVIC's knowledge, threatened, against HOVIC or any of its properties, assets or rights (other than Seller or any of its properties, assets or rights) that would, if determined adversely, reasonably be expected to, individually or in the aggregate, prevent, prohibit, materially delay or impair HOVIC's ability to consummate the Tug Boat Sale and (ii) there are no material Orders outstanding applicable to the Tug Boats that have not been fully satisfied.

5.5     <u>Title to Tug Boats</u>.    HOVIC has and will convey, transfer and assign and deliver to the Purchaser, upon payment of the Purchase Price to Seller, Pinnacle Services L.L.C. and the USVI Government, as applicable, at the Closing and delivery by the Parties of the applicable documents and instruments referred to in <u>Section 3.5</u>, good and valid title to the Tug Boats, in each case, free and clear of any Liens (other than Permitted Liens).

5.6     <u>Exclusivity of Representations; Projections, etc</u>.

(a)     THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY HOVIC IN THIS <u>ARTICLE V</u> ARE THE EXCLUSIVE REPRESENTATIONS AND WARRANTIES MADE BY HOVIC.    EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES OF HOVIC EXPRESSLY SET FORTH IN THIS <u>ARTICLE V</u> OR IN THE HOVIC DISCLOSURE LETTER, THE PURCHASED ASSETS AND EACH TUG BOAT ARE SOLD AND TRANSFERRED UNTO PURCHASER, ITS SUCCESSORS AND ASSIGNS, "AS IS, WHERE IS," WITH ALL FAULTS ACCEPTED BY PURCHASER AND THE PURCHASED ASSETS AND EACH TUG BOAT ARE SOLD WITHOUT ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, BY HOVIC, AND HOVIC EXPRESSLY DISCLAIMS (ON ITS OWN BEHALF AND ON BEHALF OF ITS AFFILIATES) ANY OTHER REPRESENTATION, WARRANTY OR GUARANTY OF ANY KIND OR NATURE, EITHER EXPRESS OR IMPLIED,  STATUTORY OR OTHERWISE, WITH REGARD TO EACH TUG BOAT, LIABILITIES, THE OPERATIONS OF SELLER, THE TITLE, CONDITION, VALUE OR QUALITY OF ASSETS OF SELLER OR HOVIC, THE PROSPECTS (FINANCIAL OR OTHERWISE), RISKS AND OTHER INCIDENTS OF HOVIC OR SELLER AS THEY RELATE TO HOVIC OR SELLER,  INCLUDING, BUT NOT LIMITED TO SEAWORTHINESS, VALUE, DESIGN, OPERATION, MERCHANTABILITY, FITNESS FOR USE FOR A PARTICULAR PURPOSE OF SUCH TUG BOAT OR AS TO

50

THE ELIGIBILITY OF SUCH TUG BOAT FOR ANY PARTICULAR TRADE, AND HOVIC SPECIFICALLY DISCLAIMS (ON ITS OWN BEHALF AND ON BEHALF OF ITS AFFILIATES) AND PURCHASER HEREBY WAIVE AS AGAINST HOVIC AND ITS AFFILIATES ALL WARRANTIES OR REMEDIES OR LIABILITIES WITH RESPECT TO SUCH WARRANTIES ARISING BY LAW OR OTHERWISE WITH RESPECT TO THE TUG BOATS, INCLUDING, BUT NOT LIMITED TO (1) ANY REPRESENTATION OR WARRANTY OF QUALITY, NON-INFRINGEMENT, CONFORMITY TO SAMPLES, OR CONDITION OF THE TUG BOATS OR ANY PART THEREOF, WHETHER LATENT OR PATENT (2) ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND (3) ANY IMPLIED WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE.   No material or information provided by or communications made by HOVIC or any of its Affiliates, or by any advisor thereof, whether by use of a "data room," or in any information memorandum, or otherwise, or by any broker or investment banker, will cause or create any warranty, express or implied, as to or in respect of HOVIC, Seller, any Affiliate of Seller or the title, condition, value or quality of the assets and liabilities of Seller or of the Tug Boats.

(b)      HOVIC makes no representation or warranty whatsoever with respect to any estimates, projections and other forecasts and plans (including the reasonableness of the assumptions underlying such estimates, projections and forecasts).

ARTICLE VI

REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller and HOVIC as follows as of the date hereof and as of the Closing Date (or as of such other date as may be specified herein):

6.1      Due Organization, Good Standing and Limited Liability Company Power of Purchaser.  Purchaser is a limited liability company duly organized, validly existing and in good standing (or the equivalent thereof) under the Laws of the U.S. Virgin Islands and has all requisite limited liability company power and authority to own, lease and operate its assets and properties and to conduct its business as now being conducted.  Purchaser is in good standing under the laws of each jurisdiction where the character of its assets or properties or the conduct of its business requires such qualification, except where the failure to be in good standing would not reasonably be expected to prevent, materially delay or impair Purchaser's ability to consummate the transactions contemplated by this Agreement or any Transaction Document.

6.2      Authorization; Noncontravention.  (a) Purchaser has the requisite limited liability company power and authority and has taken all limited liability company or other action necessary to execute and deliver this Agreement, the Transaction Documents and all other instruments and agreements to be delivered by Purchaser as contemplated hereby, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Purchaser of this Agreement, the Transaction Documents and all other instruments and agreements to be delivered by Purchaser as contemplated hereby, the consummation by it of the transactions contemplated hereby and thereby and the performance of its obligations hereunder and thereunder have been, and in the

51

case of documents required to be delivered at the Closing will be, duly authorized and approved by the members of Purchaser.  This Agreement has been, and the Transaction Documents and all other instruments and agreements to be executed and delivered by Purchaser as contemplated hereby will be, duly executed and delivered by Purchaser.  Assuming that this Agreement, the Transaction Documents and all such other instruments and agreements constitute valid and binding obligations of Seller, HOVIC and each other Person (other than Purchaser) party hereto and thereto, this Agreement and all such other instruments and agreements constitute valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with the terms thereof, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether considered in a proceeding in equity or at law).

(b)      Except as a result of the Bankruptcy Case, the execution and delivery by Purchaser of this Agreement, the Transaction Documents and all other instruments and agreements to be delivered by Purchaser as contemplated hereby do not, and the consummation of the transactions contemplated hereby and thereby will not, (i) conflict with any of the provisions of the certificate of incorporation or by-laws or similar governance documents of Purchaser, in each case, as amended to the date of this Agreement, (ii) conflict with or result in a breach of, or constitute a default under, any Contract or other instrument to which Purchaser is a party or by which Purchaser or any of its properties or assets are bound, or (iii) subject to receipt of the Required Governmental Approvals, contravene any Law or any Order applicable to Purchaser or by which any of its properties or assets are bound, except in the case of clauses (ii) and (iii) above, for such conflicts, breaches, defaults, consents, approvals, authorizations, declarations, filings or notices which do not and would not reasonably be expected to, individually or in the aggregate, prevent, materially delay or impair Purchaser's ability to consummate the transactions contemplated by this Agreement.

6.3      <u>Governmental Consents and Approvals</u>.  Except as a result of the Bankruptcy Case, and except for such consents and filings with the USVI Government as expressly provided for by the Transaction Documents, no additional Consent of or filing with any Governmental Entity must be obtained or made by Purchaser in connection with the execution and delivery of this Agreement or any Transaction Document by Purchaser or the consummation by Purchaser of the transactions contemplated by this Agreement or any Transaction Document, except for any Consents which have been obtained or made or, if not made or obtained, do not and would not reasonably be expected to, individually or in the aggregate, prevent, materially delay or impair Purchaser's ability to consummate the transactions contemplated by this Agreement or any Transaction Document.

6.4      <u>Financing</u>.  As of the Closing Date, Purchaser will have sufficient funds to consummate the transactions contemplated hereby, to perform its obligations hereunder (including all payments to be made by it in connection herewith) and to pay all of its expenses related to this Agreement and the transactions contemplated hereby.  Concurrently with the execution of the Initial Purchase Agreement, Purchaser delivered to Seller true, correct and complete copies of an executed Initial Equity Commitment Letter from ArcLight Energy Partners Fund VI, L.P. (the "**Equity Financing Source**") to provide equity financing to Limetree Delaware in an amount sufficient to complete the transactions contemplated by this Agreement

52

(the "**Equity Financing**") and concurrently with the execution of this Agreement, Limetree Delaware assigned the Equity Commitment Letter to Purchaser. Seller and HOVIC are express third party beneficiaries of the Equity Commitment Letter. The Equity Commitment Letter in the form so delivered is, as to Purchaser and the other parties thereto, valid and in full force and effect, such commitment has not been withdrawn, terminated or otherwise amended or modified in any respect, and no event has occurred that, with or without notice, lapse of time or both, would constitute a default or breach on the part of Purchaser under any term or condition of the Equity Commitment Letter. The Equity Commitment Letter constitutes the entire and complete agreement between the parties thereto with respect to the Equity Financing, and, except as set forth, described or provided for in the Equity Commitment Letter, (i) there are no conditions precedent to the obligation of the Equity Financing Source to fund the Equity Financing and (ii) there are no contractual contingencies or other provisions under any agreement (including any side letters) relating to the transactions contemplated by this Agreement to which Purchaser or any of its Affiliates is a party that would permit the Equity Financing Source to reduce the total amount of the Equity Financing or impose any additional conditions precedent to the availability of the Equity Financing. As of the date hereof, Purchaser has no reason to believe that any of the conditions to the Equity Financing will not be satisfied on a timely basis or that the funding contemplated in the Equity Financing will not be made available to Purchaser on a timely basis in order to consummate the transactions contemplated by this Agreement. The Equity Financing is sufficient to pay the Purchase Price, all other amounts to be paid or repaid by Purchaser under this Agreement (whether payable on or after the Closing), and all of Purchaser's and its Affiliates' fees and expenses associated with the transactions contemplated in this Agreement in accordance with the terms hereof. The obligations of Purchaser under this Agreement are not contingent on the availability of debt financing.

6.5    <u>Litigation</u>. There is no Proceeding pending against or affecting Purchaser, or any of their respective properties or rights, except as have not and would not reasonably be expected to, individually or in the aggregate, prevent, materially delay or impair Purchaser's ability to consummate the transactions contemplated by this Agreement or any Transaction Document. Purchaser is not subject to any Order which seeks to or would reasonably be expected to, individually or in the aggregate, prevent, materially delay or impair Purchaser's ability to consummate the transactions contemplated by this Agreement or any Transaction Document.

6.6    <u>Finders; Brokers</u>. No agent, broker, Person or firm acting on behalf of Purchaser or any of its Affiliates is or shall be entitled to any broker's fees, finder's fees or commissions from Seller, HOVIC or any of their respective Affiliates in connection with this Agreement or any Transaction Document or any of the transactions contemplated hereby or thereby.

6.7    <u>Investigation by Purchaser</u>. Purchaser has conducted its own independent investigation, verification, review and analysis of the Business (as currently or formerly conducted), the Tug Boats and results of operations, financial condition, technology and prospects, the Purchased Assets, the Assumed Liabilities and the Tug Boats, which investigation, review and analysis was conducted by Purchaser and its Affiliates and, to the extent Purchaser deemed appropriate, by Purchaser's Representatives. Purchaser acknowledges that it and its Representatives have been provided adequate access to Seller's personnel, properties, premises and records, the Purchased Assets, the Assumed Liabilities and the Tug Boats. In entering into this Agreement, Purchaser acknowledges that it has relied solely upon the aforementioned

investigation, review and analysis and not on any factual representations or opinions of Seller or HOVIC or any of their respective Affiliates (except the representations and warranties of Seller and of HOVIC set forth in Article IV and Article V, respectively or in the Transaction Documents), and Purchaser acknowledges and agrees, to the fullest extent permitted by Law, that except in the case of fraud:

(a)    none of Seller, HOVIC or any of their respective Affiliates, Representatives or any other Person makes or has made any oral or written representation or warranty, either express or implied, as to the accuracy or completeness of any information made available or delivered to Purchaser, or its Affiliates and Representatives, including any information, whether oral or written (including cost estimates, financial information and projections and other projections and forward-looking statements) (i) included in management presentations, "break-out" discussions, responses to questions submitted by or on behalf of Purchaser or its Affiliates and Representatives, or any "data room" or (ii) delivered or made available pursuant to Section 7.1(a) or otherwise;

(b)    none of Seller, HOVIC or any of their respective equity holders, Affiliates, Representatives or any other Person shall have any Liability or responsibility whatsoever to Purchaser or its equity holders, Affiliates or Representatives on any basis (including in contract, tort or equity, under any securities Laws or otherwise) based upon any information described in Section 6.7(a);

(c)    without limiting the generality of the foregoing, none of Seller, HOVIC or any of their respective equity holders, Affiliates, Representatives or any other Person makes any representation or warranty regarding (and Purchaser disclaims) any Third Party beneficiary rights or other rights which Purchaser might claim under any studies, reports, tests or analyses prepared by any Third Parties for Seller or HOVIC or any of their respective Affiliates, even if the same were made available for review by Purchaser or its equity holders, Affiliates or Representatives; and

(d)    without limiting the generality of the foregoing, Purchaser expressly acknowledge and agree that none of the documents, information or other materials provided to them at any time or in any format by Seller or HOVIC or any of their respective equity holders, Affiliates or Representatives constitutes legal advice, and Purchaser waives all rights to assert that it received any legal advice from Seller or HOVIC or any of their respective equity holders, Affiliates, or any of their respective Representatives, or that it had any sort of attorney-client relationship with any of such Persons.

6.8    Solvency of Purchaser.    As of Closing, after giving effect to the transactions contemplated by this Agreement, Purchaser will not: (a) be insolvent (either because its financial condition is such that the sum of its debts is greater than the fair market value of its assets or because the fair saleable value of its assets is less than the amount required to pay its probable liabilities on its existing debts as they mature); (b) have unreasonably small capital with which to engage in its business; or (c) have incurred debts beyond its ability to pay as they become due.

6.9    Exclusivity of Representations.    THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY PURCHASER IN THIS ARTICLE VI OR IN ANY

Americas 90921623

TRANSACTION DOCUMENT ARE THE EXCLUSIVE REPRESENTATIONS AND WARRANTIES MADE BY PURCHASER TO SELLER AND HOVIC IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY.    EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS ARTICLE VI, OR IN ANY TRANSACTION DOCUMENT, ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE EXPRESSED OR IMPLIED ARE SPECIFICALLY DISCLAIMED BY PURCHASER.

## ARTICLE VII

## COVENANTS

7.1    <u>Access to Information Concerning Properties and Records</u>.  (a) During the period from the date of this Agreement through and including the earlier of (i) the date this Agreement is terminated in accordance with <u>Section 9.1</u> and (ii) the Closing Date, (A) Seller shall, upon reasonable prior notice and during regular business hours, afford Purchaser and its Representatives reasonable access to the personnel, properties, facilities, books and records and other Files and Records of Seller, the Purchased Assets and the Assumed Liabilities (including to conduct any Phase I or other similar environmental investigation, provided that Seller shall not be required to conduct, or permit Purchaser or any of its Representatives, without the express written permission of Seller, to conduct any Phase II investigation or other similar environmental air, building materials, soil, soil gas, surface water, groundwater or other environmental media investigation, sampling or analysis on or relating to any real property owned by or leased to Seller), (B) Seller shall furnish to Purchaser access to all financial and operating data and other information concerning Seller that are in the possession or control of Seller as Purchaser may reasonably request and (C) HOVIC shall furnish to Purchaser access to such documentary information concerning the Tug Boats which is in the possession of HOVIC as Purchaser may reasonably request.  Information obtained by Purchaser and its Representatives in connection with the transactions contemplated by this Agreement shall be subject to the provisions of the Confidentiality Agreement, which shall survive the termination of this Agreement in accordance with its terms.    Purchaser hereby agrees to abide by the Confidentiality Agreement. Notwithstanding anything to the contrary contained in this Agreement, Seller, HOVIC and their respective Affiliates' obligations to provide any information or access pursuant to this <u>Section 7.1(a)</u> shall be subject to the Disclosure Conditions.

(b)    Purchaser hereby acknowledges that any access granted pursuant to <u>Section 7.1(a)</u> and utilized by Purchaser or any of its Representatives shall be at the sole risk, cost and expense of Purchaser. Purchaser shall, and shall use commercially reasonable efforts to ensure that each of its Representatives, complies with all safety and similar requirements imposed by Seller on its properties in the ordinary course of business.  Purchaser shall indemnify, defend and hold harmless Seller and its Affiliates and their respective shareholders, partners, members, managers, officers and directors (the "**Seller Access Indemnitees**") from and against any Losses suffered, incurred or paid by them to the extent such Losses are a result of or arise out of Purchaser's or any of its Representatives' access granted pursuant to <u>Section 7.1(a);</u> <u>provided</u>, that Purchaser shall not be required to indemnify and hold harmless any Seller Access Indemnitee to the extent any Losses incurred by such Seller Access Indemnitee arise due to the gross negligence or willful misconduct of such Seller Access Indemnitee. Notwithstanding

55

anything to the contrary contained in this Agreement, the provisions of this <u>Section 7.1(b)</u> shall survive the Closing and any cancellation or termination of this Agreement.

(c)    Nothing contained in this Agreement shall be construed to give to Purchaser, directly or indirectly, rights to control or direct Seller or HOVIC or any business or operations of Seller or HOVIC prior to the Closing in a manner that would violate any Antitrust Laws.  Prior to the Closing, Seller shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision of its business and operations.

(d)    Purchaser hereby agrees that it is not authorized to and shall not (and shall not permit any of its Representatives to), without providing prior written notice to Seller, contact any competitor, contractor, vendor, supplier, distributor, customer, agent or Representative of Seller, the EPA or any Governmental Entity having jurisdiction over Seller or the Seller Facilities (other than the USVI Government, which contact shall be governed by <u>Section 7.11</u>, or any directors, managers, officers, former employees or consultants of Seller (including, for the avoidance of doubt, any Hovensa Consultants), each of which shall require that Purchaser provide Seller with prior written notice and the opportunity to participate in any such meetings or discussions), in each case, with respect to Seller, the Purchased Assets (including, for the avoidance of doubt, the Seller Facilities) or the Assumed Liabilities, prior to the Closing. Purchaser shall keep Seller informed on a reasonably current basis of any contact with any customers, competitors, vendors or suppliers of Seller.

(e)    Notwithstanding anything to the contrary contained herein, no access or investigation by Purchaser, its Affiliates or their respective Representatives shall effect or otherwise modify in any respect any of Purchaser's rights or benefits under this Agreement, including the conditions to Purchaser's obligation to consummate the transactions contemplated by the Agreement as set forth in <u>Sections 8.1</u> and <u>8.2</u>.

7.2    <u>Conduct Pending the Closing Date</u>.

(a)    Except (i) as set forth in <u>Section 7.2</u> of the Seller Disclosure Letter, (ii) as may be expressly required by this Agreement, (iii) as required by Law or Order or by a Governmental Entity, (iv) as required by the Bankruptcy Court or (v) as a consequence of the commencement and continuation of the Bankruptcy Case, during the period commencing on the date hereof and ending on the earlier of the Closing Date and the termination of this Agreement pursuant to <u>Section 9.1</u>, Seller shall (x) operate the Business in compliance in all material respects with all Laws (including Environmental Laws), Orders, Contracts and Permits (including Environmental Permits) applicable thereto, and (y) use commercially reasonable efforts to preserve, maintain and protect in all material respects the Purchased Assets, the current goodwill of the Business and Seller's present relationships with Governmental Entities and other Persons having significant relationships with Seller in connection with the Business (as currently conducted).

(b)    Except (v) as set forth in <u>Section 7.2</u> of the Seller Disclosure Letter, (w) as may be expressly required by this Agreement, (x) as required by Law or Order or by a Governmental Entity, (y) as required or approved by the Bankruptcy Court or (z) as a consequence of the commencement and continuation of the Bankruptcy Case, during the period

56

commencing on the date hereof and ending on the earlier of the Closing Date and the termination of this Agreement pursuant to Section 9.1, Seller shall not effect any of the following (as each pertains to or is related to the Business, the Purchased Assets or the Assumed Liabilities) without the prior written consent of Purchaser (such consent not to be unreasonably withheld, conditioned or delayed):

        (i)     sell, transfer, lease, license or otherwise dispose of any of its assets or properties that would be Purchased Assets if not sold;

        (ii)    except as required by GAAP, make any change in any method of accounting or auditing practice with respect to the Business;

        (iii)   fail to pay, discharge, settle or satisfy any Assumed Liabilities as they become due other than in connection with a good faith dispute;

        (iv)   create, permit, subject or allow to exist any Lien on any of the Purchased Assets other than a Permitted Lien and other than any Lien that will be extinguished at or prior to Closing;

        (v)    extend, materially amend or terminate or grant any material waiver under any Business Contract or Real Property Lease or enter into any Contract that would be categorized as a Material Contract if in effect on the date hereof;

        (vi)   abandon any rights under, request the rejection under Section 365 of the Bankruptcy Code of, or amend, modify or supplement the terms of, any of the Business Contracts or Real Property Leases;

        (vii)  fail to take any reasonable action that would prevent the expiration, lapse, termination or abandonment of any Permit (including any Environmental Permit) material to the Business;

        (viii)  settle or compromise any Proceeding, or enter into any consent decree or settlement agreement with any Third Party, against or affecting the Business that, in each case, would constitute an Assumed Liability;

        (ix)   waive any material claims or rights of material value that are included in the Purchased Assets;

        (x)    incur, assume, or guarantee any Indebtedness or make any material capital expenditures that, in each case, would constitute an Assumed Liability;

        (xi)   hire any employees or enter into any Contract or arrangement with any independent contractors who are natural persons or materially amend, materially modify or terminate the Pinnacle Contract or any other existing Contract or arrangement with any independent contractor who is a natural person; provided, that, for the avoidance of doubt, Seller may extend the Pinnacle Contract and any existing Contract between Seller and any Hovensa Consultant that otherwise would expire in accordance with its terms prior to January 15, 2016;

57

(xii)    make or change any election or accounting method with respect to Taxes, file any amended Return, enter into any closing agreement, Tax indemnity agreement, Tax sharing agreement or other similar agreement, settle or compromise any material Tax claim or assessment, consent to an extension or waiver of the limitations period applicable to any Taxes, or make any voluntary Tax disclosure or amnesty or similar filing, in each case, to the extent such change, filing, agreement, settlement or compromise, consent, disclosure, amnesty or similar filing would result in a Lien (other than a Permitted Lien) on the Purchased Assets, adversely affect the Business, or result in Purchaser or its Affiliates becoming liable for such Taxes; or

(xiii)    authorize any of the foregoing or commit or agree to do any of the foregoing.

(c)    Notwithstanding anything to the contrary contained in this Agreement, the Parties acknowledge and agree that, effective as of the Closing, HOVIC and Seller, as applicable, shall terminate or cause to be terminated each of the Charter Agreements.

7.3    <u>Employee Relations and Benefits</u>.  Prior to the Closing Date, Seller shall make each Hovensa Consultant available to interview with Purchaser or its Affiliates for potential employment on terms and conditions as determined by Purchaser.  Prior to the Closing Date, Purchaser may offer employment to any Hovensa Consultant upon such terms and conditions it determines appropriate.  Nothing expressed or implied herein shall confer upon any Person, including any past or present employee or consultant of Seller, or his or her Representatives, beneficiaries, successors and assigns, any rights or remedies of any nature, including, any rights to continued employment or engagement with Seller or Purchaser or any of their respective Subsidiaries or any of their respective successors or Affiliates.

7.4    <u>Efforts to Close</u>.  (a) Except as otherwise provided in this <u>Section 7.4</u>, the Parties shall, and shall cause their respective controlled Affiliates and Representatives to, and shall use commercially reasonable efforts to direct their respective equityholders to, cooperate and use their respective commercially reasonable efforts to take, or cause to be taken, all appropriate action, and to make, or cause to be made, all filings necessary, proper or advisable under applicable Laws and to consummate and make effective the transactions contemplated by this Agreement, including those respective commercially reasonable efforts to obtain, prior to the Closing Date, all Permits, Consents and Orders of Governmental Entities as are necessary for consummation of the transactions contemplated by this Agreement and to fulfill the conditions to consummation of the transactions contemplated hereby set forth in <u>Section 8.1</u>, <u>Section 8.2</u> and <u>Section 8.3</u>; <u>provided</u>, that (w) no Party or its Affiliates shall be required to make any concessions that would adversely affect its business or be materially more burdensome to such Party (including to amend any Contract to increase the amount payable thereunder, commence any litigation, settle or compromise any matter, offer or grant any accommodation (financial or otherwise) to any Third Party or Governmental Entity, pay any amount or bear any other incremental economic burden to obtain any such Permit, Consent or Order), (x)  no Party or its Affiliates shall incur any expense that would be payable or otherwise borne by the other Party or such other Party's Affiliates without the consent of such other Party, (y) Seller shall not make any concessions that would purport to bind the Business from and after the Closing or be an Assumed Liability and (z) Purchaser shall not make any concessions that would purport to bind

58

Seller or any of its Affiliates (the conditions set forth in the foregoing clauses (w) – (z), the "**Efforts Conditions**").

(b)    Notwithstanding anything to the contrary contained in this Agreement, neither Seller nor any of its Affiliates or Representatives shall be required to repay any Indebtedness, amend or enter into any Contract or other arrangement, commence any litigation, settle or compromise any matter, offer or grant any accommodation (financial or otherwise) to any Third Party, pay any amount or bear any other incremental economic burden to procure any amendments, modification or termination of the Concession Agreement.

(c)    Purchaser and Seller shall timely notify all Governmental Entities required to be notified under the Consent Decree of the Purchase and the Closing.  Purchaser and Seller shall use commercially reasonable efforts, in cooperation with the applicable Governmental Entities, to terminate the Consent Decree as soon as reasonably practicable, and in a manner that does not require Purchaser and Seller to execute a modification to the Consent Decree pursuant to which Purchaser would assume the terms, conditions, obligations and liabilities of Seller applicable to the Purchased Assets under the Consent Decree.  If, despite Purchaser's and Seller's respective efforts, the applicable Governmental Entities do not agree to terminate the Consent Decree, regardless of whether such failure to agree occurs before or after the Closing, Purchaser and Seller promptly thereafter shall use commercially reasonable efforts, and shall cause their respective controlled Affiliates and Representatives to, and shall use commercially reasonable efforts to direct their respective equity holders to, use commercially reasonable efforts, in cooperation with the applicable Governmental Entities, to cooperate and take, or cause to be taken, all steps required under the Consent Decree to make the terms, conditions, obligations and liabilities of the Consent Decree applicable to the Purchased Assets, including (i) Purchaser and Seller executing a modification to the Consent Decree pursuant to which Purchaser shall assume the terms, conditions, obligations and liabilities of Seller as they relate to the Purchased Assets under the Consent Decree and Seller shall be released from such terms, conditions, obligations and liabilities (the "**Limited Consent Decree Modification**") and obtaining the appropriate signatures thereto of all Governmental Entities party to the Consent Decree, (ii) filing any motion with the United States District Court for the District of the Virgin Islands to approve the Limited Consent Decree Modification, making the terms, conditions, obligations and liabilities as they relate to the Purchased Assets with respect to the Consent Decree applicable to Purchaser and (iii) obtaining approval of the United States District Court for the District of the Virgin Islands and all other Governmental Entities party to the Consent Decree of the Limited Consent Decree Modification.  If, despite Purchaser's and Seller's respective efforts, the applicable Governmental Entities do not agree to the Limited Consent Decree Modification, regardless of whether such failure to agree occurs before or after the Closing, Purchaser and Seller promptly thereafter shall, and shall cause their respective controlled Affiliates and Representatives to, and shall use commercially reasonable efforts to direct their respective equity holders to, cooperate and take, or cause to be taken, all steps required under the Consent Decree to make the terms, conditions, obligations and liabilities of the Consent Decree applicable to Purchaser, including (A) Purchaser and Seller executing a modification to the Consent Decree pursuant to which Purchaser shall assume the terms, conditions, obligations and liabilities of Seller under the Consent Decree and Seller shall be released from such terms, conditions, obligations and liabilities (the "**Consent Decree Modification**") and obtaining the appropriate signatures thereto of all Governmental Entities party to the Consent Decree, (B)

59

filing any motion with the United States District Court for the District of the Virgin Islands to approve the Consent Decree Modification, making the terms, conditions, obligations and liabilities with respect to the Consent Decree applicable to Purchaser and (C) obtaining approval of the United States District Court for the District of the Virgin Islands and all other Governmental Entities party to the Consent Decree or the Consent Decree Modification. Nothing in this <u>Section 7.4(c)</u> shall alter the rights and obligations of the Parties pursuant to <u>Articles II</u> and <u>X</u> of this Agreement.

7.5    <u>Public Announcements</u>.  Each Party shall (a) consult with each other Party before issuing any press release or otherwise making any public statement with respect to the transactions contemplated by this Agreement or any Transaction Document, (b) provide to the other Parties for review a copy of any such press release or public statement and (c) not issue any such press release or make any such public statement prior to such consultation and review and the receipt of the prior consent of the other Parties, unless required by Laws or regulations applicable to such Party or its Affiliates, regulations of any stock exchange applicable to such Party or its Affiliates, or the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, in which case, the Party required to issue the press release or make the public statement or filing shall, prior to issuing such press release or making such public statement or filing, use its commercially reasonable efforts to allow the other Parties reasonable time to comment on such release, statement or filing to the extent practicable and permitted by Law.  Notwithstanding anything to the contrary contained in this Agreement (including, for the avoidance of doubt, <u>Section 7.22</u>), each of the Parties and its legal counsel and other Representatives shall be permitted to make filings on the docket of, or statements on the record before, the Bankruptcy Court relating to this Agreement and the transactions contemplated hereby without prior approval or consultation.

7.6    <u>Notification of Certain Matters</u>.  Seller and Purchaser shall use their respective commercially reasonable efforts to promptly notify each other of any material Proceedings in connection with the transactions contemplated by this Agreement or the Transaction Documents commenced or, to the Knowledge of Purchaser or the Knowledge of Seller, threatened, against Seller or Purchaser, as the case may be, or any of their respective Affiliates.

7.7    <u>Supplements to Schedules</u>.

(a)    HOVIC and Seller shall have the right (but not the obligation) to deliver to Purchaser, from time to time but not later than five (5) Business Days prior to the Closing Date, a schedule of changes (each, an "**Update Schedule**" or, individually, a "**HOVIC Update Schedule**" or a "**Seller Update Schedule**", as applicable) to disclose any action taken by Seller and HOVIC, as applicable, or Event occurring, with respect to the Business, the Purchased Assets, the Assumed Liabilities or Tug Boats after the date hereof. Each such Update Schedule shall constitute an amendment to the representation, warranty or statement to which it relates for all purposes of this Agreement and the transactions contemplated hereby, and each Update Schedule shall be deemed to be incorporated into and to supplement and amend the Seller Disclosure Letter (and all references to the "**Seller Disclosure Letter**" and "**HOVIC Disclosure Letter**" in this Agreement shall include each such Update Schedule to the extent applicable). Except as set forth in <u>Section 7.7(b)</u>, subject to the terms of this Agreement, Purchaser shall have the right to not consummate the transactions contemplated by this Agreement as a result of the

60

failure of the conditions contained in <u>Sections 8.1</u> or <u>8.2</u> on the basis of the information disclosed in any Update Schedule.

(b)     If any fact or circumstance occurring prior to the date hereof and disclosed on any Update Schedule would, but for this <u>Section 7.7</u>, permit Purchaser to terminate this Agreement in accordance with <u>Section 9.1(d)</u>, but Purchaser does not provide a written termination notice pursuant to <u>Section 9.1(d)</u> within five (5) Business Days after receiving such Update Schedule, Purchaser shall be deemed to have waived, for all purposes of this Agreement and the transactions contemplated hereby, all rights to terminate this Agreement on account of the matters disclosed on such Update Schedule (including their right to not consummate the transactions contemplated hereby due to the failure of any of the conditions set forth in <u>Sections 8.1</u> or <u>8.2</u>).

7.8     <u>Post-Closing Access to Records and Personnel; Litigation Support</u>.

(a)     For a period of three (3) years after the Closing Date, Purchaser shall preserve and retain all corporate, accounting, Tax, legal, auditing, human resources and other books and records relating to the Purchased Assets and the Assumed Liabilities and related business with respect to periods prior to the Closing Date (including (i) any documents relating to any Proceeding or other dispute and (ii) all Returns, schedules, work papers and other material records or other documents relating to Taxes relating to the Purchased Assets and the Assumed Liabilities.  Notwithstanding the foregoing, during such three (3) year period, Purchaser may dispose of any such books and records which are first offered to Seller, but not accepted by Seller.  At the end of such three (3) year period, Purchaser may dispose of any such books and records (not already disposed of pursuant to the immediately preceding sentence) only after they are first offered to and not accepted by Seller.

(b)     Following the Closing, Purchaser shall allow Seller and its Affiliates and their respective Representatives reasonable access to (i) all books and records related the Purchased Assets and the Assumed Liabilities and the Business and (ii) such personnel having knowledge of the location or contents of such books and records, in each case of the foregoing clauses (i) and (ii), for legitimate business reasons; <u>provided</u>, that no such access shall unreasonably interfere with Purchaser's operation of the Business.  Notwithstanding anything to the contrary contained in this Agreement, Purchaser's obligations to provide any information or access pursuant to this <u>Section 7.8(b)</u> shall be subject to the Disclosure Conditions.  Purchaser shall be entitled to recover from Seller, Purchaser's out-of-pocket costs (including copying costs) incurred in providing such books and records or personnel to Seller.   Seller will hold in confidence all confidential information obtained from Purchaser or any of its Representatives, except as otherwise required by applicable Law or Order or the rules of any securities exchange to which Seller or its Affiliates are subject.

(c)     Following the Closing, Seller shall allow Purchaser and its Affiliates and their respective Representatives reasonable access to (i) all books and records related the Purchased Assets and the Assumed Liabilities and the Business and (ii) such personnel having knowledge of the location or contents of such books and records, in each case of the foregoing clauses (i) and (ii), for legitimate business reasons.  Notwithstanding anything to the contrary contained in this Agreement, Seller's obligations to provide any information or access pursuant

61

to this Section 7.8(c) shall be subject to the Disclosure Conditions. Purchaser will hold in confidence all confidential information obtained from Seller or any of its Representatives, except as otherwise required by applicable Law or Order or the rules of any securities exchange to which Purchaser or its Affiliates are subject.

(d)    If and for so long as any Party (or any of its Affiliates) is actively contesting or defending against any Proceeding brought by a Third Party in connection with (i) the Purchase or (ii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving Seller or the Business (as currently or formerly conducted), the Purchased Assets or the Assumed Liabilities the non-contesting or non-defending Person or Persons shall, at the sole cost and expense of the contesting or defending Person or Persons), (x) cooperate with the contesting or defending Person or Persons and its or their counsel in the defense or contest, (y) make available its or their personnel (including to act as a witness) and (z) provide such access to its or their books and records as shall be necessary or reasonably requested in connection with the defense or contests; provided, that no such cooperation or access shall unreasonably interfere with the operation of the businesses of the non-contesting or non-defending Person or Persons and no Party shall be required to cooperate or provide access to another Party in connection with a Proceeding between such Party and/or its Affiliates, on the one hand, and such other Party and/or its Affiliates, on the other hand. All non-public information received pursuant to this Section 7.8 will be kept confidential, except as otherwise required by any applicable Law or Order or stock exchange regulation. Notwithstanding anything to the contrary contained in this Agreement, each Person's obligations to provide access pursuant to this Section 7.8(d) shall be subject to the Disclosure Conditions. Each Party shall be entitled to recover from the other its out-of-pocket costs incurred in providing such personnel and access to the other Party.

(e)    The obligations of a Party under this Section 7.8 shall be binding upon the successors and assigns of such Party. If a Party or any of its successors or assigns (i) consolidates with or merges into any other Person or (ii) with respect to Purchaser, transfers all or substantially all of the Purchased Assets or the Assumed Liabilities to any Person, in each case proper provision shall be made so that the successors and assigns of such Party honor the obligations set forth in this Section 7.8.

7.9    Compliance with WARN, Plant Closing Act and Similar Statutes. Purchaser shall be responsible for compliance with any notice or severance obligations under the Worker Adjustment and Retraining Notification Act of 1988 ("**WARN**"), the Plant Closing Act (and any comparable Law requiring notice or severance to employees) and the Pinnacle Contract (including, for the avoidance of doubt, any Liability for accrued but unused paid time-off and severance), in each case, arising on or after the Closing Date with respect to the termination of any Hovensa Consultants and any employees or consultants of Pinnacle that (a) provide services to Hovensa as of the date hereof or at any other time from the date hereof through the Closing Date, which services relate to the Purchased Assets or the Business (as currently or formerly conducted) and (b) provide services to Purchaser or any of its Affiliates after the Closing and such services relate to the Purchased Assets or the Business (each, a "**Pinnacle Employee**"). Without limiting the foregoing, pursuant to Section 473(a)(3) of the Plant Closing Act, Purchaser assumes responsibility and liability as successor employer under the Plant Closing Act for all the prior years of service, along with any years accumulated moving forward, for such Hovensa

Consultants or Pinnacle Employees. Seller shall be responsible for compliance with any notice or severance obligations relating to the Business (as currently or formerly conducted), the Purchased Assets or the Assumed Liabilities under WARN and the Plant Closing Act (and any comparable Law requiring notice or severance to employees) arising prior to the Closing Date. Seller shall notify Purchaser prior to the Closing of any "employment loss", in the 90-day period immediately prior to the Closing with respect to any Hovensa Consultant, and, provided that Pinnacle has notified Seller of such "employment loss," with respect to any Pinnacle Employee.

7.10    Tax Matters.

(a)    All stamp, transfer, documentary, sales and use, value added, registration and other such taxes and fees (including any penalties, interest and recording and filing fees) incurred in connection with the Purchase or otherwise in connection with this Agreement and not exempted under a Sale Order, whether or not customarily paid by sellers or purchasers (collectively, the "**Transfer Taxes**"), shall be borne fifty percent (50%) by Seller and fifty percent (50%) by Purchaser. Purchaser shall properly file on a timely basis all necessary Returns and other documentation with respect to any Transfer Tax and provide to Seller evidence of payment of all Transfer Taxes. Seller shall pay to Purchaser fifty percent (50%) of any reasonable fees, costs or expenses incurred in connection with the preparation and filing of such Returns.

(b)    In connection with the Bankruptcy Case, Seller may file a motion with the Bankruptcy Court for an Order exempting the transactions contemplated by this Agreement, including the sale and transfer of the Purchased Assets from Seller to Purchaser, from any transfer Tax, documentary stamp Tax or other similar Tax. At the Closing, Purchaser shall remit to Seller such properly completed resale exemption certificates and other similar certificates or instruments as Purchaser is entitled to provide and are applicable to claim available exemptions from the payment of sales, transfer, use or other similar Taxes under applicable Law. Purchaser and Seller shall cooperate in preparing such forms and shall execute and deliver such affidavits and forms as are reasonably requested by the other Party. Notwithstanding the foregoing, Purchaser shall not be required to provide any certificates or other documentation pursuant to this Section 7.10(b) that would subject Purchaser to any material unreimbursed cost or expense or would otherwise be materially adverse to Purchaser.

(c)    Purchaser and Seller agree to furnish or cause to be furnished to each other, as promptly as reasonably practicable, such information and assistance relating to the Purchased Assets as is reasonably necessary for the preparation and filing of any Return, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer of any governmental or regulatory inquiry relating to Tax matters.

(d)    For purposes of this Agreement, all Property Taxes and any other Taxes that are imposed on a periodic basis (which are not based on income) with respect to the Purchased Assets with respect to any taxable period that begins on or before and ends after the Closing Date shall be apportioned between the portion of such period that falls within the Pre-Closing Period and the portion of such period that falls within the Post-Closing Period proportionally in accordance with the number of days in each such portion of the period.

Americas 90921623

7.11    USVI Concession Agreement.

(a)    Purchaser shall, and shall cause its Affiliates and Representatives to, use their respective commercially reasonable efforts to (i) enter into the USVI Concession Agreement as promptly as practicable following the date hereof and (ii) obtain from the USVI Government the full and unconditional release and discharge of Seller with respect to the Concession Agreement, including the Fourth Amendment Agreement.

(b)    Purchaser shall consult and cooperate with Seller and consider in good faith the views of Seller in connection with Purchaser's negotiations with the USVI Government, and shall not make initial contact with, or commence any discussions or negotiations with, the USVI Government or any of its Representatives, in each case, in connection with Seller, the Business (as currently or formerly conducted), the Purchased Assets, the Assumed Liabilities, the USVI Concession Agreement or the transactions contemplated by this Agreement or the Transaction Documents, without the prior written consent of Seller.    Purchaser and Seller shall consult with each other and consider in good faith the views of each other, in each case, prior to delivering any substantive written communication to the USVI Government regarding the USVI Concession Agreement or attending any substantive meeting with the USVI Government regarding the USVI Concession Agreement.    Each Party shall promptly inform the other Party of any substantive communication from the USVI Government regarding the USVI Concession Agreement contemplated hereby, and provide the other Party with copies of any written communication to or from the USVI Government (including drafts of the USVI Concession Agreement and any related agreements and such other information and documentation as shall be reasonably necessary to allow the other Party to monitor the status of the Purchaser's efforts to enter into the USVI Concession Agreement) after delivery of such communication; provided, that the foregoing obligations of the Parties and their respective Affiliates and Representatives shall be subject to the Disclosure Conditions. Each Party shall provide the other Party with an opportunity to attend any substantive meetings or substantive discussions with the USVI Government concerning the USVI Concession Agreement contemplated hereby.    In any event, each Party shall keep the other Party reasonably informed of material developments in connection with the status of USVI Government's approval of the USVI Concession Agreement and the transactions contemplated by this Agreement or the Transaction Documents and Purchaser shall not, without prior written consent of Seller, make any concessions, agreements or undertakings that would purport to bind Seller or any of its Affiliates or require Seller or any of its Affiliates to incur or assume any Liability.

7.12    Remediation Access Easement.    Seller shall retain and have the right, but not the obligation, to (a) conduct and control any Remedial Action concerning any Excluded Liabilities and (b) dismantle and remove from the Business Real Property all or any portion of the Retained Refinery Assets or any other Excluded Assets, and the Remediation Access Easement shall be recorded against legal title to the Business Real Property immediately following recordation of the deed with respect to the transfer of such Business Real Property to allow for the same.    If Seller opts or is required to conduct a Remedial Action or dismantle, remove or decommission any Retained Refinery Assets or other Excluded Assets, Seller shall use its commercially reasonably efforts to do so without unreasonably interfering with Purchaser's operations or Environmental Permits, and Purchaser shall, and shall cause its Representatives to, use commercially reasonable efforts to cooperate with Seller, including by timely filing any required

64

documents with the appropriate Governmental Entities, providing access to and use of the subject site, employees, documents and on-site structures, infrastructure and utility services (including electricity, underground piping or wastewater or sewer systems) and/or utilities as necessary to perform any required Remedial Action or dismantle, remove or decommission any Retained Refinery Assets or other Excluded Assets, including access to install, maintain, replace and operate wells and remove impacted soil and/or groundwater pursuant to the Remediation Access Easement and by otherwise complying with the Remediation Access Easement. Seller shall reasonably cooperate with Purchaser with respect to any potential modifications or changes to Purchaser's Environmental Permits in connection with Seller's dismantling, removal or decommissioning of any Retained Refinery Assets or other Excluded Assets. To the extent required under any Environmental Law, Purchaser shall execute, record, obtain and maintain in good standing any authorization, permit or "generator number" as may be reasonably necessary for the proper storage, transportation and/or off-site disposal of any Hazardous Material generated in the course of the Remedial Action. Purchaser shall sign or cause to be signed and record or caused to be recorded any deed, environmental covenant or other recordable real property instrument reasonably requested by Seller and reasonably acceptable to Purchaser in form and content which is necessary to permit the use of site specific corrective action remedies or remedies based on exposure controls as part of such Remedial Action. Purchaser agrees not to use the groundwater under the Business Real Property if such restriction is necessary to permit the use of site specific corrective action remedies or remedies based on exposure controls as part of such Remedial Action. Purchaser shall be entitled to recover from Seller, Purchaser's reasonable and documented out-of-pocket costs incurred in connection with providing any of the cooperation, or taking any of the actions, required by this Section 7.12.

7.13   Bulk Sales Act. Purchaser hereby waives compliance by Seller with respect to any applicable bulk sale, bulk transfer, successor liability and similar Laws, or with any Laws triggered by a bulk sale or transfer of property, of any jurisdiction in connection with the transactions contemplated by this Agreement or similar Laws of any jurisdiction in connection with the Purchase.

7.14   Bankruptcy Action.

(a)   Seller shall comply in all material respects with all of the obligations of Seller under the Bid Procedures Order and the Sale Order (with respect to the Sale Order, after the entry of such Sale Order by the Bankruptcy Court).

(b)   Seller shall use commercially reasonable efforts to comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and the Bankruptcy Rules in connection with obtaining approval of the transactions contemplated by this Agreement. Seller shall serve (i) all Persons who are known to possess or assert a Claim against or Interest in any of the Purchased Assets, (ii) the IRS, (iii) all applicable Governmental Entities, (iv) all applicable state and local Governmental Entities with taxing authority, (v) all other Persons required by any Order of the Bankruptcy Court, (vi) all parties to Business Contracts and Real Property Leases and (vii) all Persons that request or are entitled to notice under Bankruptcy Rule 2002. Seller shall use its commercially reasonable efforts to serve any other Persons that Purchaser reasonably may request and any notice required to be served under the Bid Procedures Order, or the Sale Order, in each case in accordance with

65

all applicable Bankruptcy Rules, the Bid Procedures Order, and any applicable local rules of the Bankruptcy Court.

(c)     All Parties shall use their respective commercially reasonable efforts to have the Bankruptcy Court enter the Sale Order as promptly as possible.

(d)     [Intentionally Omitted].

(e)     Seller and Purchaser shall consult with one another regarding pleadings which any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of the Sale Order and shall provide each other with a reasonable opportunity to review and comment on such pleadings, related motions, applications, petitions schedules and supporting papers. Seller shall promptly provide Purchaser and its counsel with copies of all notices, filings and orders of the Bankruptcy Court that Seller has in its possession (or receives) pertaining to the Sale Motion, the Bid Procedures Order, the Sale Order, or any other order related to any of the transactions contemplated by this Agreement, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to Purchaser and its counsel.

(f)     If the Bid Procedures Order, the Sale Order, or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bid Procedures Order, the Sale Order, or other such order), subject to rights otherwise arising from this Agreement, Seller and Purchaser shall use their commercially reasonable efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

7.15    <u>Sale Order</u>.

(a)     Seller and Purchaser acknowledge that this Agreement and the sale of the Purchased Assets are subject to Bankruptcy Court approval. Seller and Purchaser acknowledge that (i) to obtain such approval, Seller must demonstrate that it has taken steps to obtain the highest and otherwise best offer possible for the Purchased Assets including giving notice of the transactions contemplated by this Agreement to creditors and certain other interested parties as ordered by the Bankruptcy Court and conducting the Auction (as defined in the Bid Procedures Order) and (ii) Purchaser must provide adequate assurance of future performance under the Business Contracts and Real Property Leases included in the Purchased Assets.

(b)     The Sale Order shall, among other things:

(i)     approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Seller of this Agreement, (B) the transfer of the Purchased Assets to the Purchaser free and clear of all Liens, Claims, and Liabilities of any kind whatsoever (other than Permitted Liens), and (C) the timely performance by Seller of its obligations under this Agreement;

Americas 90921623

(ii)     authorize and empower Seller to assume and assign the Business Contracts and Real Property Leases to the Purchaser;

(iii)    find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code and grant Purchaser the full benefits and protections of section 363(m) of the Bankruptcy Code;

(iv)    find that this Agreement was negotiated, proposed and entered into by Seller and Purchaser without collusion, in good faith and from arm's length bargaining positions;

(v)     find that due and adequate notice and an opportunity to be heard in accordance with all applicable Laws were given to the necessary parties in the Bankruptcy Case;

(vi)    contain findings of fact and conclusions of law that Purchaser (a) is not a successor to, or subject to successor liability for, the Seller; (b) has not, de facto or otherwise, merged with or into the Seller; (c) is not an alter ego or a continuation of the Seller; or (d) does not have any responsibility for any obligations of Seller based on any theory of successor or similar theories of liability;

(vii)   find that the Purchase Price is fair and reasonable;

(viii)  find that the Bankruptcy Court retains jurisdiction to resolve any claim or dispute arising out of or related to this Agreement; and

(ix)    contain such other terms and conditions as are acceptable to Seller and Purchaser in their respective sole discretion.

(c)     Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry by the Bankruptcy Court of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of: (A) demonstrating that Purchaser is a "good faith" purchaser; and (B) establishing "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code.

7.16    [Intentionally Omitted].

7.17    Backup Bidder.  Purchaser hereby agrees that Purchaser shall, to the extent selected as a Backup Bidder (as defined in the Bid Procedures Order), serve as the Backup Bidder until the earlier of (i) twenty (20) Business Days following the End Date and (ii) the closing date of an Alternative Transaction.

7.18    Transfer of Permits; Seller Letters of Credit.

(a)     Except for those Permits that are not transferable to Purchaser by Law (which are set forth on Section 7.18 of the Seller Disclosure Letter) and the RCRA Permit, the Parties shall use commercially reasonable efforts to cause the issuance or transfer of all of the

67

Business Permits and Environmental Permits described in <u>Section 2.1(a)(vii)</u> of the Seller Disclosure Letter and shall give and make all notices and reports that such Party is required to make to the appropriate Governmental Entities and other Persons with respect to such Permits. All costs and expenses associated with the issuance or transfer of the Business Permits shall be borne by Purchaser.  The Parties shall each become a co-permittee on each Permit for which any applicable Governmental Entity requires (subject to any good faith contest) that the Parties be co-permittees.  Any Business Permit not able to be issued or transferred to Purchaser as of the Closing shall be deemed a "Deferred Asset" and subject to the provisions of <u>Section 2.6</u>.

(b)    Purchaser shall (i) be solely responsible for all Liabilities of Seller associated with any Seller Letter of Credit to the extent such Liabilities are exacerbated, triggered, increased or have their timing accelerated by any act or omission of, or any delay caused by, Purchaser or any of its Affiliates, their respective successors or assigns or their respective Representatives and (ii) indemnify and defend Seller and its Affiliates and save and hold each of them harmless against any Losses suffered, incurred or paid by them (including any reimbursement obligations related to any Seller Letter of Credit) to the extent such Losses are a result of, arise out of or are related to any such act, omission or delay.

(c)    Purchaser and Seller shall use commercially reasonable efforts, in cooperation with the applicable Governmental Entities, to modify the RCRA Permit in a manner that makes the RCRA Permit inapplicable to the Purchased Assets, provided that the Parties acknowledge that such Governmental Entities may not agree to make the RCRA Permit inapplicable to the Purchased Assets and that such modification shall not be a condition to Purchaser's obligations under this Agreement.  The Parties further acknowledge that this <u>Section 7.18(c)</u> shall not require that Purchaser or Seller obtain a determination by applicable Governmental Entities that the RCRA Permit is inapplicable to the Purchased Assets.

(d)    Seller shall maintain and comply with the Permits identified in <u>Section 7.18(d)</u> of the Seller Disclosure Letter (the "**Purchaser's Required Permits**") on and after the Closing until comparable Permits are issued by the applicable Governmental Entities to Purchaser or Purchaser's Affiliates or, with respect to any Purchaser's Required Permits that are also Deferred Assets, until such Permits are issued or transferred to Purchaser or Purchaser's Affiliates.  During any periods after Closing until such comparable Permits are issued to Purchaser or Purchaser's Affiliates and such Permits that are Deferred Assets are issued or transferred to Purchaser or Purchaser's Affiliates, and subject to the limitations of this <u>Section 7.18(d)</u>, (i) if any fees or financial assurance are required to be paid by Seller to maintain Purchaser's Required Permits in place, Purchaser shall either pay or promptly reimburse Seller for such fees or financial assurance to the extent such Purchaser's Required Permits are maintained solely for the benefit of Purchaser; (ii) Purchaser agrees to comply with the terms, limits, standards and conditions of each Purchaser's Required Permits as if they had been issued to Purchaser or Purchaser's Affiliates and shall indemnify and defend the Seller and its Affiliates and save and hold each of them harmless against any Losses suffered, incurred or paid by them to the extent such Losses are a result of, arise out of or are related to any failure by Purchaser or its Affiliates to comply with the terms, limits, standards and conditions of Purchaser's Required Permits; (iii) Purchaser may operate under the Purchaser's Required Permits only if and to the extent all applicable Governmental Entities do not object to Purchaser's operation under the Purchaser's Required Permits; and (iv) Purchaser shall be solely responsible for all Liabilities

68

associated with any unauthorized operation under the Purchaser's Required Permits, and shall indemnify and defend Seller and its Affiliates and save and hold each of them harmless against any Losses suffered, incurred or paid by them to the extent such Losses are a result of, arise out of or are related to unauthorized operation under Purchaser's Required Permits.  Seller and Purchaser acknowledge that clause (iii) of this Section 7.18(d) shall not require that Purchaser obtain a determination by such applicable Governmental Entities that Purchaser may operate under the Purchaser's Required Permits.  Notwithstanding anything herein to the contrary, following the date that is twenty four (24) months after the Closing Date, (x) Seller may, in its sole discretion, revoke the right of Purchaser to operate under any or all of the Purchaser's Required Permits and (y) Seller shall not have any further obligations to maintain any of the Purchaser's Required Permits in place (regardless, for the avoidance of doubt, of whether comparable Permits have been issued by the applicable Governmental Entities to Purchaser or Purchaser's Affiliates); provided, however, that, notwithstanding the foregoing, Seller shall grant Purchaser such reasonable extension of this twenty four (24) month period pursuant to which Purchaser may operate under any Purchaser's Required Permit in accordance with this Section 7.18(d) and will continue to maintain any such Purchaser's Required Permit in accordance with this Section 7.18(d) so long as the Parties have made and continue to make commercially reasonable efforts to obtain a comparable Permit or complete the issuance or transfer of such Permit (as applicable) (in each case such efforts to include submitting all applications and other documents required by applicable Governmental Entities within all time periods under Environmental Law).  Purchaser shall promptly notify Seller when any comparable Permits are issued to Purchaser or Purchaser's Affiliates or, with respect to any Purchaser's Required Permit that is also a Deferred Asset, when such Permit is issued or transferred to Purchaser or Purchaser's Affiliates, and in each case shall cooperate with Seller as needed for Seller to terminate the applicable Purchaser's Required Permits.

(e)     Seller shall not make any oral or written statement or filing with any Person (including any Governmental Entity) that would reasonably be expected to adversely affect Purchaser's rights to operate the Purchased Assets in accordance with this Section 7.18 and under the Environmental Permits that are the subject of this Section 7.18.

7.19    Expenses.

(a)     Seller shall, without the requirement of any notice or demand from Purchaser or any application to or order of the Bankruptcy Court, pay the Purchaser Expense Reimbursement in cash to Purchaser if this Agreement is terminated for any reason other than pursuant to Section 9.1(a) or Section 9.1(c).  If payable in accordance with this Section 7.19(a), the Purchaser Expense Reimbursement shall be made by wire transfer of immediately available funds to an account designated by Purchaser no later than (i) the date that is two (2) Business Days after such termination by Purchaser or (ii) the date that Seller terminates this Agreement.

(b)     Except to the extent otherwise specifically provided herein, whether or not the transactions contemplated hereby are consummated, all fees, costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the Party incurring such fees, costs and expenses.

7.20    Breakup Fee.

69

(a)    If (x) this Agreement is terminated for any reason other than pursuant to Section 9.1(a), Section 9.1(b)(i), Section 9.1(b)(ii) by Purchaser, Section 9.1(c) or Section 9.1(e) and (y) Seller consummates an Alternative Transaction at any time, then Seller shall, without the requirement of any notice or demand from Purchaser or any application to or order of the Bankruptcy Court, immediately pay to Purchaser the Breakup Fee in cash on the day such Alternative Transaction is consummated.

(b)    The Breakup Fee shall be made by wire transfer of immediately available funds to an account designated by Purchaser.

(c)    Each of the Parties hereto acknowledges and agrees that the agreements contained in Section 7.19 and this Section 7.20 are an integral part of the transactions contemplated by this Agreement and that the Breakup Fee is not a penalty, but rather is liquidated damages in a reasonable amount that will reasonably compensate Purchaser in the circumstances in which such Breakup Fee is payable for the efforts and resources expended and opportunities foregone by Purchaser while negotiating and pursuing the transactions contemplated by this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

7.21    Rejected Contracts.  Seller shall not reject any Business Contract or Real Property Lease in any bankruptcy proceeding following the date of this Agreement and prior to the Closing Date without the prior written consent of Purchaser.

7.22    Confidentiality.  From and after the date of this Agreement, Purchaser and Seller shall continue to be bound by and comply with the obligations of the Confidentiality Agreement except as otherwise required under the Bankruptcy Code, bankruptcy law or the Bankruptcy Court.  Except as specifically provided in the proviso to this sentence, after the Closing, the Confidentiality Agreement shall be deemed to have been terminated by the parties thereto and shall no longer be binding; provided, that notwithstanding anything in this Section 7.22 to the contrary, to the extent that Purchaser is in possession of any Evaluation Material (as defined in the Confidentiality Agreement) regarding Seller, HOVIC and their respective Affiliates, or the Excluded Assets, Purchaser shall continue to be bound by the Confidentiality Agreement with respect to such Evaluation Material until the later of (i) the end of the remainder of the term set forth in such Confidentiality Agreement and (ii) if the Closing occurs, the date that is one year after the Closing.  Seller acknowledges that it and its controlled Affiliates and Representatives are, or may come into after the date hereof, possession of Evaluation Material or other confidential information concerning the Business, the Purchased Assets and the Assumed Liabilities (the "**Business Confidential Information**").  Seller shall, and shall cause its controlled Affiliates and Representatives to, treat confidentially and not disclose all or any portion of such Business Confidential Information and shall use at least the same standard of care in protecting such Business Confidential as Seller and its Affiliates use in protecting their own confidential information; provided, that Seller and its Affiliates and Representatives may disclose the Business Confidential Information as necessary for the purpose of operating their business in the ordinary course and complying with the terms of this Agreement and may disclose Business Confidential Information as required by any applicable Law or Order or the rules of any securities exchange to which Seller or its Affiliates are subject.  From and after the

70

Closing, if Seller or its Affiliates or Representatives are requested or required by Law or Order to disclose any of the Business Confidential Information (whether by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process), Seller shall, or shall cause such Affiliate or Representative, to provide Purchaser with prompt written notice of such request so that Purchaser may seek (at its sole cost) an appropriate protective order or other appropriate remedy. At any time that such protective order or remedy has not been obtained, Seller or such Affiliate or Representative may disclose that portion of the Business Confidential Information which such Person is advised by counsel is legally required to be disclosed or which such Person is requested to disclose.

7.23    Seller's Marks.    Following the Closing and except as otherwise expressly permitted hereunder or in writing by Seller, neither Purchaser nor any of its Affiliates shall register, or attempt or seek to register, or use, in any fashion, including in signage, corporate letterhead, business cards, Internet web sites, marketing material or content and the like in connection with any products or services anywhere in the world in any medium, any trademark, service mark, trade dress, domain name, corporate name, trade name or other indicia of origin that is confusingly similar to any of the trademarks, service marks, trade dress, domain names, corporate names, trade names or other indicia of origin that are not Purchased Assets and are owned or used as of the Closing by Seller or any of its Affiliates, including those described in Section 7.23 of the Seller Disclosure Letter (collectively, "**Seller's Marks**"). Except as otherwise expressly permitted in writing by Seller, Purchaser shall ensure that, as soon as practical (but in no event more than thirty (30) days following the Closing Date with respect to materials that publicly display Seller's Marks or are otherwise distributed to the public (including letterhead, advertising materials, marketing brochures and the like), any such materials bearing Seller's Marks are at Seller's election, returned to Seller, destroyed or otherwise permanently altered to entirely remove Seller's Marks. Furthermore, unless otherwise provided in the Transition Services Agreement, Purchaser shall ensure that, as soon as practical (but in no event more than thirty (30) days following the Closing Date) any hypertext links to Internet web sites operated by Seller or any of its Subsidiaries and any other use of Seller's Marks are removed from any Internet web sites included in the Purchased Assets; provided, that, notwithstanding the foregoing, unless otherwise provided in the Transition Services Agreement, Purchaser shall ensure such removal on or before the fifth (5th) Business Day after it become aware of such links or use. For the avoidance of doubt, nothing in this Section 7.23 shall preclude any references to Seller's Marks that are required by Law, that constitute "fair use" under applicable Law, or that are in historical, tax, and similar records.

7.24    Shared Services Agreement.    At the Closing, Seller and Purchaser or their respective Affiliates will enter into the Shared Services Agreement, which Shared Services Agreement shall be promptly recorded in the office of the Recorder of Deeds for the District of St. Croix, U.S. Virgin Islands. The Shared Services Agreement shall, among other things, require Purchaser to, or to cause one of its Affiliates to, supply electric power to Seller for thirty (30) years (or such lesser period as Seller may determine in its sole discretion) sufficient for Seller to wind down its affairs (including by conducting any Remedial Actions related to the Excluded Liabilities and dismantling and disposing of any Retained Refinery Assets or other Excluded Assets). To the extent that the power generated by Purchaser's power plant (which may be the power plant included in the Purchased Assets or another power plant providing power for Purchaser's ownership and operation of the Purchased Assets and the Business), when

71

operated at the "minimum turndown" level, exceeds Purchaser's requirements to own and operate the Purchased Assets and the Business (assuming the Business includes an Operational Terminals Business) (such excess being the "**Excess Power**"), the Excess Power shall be supplied to Seller free of charge or expense.  If Purchaser has complied with its obligation in the preceding sentence, but to satisfy its obligations under this Section 7.24, Purchaser must supply electric power in addition to the Excess Power (such additional amount being the "**Additional Requirements**") because (a) such Additional Requirements must be supplied from a source other than Purchaser's power plant and/or (b) the Excess Power is an amount insufficient to satisfy Seller's needs, then Purchaser will supply (or cause one of its Affiliates to supply) the first $15,000,000 of such Additional Requirements free of any cost or expense and any further Additional Requirements beyond the first $15,000,000 of power shall be provided by Purchaser or its Affiliates to Seller at cost; provided, that such cost shall only reflect (i) variable costs, such as fuel, to the extent required to supply such Additional Requirements and (ii) any fixed costs or overhead costs, solely to the extent such costs would not have otherwise been incurred by Purchaser and its Affiliates.  Purchaser acknowledges that certain Information Technology is used by the Business on a shared basis under arrangements made by Seller or its Affiliates.  Purchaser agrees that such Information Technology that is an Excluded Asset shall not be used by Purchaser following the Closing, except as expressly provided in the Shared Services Agreement or the Transition Services Agreement.  Prior to the Closing Date, or, if continued use of the Information Technology that is an Excluded Asset is permitted under the Shared Services Agreement or the Transition Services Agreement, prior to the expiration or termination of the Shared Services Agreement or the Transition Services Agreement, Purchaser shall remove, disable, return, and, if directed by Seller, delete all such Information Technology that is an Excluded Asset that Purchaser does not own or directly license from a Third Party.

7.25   Permitting Process.  Commencing on the date of this Agreement, Purchaser and HOVIC, cooperating in good faith, shall use their commercially reasonable efforts to take such steps, including the filing of any required applications with any Governmental Entity, as may be necessary (a) to effect the transfer of all Permits, if any, relating to the Tug Boats (the "**Tug Boat Permits**") to Purchaser on or as soon as practicable after the Closing Date, to the extent such transfer is permissible under applicable Law, (b) to enable Purchaser to obtain, on or as soon as practicable after the Closing Date, any additional Tug Boat Permits as may be necessary for the lawful operation of the Tug Boats from and after the Closing Date (the actions described in the foregoing clauses (a) and (b) being referred to herein as the "**Permitting Process**") and (c) effect the transfer of good and valid title to the Tug Boats to Purchaser under all applicable Law.  Any filing or other fees and other out-of-pocket expenses associated with the Permitting Process shall be paid by Purchaser.

7.26   Registration of Tug Boats.   As promptly as practicable following the Closing, Purchaser shall make all filings necessary, proper or advisable with respect to each Tug Boat (including recording the Tug Boat Bill of Sale and Acceptance for such Tug Boat in the ship registry of the applicable jurisdiction) to effect the registration of Purchaser as the owner of such Tug Boat or to otherwise effect or record the transfer of title of such Tug Boat from HOVIC to Purchaser.

7.27   Post-Closing Cooperation for Financial Statements.  For a period of twelve (12) months after the Closing, Seller shall use its commercially reasonable efforts to cooperate with

72

Purchaser and provide historical information regarding the Purchased Assets in its possession as may be reasonably requested by Purchaser from time to time (including by providing financial information in its possession as promptly as reasonably practicable, access to personnel and otherwise providing reasonable assistance to Purchaser) in preparing financial statements; provided, that Seller's obligations to cooperate and provide any information or access pursuant to this Section 7.27 shall be subject to the Disclosure Conditions. Purchaser shall promptly reimburse Seller for any out-of-pocket costs expended in connection with Seller's compliance with this Section 7.27.    Except in the case of fraud, Purchaser shall indemnify the Seller Indemnitees for any and all Losses that may be incurred by them as a result of Seller's cooperation or information provided to Purchaser in accordance with this Section 7.27.

    7.28    Division of Subdivision Parcels; Cross-Easement Agreements.    To the extent necessary for proper conveyancing under applicable Law and local custom, Purchaser and Seller shall cooperate and use their respective commercially reasonable efforts to take, or cause to be taken, all appropriate actions, and to make, or cause to be made, all filings necessary under applicable Law to cause those portions of the Real Property owned by Seller in fee simple that are depicted in the drawing attached hereto as Exhibit H (the "**Subdivision Parcels**") to be divided and separated into legally separate parcels of real property, such that (a) the Purchaser may lawfully take fee simple title to each portion of the Subdivision Parcels that is identified in Exhibit H as a "Terminal" parcel (collectively, the "**Deferred Terminal Parcels**") at Closing or as soon as reasonably practicable thereafter, and (b) the Seller may lawfully retain fee simple title to each portion of the Subdivision Parcels that (x) is identified in Exhibit H as a "Refinery" parcel (collectively, the "**Option Refinery Parcels**") and (y) is identified in Exhibit H as a "Government" parcel (collectively, the "**Government Parcels**").    Purchaser and Seller shall cooperate and use their respective commercially reasonable efforts to take all appropriate actions to cause those portions of the leased real property subject to the Submerged Land Lease, 1976 Contract and the 1998 Letter Agreement, to be divided and separated into legally separate parcels of real property as identified in Exhibit H, and with each such separate property subject to such lease or other use agreements as are acceptable to each of Purchaser and Seller in its sole discretion.    At Closing, Seller shall convey the Deferred Terminal Parcels by deed with the property descriptions referencing the drawing in Exhibit H, which deed will not be in recordable form (an "**Imperfect Deed**") and Seller and Purchaser shall enter into (i) the Remediation Access Easement, the Miscellaneous Access Easement and the Limetree Access Easement and (ii) such Cross-Easement Agreements (the "**Closing Cross-Easement Agreements**") as are reasonably necessary for each of Purchaser and Seller to have reasonable access upon, over, in, under, across and through the Excluded Real Property and the Option Refinery Property (with respect to Purchaser) and the Purchased Real Property and the Leased Submerged Lands (with respect to Seller), in the form attached hereto as Exhibit K.    With respect to the Deferred Terminal Parcels, once all of the Subdivision Parcels are divided and separated into legally separate parcels of real property in accordance with the terms of this Agreement, the Deferred Terminal Parcels shall be deeded to Purchaser by a deed in a recordable form.    For the avoidance of doubt, the Parties acknowledge and agree that (A) nothing in this Section 7.28 shall limit or have an effect on the conditions to Closing set forth in Article VIII, other than Seller's obligation to deliver the Imperfect Deed, the Closing Cross-Easement Agreements, the Remediation Access Easement and the Limetree Access Easement, (B) the Deferred Terminal Parcels may be transferred to Purchaser at the Closing via an Imperfect Deed, which is not recordable, and the transfer and conveyance of the Deferred Terminal Parcels via a recordable deed shall not be a

condition to Closing, (C) the Option Refinery Parcels (if Purchaser elects to exercise its option with respect to any Option Refinery Parcels) may not be transferred to Purchaser at the Closing along with the other Purchased Real Property and the transfer and conveyance of such Option Refinery Parcels shall not be a condition to Closing and (D) neither Seller nor any of its Affiliates shall have any Liability whatsoever arising directly or indirectly out of or relating to the failure to transfer the Deferred Terminal Parcels or any Option Refinery Parcels to Purchaser at the Closing and (E) if Purchaser elects to exercise its option to acquire any Option Refinery Property pursuant to the Option Agreement, such Option Refinery Property shall be considered Purchased Real Property for purposes of this Agreement.

7.29    <u>Title Policy and Survey</u>.  Seller shall, in connection with the Closing, to the extent necessary for Purchaser to obtain (a) from First American Title Insurance Company (or other reputable title insurance company) a customary owner's title insurance policy insuring Purchaser's fee simple title to the Purchased Real Property and (b) from Smith-Roberts National Corporation (or other reputable surveyor) an American Land Title Association survey of the Purchased Real Property, provide customary title affidavits and indemnities, evidence of corporate, partnership or limited liability company authority, evidence of mergers, consolidations and name changes, and such other customary documents, agreements, certificates, affidavits, instruments and information, in each case to the extent reasonably required by Purchaser's title insurance company or surveyor, duly executed by Seller.

7.30    <u>Additional Cross-Easement Agreements</u>.  In addition to the Closing Cross-Easement Agreements and the Cross-Easement Agreements contemplated pursuant to <u>Section 7.28</u>, if at any time, or from time to time after the Closing, the reasonable and lawful operation and use of the Purchased Real Property by Purchaser or the Excluded Real Property, or the Leased Submerged Lands by Seller, requires that such Party have reasonable access upon, over, in, under, across or through the Purchased Real Property or the Leased Submerged Lands (with respect to Seller) or the Excluded Real Property (with respect to Purchaser), Purchaser and Seller shall cooperate in good faith to enter into such additional Cross-Easement Agreements as may be reasonably required to facilitate such access; <u>provided</u>, that any such Cross-Easement Agreement or related access does not unreasonably interfere with Purchaser's operation and use of the Purchased Real Property or the Leased Submerged Lands or Seller's operation and use of the Excluded Real Property (as applicable).

7.31    <u>Cooperation</u>.  Seller agrees to cooperate in good faith with Purchaser in doing all things reasonably necessary, proper or advisable under applicable Laws to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by <u>Sections 7.28</u>, <u>7.29</u> and <u>7.30</u> of this Agreement, including, but not limited to, (a) the satisfaction of the conditions precedent to the obligations of any of the parties hereto, (b) the confirmation of the accuracy and adequacy of any and all legal descriptions of the Purchased Real Property and the Excluded Real Property, and (c) the completion of the surveys referenced in <u>Section 7.29</u> above (which surveys will be obtained at Purchaser's sole cost and expense).

7.32    <u>Transfer of Government Parcels</u>.  Concurrent with the Closing, and conditioned on the occurrence of the Closing, Seller shall enter into documentation reasonably satisfactory to Seller, Purchaser and the USVI Government to transfer at or after Closing, as applicable, the Government Parcels to the USVI Government, pursuant to a deed in recordable and customary

form for conveyances of commercial real property in the United States Virgin Islands conveying the Government Parcels, which has the real property legal description approved by the Office of the Public Surveyor of the Government of the Virgin Islands.

7.33    Costs and Expenses of Seller.    From and after the Closing, Purchaser shall reimburse Seller (or, upon Seller's request, pay on Seller's behalf) for its reasonable and documented out-of-pocket costs and expenses incurred in connection with the winding-up of its affairs, (including conducting Remedial Actions related to Excluded Liabilities and dismantling and disposing of any Retained Refinery Assets or other Excluded Assets) (the "**Wind-Up Costs**") and the performance of its obligations under the Transaction Documents, if any; provided, that the aggregate amount of such Wind-Up Costs to be reimbursed (or paid on Seller's behalf) by Purchaser shall not exceed $30,000,000 (the "**Wind-Up Cost Cap**"). Notwithstanding the foregoing, to the extent permissible under applicable Law and any permit issued by, or agreement with, the relevant Governmental Entities, Seller shall use commercially reasonable efforts to use Trust Funds to fund any Remedial Actions related to Excluded Liabilities and dismantling and disposing of any Retained Refinery Assets or other Excluded Assets.  If, following Purchaser's reimbursement of Wind-Up Costs in respect of any such Remedial Actions, Seller receives any Trust Funds in respect of such Remedial Actions, Seller shall return such reimbursed Wind-Up Costs to Purchaser to the extent of such Trust Funds actually received; provided, however, that any reimbursed Wind-Up Costs that are returned to Purchaser by Seller pursuant to this sentence shall not be deemed to be Wind- Up Costs that have been reimbursed by Purchaser and shall not be counted toward the Wind-Up Cost Cap.  For the avoidance of doubt, any amount paid by Purchaser (x) into the Environmental Response Trust, (y)on behalf of the Environmental Response Trust, or (z) otherwise in respect of any Excluded Liabilities that are obligations under the RCRA Permit (including any obligation imposed on Purchaser to post additional financial assurances under the RCRA Permit), and in each case that is not reimbursed to Purchaser pursuant to the preceding sentence shall be "Wind-Up Costs" and shall reduce (i) first, the remaining funds available under the Wind-Up Cost Cap and (ii) second, the remaining portion of the $15,000,000 available for Additional Requirements, in each case, dollar-for-dollar.  Purchaser's obligations under this Section 7.33 shall be subject to the Plan (i) designating the Environmental Response Trust, or another entity acceptable to the Purchaser in its sole discretion, as the entity that will assume and perform the Seller's obligations under the Transaction Documents upon the effective date of the Plan and (ii) stating that the Environmental Response Trust shall exist as long as the Seller (or its designee) has or may have obligations remaining under the Transaction Documents (provided, however, that the Environmental Response Trust shall not be required to exist for a period of time longer than thirty-five (35) years following the Closing Date).

7.34    Environmental Response Trust Insurance Policies.  As soon as practicable following the Closing, Seller agrees to use commercially reasonable efforts to add or include Purchaser as a named insured or an additional insured under the environmental insurance policies to be obtained by the Environmental Response Trust as required by the USVI Government.

ARTICLE VIII

CONDITIONS PRECEDENT

75

8.1     Conditions to the Obligations of Each Party.  The respective obligations of the Parties to consummate and cause the consummation of the Purchase are subject to the satisfaction or waiver in writing by the Parties at or before the Closing Date of each of the following conditions:

(a)     Injunctions; Illegality.   No Governmental Entity shall have issued, enacted, entered, promulgated or enforced any Law or Order restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement or the Transaction Documents and there shall be no Proceeding pending by any Governmental Entity seeking any such Order.

(b)     [Intentionally Omitted].

(c)     Sale Order.   The Bankruptcy Court shall have entered the Sale Order approving Purchaser as the "Purchaser" thereunder, and the Sale Order shall be in full force and effect, shall not have been modified, amended, reversed, vacated or stayed, and shall have become a Final Order.

(d)     Bid Procedures Order.  The Bid Procedures Order shall be in full force and effect, shall not have been modified, amended, reversed, vacated or stayed, and shall have become a Final Order.

(e)     Governmental Approvals.   Seller shall have obtained (and delivered to Purchaser) those Consents from the Governmental Entities set forth on Section 8.1(e) of the Seller Disclosure Letter (the "**Required Governmental Approvals**"), which Consents are in a form and substance reasonably satisfactory to each of Purchaser and Seller.

(f)     USVI Concession Agreement.   The USVI Government shall have executed a USVI Concession Agreement in form and substance satisfactory to Seller (to the extent such USVI Concession Agreement contemplates that any Liability or Obligation be assumed by or imposed upon Seller) and Purchaser and such USVI Concession Agreement shall be effective as of the Closing.

8.2     Conditions to the Obligations of Purchaser.   The obligations of Purchaser to consummate and cause the consummation of the Purchase are subject to the satisfaction (or waiver by Purchaser), on or prior to the Closing Date, of the following further conditions:

(a)     Performance.  All of the agreements and covenants of Seller and HOVIC to be performed at or prior to the Closing pursuant to this Agreement shall have been duly performed in all material respects.

(b)     Representations and Warranties.   The representations and warranties of Seller and HOVIC contained in Article IV  and Article V, disregarding all qualifications contained therein relating to materiality or Material Adverse Effect, shall be true and correct in all respects as of the Closing Date as if made at and as of such date (other than those representations and warranties made as of a specified date, which representations and warranties shall be true and correct as of such specified date), except for such failures to be true and correct that do not have a Material Adverse Effect.

76

(c)     <u>Closing Deliverables</u>.  Seller shall have delivered or caused to be delivered to Purchaser each of the items set forth in <u>Section 3.5(b)</u> and HOVIC shall have delivered or caused to be delivered to Purchaser each of the items set forth in <u>Section 3.5(d)</u>.

(d)     <u>Other Required Approvals</u>.  Seller shall have obtained (and delivered to Purchaser) those Consents set forth on <u>Section 8.2(d)</u> of the Disclosure Letter (the "**Other Required Approvals**"), which Consents are in a form and substance reasonably satisfactory to Purchaser.

(e)     <u>MAE</u>.  Since the date hereof, no Material Adverse Effect shall have occurred and be continuing.

(f)     <u>Permits</u>.  (i) Seller shall not have received notice from the Virgin Islands Department of Planning and Natural Resources, the United States Environmental Protection Agency or any other Governmental Entity that Seller's application for the renewal of Clean Air Act Title V Permit No. STX-TV-003-10 is not complete or that Purchaser will not be able to continue operating the Business under such Permit after Closing; and (ii) subject to <u>Section 7.18</u>, Seller shall have filed or otherwise provided all applications, documents or other information that Seller is required by any Governmental Authorities or by applicable Environmental Law to make or provide prior to Closing, to transfer or otherwise make available the benefit of the Purchaser's Required Permits to Purchaser.

(g)     <u>Assignment</u>.  The Bankruptcy Court shall have entered one or more orders (which may be the Sale Order), in form and substance acceptable to Purchaser in its sole discretion, approving the assumption and assignment of the Business Contracts and Real Property Leases to Purchaser pursuant to Section 365 of the Bankruptcy Code and such order(s) shall be Final Orders (unless such Final Order requirement is waived by Purchaser in its sole discretion).

8.3     <u>Conditions to the Obligations of Seller and HOVIC</u>.  The obligation of Seller to consummate and cause the consummation of the Purchase is subject to the satisfaction (or waiver by Seller or HOVIC, as applicable), on or prior to the Closing Date, of the following further conditions:

(a)     <u>Performance</u>.  All of the agreements and covenants of Purchaser to be performed at or prior to the Closing pursuant to this Agreement shall have been duly performed in all material respects.

(b)     <u>Representations and Warranties</u>.  The representations and warranties of Purchaser contained in <u>Article VII</u> shall be true and correct at and as of the Closing Date as if made at and as of such time, except for such failures as do not prevent Purchaser from consummating the transactions contemplated by this Agreement.

(c)     <u>Closing Deliverables</u>.  Purchaser shall have delivered or caused to be delivered to Seller, the Escrow Agent, HOVIC, Pinnacle Services L.L.C. and the USVI Government, as applicable, each of the items set forth in <u>Sections 3.5(c)</u>, <u>3.5(e)</u>, <u>3.5(f)</u> and <u>3.5(g)</u>.

77

(d) <u>Concession Agreement</u>.  The Concession Agreement shall have been terminated and Seller shall have received from the USVI Government the full and unconditional release and discharge in the form attached hereto as <u>Exhibit I</u>, with such changes as are agreed to by Seller.

(e) <u>1976 Contract and Submerged Land Lease</u>.  Seller shall have received from the USVI Government and the Virgin Islands Port Authority (with respect to the 1976 Contract only) the full and unconditional release and discharge of the 1976 Contract, the Submerged Land Lease and the 1998 Letter Agreement, in the form attached hereto as <u>Exhibit I</u>, with such changes as are agreed to by Seller, and the property subject to the Submerged Land Lease, 1976 Contract, the 1998 Letter Agreement and the 1976 Contract Permits shall have been divided into legally separable parcels of real property as identified in <u>Exhibit H</u> with each such separate property subject to such lease or use agreements as are reasonably acceptable to Seller.

(f) <u>Release Agreement</u>. The USVI Government, Seller, HOVIC and PDVSA VI shall have entered into a release agreement in form and substance reasonably acceptable to Seller, HOVIC, PDVSA VI and the Governor of the U.S. Virgin Islands, including, without limitation, (i) the release of claims by HOVIC and PDVSA VI and their respective Affiliates (including Hess Corporation) against Seller (including with respect to the Notes) and the USVI Government and (ii) the release of claims by the USVI Government against Seller and its Affiliates (including for the avoidance of doubt, HOVIC, PDVSA VI and their respective Affiliates (including Hess Corporation)), in each case, other than claims under this Agreement and the Transaction Documents; <u>provided</u>, that any releases granted by Seller to HOVIC, PDVSA VI and their respective Affiliates would be effective only upon consummation of a Chapter 11 plan of Seller.

8.4 <u>Frustration of Closing Conditions</u>.  No Party may rely on the failure of any condition set forth in this <u>Article VIII</u> to be satisfied if such failure was caused by such Party's failure to act in good faith or such Party's failure to comply with <u>Section 7.4</u>.

ARTICLE IX

TERMINATION

9.1 <u>Termination Events</u>.  This Agreement may be terminated at any time prior to the Closing:

(a) by mutual written consent of Seller and Purchaser;

(b) by Seller or Purchaser, if:

(i) following the date of this Agreement, any court or other Governmental Entity shall have issued, enacted, entered, promulgated or enforced any Law or Order (that is final and non-appealable and that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the consummation of the Closing; <u>provided</u>, that the Party seeking to terminate this Agreement pursuant to this <u>Section 9.1(b)(i)</u> shall not have the right to terminate this Agreement pursuant to this

78

Section 9.1(b)(i) if such Party has failed to comply with its obligations, if any under Section 7.4; or

(ii)    the Closing Date shall not have occurred on or prior to January 31, 2016, or such later date as Seller and Purchaser mutually agree in writing (the "**End Date**"); provided, that if as of the End Date, all conditions set forth in Sections 8.1, 8.2 and 8.3 have been satisfied, other than the condition set forth in Section 8.1(f), but as of such date the Governor of the U.S. Virgin Islands has agreed to a form of the USVI Concession Agreement that is satisfactory to Seller and Purchaser in their respective sole discretion and has submitted such USVI Concession Agreement to the legislature of the U.S. Virgin Islands for its approval, but such approval has not yet been obtained, then either Seller or Purchaser may extend the End Date for a single, one-time additional period of thirty (30) days for the purpose of continuing to seek the satisfaction of the condition set forth in Section 8.1(f); provided that such extension is made in writing and provided to the other Party on or prior to January 31, 2016; provided, further, that the Party seeking to terminate this Agreement pursuant to this Section 9.1(b)(ii) shall not have the right to terminate this Agreement pursuant to this Section 9.1(b)(ii) if such Party is in material breach of this Agreement;

(c)    by Seller, if: (i) any of the representations and warranties of Purchaser contained in Article VI shall fail to be true and correct; or (ii) there shall be a breach by Purchaser of any covenant or agreement of Purchaser in this Agreement that, in either case, (x) would result in the failure of a condition set forth in Section 8.3(a) or Section 8.3(b) and (y) which is not curable or, if curable, is not cured by the earlier of (1) the thirtieth (30th) day after written notice thereof is given by Seller to Purchaser and (2) the day that is five (5) Business Days prior to the End Date; provided, that Seller may not terminate this Agreement pursuant to this Section 9.1(c) if it is in material breach of this Agreement, the Bid Procedures Order or the Sale Order;

(d)    by Purchaser, if: (i) any of the representations and warranties of Seller or HOVIC contained in Article IV or Article V, as applicable, shall fail to be true and correct, or (ii) there shall be a breach by Seller or HOVIC of any covenant or agreement of Seller or HOVIC in this Agreement to be performed at or prior to the Closing that (x) would result in the failure of a condition set forth in Section 8.2(a) or Section 8.2(b) and (y) which is not curable or, if curable, is not cured by the earlier of (1) the thirtieth (30th) day after written notice thereof is given by Purchaser to Seller and (2) the day that is five (5) Business Days prior to the End Date; provided, that Purchaser may not terminate this Agreement pursuant to this Section 9.1(d) if Purchaser is in material breach of this Agreement, the Bid Procedures Order or the Sale Order;

(e)    by Purchaser, if, at any time prior to the Closing Date,

(i)    as a result of an Order of the Bankruptcy Court, (x) the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or (y) a trustee or an examiner with expanded powers is appointed in the Bankruptcy Case;

(ii)    Seller (w) withdraws the Sale Motion, or publicly announces its intention to withdraw the Sale Motion, (x) moves to voluntarily dismiss the Bankruptcy

Americas 90921623

Case, (y) moves for conversion of the Bankruptcy Case to Chapter 7 of the Bankruptcy Code or (z) moves for appointment of an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code or a trustee in the Bankruptcy Case;

        (iii)    the Bid Procedures Order shall have been stayed, vacated, reversed, modified or amended at any time in any respect without the prior written consent of Purchaser given in its sole discretion; or

        (iv)    the Bankruptcy Court shall not have entered the Sale Order, in form and substance acceptable to Purchaser in its sole discretion, on or prior to December 31, 2015, or such order shall have been stayed, vacated, reversed, modified or amended at any time in any respect without the prior written consent of Purchaser given in its sole discretion;

        (f)    by Seller, if its Executive Committee (as such term is defined in the Hovensa Operating Agreement) or equivalent governing body determines based upon consultation with outside legal counsel that proceeding with the transaction as contemplated by this Agreement would be inconsistent with its fiduciary duties under applicable Law;

        (g)    by Seller or Purchaser, if the Bankruptcy Court approves (i) an Alternative Transaction, (ii) the sale of all or substantially all of the assets of Seller or any of the Purchased Assets or (iii) the sale of all or any portion of the issued and outstanding limited liability company interests of Seller, in each case, to a Person (or group of Persons) other than Purchaser; provided, that, Purchaser may only terminate this Agreement under this Section 9.1(g) if Purchaser is no longer required to serve as a Backup Bidder pursuant to the Bid Procedures Order; or

        (h)    automatically upon consummation of an Alternative Transaction.

        9.2    Effect of Termination.  In the event of the termination of this Agreement pursuant to Section 9.1 by Purchaser, on the one hand, or Seller, on the other hand, written notice thereof shall forthwith be given to the other Party specifying the provision hereof pursuant to which such termination is made, and this Agreement shall be terminated and become void and have no effect and there shall be no Liability hereunder on the part of any Party, except that Section 3.2 (Good Faith Escrow Deposit), the indemnification obligations set forth in Section 7.1(b) (Access to Information Concerning Properties and Records), Section 7.15 (Sale Order), this Article IX (Termination) and Article XI (Miscellaneous) and the defined terms and rules of construction used therein and set forth in Article I shall survive any termination of this Agreement; provided, however, that (a) subject to the terms and conditions of Section 3.2(c) and Section 11.10 no Party shall be relieved of or released from any Liability arising from any material breach by such Party of any provision of this Agreement, (b) this Section 9.2, Section 7.19 and Section 7.20, and the Confidentiality Agreement shall remain in full force and effect and survive any termination of this Agreement, and (c) Seller shall remain liable for payment of the Purchaser Expense Reimbursement and the Breakup Fee to the extent set forth in this Agreement and in the Bid Procedures Order.

ARTICLE X
SURVIVAL AND RELEASE

10.1    <u>No Survival of Representations and Warranties</u>.    The (a) respective representations and warranties of the Parties and (b) the respective covenants and agreements of the Parties that by their terms are to be performed before the Closing, whether contained in this Agreement or in any certificate or other writing delivered in connection herewith, shall not survive the Closing.  Any covenants and agreements contained in this Agreement that by their terms are to be performed after Closing (including, for the avoidance of doubt, any provision requiring any Party to indemnify or pay another Person) shall survive the Closing until such agreements are performed.

10.2    <u>Release</u>.  If the Closing occurs, effective as of the Closing,  Purchaser, on behalf of itself and its respective equity holders, Subsidiaries, Affiliates, Representatives, direct and indirect parent companies, managers, officers and directors, and each of their respective successors and assigns (each a "**Releasor**"), hereby releases, waives, acquits and forever discharges, to the fullest extent permitted by Law, Seller, PDVSA VI, HOVIC and their respective past, present and future equity holders, Subsidiaries, Affiliates, Representatives, direct and indirect parent companies, managers, officers and directors (each, a "**Releasee**") of, from and against any and all actions, causes of action, claims, demands, damages, judgments, Liabilities, debts, dues and suits of every kind, nature and description whatsoever, arising directly or indirectly out of the Assumed Liabilities, the Purchased Assets and the Business (as presently or formerly conducted) (including, for the avoidance of doubt, the 1976 Contract and the Submerged Land Lease), the Excluded Liabilities, the Excluded Assets and HOVIC's ownership of the Tug Boats and the Charter Agreements (the "**Released Claims**"), which such Releasor ever had, now has or may have on or by reason of any matter, cause or thing whatsoever on or prior to the Closing Date, including any claim or remedy now or hereafter available under any applicable Environmental Law, including the Comprehensive Environmental Response, Compensation and Liability Act or similar international, foreign, federal, regional or state Law, whether or not in existence on the date hereof.  Each Releasor agrees not to, and agrees to cause its respective equity holders, Subsidiaries, Affiliates and Representatives, and each of their respective successors and assigns, not to, assert any claim against the Releasees with respect to the Released Claims.  Notwithstanding the foregoing, no Releasor releases (i) its rights and interests under this Agreement (including, for the avoidance of doubt, pursuant to <u>Section 7.33</u>), any Transaction Document, the Environmental Response Trust Agreement or the Confidentiality Agreement, (ii) any claims under the Environmental Response Trust or (iii) its rights and interests with respect to claims for fraud.

ARTICLE XI

MISCELLANEOUS

11.1    <u>Expenses</u>.  Except as otherwise provided in this Agreement, whether or not the Closing occurs, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby will be paid by the Party incurring such costs and expenses.

81

11.2    Extension; Waiver.  Subject to the express limitations herein, the Parties may (a) extend the time for the performance of any of the obligations or other acts of the other Parties, (b) waive any inaccuracies in the representations and warranties contained herein by the other Parties or in any document, certificate or writing delivered pursuant hereto by such other Parties or (c) waive compliance with any of the agreements or conditions contained herein.  Any agreement on the part of any Party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed by or on behalf of such Party.  No failure or delay on the part of any Party in the exercise of any right hereunder shall impair such right or be construed as a waiver of, or acquiescence in, any breach of any representation, warranty, covenant or agreement herein, nor shall any single or partial exercise of any such right preclude other or further exercise thereof or of any other right.  The condition contained in Section 8.3(f) may not be waived without the express written consent of each of Seller, Purchaser, HOVIC and PDVSA VI.

11.3    Notices.  Except as otherwise provided herein, all notices, requests, claims, demands, waivers and other communications hereunder shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by email transmission to the respective Parties as follows (or, in each case, as otherwise notified by any of the Parties) and shall be effective and deemed to have been given (a) immediately upon sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment) when sent by email, provided that if such notice or other communication is sent after 5:00 p.m., New York time, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient and (b) when received by the addressee if delivered by hand or overnight courier service or certified or registered mail on any Business Day:

        (i)    If to Seller, to:

        HOVENSA L.L.C.
        1 Estate Hope
        Christiansted, St. Croix 00820
        Attention: Sloan Schoyer
        email: sschoyer@hovensa.com

        with a copy (which shall not constitute notice or service of process) to:

        White & Case LLP
        1155 Avenue of the Americas
        New York, New York 10036
        Attention: John M. Reiss
            Gregory Pryor
        Fax: (212) 354-8113
        email:  jreiss@whitecase.com
            gpryor@whitecase.com;

        PDVSA V.I., Inc.
        c/o Petróleos de Venezuela, S.A.

Edificio Petróleos de Venezuela
Avenida Libertador, Torre Este
La Campiña, Apartado 169
Caracas 1050-A
República Bolivariana de Venezuela
Attention: Director de Refinación
 with a copy to:
Attention: Consultor Jurídico;

Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, New York 10178
United States of America
Attention: General Counsel
Fax: (212) 697-1559;

and to HOVIC at the address set forth in clause (ii) below;

(ii)    If to HOVIC, to:

c/o Hess Oil Virgin Islands Corporation
1185 Avenue of the Americas, Floor 40
New York, New York 10024
Attention: Jackie Asafu-Adjaye, Assistant Secretary
Fax: (212) 536-8241
email:  jasafu-adjaye@hess.com

with a copy (which shall not constitute notice or service of process) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention: Jonathan S. Henes
Fax: (212) 446-6460
email:  jonathan.henes@kirkland.com;

(iii)    If to Purchaser, to:

Limetree Bay Terminals, LLC
c/o ArcLight Capital Partners, LLC
200 Clarendon Street, 55th Floor
Boston, Massachusetts 02117

Attention: Christine M. Miller
Fax: (617) 867-4698
email:  cmiller@arclightcapital.com;

83

with a copy (which shall not constitute notice or service of process) to:

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
Attention: David S. Allinson
             Christopher G. Cross
Fax: (212) 751-4864
email:  david.allinson@lw.com
        christopher.cross@lw.com;

and

Nichols, Newman, Logan, Grey & Lockwood, P.C.
1131 King Street, Christiansted, St. Croix
U.S. Virgin Islands 00820-4971
Attention:  G. Hunter Logan, Jr.
             Todd H. Newman
Fax: (340) 773-3409
email:  hlogan@nnldlaw.com
        tnewman@nnldlaw.com


Notices sent by multiple means, each of which is in compliance with the provisions of this Agreement will be deemed to have been received at the earliest time provided for by this Agreement.

11.4     Entire Agreement.  This Agreement, together with the Exhibits hereto, the Seller Disclosure Letter, the HOVIC Disclosure Letter, the Confidentiality Agreement and the Transaction Documents, the Sale Order and the Bid Procedures Order contain the entire understanding of the Parties with respect to the subject matter contained herein and supersedes all prior agreements and understandings, oral and written, with respect thereto.

11.5     Binding Effect; Benefit; Assignment.  This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns, including, in the case of the Seller, any trustee in the Bankruptcy Case or in any subsequent Chapter 7 case. Except with respect to (a) Section 10.2, which shall inure to the benefit of each Releasee, all of whom are intended as express third-party beneficiaries thereof, (b) Section 8.3(f) and the third sentence of Section 11.2, which shall each inure to the benefit of PDVSA VI, which is intended as an express third party beneficiary thereof and (c) Section 2.1(a)(x) and Section 8.3(f), which shall each inure to the benefit of the Official Committee of Unsecured Creditors in Seller's Bankruptcy Case, which is intended as an express third-party beneficiary thereof, no other Person not party to this Agreement shall be entitled to the benefits of this Agreement, whether such benefits are legal or equitable or of any other nature whatsoever.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the Parties without the prior written consent of the other Parties; provided, that Purchaser shall have the right to assign all or any part of its rights or obligations under this Agreement to one or more

84

Affiliates of Purchaser, or to any lender or other party providing debt financing to the Purchaser or an Affiliate of Purchaser as collateral in connection with such debt financing, but in no event shall any such assignment release Purchaser from any of its obligations under this Agreement. The Parties acknowledge and agree that nothing in the termination and release agreement to be entered into pursuant to <u>Sections 8.3(d)</u> and <u>8.3(e)</u> (the form of which is attached hereto as <u>Exhibit I</u>), the Plan of Liquidation filed in connection with the Bankruptcy Case, or the Environmental Response Trust Agreement to be entered into pursuant to <u>Exhibit I</u> shall, as among the Parties, amend or otherwise modify the rights and obligations of any Party.

     11.6   <u>Amendment and Modification</u>.  This Agreement may not be amended except by a written instrument executed by all Parties; <u>provided</u>, that to the extent any Person is an express third party beneficiary of any provision of this Agreement, such provision cannot be amended without the written consent of such third party beneficiary.

     11.7   <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same instrument.  Signed counterparts of this Agreement may be delivered by scanned .pdf image.

     11.8   <u>Applicable Law; Jurisdiction</u>.  THIS AGREEMENT AND THE LEGAL RELATIONS BETWEEN THE PARTIES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, WITHOUT REGARD TO THE CONFLICT OF LAWS RULES THEREOF.

EACH PARTY AGREES THAT THE BANKRUPTCY COURT, WHICH SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN THE PARTIES HERETO, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE AGREEMENTS, INSTRUMENTS AND DOCUMENTS CONTEMPLATED HEREBY AND THE PARTIES CONSENT TO AND AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION OF SUCH COURT.

EACH OF THE PARTIES HEREBY WAIVES AND AGREES NOT TO ASSERT IN ANY RECOGNITION OR ENFORCEMENT PROCEEDING, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY DEFENSE THAT (A) SUCH PARTY IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF SUCH COURT, (B) SUCH PARTY AND SUCH PARTY'S PROPERTY IS IMMUNE FROM ANY LEGAL PROCESS ISSUED BY SUCH COURT OR (C) ANY ACTION OR PROCEEDING COMMENCED IN SUCH COURT IS BROUGHT IN AN INCONVENIENT FORUM.

EACH PARTY HEREBY AGREES THAT THE ACTIVITIES CONTEMPLATED HEREBY ARE COMMERCIAL IN NATURE.  TO THE EXTENT THAT ANY PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ATTACHMENT IN AID OF EXECUTION OR ANY OTHER LEGAL PROCESS (INCLUDING PREJUDGMENT ATTACHMENT) IN ANY ACTION OR PROCEEDING IN ANY MANNER ARISING OUT OF THIS AGREEMENT WITH RESPECT TO ITSELF OR ITS ASSETS, SUCH PARTY HEREBY IRREVOCABLY AGREES NOT TO INVOKE SUCH

Americas 90921623

IMMUNITY AS A DEFENSE AND IRREVOCABLY WAIVES SUCH IMMUNITY. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH PARTY AGREES THAT SUCH WAIVER SHALL HAVE THE FULLEST SCOPE PERMITTED UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT 1976 OF THE UNITED STATES AND ARE INTENDED TO BE IRREVOCABLE FOR THE PURPOSES OF SUCH ACT. THE PARTIES HEREBY AGREE THAT, IN CONNECTION WITH ANY ACTION OR PROCEEDING BROUGHT IN CONNECTION WITH THIS AGREEMENT, MAILING OF PROCESS OR OTHER PAPERS IN THE MANNER PROVIDED IN SECTION 11.3, OR IN SUCH OTHER MANNER AS MAY BE PERMITTED BY LAW, SHALL BE VALID AND SUFFICIENT SERVICE THEREOF AND HEREBY WAIVE ANY OBJECTIONS TO SERVICE ACCOMPLISHED IN THE MANNER HEREIN PROVIDED.

11.9    Severability.  If any term, provision, agreement, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, agreements, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic and legal substance of the transactions contemplated hereby are not affected in any manner adverse to any Party.  Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible.

11.10    Specific Enforcement; Limitation on Damages.  Subject to the last sentence of this paragraph with respect to periods prior to Closing, the Parties agree that irreparable damage would occur if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached or threatened to be breached and that an award of money damages would be inadequate in such event.  Accordingly, with respect to periods after the Closing, it is acknowledged that the Parties shall be entitled to equitable relief, without proof of actual damages, including an Order for specific performance to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, in addition to any other remedy to which they are entitled at law or in equity as a remedy for any such breach or threatened breach.  Each Party further agrees that, with respect to periods after the Closing, neither the other Parties nor any other Person shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this Section 11.10, and each Party irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument.  Each Party further agrees that, with respect to periods after the Closing, the only permitted objection that it may raise in response to any action for equitable relief is that it contests the existence of a breach or threatened breach of this Agreement.  Notwithstanding the foregoing, if this Agreement is validly terminated for any reason prior to the Closing (a) the distribution of the Good Faith Deposit to Seller if, as and when required pursuant to Section 3.2(c) shall be Seller's sole and exclusive remedy (whether at law, in equity, contract, tort or otherwise) against Purchaser and its Affiliates and Representatives under this Agreement and (b) (x) the payment of the Purchaser Expense Reimbursement and the Breakup Fee to Purchaser if, as and when required pursuant to Section 7.19 and Section 7.20, as applicable, and (y) monetary damages in an amount not to exceed $19,000,000, less the amount of the Purchaser Expense Reimbursement and Breakup Fee,

86

if any, actually received pursuant to <u>Section 7.19</u> and <u>Section 7.20</u>, shall be Purchaser's sole and exclusive remedy (whether at law, in equity, contract, tort or otherwise) against Seller and its Affiliates and Representatives under this Agreement (provided, that in no event shall Seller and its Affiliates and Representatives have any liability for monetary damages in excess of an aggregate of $19,000,000, which amount includes any Purchaser Expense Reimbursement and Breakup Fee). Prior to the Closing, no Party shall be entitled to seek or obtain specific performance or other injunctive or equitable relief to require any other Party to perform its obligations hereunder or to effect or effectuate the Closing, including the transfer of the Purchased Assets or the payment of the Purchase Price.

11.11    <u>Waiver of Jury Trial</u>. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES, AND SHALL CAUSE ITS SUBSIDIARIES AND AFFILIATES TO WAIVE, ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

11.12    <u>Rules of Construction</u>.  The Parties agree that they have been represented by counsel during the negotiation and execution of this Agreement and have participated jointly in the drafting of this Agreement and, therefore, waive the application of any Law, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the Party drafting such agreement or document.

11.13    <u>Headings</u>.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

11.14    <u>Non- Recourse</u>.  Except as otherwise expressly set forth in this Agreement, (a) no Person other than the Parties and their respective successors and permitted assigns shall have any obligation under this Agreement or in connection with the transactions contemplated hereby and (b) notwithstanding that any Party or any of its successors or permitted assigns may be a partnership or limited liability company, no Person has any rights of recovery against, and no recourse under this Agreement or under any documents or instruments delivered in connection herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith shall be had against, any Person who is not a Party, including (i) (other than the Parties hereto) any past, present or future, direct or indirect, director, officer, employee, incorporator, member, general or limited partner, manager, management company, stockholder, equityholder, controlling Person, Affiliate, Subsidiary, portfolio company, agent, attorney, Representative or assignee of, and any financial advisor, financing source or lender to, any Party, (ii) any of their respective heirs, executors, administrators, successors, assignees, (iii) (other than the Parties hereto) any past, present or future, direct or indirect, director, officer, employee, incorporator, member, general or limited partner, manager, management company, stockholder, equityholder, controlling Person, Affiliate, Subsidiary, portfolio company, agent, attorney, Representative or assignee of, and any financial advisor, financing source or lender to, any of the foregoing Persons set forth in clauses (i) and (ii), and (iv) (other than the Parties hereto) any of their heirs, executors, administrators, successors, assignees (collectively the Persons set forth in clauses (i) – (iv) that are not Parties, such Party's "**Related Parties**"), whether by or through attempted piercing of the corporate veil, by or through a claim (whether at law or equity in tort, contract or otherwise) by or on behalf of any Party against any Related Party of any Party, by the

Americas 90921623

enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any applicable Law, or otherwise, it being agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any Related Party of any Party for any obligations of a Party to this Agreement or any document or instrument delivered in connection herewith or any of its successors or permitted assigns or in respect of any oral representations made or alleged to be made in connection herewith or therewith or for any claim (whether at law or equity or in tort, contract or otherwise) based on, in respect of, or by reason of such obligations or their creation or the transactions contemplated hereby or thereby. Each Party hereby covenants and agrees that, except to the extent any Related Party of any Party is a Party to or has any express obligations under this Agreement, it shall not institute, and shall cause its Affiliates not to institute, any legal Proceeding or bring any other claim (whether at law or equity in tort, contract or otherwise) arising under, or in connection with, this Agreement or the transactions contemplated hereby, or in respect of any oral representations made or alleged to be made in connection herewith or therewith, against any Related Party of any Party. Without limiting the foregoing, to the maximum extent permitted by Law, except to the extent otherwise expressly set forth in this Agreement, each Party disclaims any reliance upon any Related Party of any Party with respect to the performance of this Agreement or any representation or warranty made in, in connection with, or as an inducement to this Agreement.

*[Remainder of Page Intentionally Left Blank]*

Americas 90921623

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their respective officers thereunto duly authorized, all as of the date first above written.

LIMETREE BAY TERMINALS, LLC

By: _____

Name: John F. Erhard
Title: Manager

[Signature Page to Asset Purchase Agreement – Limetree Bay Terminals, LLC]

LIMETREE BAY HOLDINGS, LLC

By: _____

Name:  Daniel R. Revers
Title:   President

*[Signature Page to Asset Purchase Agreement – Limetree Bay Holdings, LLC]*

HOVENSA L.L.C.

By: _____

    Name:  Thomas E. Hill
    Title:   Chief Restructuring Officer

[Signature Page to Asset Purchase Agreement]

HESS OIL VIRGIN ISLANDS CORP.

By: _____

Name: Nicholas Brountas
Title:   Assistant Secretary

[Signature Page to Asset Purchase Agreement]

Americas 90921623